# EXHIBIT A

# Judgment

**COURT OF THE FIRST INSTANCE OF CURAÇAO**

Case numbers: CUR201903842/3843/3796/3844/3845/3846

Judgment of 29 November 2021

in the matter of

1. **the public limited company ENNIA CARIBE HOLDING N.V.,**
2. **the public limited company ENNIA CARIBE LEVEN N.V.,**
3. **the public limited company ENNIA CARIBE SCHADE N.V.,**
4. **the public limited company ENNIA CARIBE ZORG N.V.,**
5. **the private limited company EC INVESTMENTS B.V.,** all
established in Curaçao, representatives ad litem: *mr.* S.M. Altena, *mr.*
K.D. Keizer and *mr.* M.D. van den Brink,

claimants,

versus

1. **Hushang ANSARY,**
residing in Houston, Texas, USA,
2. **the private limited company PARMAN INTERNATIONAL B.V.,**
established in Curaçao,
3. **Nina ANSARY,**
residing in Los Angeles, California, United States,
4. **Abdallah ANDRAOUS,**
residing in Sint Maarten,
5. **Ralph PALM,**
residing in Curaçao,
representatives ad litem: *mr.* M.F. Murray and *mr.* K.A. Doekhi,
and
6. **Gijsbert VAN DOORN,** residing in Curaçao,
representatives ad litem agents: *mr.* J.A. de Baar and *mr.* U.
van Bemmelen,



defendants.

The claimants will hereinafter be referred to as Ennia Holding, Ennia Leven, Ennia
Schade, Ennia Zorg and Ennia Investments. The claimants will jointly be referred
to (in the singular) as Ennia et al.
The defendants will hereinafter be referred to as Ansary, Parman International,
Nina Ansary, Andraous, Palm and Van Doorn. Defendants (1)-(5) will be jointly
referred to (in the singular) as Ansary et al.



case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 2
date of judgment: 29 November 2021

**Introduction**

This case follows the Central Bank's revocation of Ennia et al.'s insurer licence in
July 2018 and the pronouncement of emergency regulations in respect of Ennia et
al. The Central Bank has been at the helm of Ennia et al. since then. In this case,
Ennia et al. sues a number of its (former) directors, supervisory directors and
shareholders for damages, estimated by Ennia et al. at more than NAf 1.1 billion.
According to Ennia et al., unlawful conduct (as collective conduct),
mismanagement, and improper supervision were involved, with defendants
harming the interests of Ennia et al. and its policyholders, and putting other (own)
interests first. The defendants contest that this was the case and refute the
accusations made against them by Ennia et al.

This judgment has the following content:

1. Course of the proceedings
2. The facts
   - *Facts relating to the parties and entities (indirectly) involved in the
     proceedings - Facts relating to the situation of Ennia et al. from the takeover
     by Ansary in 2005/2006 until after the pronouncement of the emergency
     regulations*
   - *Facts relating to the separate acts of behaviour Ennia et al. accuses the
     defendants of*
3. The claims
4. The basis of the claims and the defendants' defence
5. The assessment
   - *The right of action of Ennia et al.*
   - *The assessment frameworks*
   - *The general accusations*
   - *Group liability*
   - *The accusation in respect of S&S*
   - *The accusation in respect of the oil rigs*
   - *The accusation in respect of the (dividend) payments*
   - *The accusation in respect of excessive expenditure*
   - *Conclusion*
   - *Costs of the proceedings and extrajudicial costs*
6. The decision

**1.      The course of the proceedings**

1.1      The course of the proceedings is apparent from:

- the order of the cause-list judge giving notice to re-appear of 20 April 2020;
- the judgment in the ancillary action for indemnification of 14 September 2020;



case numbers: CUR201903842/3843/3796/3844/3845/3846          page 3
date of judgment: 29 November 2021

- the judgment in ancillary actions for the joining of cases and inspection and in the
  main action of 26 October 2020;
- the record of the parties' personal appearance of 2 December 2020;
- the judgment in the ancillary action for inspection and in the main action of 18
  January 2021;
- Ennia et al.'s Reply dated 22 March 2021;
- Ansary et al.'s Rejoinder dated 31 May 2021;
- Van Doorn's Rejoinder dated 31 May 2021;
- Ennia et al.'s document commenting on Exhibits dated 28 June 2021;
- the record of the oral arguments held on 14 and 15 October 2021.



1.2. Pronouncement of the judgment was fixed for the present day.

**2.    The facts**

2.1.    The facts are divided into
- facts relating to the parties and entities involved in the proceedings;
- facts relating to the situation of Ennia et al. from the takeover by Ansary in
  2005/2006 until after the emergency regulations;
- facts relating to the individual acts of behaviour the defendants are accused
  of by Ennia et al.

*Facts relating to the parties and entities (indirectly) involved in the proceedings*

2.2.    The Ennia Group (hereinafter: Ennia), to which Ennia et al. belongs, consists of,
in addition to Ennia et al. itself, Banco di Caribe N.V. (hereinafter: Banco di Caribe)
and a number of group companies. Ennia Leven, Ennia Zorg and Ennia Schade
together constitute the insurers. The insurers have about 50,000 policyholders, of
which 30,000 are pension policyholders. In 2018, the insurers served 50% of the
insurance market in Curaçao, Sint Maarten, Aruba and Bonaire and 80% of the
private pension market in Curaçao. The shares of the insurers, Ennia Investments
and Banco di Caribe are owned by Ennia Holding.

2.3. Based on the National Ordinance on Supervision of the Insurance Industry
(LTV), the insurers are supervised by (formerly) the Bank of the Netherlands
Antilles and (currently) the Central Bank of Curaçao and Sint Maarten (hereinafter
in both cases: the Central Bank).

2.4. The companies belonging to Ennia et al. are subsidiaries of Parman
International. Parman International's shareholders, according to the shareholders'
register as at 31 December 2017, include Ansary (77.1%), Nina Ansary (15.9%) and
Andraous (1%).

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 4
date of judgment: 29 November 2021

2.5 Ansary is, *inter alia*, a major shareholder of Parman International and of Parman Capital Group LLC (hereinafter: Parman Capital). In the period 15 December 2005 to 8 October 2012, he was also a director of both companies. Ansary was the chairman of Ennia Holding's supervisory board and chairman of Ennia Holding's investment committee from 25 January 2006 to 4 July 2018. Ansary is also a major shareholder and director of SunResorts Ltd N.V. (hereinafter: SunResorts). The main asset of SunResorts is Mullet Bay, a (former) resort in Sint Maarten. Since 23 November 2005, Ansary has also been chairman of the Board and of the Executive Committee of Stewart & Stevenson LLC (hereinafter: S&S). Ansary has been a director of Resorts Caribe B.V. (hereinafter: Resorts Caribe) since 21 July 2006.

| *Ansary:* | | |
|---|---|---|
| **Entity** | **Position(s)** | **Period** |
| Parman Capital | director<br>major shareholder | 15 Dec 2005 - 08 Oct 2012<br>from acquisition Ennia - present |
| Parman International | director<br>major shareholder | 15 Dec 2005 - 08 Oct 2012<br>from acquisition Ennia - present |
| Ennia Holding | chairman of the Supervisory Board | 25 Jan 2006 - 04 Jul 2018<br>19 May 2006 - 04 Jul 2018 |
| Ennia Investments | director | 20 Jul 2006 - 04 Jul 2007 |
| S&S | chairman of the board<br>chairman executive committee | 23 Nov 2005 - present 23 Nov - present |
| SunResorts | director | from takeover Ennia - present |
| Resorts Caribe | director | 21 Jul 2006 - present |

2.6. Nina Ansary is a director and shareholder of Parman Capital. She is also a shareholder and, since 15 December 2015, a director of Parman International. From 20 May 2009 to 4 July 2018, she was a supervisory director of Ennia Holding. She is also a director of S&S.

| *Nina Ansary:* | | |
|---|---|---|
| **Entity** | **Position(s)** | **Period** |
| Parman Capital | director<br><br>shareholder | from takeover Ennia - present<br>from takeover Ennia - present |
| Parman International | director<br>shareholder | 15 Dec 2005 - present<br>from takeover Ennia - present |
| Ennia Holding | supervisory director | 20 May 2009 - 04 Jul 2018 |
| S&S | director | from takeover Ennia - present |

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 5
date of judgment: 29 November 2021

2.7. Andraous is CFO at Parman Capital. Since 7 July 2005, he has been a director of
Parman International. From 9 February 2011 to April 2018, he was a director of
Ennia Holding and a member of the investment committee. In addition, Andraous
was a director of Ennia Investments from 4 May 2017 to 4 July 2018 and a director of
the insurers from 26 March 2011 to 4 July 2018. He is also a director of Resorts
Caribe, among other things.

| Andraous: | | |
|---|---|---|
| **Entity** | **Position(s)** | **Period** |
| Parman Capital | chief financial officer (CFO) | from takeover Ennia - present |
| Parman International | director | 7 Jul 2005 - present |
| | shareholder | from takeover Ennia - present |
| Ennia Holding | director | 09 Feb - 04 19 May 2006 - 04 |
| | member of the investment | 2018 |
| Ennia Investments | director | 04 May 2017 - 04 Jul 2018 |
| Ennia Zorg | director | 26 Mar 2011 - 04 Jul 2018 |
| Ennia Leven | director | 26 Mar 2011 - 04 Jul 2018 |
| Ennia Schade | director | 26 Mar 2011 - 04 Jul 2018 |
| Resorts Caribe | director | 21 Jul 2006 - present |

2.8. Van Doorn worked for Ennia et al. during two periods. From 14 March 2005 to
16 June 2008 and from 25 June 2009 to 30 April 2011, he was a director (CEO) of
Ennia Holding and the insurers and a member of the investment committee. He was
also a director of Ennia Investments from 20 July 2006 to 1 May 2009.

| Van Doorn: | | |
|---|---|---|
| **Entity** | **Position(s)** | **Period** |
| Ennia Holding | director | 14 Mar 2005 - 16 Jun 2008 |
| | | 25 Jun 2009 - 30 Apr 2011 |
| | member of the investment | 14 Mar 2005 - 16 Jun 2008 |
| | | 25 Jun 2009 - 30 Apr 2011 |
| Ennia Investments | director | 20 Jul 2006 - 01 May 2009 |
| Ennia Zorg | director | 14 Mar 2005 - 16 Jun 2008 |
| | | 25 Jun 2009 - 30 Apr 2011 |
| Ennia Leven | director | 14 Mar 2005 - 16 Jun 2008 |
| | | 25 Jun 2009 - 30 Apr 2011 |
| Ennia Schade | director | 14 Mar 2005 - 16 Jun 2008 |
| | | 25 Jun 2009 - 30 Apr 2011 |
| Resorts Caribe | director | 31 Jul 2006 - 01 Feb 2011 |

2.9. Palm took over as CEO from Van Doorn in March 2011. From 9 February 2011
to 4 July 2018, he was a director of Ennia Holding and a member of the investment
committee. From 26 March 2011 to 4 July 2018, he was a director of the insurers

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 6
date of judgment: 29 November 2021

and from 1 January 2012 to 4 July 2018, he was a director of Ennia Investments.

| Palm: | | |
|---|---|---|
| **Entity** | **Position(s)** | **Period** |
| Ennia Holding | director | 09 Feb 2011 - 04 Jul 2018 |
| | member of the investment | 19 May 2006 - 04 Jul 2018 |
| Ennia Investments | director | 01 Feb 2012 - 04 Jul 2018 |
| Ennia Zorg | director | 26 Mar 2011 - 04 Jul 2018 |
| Ennia Leven | director | 26 Mar 2011 - 04 Jul 2018 |
| Ennia Schade | director | 26 Mar 2011 - 04 Jul 2018 |
| Resorts Caribe | director | 19 Aug 2011 - present |

*Facts relating to the situation of Ennia et al. from the takeover by Ansary in
2005/2006 until after the pronouncement of the emergency regulations*

2.10. Until the takeover of Ennia by Ansary, most of the shares of Ennia Holding
were owned by Delta Lloyd Antilles N.V. (hereinafter: Delta Lloyd). Ennia Holding
(indirectly) held all the shares in the insurers. The insurers had a licence and were
supervised by the Central Bank. In that context, they had to provide insight into
their financial position annually. The shares in Banco di Caribe were held by a
number of individuals.

2.11. On 20 May 2005, Delta Lloyd and Ansary entered into an agreement for the
acquisition of Ennia Holding by Ansary. The purchase agreement states (in Clause
10.1):

> As from Completion, Purchaser will procure that the solvency of the Group
> Companies will be and remain to the satisfaction of the competent Governmental
> Bodies.

2.12. On 20 December 2005, 50.1% of the shares in Banco di Caribe were
transferred to Parman International. At an extraordinary general meeting of
shareholders of Banco di Caribe on 20 December 2005, Ansary made *inter alia* the
following announcement:

> In order to grow and expand it is the intention of the Parman Group to invest one
> hundred million guilders in the Bank, in tranches, subject to the decision of the
> management and in accordance with the articles of incorporation.

2.13. The shares in Ennia Holding were transferred by Delta Lloyd to Banco
di Caribe on 5 January 2006.

2.14. On 25 January 2006, an extraordinary general meeting of shareholders of
Ennia Holding took place. At this meeting, Ansary indicated to intend to make a
capital injection of NAf 100 million by increasing the share capital of Ennia
Holding. At this meeting, the shareholders approved the aforementioned

increase in the share capital.

2.15. On 22 December 2005 and in December 2006, capital was contributed to Banco di Caribe by Parman International. Parman International did this in the form of shares in SunResorts for a value (on paper) of NAf 98.5 million. After this contribution and the related issue of shares in Banco di Caribe, Parman International held 79.88% of the shares in Banco di Caribe. Subsequently, Banco di Caribe transferred SunResorts shares to Ennia Holding for a value (on paper) of NAf 100 million. This involved a total stake of 22.5% in SunResorts.

2.16. Following the takeover of Banco di Caribe and Ennia Holding, Ansary was appointed chairman of the Supervisory Boards of both Banco di Caribe and Ennia Holding, with the Supervisory Board in January 2006 granting Ansary the power to make (all) investments on behalf of Banco di Caribe.

2.17. On 19 May 2006, Ennia Holding's Supervisory Board decided to establish an investment committee. Ansary was appointed chairman. The investment committee was given the power by the Supervisory Board to take decisions regarding investments of Ennia Holding and the insurers.

2.18. On 20 July 2006, Ennia Investments (as a subsidiary of Ennia Holding) was incorporated. Ennia Investments became responsible for all investments of Ennia et al. The investment portfolio existing before the acquisition of Ennia et al. was altered, with existing investments being liquidated and new investments being made. These investments were made from Ennia Investments using funds of the insurers, creating intercompany receivables between the insurers and Ennia Investments (or Ennia Holding).

2.19. By letter dated 22 August 2006, the Central Bank informed Banco di Caribe (the parent company of Ennia et al. at the time) that it had identified shortcomings, including a solvency deficit. This letter mentions the investments in S&S and SunResorts.

2.20. By a decision of Ennia Holding's Supervisory Board of 19 February 2007, all investment decisions taken up to that point were approved. The same decision was taken by Banco di Caribe's Supervisory Board on 19 February 2007. This concerns, among other things, investments in S&S and Resorts Caribe (Mullet Bay).

2.21. Resorts Caribe was incorporated on 21 July 2006 by Parman International and acquired ownership of part of Mullet Bay (approximately 49,000 m2).

case numbers: CUR201903842/3843/3796/3844/3845/3846                     page 8
date of judgment: 29 November 2021

2.22. On 24 July 2008, the Central Bank issued an investigation report on Ennia
Leven for the period December 2006 to May 2008. It states that investments made
by Ennia Holding and Ennia Investments cannot be taken into account when
assessing the solvency of Ennia Leven.

2.23. By letter from the Central Bank to Ennia Schade dated 23 September 2008, the
Central Bank indicated that an investigation had been conducted into Ennia
Schade. The letter goes on to say:

> Based on our examination we wish to inform you that Ennia Caribe Schade N.V. is in
> compliance with our rules and regulations. Since the acquisition of Ennia by the
> Parman Group, the management of the company has recorded impressive progress.
> Thanks to the investments decisions made by the group and additional capital
> infusion the company is now not only solvent but in a much stronger position.

A letter with the same content was sent to Ennia Zorg.

2.24. At the request of the Central Bank, the corporate structure of Banco di Caribe
and Ennia was changed. A letter dated 11 March 2009 addressed to Banco di Caribe
states, among other things:

> From a supervisory perspective it is imperative to increase the transparency within
> the [Banco di Caribe]-group. Therefore you should restructure [Banco di Caribe]
> group by separating the banking entities, the insurance entities, and the
> nonbanking/insurance entities from each other. This means that [Ennia Holding] is
> no longer allowed to be a subsidiary of [Banco di Caribe] (…).
> The capital of the (immediate) parent company of the separated entities must at all
> times equal the sum of the capital of all its immediate subsidiaries. Furthermore, all
> supervised subsidiaries must be adequately capitalized and meet all our supervisory
> guidelines at all times. (...)

2.25. The structure was subsequently changed, with Ennia Holding becoming the
parent company, with the insurers and Banco di Caribe as subsidiaries. Also,
Ennia Investments (as a subsidiary of Ennia Holding) was included in the
corporate structure. The corporate structure (in limited form) is shown
schematically below.



2.26. A memo dated 10 February 2010 from L. Voigt (hereinafter: Voigt), legal counsel at Ennia et al., addressed to the management of Ennia, states *inter alia* the following:

> In addition to my earlier reports and notices, the following is a non-exhaustive list of issues that I have identified as being in breach of current legislation and/or in urgent need of attention.
>
> (...)
>
> In practice, the [Ennia Holding] Supervisory Board decides, informing and instructing the [Ennia Leven] and [Ennia Schade] management boards to implement decisions. I know that the management has repeatedly tried to make this issue open to discussion with the supervisory boards of [Ennia Schade], [Ennia Zorg] and [Ennia Leven].
>
> (...)
>
> It is common ground that the chairman of the board and the shareholder consult on a daily basis, whereby afterwards certain decisions on transactions are made. From a prudential point of view, such frequent consultation is undesirable.
>
> (...)
>
> Notification by the Central Bank (...) that ENNIA is to <u>a large extent, if not predominantly,</u> acting in breach of applicable compliance laws.
>
> (...)
>
> Investments have been delegated to a number of persons by the Supervisory Board of the holding (?). The legality of that decision is, in my opinion, questionable and must be changed. Moreover, there is a conflict of interests here as well, as it does not concern money of the company, but money of third parties (policyholders). Regulatory legislation and the central bank's *Guidance Notes* require prudent investments. <u>There is reason to believe that the investment of the current assets of the policyholders does not merit the qualification of prudence</u> (see Spigthoff's memorandum, p. 3).
>
> (...)
>
> In my opinion, many transactions lack the approval of the board required by the articles of association and are nevertheless carried out. This includes donations, loans and payments to third parties (...)

2.27. In an email dated 8 July 2010, the insurers' in-house actuary Mr H. Couperus, informed the board of his concerns about Ennia Leven's managing structure and the existing concentration risk relating to investments. He writes, among other things:

> (...)
>
> Ennia Leven Aruba is in order (...)
>
> Ennia Leven itself is not: too large a share in Land on SXM and [S&S] where S&S even has a CCC rating. The interest on the loans is not paid. (...) we do need to intervene here: reducing the concentration risk (i.e. selling part of SXM and S&S), paying the interest and putting everything under the control of the Leven (Life) business. And of course the solvency of [Ennia Leven] must be supplemented. (...)

2.28 As a result of a subsequent consultation, the directors of the insurers documented

a decision on 13 October 2010, which included the stipulation that intercompany receivables were not to increase further, that the agreed interest would be paid and that the concentration risk would be reduced.

2.29. By memo of 24 November 2010, Voigt reported, *inter alia*, the following:

> In my capacity as Legal Counsel, I conducted a (limited) investigation into the course of events at ENNIA.
> The central question in my investigation was whether the rights of insured parties in ENNIA (Leven or Zorg) are sufficiently safeguarded.
> In my opinion, my findings give cause to speak of a very serious, worrying and alarming situation. Below is a list of some of the facts established.
>
> 1. More than 70% of the invested assets of ENNIA Leven have been granted as loans to [Ennia Investments], or securities related to the Parman Group. No security whatsoever is involved. [Ennia Investments] reportedly used the funds to participate in real estate companies affiliated with the Parman group and securities in Stewart & Stevenson. The value of the latter company is questionable.
> 2. The interest payments on the loans are not being made and there is a deficit of 62 million.
> 3. Generous substantial donations without any apparent purpose to the society in which ENNIA operates or to ENNIA.
> 4. Payment of substantial costs unrelated to ENNIA.
> 5. Doubtful loans, including 19 million to EVDA without security being provided. It has transpired by now that no repayments have been made while any action from ENNIA is not forthcoming.
> 6. Proposals for an interim dividend (and possible payment) of USD 2.5 and 1.5 million respectively, in a situation where it is known that because of the damage caused by Tomas, the consolidated result will be marginal or even negative.
> 7. Failure to purchase adequate reinsurance.
>
> The picture has emerged of very dominant officers of Parman International or the chairman of the Supervisory Board initiating financial transactions without any benefit to ENNIA, with the management board following without any protest. A truly worrying development indeed.
> Given the seriousness of the situation I have outlined, I would like to discuss the matter with the entire management board in the short term, and in any event before 1 December 2010, in order to determine whether a recovery plan exists and, if so, what guarantees there are to safeguard policyholders' rights. (...)

2.30. A consultation was held on 18 January 2011 at which the directors of Ennia et al. (Andraous, Gibson, Van Doorn, Martina, Curiel and Meuleman) and Ansary were present. The report of this consultation, drawn up by Van Doorn, states, among other things:

case numbers: CUR201903842/3843/3796/3844/3845/3846                page 11
date of judgment: 29 November 2021

The outcome of the meeting was that:
- Mr Ansary made it extremely clear that he would continue to make the investment decisions himself and that we, as the board under the articles of association, would not play any role in this. - He did not endorse the need to reduce the positions in IC loans.

Van Doorn ceased working for Ennia et al. at the end of January 2011 and formally left employment in April 2011.

2.31. In the following period, both internal and external supervisors made (critical) comments on how and by whom decisions were taken within Ennia et al., on the intercompany receivables and underlying investments (S&S and Mullet Bay) and on solvency.

2.32. A report dated 10 March 2011 by the external actuary of Ennia et al., Buck Consultants, states, among other things:

As agreed in our meeting of March 4, 2011 at the office of KPMG in Willemstad, Curacao, we hereby provide you with our findings regarding the Liability Adequacy Test (hereafter: LAT) of [Ennia Leven] as per December 31, 2010. We acknowledge that the deficit resulting from the LAT for [Ennia Leven] is NAF 40 to 60 million. The cause for this deficit is the mismatch in assets and insurance liabilities of [Ennia Leven]. In our belief surplus or deficit of the LAT is the outcome of a management decision process. We therefore perceive the following current situation.

**Current situation**
1. Too small amount (approximately NAF 200 million) has been invested in fixed income assets with a duration of more than 5 years.
2. High concentration of assets. More than NAF 650 million of the assets in only two investments (S&S bonds NAF 139 million, S&S share NAF 218 million and Sun Resorts NAF 321 million).
3. Investment focus is primarily on group level and structured from a fiscal point of view. Too little attention for the specific requirements of a life insurer.
4. No clear and simple structure for loans to [Ennia Holding] and/or [Ennia Investments] within the loan portfolio of [Ennia Leven].
5. NAF 75 million of (yet) unpaid interest by [Ennia Investments] and [Ennia Holding] to [Ennia Leven]
6. NAF 73 million of intercompany balances between [Ennia Leven] and [Ennia Holding]
7. NAF 90 million of shares (**CITI**), which are by nature not yielding a fixed income
8. No defined and applied strategic [Ennia Leven] investment policy



2.33. In April 2012, the Central Bank issued an investigation report on Ennia Leven for the period 2010-2012. In this report, the Central Bank concluded that the investments of Ennia Leven were in breach of (its own) investment policy and the principles of prudent investments. The report states, among other things:

> During our review of the investment plan we determined that [Ennia Leven] does
> not comply with the investment mix indicated in the plan, specifically the allocation
> of fixed income securities. The plan mentions a bandwith of 5-10 % for investments
> in loans of affiliates. We determined however, that [Ennia Leven] had invested 81%
> of the fixed income securities, in loans of affiliates. The granting of these loans by
> [Ennia Leven] to an affiliated company are in the bank's opinion in conflict with its
> own investment plan and prudent investments practices and exposes [Ennia Leven]
> to an unacceptable level of concentration risk.
> The Bank is in process of finalizing its valuation guidelines which should be used for
> the completion of the ARAS filings in the future. In this guideline:
>> - Loans granted to affiliates are subject to admissibility by the Bank. If any
>>   combination of loans to affiliates exceeds greater of 10% of all other
>>   admissible assets or 25% of the previous year's Net Equity Unassigned that
>>   is reported in ARAS File 106, Line 8, then the excess must be reported and
>>   deducted as an excess loan.
>> - Investments with a rating of BBB (S&P) or BAA (Moody's) or higher can be
>>   reported as admissible assets.

In addition, the report states that an unacceptably high concentration risk is
involved. Regarding Ennia et al.'s investment in bonds of S&S, which represent
58% of Ennia's total investments, the Central Bank states that S&S has a CCC (S&P)
rating. The Central Bank then continues:

> Based on the provisions in article 34 of the Insurance Supervision Ordinance the
> Bank disapproves the reporting of these investments on [Ennia Leven]'s balance
> sheet as assets to cover the technical provisions. Only investments with at least a
> rating of BBB (S&P) or BAA (Moody's) will be allowed to be reported as admissible
> assets in future ARAS filings.

Regarding Ansary's role at Ennia et al., the Central Bank states that it disapproves
of the fact that Ansary is both majority shareholder of Ennia Leven and chairman of
the Supervisory Board and the investment committee of Ennia Investments.

2.34. In late 2012, Ennia Investments founded two new entities, which
organisationally came to be controlled by Ennia Investments, namely EC
International Cy Ltd in Cyprus and EC Investments International S.a.r.l. in
Luxemburg (hereafter: ECII Luxemburg), the latter with a US Branch in the
United States.

2.35. By letter dated 23 December 2013, the Central Bank informed Ennia Schade
that the financial figures for 2012 had been received and that a number of
questions remained. The letter also stated, among other things:



> (...) Finally we refer you to the Valuation Guidelines developed by the Bank which
> were presented to the sector in December of 2011 and subsequently discussed with
> the sector which contains guidelines as to how assets reported in the ARAS filings
> should be valued.
> We also refer you to article 34 paragraph 2 of the National Ordinance Insurance
> Supervision (N.G. 1990, nr. 77) which stipulates that the technical provisions

> reported by an insurance company must be fully covered by assets and that the
> Bank can object to the nature and appraisal of the assets, whereupon the insurer
> shall take steps to meet the Bank's requirements. (...) It concerns in particular the
> affiliated loans and receivables reported by [Ennia Schade] on its balance sheet. (...)

2.36. In response to the Central Bank's letter of 23 December 2013, Palm wrote on
behalf of Ennia Schade in a letter dated 30 December 2013, among other things, as
follows:

> We are aware of the several drafts of the Valuation Guidelines and the possible
> impact on [Ennia Schade] once the guidelines are formally issued. We are also aware
> that we need to take steps between now and issuance of the final Valuation
> Guidelines to meet the revised solvency requirements. In the meantime we are in
> compliance with the solvency requirements as confirmed in your letter dated
> August 14, 2013.

2.37. A letter from the Central Bank to Ennia Leven dated 10 March 2014 states,
among other things, that no additional loans were to be granted by Ennia Leven to
Ennia Holding or Ennia Investments and that the existing loans were not to be
extended on their maturity dates. It was also established again that the assets on the
Ennia Investments balance sheet consist largely of investments in S&S and
SunResorts and that concentration risk is also involved there. In this context, it is
requested that the financial statements of the companies concerned be submitted.

2.38. By letter dated 5 January 2015, the Central Bank informed Ennia Leven of the
following, among other things:

> The Bank has repeatedly pointed out to you that the concentration of [Ennia
> Leven's] investments with the affiliated entities is unacceptable to the Bank. The
> Bank has urged you to take steps to arrive at a situation where concentration risk is
> reduced to a minimum. (...) Contrary to your confirmation (...), the 2013 financial
> statements of [Ennia Investments] show that the loan agreement with [Ennia
> Investments] has been extended for the amount of NAf 565,259,725 (representing
> 43% of the total assets as at 31 December 2013 of [Ennia Investments] by 23 years .
> (...) The Bank does not tolerate this and emphasises that the extension of this
> agreement (...) is unacceptable to the Bank. (...)
>
> In our letter dated 10 March 2014, we last indicated to you that the Bank will assess
> the loans to affiliated entities/receivable from affiliated entities to be recognised on
> [Ennia Life]'s 2013 balance sheet. The Bank had instructed you to provide to the
> Bank for this purpose the 2013 financial statements of [Ennia Investments], [S&S],
> SunResorts Ltd and [Ennia Holding] no later than 1 July 2014. The consequences of
> non-compliance have been communicated to you by the Bank on several
> occasions, namely that the Bank will not allow ("non-admissible") the
> recognition of these loans on the [Ennia Investments] balance sheet. You also failed
> to comply with this instruction. (...)



Subsequently, the Central Bank again gave Ennia Leven a number of instructions.

case numbers: CUR201903842/3843/3796/3844/3845/3846                 page 14
date of judgment: 29 November 2021

2.39. By letter dated 25 June 2015 from the Central Bank to the insurers, it was established that the instructions were not being complied with and the instructions were repeated.

2.40. In September 2015, the Central Bank changed the solvency requirements. The amended rules are included in the *General insurance annual statement composition and valuation guidelines non-life insurance aras v 2.7.* (hereinafter: General Valuation Guidelines). These state, *inter alia*:

> This guide sets forth a compilation of the accounting practices and procedures prescribed by the Bank relative to the Annual Statement submitted by the licenses insurance companies transacting business in or from Curacao and Sint Maarten.

In view of the amended guidelines, intercompany receivables could in principle no longer be included in the calculation of the solvency ratio.

2.41. The letter of 6 October 2015 from the Central Bank to insurers identified a solvency deficit as a result of the continued increase in unauthorised investments and receivables from affiliated entities, which the Central Bank classifies as unauthorised assets.

2.42. The Central Bank wrote in a letter to the insurers dated 4 August 2016, among other things:

> (...) Based on the evaluation of the measures proposed by Ennia and in order to guarantee the obligations to policyholders, the Bank urges Ennia to implement the following points: (...)

This is followed by ten points/instructions, including the instruction that further loans to and receivables from affiliated entities are no longer permitted and that existing loans must be repaid or reduced within a maximum period of three years. In addition, Ennia was to ensure that Mullet Bay and the shares of S&S were sold within a maximum of three years and that the proceeds would be used for investments permitted by the Central Bank as determined in the valuation principles. A number of measures to strengthen the liquidity position were also included.

2.43. In a letter from the Central Bank dated 22 September 2016 addressed to the insurers, the Central Bank reiterated the above points and indicated the status. Next, this letter stated:

> The Bank is also of the opinion that Ennia has not sufficiently followed up on its instructions, given the outstanding issues as of the date of this letter. In light of this, the Bank considers the measure under Article 31(3)(a) of the LTV (as amended) necessary. (...)

2.44. By letter from the Central Bank dated 29 September 2016, the Central Bank gave Ennia Leven notice that the measure referred to in Article 31(3)(a) LTV would take effect from 1 October 2016. The letter goes on to say:

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 15
date of judgment: 29 November 2021

The foregoing implies that from that time onwards the management of Ennia would only be allowed to exercise its powers with the approval of the persons appointed by the Bank.

Two persons were appointed (as undisclosed trustees) by the Central Bank.

2.45. On 11 November 2016, auditor R. de Paus (hereinafter: De Paus) sent an email to Ansary, CC to Palm, Andraous and Supervisory Board members Saleh and Gomes Casseres. In March 2016 De Paus became a member of the Supervisory Board of Ennia Holding. The email stated, among other things:

(...)

It is not a pleasure or an honor to be part of this at all. It is a daily headache and it is very damaging for my reputation. I do not need all this and I do not want it. I am about to offer you my resignation right now unless we would be able to solve the majority of the problems on very short notice.

(...)

We are having whistleblowers, major issues with all the supervising Central Banks, rulings by the Central Banks, major issues with the external auditor, very unhappy local management that is spending a lot of time fighting all these issues instead of being busy doing business and making money etc etc.

(...)

What I want us to do to solve this situation is:
- We give local KPMG everything that they ask for and have them finalize the 2015 accounts before the end of the year. I know they can do it. Please let us handle this.
- We give the supervising Central Banks what they ask for and we prevent that they will be imposing an emergency ruling on us. Please let us handle this.
- You find another way to finance S&S (bank loans, another unitholder, increase your personal investment or whatever) and make S&S (or another party) repay or take over one serie of perpetual units within a couple of weeks from now or preferably sooner. This investment in S&S is by far the biggest problem that we have to solve in order to return to a normal situation for an Insurance company and a bank. Please do that without further delay. We have to show our good intentions.
- As long as we have a stake in S&S, local management has to receive monthly financial updates from them. (Balance sheets, profit and loss statements and statements of shareholders equity). Up to now local management has not the faintest idea how our most important investment of NAf 500 million is performing and neither do we. That is absolutely absurd. Please let us have the most recent financial information from them today or tomorrow.
- Hopefully not, but in case the Ennia Companies would not meet the solvency requirements (after impairments) the company needs additional funding. Hopefully you can arrange for that if necessary.

(...)

2.46. On 16 November 2016, a meeting took place between the Central Bank and Ennia Leven. Present on behalf of Ennia Leven were Mr G. Martina and De

case numbers: CUR201903842/3843/3796/3844/3845/3846                page 16
date of judgment: 29 November 2021

Paus. At agenda item 6 (the Supervisory Board's position to date on the current
situation), the minutes of these consultations state:

> [De Paus] commented on his involvement with ENNIA. He said that the procedure
> for his appointment had started in March but that he had only been involved since
> 20 September. He said he was very shocked at the state of ENNIA and BDC.
> According to him, strange investments had been made, Ansary makes people do
> things they do not want to do. He wonders how this is possible. All the assets were
> invested in 2 assets, against all standards of decency, although not contrary to the
> rules and regulations at the time. He wonders why he was not stopped by the
> management board and supervisory board? (...)

2.47. De Paus submitted his resignation as Supervisory Director at the end of
November 2016.

2.48. An agreement was drawn up on 22 June 2018. This agreement, signed by
Gibson and Andraous on behalf of Ennia Investments and Ansary on behalf of
S&S, states, among other things:

> This Investment Management Agreement (...) is by and between
> [Ennia Investments] and [S&S] (the "IM"). The parties hereto agree
> as follows:
> 1. [S&S] will accept and manage the investment of US$ 250 million, of which US$ 100
> million of [Ennia Investments] funds be transferred now and the balance at later
> dates.
> 2. [S&S] guarantees a return on investment of funds deposited with it of 6.5% per
> annum from the date of the receipt of each tranche by [S&S], such guaranteed return
> to be payable semi-annually.
> 3. (...)



On the same day, USD 100 million was transferred from Ennia Investments
to S&S.

2.49. On 3 July 2018, the Central Bank revoked the licence of the insurers. The
insurers' application for suspension of the revocation decision was rejected by
this Court.

2.50. By court order of 4 July 2018 (ECLI:NL:OGEAC:2018:160), at the request of the
Central Bank, the emergency regulations as referred to in Article 60 LTV were
pronounced in respect of Ennia et al. The Central Bank is authorised in accordance
with the provisions of Article 60(2) LTV in respect of all defendants covered by the
emergency regulations. The authorisation concerns the liquidation of all or part of
the insurer's portfolio, the transfer of all or part of the rights and obligations under
or pursuant to insurance agreements, or restructuring of the insurer's business. The
authorisation also serves to liquidate the assets of the insurer's business.

2.51. On 5 July 2018, after the emergency regulations were pronounced, the
amount of USD 100 million referred to in 2.48 was (re)booked to Ennia Leven.
Half of this amount was transferred from S&S, the other half from Ansary's

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 17
date of judgment: 29 November 2021

private account.

2.52. On 25 September 2018, the Central Bank filed so-called Chapter 15 proceedings in New York, requesting the recognition of the emergency regulations in the United States. Parman International filed an Objection against this on 24 October 2018. On 20 December 2018, the New York District Court ruled that the emergency regulations were recognised. On 29 January 2019, the New York District Court granted the Central Bank's application for a provision to obtain disposal of assets of Ennia et al. in the United States in accounts with the Merrill Lynch bank.

2.53. On 31 January 2019, this Court rendered a judgment in preliminary relief proceedings in a case between Parman International and the Central Bank (ECLI:NL:OGEAC:2019:15). In summary, in this case Parman International sought an order to have the Central Bank revoke the emergency regulations and suspend the measures and decisions already taken and to order the Central Bank to enter into consultations with Parman International with the aim of agreeing on a restructuring of Ennia that would be acceptable to all the parties. Parman International's claims were dismissed. The judgment included the following, *inter alia*:

> 4.19. All of the foregoing leads the Court to conclude that it is not likely that the court hearing the case on the merits will find that [the Central Bank] acted unlawfully by submitting the request pursuant to Article 60(1) LTV. Nor is it likely that the court hearing the case on the merits (...) will find that the emergency regulations should not be pronounced. In summary, the situation is that for a long time the Insurers have not complied with the applicable solvency rules, that there has been no improvement in this despite instructions from [the Central Bank], that a final plan has been blocked by the (ultimate) shareholder and that, instead, a substantial amount is being withdrawn from the Group. In these circumstances, it is likely that (also) a court hearing the case on the merits will reach the opinion that the interests of the joint creditors requires intervention by the regulator and that this intervention must take place in the form of the emergency regulations. (...)
> 4.24. Everything considered, the Court reaches the preliminary conclusion that the Ennia companies must be considered jointly as "insurer" within the meaning of the LTV. [The Central Bank] was therefore authorised to request application of the emergency regulations also in respect of [Ennia Leven] and [Ennia Investments]. (...)



2.54. On 9 October 2019, an assignment agreement was concluded between ECII Luxemburg and Ennia Investments, under which ECII Luxemburg assigns to Ennia Investments its claims against - among others - the direct and indirect shareholders of Ennia Holding arising in the period 2005- 2018. A similar assignment agreement was concluded between Energy Equipment International Ltd (hereinafter: Energy Equipment) and Ennia Investments on 19 March 2021.

*Facts relating to the separate acts of behaviour Ennia et al. accuses the
defendants of*

*S&S*

> *Accusations Ennia et al.: the investment involved too great (concentration) risks,
> transactions and conversions took place that were unfavourable to Ennia et al.
> and Ennia et al. wrongly did not participate fully in the profits*

2.55. S&S Inc is a US company that focuses on the oil and gas industry. S&S Inc
manufactures and distributes equipment for this industry. Two agreements were
reached between S&S Inc and Ansary on 27 September 2005 and 24 October 2005
for the purchase of all assets of S&S Inc for an amount of USD 277 million. To this
end S&S was incorporated by Ansary on 29 November 2005. The operating
agreement of S&S dates from 23 January 2006.

2.56. From S&S's incorporation up to and including the sale of S&S, Ansary has
been chairman of the board and of the executive committee of S&S. Parman Capital
and (various entities of) Ennia, including BdC Investments B.V. (hereinafter: BdC
Investments) were shareholders of S&S. Ansary is a major shareholder of Parman
Capital. In January 2006, Banco di Caribe's Supervisory Board granted Ansary the
freedom to make all decisions concerning any investments. On 19 May 2006, Ennia
Holding's Supervisory Board granted similar powers to Ennia Holding's investment
committee.

2.57. The purchase price of USD 277 million for the assets of S&S Inc was satisfied
by Ansary raising debt capital of USD 250 million (a loan and credit facility with JP
Morgan Chase) and contributing equity capital of USD 70 million. Of this USD 70
million, USD 5 million (7.1%) was contributed by Parman Capital against the issue
of 5,000 'common shares' in S&S with a nominal value of USD 1,000 per share. The
common shares offered voting rights and entitlement to profit. USD 65 million
(92.9%) was contributed by BdC Investments, against the issue of 6,500 'preferred
shares, non convertible' in S&S with a nominal value of USD 10,000 per share. The
preferred shares came with an entitlement to a maximum annual return of 8%. No
voting rights or entitlement to profit were attached to the shares.

2.58. On 17 October 2006, BdC Investments transferred 6,000 preferred shares in
S&S to Ennia Investments against payment of USD 60 million. The payment was
borne by Ennia Leven. In this context, savings deposits worth USD 62 million
were cancelled by Ennia Leven.

case numbers: CUR201903842/3843/3796/3844/3845/3846     page 19
date of judgment: 29 November 2021

2.59. On 9 November 2006, the 500 preferred shares held by BdC Investments and the 6,000 held by Ennia Investments were converted into 1,667 common shares. Following this conversion, the combined equity interest of BdC Investments and Ennia Investments in S&S was 25%. Parman Capital's equity interest in S&S was 75% at the time. The common shares held by Parman Capital were designated as Class B common shares. These shares gave ten voting rights per share and could only be held by certain persons designated in the articles of association, including Ansary, his wife and his direct descendants, as well as trusts and legal entities owned by those persons. The common shares of BdC Investments and Ennia Investments had one voting right per share.

2.60. On 5 September 2007, the common shares in S&S were split. The shareholding structure has not changed as a result. After the split, BdC Investments and Ennia Investments held about 25 million shares in S&S and Parman Capital held about 75 million Class B shares.

2.61. On 16 March 2009, Ennia Investments signed an agreement with Parman International (acting on behalf of Parman Capital) for the purchase by Ennia Investments of additional shares (15%) in S&S for USD 26.7 million. This agreement included a repurchase option, whereby Parman Capital could repurchase the 15% equity interest within two years against payment of the nominal value (USD 26.7 million), plus a mark-up of 12% per annum.

2.62. The amount of USD 26.7 million has been transferred to the account of Parman International. Of this amount, Parman International transferred USD 3 million to Nina Ansary, USD 21.4 million to Ansary and USD 2.3 million to co-shareholder F. Carlucci.

2.63. Also on 16 March 2009, Ennia Investments acquired the remaining shares of BdC Investments. The purchase price was charged to Ennia Leven, resulting in Ennia Leven having an intercompany receivable from Ennia Investments. This second purchase agreement, dated 16 March 2009, brought Ennia Investments' stake in S&S to 40%.

2.64. A valuation of the equity value of S&S was carried out by Goldman Sachs in 2011. In the report of 5 April 2011, the equity value was valued at a range of USD 780 million - USD 1.7 billion. In a Wells Fargo report of 7 April 2011, the equity value of S&S was assessed at between USD 1.16 billion and USD 1.44 billion.

2.65 Ennia bought bonds in S&S for (approximately) USD 127 million in the period from 2008 to 2011. The bonds had a maturity of up to 2014 and S&S

owed interest of 10% per annum on the nominal amount of the bonds. The bonds were converted into shares designated as adjustable rate non-cumulative perpetual preferred units – series 1, (hereinafter: preferred units 1), in 2013 at a nominal value of USD 141.96 million and a return capped at 6% per annum. The preferred units 1 have an indefinite duration. There is no voting right or entitlement to profit sharing above a certain interest rate. Transfer is only possible after approval by the holders of common shares.

2.66. On 17 December 2012, after the creation by Ennia Investment of the two new entities EC International Cy Ltd and ECII Luxemburg (see also at 2.34), Ennia Investment contributed all the shares and bonds issued by S&S to EC International Cy Ltd. Subsequently, these assets were transferred to ECII Luxemburg and on 21 December 2012 to the US Branch of ECII Luxemburg.

2.67. On 22 May 2014, Ennia Holding's CFO, Mr R Breedijk (hereinafter: Breedijk) prepared a memorandum for Palm and Andraous on the valuation of the S&S common units. The memorandum states, *inter alia*:

> **Impairment test fiscal 2013** – As per the January 31, 2014 audited S&S financial statements the fair value of the S&S Common Units were determined to be US$ 11 per common unit by an independent, third party valuation of S&S in connection with a share-based compensation plan. Based on the above and the total S&S Common Units outstanding of 56,025,210, [ECII Luxemburg] share of 40% results in a valuation of US$ 247 million.

2.68. On 26 June 2014, ECII Luxemburg's entire stake in S&S (40%) was sold to Parman Capital for USD 133.4 million, in exchange for which ECII Luxemburg received a promissory note. The interest on the promissory note was 4% per annum and the term was ten years with an option for earlier repayment. Prior to this transaction, correspondence took place between Andraous and Mr W.F. Henze (hereinafter: Henze) via email. During the relevant period, Henze worked as an attorney at the law firm Jones Day. Henze was (also) an adviser to the board of S&S. An email dated 28 April 2014, with the subject 'draft promissory note', stated the following:

> Here's a draft of a note that could serve to be consideration for the transfer by [ECII Luxemburg] of its 40% of the S&S common units to Parman (Delaware). I assumed that this needs to look and feel like a bona fide enforceable instrument. Accordingly, it contains the general terms and conditions that one would expect to find in a transaction between unrelated parties.
> (...)

2.69. On 4 September 2015, Henze sent an email to Palm regarding the conversion of the promissory note to preferred units. These state, *inter alia*:

> At Mr. Ansary's request, attached is a draft letter from [ECII Luxemburg] to S&S pursuant to which [ECII Luxemburg] offers to exchange that certain promissory note dated June 26, 2014 in the original principal amount of $ 133,411,778, (together with

(i) a refund of the cash interest paid thereon, $ 5,336,472, and (ii) interest accrued thereon through September 26, 2015 (the effective date of the exchange) for 140,093 Preferred Units -Series 2.

The draft letter prepared by Henze, after being seen by Palm and Andraous, was sent unchanged on 16 September 2015 by ECII Luxemburg US Branch to S&S.

2.70. On 26 September 2015, the promissory note was cancelled against issue of 140,093 preferred shares (adjustable rate non-cumulative preferred units- series 2, hereinafter: preferred units 2) in S&S at a nominal value of USD 140.093 million. The preferred units 2 have an indefinite duration. There is no voting right or entitlement to profit sharing above a certain interest rate. The interest rate shall not exceed 6% per annum. Transfer is (only) possible after approval by the holders of common shares. A report prepared by KPMG in September 2016 identified a number of disadvantages associated with the preferred units 2.

2.71. A valuation report in respect of S&S was issued by PWC on 26 April 2016. The equity value of S&S as at 30 June 2015 was estimated at USD 690-770 million. Based on this valuation, a 40% stake would represent a value of USD 219-252 million.

2.72. At the end of 2017, S&S sold its assets to Kirby Corporation (hereinafter: Kirby) for USD 744.5 million. Of this amount, Ennia received a total of USD 286 million (38% of the proceeds): on 13 September 2017 an amount of USD 145 million and on 26 October 2017, 2,262,883 shares in Kirby, which at the time of sale of the assets represented a value of USD 141 million. The amount of USD 286 million was based on the nominal value of preferred units 1 (USD 141.96 million), the nominal value of preferred units 2 (USD 140.09 million) and the accrued interest on preferred units 1 and 2 (USD 1.02 million and USD 3.11 million respectively).

*Oil rigs*

> *Accusations Ennia et al.: this investment was in the sole interest of S&S and Ennia et al. incurred a loss on the sale*

2.73. In 2009, Energy Equipment (first a subsidiary of BdC Investments and then of Ennia Investments, see also at 2.54) purchased a number of mobile oil rigs from S&S. On 11 November 2009, three oil rigs were purchased for an amount of USD 16,492,308. On that same day, another three oil rigs were purchased for an amount of USD 20,976,924. Both agreements were signed by Van Doorn on behalf of Energy Equipment. The payment was made from Banco di Caribe. The CEO of Banco di Caribe, in an email dated 13 December 2010, with regard to the payment of the

oil rigs, wrote the following to Andraous, Van Doorn and Steve Graybill:

> I will make the payments
>
> However, I want to make sure that everyone understands that this is violation with Central Bank Regulations which states that we may not invest for more than ANG 22 mln (10% of equity) in any one vehicle (and they consider oil rigs as an investment since it is not "banking" related and it is consolidated). We are already at ANG 33 mln. They will be making a point of this in our on site inspection report. (...)

2.74. In July 2011, an oil rig was sold by Energy Equipment for USD 7,444,148. In June 2013, an oil rig was sold for USD 6,992,308. In September 2017, the remaining four oil rigs were sold for a total amount of USD 12 million. The sales contract was signed by Palm on behalf of Energy Equipment. All oil rigs have been sold back to S&S.

*Mullet Bay*

> *Accusations Ennia et al.: Mullet Bay was deliberately overvalued and the concentration risk was too great*

2.75. Mullet Bay is a plot of land located in Sint Maarten of about 67.7 hectares, 40 hectares of which are a golf course. Mullet Bay is accommodated in SunResorts. Mullet Bay was a golf resort and timeshare venue and was purchased in the 1980s by Ansary, among others. In 1995, Mullet Bay was damaged by Hurricane Luis, causing damage to the structures. The Towers Hotel has survived and is still in use. In all other respects, the site has not been further (re)developed.

2.76. In 2005 and 2009, Ansary, through Parman International, placed SunResorts shares with Banco di Caribe and Ennia Holding.

2.77. Various valuation reports have been issued with regard to Mullet Bay.
   a) In May 2002, a valuation took place by Independent Consulting Engineers N.V. (hereinafter: ICE). ICE valued the land and associated facilities at USD 68.3 million, valuing the land at USD 54.7 million (USD 75/m²);
   b) In June 2005, Mullet Bay was valued by Mr David Morrison. The value of the land was valued at USD 242.5 million (USD 337/m²);
   c) In March 2006, a valuation was carried out by Mr Toon Valkenburg from his company Independent Expertise Bureau N.V. (hereinafter: IEB). IEB arrived at a (market) valuation of USD 250.8 million (USD 365/m²); The report states:

> (...) This survey is superficial in its nature. No aspect of any building or structure were studied in depth. (...) Due to the limited time available, none of the documentation and information received from either the cadastre or VROM was studied in detail. (...)



d) On 1 December 2006, IEB valued Mullet Bay at a market value of USD 292 million (USD 426.5/m²);

e) On 28 December 2006, IEB valued Mullet Bay at a market value of USD 337 million (USD 492.50/m²);

f) In January 2009 2009 IEB valued Mullet Bay at a market value of USD 386 million (USD 565/m²);

g) On 24 October 2011, IEB valued Mullet Bay at USD 400 million (USD 595/m²).

h) On 1 December 2014, IEB valued Mullet Bay at USD 417 million (USD 620/m²).

i) On 29 September 2016, a draft report was issued by real estate agency CBRE. In this report, Mullet Bay was valued at USD 35.4 million (USD 53/m²);

j) On 30 November 2016, the agency Conseils Evaluations Immobilieres (CEI) issued a valuation report. This report is based on the assumption that the entire plot (including the golf course) can be built on. Mullet Bay was valued at USD 436 million (USD 620/m²).

k) On 11 June 2018, IEB valued Mullet Bay at USD 419 million (USD 620/m²);

l) On the instructions of the Central Bank, on 27 September 2018, Mullet Bay was valued by Cushman & Wakefield at USD 50 million (USD 75.52/m2).

m) On 27 January 2021, on the instructions of the Central Bank, Mullet Bay was valued by JLL at USD 96.4 million.

2.78. Ennia et al. have included the valuations in the overview below.



Overzicht waarderingen Mullet Bay, in US$ miljoen



case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 24
date of judgment: 29 November 2021

2.79. The financial statements of SunResorts include Mullet Bay in the financial year
that ended on 31 August 2005 for an amount of USD 2.2 million. The basis of
valuation used is the amount for which Mullet Bay was originally purchased. For
the 2005/2006 financial statements of SunResorts, the market value was used as the
basis for valuation. In the financial year ending 31 August 2006, Mullet Bay was
recognised for an amount of USD 337 million.

2.80. As set out at 2.15, on 22 December 2005 and in December 2006 share capital
was contributed to Banco di Caribe by Ansary through Parman International.
Parman International did this in the form of shares in SunResorts for a value (on
paper) of NAf 98.5 million. After this contribution, Parman International held
79.88% of the shares in Banco di Caribe. Subsequently, Banco di Caribe transferred
SunResorts shares to Ennia Holding for a value (on paper) of NAf 100 million. This
involved a total stake of 22.5% in SunResorts.

2.81. In March 2009, after the valuation of Mullet Bay in January 2009, SunResorts
shares were contributed via Parman International against the issue of Ennia
Holding shares for NAf 150 million. In October 2010, SunResorts shares were
contributed for an amount of NAf 348.89 million. After this contribution, Ennia
Holding held 93.3% of the shares in SunResorts. At that point, Mullet Bay
represented 55% of the value of the total assets.

2.82. On 23 April 2009, KPMG, at the time the company auditors of Ennia et al.,
drafted a memo on the value of Mullet Bay. KPMG contacted PWC, the external
auditors of SunResorts, about this. The memo states, *inter alia*:

> (...)
> To get comfort with the revaluation of the land [Mullet Bay] KPMG (Marit Beishuizen)
> had a meeting with PWC (Ton van Kooten) to discuss how they came to the conclusion
> during their audit that the new value of the land is correct. Below you will find the
> questions and answers:
>> 1) To evaluate the external expert's professional competence, did you consider
>> whether the external expert:
>> - has professional certification or licensing by, or membership in, an appropriate
>>   professional body, and
>> - has experience and reputation in the field for which we are seeking audit
>>   evidence.
>
> *The external expert (Ton Valkenburg) has no license, because it is not needed in St. Maarten. It is
> a 'vrij beroep"* (translator: an independent profession). *PWC knows that this expert is doing a
> lot of work for the banks and insurers on St. Maarten. These companies like to do business with
> him. PWC knows this expert and he performed also valuations with other big projects in Cupecoy
> (Trade Win I/II) and Divi Little Bay. So he has experience with big projects.*



> *He told PWC, that [Andraous] asked him to value the land for USD 1000 per M2, but he
> remained objective and finally to USD 565 per M2. (...)*

2.83. After issuing the draft report by CBRE (2.77 under i), Breedijk asked CBRE in
response to this report whether the valuation only concerned The Towers, or the
entire site including the golf course, now that the appraised value was 10% of the
earlier valuations. CBRE replied that it concerned the valuation of the entire site.
On 27 October 2016, Breedijk asked Andraous, Palm and Martina by email what he
could tell CBRE. In response, Andraous replied to (only) Palm:

> I didnt copy the others. The Ambassador doesn't want to use them. He wants
> to choose the firm (...)

"Ambassador" was the name and title used by the directors and
supervisory directors of Ennia et al. for Ansary.


2.84. Subsequently, the agency CEI was called in (2.77 at j). CEI valued Mullet Bay at
USD 436 million. The report issued on 30 November 2016 stated:

> The analyses of the market value is based on the assumption of the sale of a building
> land to developers and investors. (...) The valuation assignment includes the
> present value of the Golf Course as a buildable land.

In response to this report, Martina sent an email to CEI on 27 January 2017
which stated, *inter alia*:

> Our auditor wants to understand more in depth besides the valuation report how
> the appraisal was performed an how the market value of $ 436.1 million was
> determined.

In response, CEI reported on the same day:

> (...)
> We are kind of surprised that you did not explain this yourself to your auditor.
> Indeed, as you well know, we were asked (likewise with the former local valuer) to
> consider this large & magnificent piece of land (70 ha) as fully buildable provided
> that building permits for many big constructions (for instance: 45 m high) are easily
> to obtain. It was also mentioned that negotiations with Chinese investors + club
> Med (major shareholder is Fosun) were on the way...
> Because as it is today: a golf course loosing money, the value would be near zero. As
> we told you & your advisor Accuracy since day one. (...)

On 26 March 2017, a meeting took place between representatives of KPMG, CEI and
Ennia about the report issued by CEI. In the memo drawn up from that, CEI's
comments include:

> If considered that the 400 million to a fully develop land and the building permits
> spent by the city of St. Maarten, it could be worth 400 million.
> But if used with a discount value of 5% per year, the value will be USD 200 million.
> We were told to be in line with the former local valuer.
> The value is what can be built on it, even though it is beautiful and big. It was
> unusual, and feel uncomfortable with the word present. Unsure about this.



case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 26
date of judgment: 29 November 2021

2.85. On 22 March 2017, KPMG sent a letter to Ennia et al.'s Supervisory Board and management board in connection with the audit for the years 2014 and 2015. On Mullet Bay, it states, *inter aiia*:

> (...) Regretfully, we have not seen sufficient concrete progress and resolutions on the remaining significant outstanding matters, which are critical for our audit procedures and finalization of the 2014 and 2015 audits and which are the following:
>
> • Clarity on the information provided to us pertaining to the underlying valuation assumptions used for the valuation of the Investment Property in Sint Maarten and the effect thereof on the available valuation reports. There is a significant difference in valuation between the draft CBRE report and those reports of both CEI en IEB; (...)

KPMG went on to suggest the following:

> • A formal conclusion on the valuation of the land at Mullet Bay which is the most significant asset covering the outstanding exposure of [Ennia Leven], [Ennia Schade] en [Ennia Zorg]. Due to the significant valuation difference between the 3 valuators hired by Ennia, we have proposed to the Management Board of Ennia to arrange a process in which the three current valuator will receive the same relevant information, documentation and assumptions (timeline of the sale, premises, cadastral recherché, time horizon of sale or development, sale in bulk, or in pieces of land etc.) and under guidance of an independent knowledgeable party come to a well-supported fair market value of the land at Mullet Bay; (...)

KPMG's proposal was not implemented. The audit assignment to KPMG was withdrawn.

*Dividend payments*

> *Accusations Ennia et al.: the distributions could not and should not have taken place at a correct valuation of Mullet Bay, the necessary decisions have not always been taken as required by the articles of association*

2.86. In the period 2009 to 2015, Parman International made withdrawals from Ennia et al. by having (dividend) distributions made on shares it held in (first) Banco di Caribe and (subsequently) Ennia Holding. Ennia Holding's articles of association contain the following provisions on making (dividend) distributions:

Article 12

1. Annually such amount may be written off from the assets of the corporation and/or may such amount or amounts be reserved for special purposes, as shall be deemed advisable by the managing board subject to the approval of the Supervisory Board.
2. The Supervisory Board shall determine which portion of a surplus balance of the profit and loss account the company profits shall be added to the reserves.
3. The then remaining surplus balance of the profit and loss account shall be considered as profits available for distribution.
4. (..)



case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 27
date of judgment: 29 November 2021

7.   Resolutions concerning an addition of profits to the reserves in whole or in part, shall only be adopted in a General Shareholders' Meeting at which all outstanding priority shares A are represented and provided that on all-such shares vote was cast in favour of the proposal, unless the preferential dividend of nine percent (9%) of the year concerned and all the previous years was distributed on the priority shares A.

8.   The managing board is authorized after prior approval form the meeting of the holders of the priority shares A, to distribute interim dividends as an advance payment in anticipation of the profits to be expected, such with due observance of the preferential rights of the holders of the priority shares A.

(...)

Article 14

If it appears from the confirmed and adopted profit and loss account in any given year, that the corporation sustained a loss in said financial year, which cannot be covered from the reserves, or be redeemed in any other way, no dividends shall be distributed in the subsequent years, until such loss has been cleared off.

(...)

2.87. In the period from 2011 up to and including 2015, a number of shareholder resolutions or management decisions were taken regarding various (forms of) distributions to the Ennia Holding shareholder. These concern payments totalling NAf 33 million and USD 76,406,343.

2.88. On 27 July 2012, Mr R. Beaujon, secretary of Ennia Holding, (hereinafter: Beaujon) and Andraous had contact via email. Beaujon first of all wrote:

(...) With my apologies for possibly spoiling your day, there are no 2012 shareholders' resolutions signed by the (Priority A) or Common (B) shareholder [Parman International].
However:
Attached is the April 2012 resolution authorizing the tax distribution signed by the Management Board.
*This should be (should have been) preceded by pre-approval of the general meeting of shareholder A according to article 11 paragraph 8 of the articles of incorporation. Note that the articles do not explicitly mention that said approval should be by resolution.*
and:
again with my apologies for being repetitious, we still do not have a resolution by the shareholder approving the 2011 Financial Statements of [Ennia Holding] and other related items (appointment Directors, appointment Auditor, etc.) (...)

Andraous:

(...) Thi[s] is even better (...)

Beaujon:

I don't understand!?

Andraous:

It is better that there are no resolutions



case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 28
date of judgment: 29 November 2021

2.89. By email of 2 April 2014, Breedijk sent the following message to (among others) Andraous and Palm regarding the payment of dividend:

> All, I consulted with Miranda yesterday. According to her the dividend is in conflict with the articles of incorporation. The law is not specific about this matter. She recommended to take a new resolution in which the attached dividend is annulled and that the $10M is distributed as a return of share premium. (...)

*Donations*

> *Accusations Ennia et al.: the donations are excessive and have no connection at all with Ennia et al. or the region in which Ennia et al. operates*

2.90. In the years 2010, 2011, 2013 and 2014, donations totalling NM 20,791,679 were made from Ennia Investments and Ennia Holding. These concern donations to the United Peace Institute (NAf 11,830,000), Museum of Fine Arts (Naf 2,184,000), Points of Light (NAf 1,456,000), Taking Charge Foundation (NAf 728,000), Pentagon Memorial Fund (NAf 546,000), James Baker Institute (NAf 1,001,000), International Crises Group (NAf 455,000), Ansary Foundation (NAf 389,470) and the Cesar Foundation (NAf 382,500). With the exception of the Cesar Foundation in Sint Maarten, the charities concerned are based in the United States. In addition, donations were made to President G.W. Bush jr (NAf 1,820,000).

2.91. With regard to a donation to the Cesar Foundation of NAf 45,500, Van Doorn informed Beaujon by email of 25 February 2010:

> Do you want to initiate this donation without revealing further details (so without forwarding this mail)? On [Ennia Investments], of course. (...)

*Payments to advisers and persons not working for Ennia*

> *Accusations Ennia et al.: Ennia et al. unduly paid advisers and other persons who did not work in the interests of or for Ennia et al.*

2.92. From various entities of Ennia et al., amounts were paid to advisers of Ansary and Parman International in the years 2006 up to and including 2017. The invoices of the relevant advisers (including Henze) were forwarded by Ansary to Andraous. In most cases, payment was made from Ennia Investments. The total amount involved was NAf 6,136,250.

2.93. In the period from 2008 up to and including 2018, an amount of NAf 10,805,610 was paid by (various entities of) Ennia et al. in salaries of persons who did not have employment contracts with Ennia et al. These individuals were mostly associated with (other companies of) Ansary.

case numbers: CUR201903842/3843/3796/3844/3845/3846          page 29
date of judgment: 29 November 2021

2.94. In addition, between January 2011 and November 2017, amounts were paid to Ansary's (personal) assistants, mainly from Ennia Holding and Ennia Investments. The total amount involved was NAf 901,980.

2.95. A total of NAf 17,843,840 was paid to advisers and persons who did not work for Ennia entities, as shown in the table below.

| Beneficiary | period | paid by | total payment (NAf) |
|---|---|---|---|
| PWC Houston | 2007-2017 | Ennia Investments | 1,700,000 |
| A. Petrello | 2014 | Ennia Investments | 3,640,000 |
| Henze | 2016-2018 | Ennia Investments | 796,250 |
| Andy Wescot | 2008-2018 | NIB | 3,513,078 |
| Clarence Derby | 2008-2018 | Ennia Investments Ennia Holding | 3,845,575 |
| Evan Tromp | 2010-2017 | Ennia Investments Ennia Holding | 2,544,977 |
| Kelly Cifford | 2011-2017 | Ennia Investments Ennia Holding | 235,320 |
| Aghili Cyrus | 2011-2017 | Ennia Investments Ennia Holding | 233,811 |
| Elisabeth Leos | 2011-2017 | Ennia Investments Ennia Holding | 165,221 |
| Chris Archie | 2011-2017 | Ennia Investments Ennia Holding | 140,184 |
| Caspian Tavalli | 2011-2017 | Ennia Investments Ennia Holding | 127,444 |

*Remuneration of the Supervisory Board and travel and accommodation expenses*

> *Accusations Ennia et al.: the allowances and travel and accommodation expenses of the Supervisory Board of Ennia et al. are disproportionate*

2.96. Around the time of the takeover of Ennia in 2005/2006, the (standard) remuneration for supervisory directors at Ennia et al. was NAf 52,780 gross per annum. A memo on the supervisory directors' fees for the year 2006 states that the existing supervisory directors, as well as the new ones, should receive an amount of net USD 6,250 (NAf 11,375) per quarter.

2.97. In the period from 2006 up to and including 2018, (a number of) supervisory directors of Ennia Holding received bonuses in addition to the fees. A total of NAf 18,659,504 in fees and bonuses was paid to supervisory directors, as shown in the table below.

case numbers: CUR201903842/3843/3796/3844/3845/3846                 page 30
date of judgment: 29 November 2021

| Supervisory director | period | total remuneration |
|---|---|---|
| Nina Ansary | 2009-2018 | 1,301,380 |
| Frank Carlucci | 2006-2018 | 1,573,738 |
| James Crystal | 2006-2018 | 1,573,738 |
| Robert de Paus | 2016 | 67,420 |
| Richard Gibson | 2006-2014 and 2018 | 7,771,303 |
| Clark Gomes Casseres | 2008-2016 | 1,560,150 |
| Jack Kemp | 2006-2009 | 281,479 |
| John Macomber | 2006-2018 | 1,573,738 |
| Jaime Saleh | 2008-2018 | 2,956,557 |

2.98. The travel, accommodation and meeting expenses of Ennia Holding's Supervisory Board for the period 2006 to 2018 amounted to approximately NAf 4,437,203.

2.99. The frequency of meetings was two to three times a year.

*Buy-out owners of destroyed Mullet Bay apartments*

> *Accusations Ennia et al.: also in view of the value of Mullet Bay, too high an amount was charged for the buy-out*

2.100. On 20 July 2006, an agreement was concluded between Resorts Caribe, SunResorts and Ennia Investments, based on which the rights of SunResorts from a settlement agreement (between SunResorts and apartment owners whose apartments were destroyed by hurricane Luis in 1995) were transferred to Resorts Caribe. SunResorts would be entitled to 20% of Resorts Caribe's pre-tax profits annually. The aforementioned settlement agreement included the sale of apartment rights by the apartment owners.

2.101. On 29 September 2006, Resorts Caribe paid the purchase price of USD 31,714,000, thus acquiring the economic ownership of the apartments and the accompanying land. Also on 29 September 2006, an amount of USD 35 million was transferred by Ennia Investments to Resorts Caribe. The remaining money, as well as a payment from the insurer of USD 6 million, was used on 12 March 2007 to buy off the right of SunResorts to 20% of the profit for an amount of USD 8.5 million.

*NetJets*



> *Accusations Ennia et al.: the use of private aircraft is unnecessary for an insurer like Ennia et al. and the costs are too high; moreover, Ansary used the aircraft privately*

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 31
date of judgment: 29 November 2021

2.102. In 2007 and 2008, Ennia Investments participated in two aircraft from the NetJets fleet. NetJets is an American airline that focuses on providing private flights. Ennia Investments paid an amount of NAf 9,168,250 for it. On 31 January 2014, an agreement was signed between Ennia Investments and (entities from) the NetJets Group to purchase a 12.5% stake of the rights regarding a Cessna and a 12.5% stake for the rights regarding a Bombardier. A purchase price of NAf 4,649,792 was paid for this on 10 December 2014 (after trading in the old shares). The guarantee deposit of NAf 728,000 for the old aircraft was paid back to Ennia Investments. In the aforementioned agreement, on NetJet Group's part Ansary was included as an 'owner's principle contact'.

2.103. Ennia Investments paid an average of about NAf 2,000,000 per year for the use of the aircraft in the period 2007 to 2017.

**3.      The claims**

3.1.      By application, Ennia et al. claimed in the first instance - in brief - to rule that all the defendants, or all the defendants considered eligible by the Court, be jointly and severally (or individually) liable for the damage suffered and yet to be suffered by Ennia et al. as a result of the unlawful conduct of those defendants, with reference to the follow-up proceedings for the determination of damages.

3.2.      By Reply, the damage was made more specific and the claim was amended, whereby the primary calculation of damage was based on a comparison of Ennia et al.'s solvency position with and without the violation of standards by the defendants. The alternative calculation of damage was based on concrete damage which, according to Ennia et al., resulted from the individual acts of behaviour they are accused of.

3.3.      Prior to the oral arguments, a change of claim was submitted in the sense that Ennia et al. requested that the primary calculation of damage be disregarded. Finally, prior to the oral arguments, a motion containing a request for a reduction of claim was submitted, in the sense that a correction/reduction of NAf 166,714,613 be applied to the claimed (alternative) calculation of damage.

3.4. The changes of claim were presented and allowed at the hearing of 14 and 15 October 2021. The claims formulated below are the claims as they read after the amendments.



case numbers: CUR201903842/3843/3796/3844/3845/3846      page 32
date of judgment: 29 November 2021

3.5.      Ennia et al. claims that the Court by provisionally enforceable judgment,

I

*principally*
     a) rule that all the defendants, or all the defendants considered eligible by the Court, are jointly and severally liable for the damage suffered and yet to be suffered by Ennia et al. as a result of the unlawful conduct of those defendants; and

     b) order the defendants jointly and severally
       i.    to pay compensation to Ennia et al. and determine the extent of the damage to be compensated at the sum of concrete damage items, as described in paragraph 8.3 of the Reply, which sum amounts to NAf 1,128,710,198 or at least NAf 912,051,306, or a minimum of NAf 600,591,305; to be increased by the statutory interest as described in paragraph 8.4 of the Reply, or at least
       ii.    to pay compensation to Ennia et al. to be assessed during separate follow-up proceedings and to be settled in accordance with the law;

*in the alternative, in the event that the principal claim is not upheld, or at least not awarded against each individual defendant,*

     a) rule that each defendant (individually) is liable for the damage suffered and yet to be suffered by Ennia et al. as a result of the unlawful conduct; and

     b) order Ennia et al. to pay compensation, fixing the extent of the damage to be compensated at:
       i.    the sum of concrete damage items, as described in paragraph 8.3 of the Reply, which sum amounts to NAf 1,128,710,198 or at least NAf 912,051,306, or a minimum of NAf 600,591,305; to be increased by the statutory interest as described in paragraph 8.4 of the Reply, or at least
       ii.    to pay compensation to Ennia et al. to be assessed during separate follow-up proceedings and to be settled in accordance with the law; and

     c) order the other defendants (individually) to pay compensation to Ennia et al., to be assessed during separate follow-up proceedings and to be settled in accordance with the law;



case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 33
date of judgment: 29 November 2021

Ennia Holding further claims that the Court, as far as possible by provisionally enforceable judgment:

*in the further alternative, if and in so far as the principal and alternative claims are dismissed or awarding the principal and alternative claims does not lead to liability of the defendants (jointly and severally or each defendant individually) for the entire amount of the withdrawals as referred to in paragraph 4.4 of the application and paragraph 8.3.2 of the Reply,*

> order Parman International and the other defendants - in so far as they are shareholders of Parman International - (each individually) on grounds of unjust enrichment or undue payment, to (re)pay to Ennia Holding an amount equal to the part of those withdrawals that do not qualify for compensation on the basis of the principal and alternative claims, to be increased by the statutory interest as described in paragraph 8.4. of the Reply;

II

> a) order the defendant jointly and severally to pay the costs incurred by Ennia et al. to prevent or limit the damage, to be assessed during separate follow-up proceedings and to be settled in accordance with the law; and

> b) order the defendants jointly and severally to pay the costs incurred by Ennia et al. to establish the damage and liability, to be assessed during separate follow-up proceedings and to be settled in accordance with the law;

> both a) and b) to be increased by statutory interest as described in paragraph 8.4 of the Reply, and

> c) order the defendants jointly and severally to pay the costs of these proceedings, determining that the costs of the proceedings be paid within two weeks after the date of the final judgment, as well as the usual subsequent costs, to be increased by the statutory interest as referred to in Article 6:119 of the Civil Code from two weeks after the date of the judgment.

## 4.      The basis of the claims and the defendants' defence

*factual bases*
4.1.     Ennia et al. accuses the defendants, in brief, of not having considered the interests of Ennia et al. and those of the policyholders, but other (own) interests. Firstly, the defendants are accused of the fact that Ansary did not strengthen but

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 34
date of judgment: 29 November 2021

weaken Ennia et al.'s capital because Ennia et al. pursued an (investment) policy
unsuitable for an insurer; because Ansary, from taking up his position in 2006,
together with Van Doorn, Andraous and Palm, took over control of the assets; and
because, through changes in the governance and corporate structure, they
subsequently withdrew these assets from the control of the insurers and the
supervision by the internal and external supervisors. The assets were transferred
from the insurers to Ennia Holding and Ennia Investments, creating large
intercompany receivables that were often not (sufficiently) secured, also in view of
the level of investments. Secondly, the defendants are accused of making
investments that were too risky and not appropriate for an insurer. The investment
in Mullet Bay was structurally (artificially) overvalued and, moreover, did not yield
any dividends or interest. Moreover, the financing (and thus the risk) of the
investments was borne by Ennia et al., whereas the benefits, for example in the case
of the S&S transaction, were largely withheld from Ennia et al. but flowed to Ansary
and parties affiliated to him instead. In addition, Ansary et al. withdrew large
amounts from Ennia et al. in the form of dividends and other capital withdrawals.
Apart from this, various payment were wrongly charged to Ennia et al., such as
substantial donations to purposes that had nothing to do with Ennia et al.

*legal bases*

4.2.   Ennia et al. has based its claims primarily on the fact that the defendants, as a
group, have acted unlawfully vis-à-vis Ennia et al. and, pursuant to Article 6:166 of
the Civil Code (group liability) are jointly and severally liable for the damage
suffered by Ennia et al. as a result of the acts of behaviour they are accused of. All
the defendants contributed in their own way to the acts of behaviour they are
accused of, which created a risk of damage to Ennia et al. and there was a deliberate
connection between the acts of behaviour. There was a chance that the acts of
behaviour would result in damage to Ennia et al. and that chance should have
dissuaded the defendants from their conduct. The participation in the group action
can be attributed to each individual defendant as an unlawful act, according to Ennia
et al. Moreover, the damage suffered by Ennia et al. was the result of the acts of
behaviour of (at least) one of the group members, so that all requirements for group
liability have been met.

4.3.   In the alternative, according to Ennia et al., unlawful conduct and
mismanagement and improper supervision are involved. The defendants acted in
various capacities, namely that of de facto director, director under the articles of
association, supervisory director and/or shareholder. The acts of behaviour the
defendants are accused of are of such a nature and seriousness that, irrespective of
the criterion to be applied, they are liable vis-à-vis Ennia et al. With regard to the
individual defendants, Ennia et al. states the following.

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 35
date of judgment: 29 November 2021

- Throughout the entire period, Ansary acted as a quasi-director of Ennia et al. and in that capacity and as director of Ennia Investments and chairman of the investment committee, is liable vis-à-vis Ennia et al. Ansary is also liable because he did not properly perform his duties as a supervisory director. Given the extent of his influence and involvement, he is also liable under the general standard of Article 6:162 of the Civil Code.
- Nina Ansary was a supervisory director of Ennia Holding, among other things. She could be expected to focus on the interests of Ennia et al. In view of the principle of collegiate supervision, she is liable for the improper performance of duties by the supervisory board.
- Parman International has contributed to the unlawful promotion of Ansary et al.'s interest at the expense of Ennia et al. Parman International acted unlawfully not only vis-à-vis Ennia Holding, from which the sums were directly withdrawn, but also vis-à-vis the insurers, who were left with uncollectable debts as a result of the withdrawals. Therefore, Parman International is in any case liable on the basis of the general standard of due care as referred to in Article 6:162 of the Civil Code.
- Andraous is liable to Ennia et al. as a formal director, as a quasi-director and as a member of the investment committee. Should his actions not be considered as the actions of a director, Andraous' acts of behaviour should not be tested against the standard of serious culpability, but against the general standard of due care of Article 6:162 of the Civil Code.
- Palm was a director under the articles of association of Ennia Holding and the insurers as from 2011 and of Ennia Investments as from 2012. He was also a member of the investment committee. Before becoming a director, he was involved in Ennia et al. as an adviser. In all these capacities Palm is liable.
- Van Doorn is liable vis-à-vis Ennia et al. as chairman of the board of Ennia Holding, Ennia Investments and the insurers and as a member of the investment committee. Most of the acts of behaviour the defendants are accused of took place in the period that Van Doorn was a director. Van Doorn acted seriously culpably because he did not put the interests of Ennia et al. first. He is therefore liable vis-à-vis all claimants for the damage suffered.

4.4. Ennia Holding has based its claim in the further alternative against Parman International on the fact that the amount of the withdrawals had to be (re)paid on the grounds of undue payment or unjust enrichment. Ansary et al., or at least the (indirect) shareholders of Parman Capital and Parman International, have moreover been unjustly enriched as a result of the withdrawals and the S&S transaction.

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 36
date of judgment: 29 November 2021
_____

*Ansary et al.'s defences*

4.5.   Ansary et al. brings forward against Ennia et al.'s assertions that Ennia et al.
is a commercial undertaking and not an institution governed by public law. Ansary
et al. had sufficient knowledge and insight to run an insurance business and the
interests of the policyholders were central to this. By incorporating Ennia
Investments, the insurers were guarded against fluctuations in the market. Ennia
Investments was not supervised by the Central Bank and therefore did not have to
comply with the guidelines that applied to insurers. Contrary to Ennia et al.'s
assertion, Ansary et al. did most certainly strengthen Ennia et al.'s capital with the
contribution of the Mullet Bay plot. Even if no strengthening of capital were
involved, this would not lead to liability, since the contribution was a voluntary
choice by Ansary. Ansary et al. has taken control of the assets through the structures
required by proper corporate governance and corporate policy. The investment
policy of Ansary et al. was well thought out and sensible. Moreover, according to
Ansary et al., Ennia et al. did not make sufficiently clear in what respect the
investment policy would not suffice and what criterion would (have to) be used for
this, and therefore Ansary et al.'s policy cannot be tested against it. Mullet Bay
was valued several times and the valuation was not kept artificially high. Nor has the
value of Mullet Bay been used to make unacceptable withdrawals or incur excessive
costs on the basis of the valuation. Ennia et al. were able to spend more because
there were more profitable investments. Contrary to what Ennia et al. asserts, Ennia
et al. benefited proportionately from the investment in S&S. Ansary et al. therefore
cannot be blamed for that either.

4.6. Ansary et al. furthermore argues that there can be no question of group liability,
since the requirement of acting in a group has not been met. Each defendant has had
their own sufficiently described and defined role within Ennia et al., working
together in varying combinations. No group as referred to in Article 6:166 of the
Civil Code was involved.

4.7.   With respect to the unlawful conduct and mismanagement and supervision
asserted by Ennia et al., Ansary et al. first of all takes the position that Ennia et al.
only involved a selective part of the directors and supervisory directors in the
proceedings and also wrongly instituted the claims from Ennia et al. as a group,
without breaking down for each entity what damage was allegedly suffered as a
result of which acts or omissions. Ansary et al. puts forward the following defence
against the roles of the various defendants as alleged by Ennia et al.
   -   Ansary did not act as a quasi-director and is not liable. Ansary, as chairman
       of the Supervisory Board and chairman of the investment committee, acted
       within the powers he had in that context. Ansary cannot be blamed because
       he did not act against the interests of Ennia et al., did not enrich himself

unjustly and certainly did not act with the aim of causing damage to Ennia et al.

- Nina Ansary did not act on the basis of a conflict of interests and no blame can be attributed to her either.
- Parman International has exercised sufficiently due care as a shareholder. The fact that Parman International's directors were also aware of the financial circumstances of Ennia et al. in other capacities, does not make that Parman International acted negligently. All withdrawals are based on board decisions or shareholder resolutions and the dividends have been approved by the auditor. No unlawful conduct is involved.
- Andraous has been involved with Ennia et al. in various capacities, but that does not make him a quasi-director. As a member of the investment committee, Andraous dealt with the investment policy. He has performed his duties as a director conscientiously and properly and contests any liability.
- Palm only joined Ennia et al. as a director in 2011. The fact that Palm had previously been involved with Ennia et al. as an adviser does not make him liable for the decisions made by the incumbent directors during that period. Palm has never benefited from the alleged withdrawals and expenses incurred and he has performed his duties as a director with due care and therefore cannot be blamed in any capacity or on any basis whatsoever.

*Van Doorn's defences*

4.8. Van Doorn contests that he acted unlawfully vis-à-vis Ennia et al. He takes the position that Ennia et al. wrongly involved him in the proceedings, which, according to Van Doorn, are in effect directed against Ansary. Van Doorn confronted Ansary on several occasions and tried (unsuccessfully) to raise his views on issues such as investments and solvency. Van Doorn cannot be blamed for Ansary's implementation of the promised capital injection through the contribution of shares. In the periods in which Van Doorn was a director of Ennia et al., the equity capital was always positive, even if a lower value of Mullet Bay is assumed.

4.9. Van Doorn also argued that he was not involved in the changes to the structure which according to Ennia et al. allegedly resulted in damage and deficits. The setting up of the investment committee was a decision of the Supervisory Board with the Central Bank's knowing. The same applies to the incorporation of Ennia Investments. That a number of the investments had an increased concentration risk



did not, in itself, result in damage. The damage alleged by Ennia et al. arose because the return from the participation in S&S largely did not end up with Ennia et al. Van Doorn cannot be blamed for this. The same applies to the withdrawals and other costs alleged by Ennia et al. That took place after Van Doorn resigned (for the second time) as director. Van Doorn was always granted discharge for his performance as a director.

4.10. The further assertions and defences of the parties, in so far as relevant to the assessment, will be discussed below.

## 5.    The assessment

### The right of action of Ennia et al.

5.1.    Ennia et al. submitted two assignment agreements together with its Reply. These show that on 9 October 2019 it was agreed between ECII Luxemburg and Ennia Investments that ECII Luxemburg would assign to Ennia Investments its claims against - among others - the direct and indirect shareholders of Ennia Holding that arose in the period 2005-2018. A similar assignment agreement was concluded between Energy Equipment International Ltd (hereinafter: Energy Equipment) and Ennia Investments on 19 March 2021. The deeds of assignment state that the agreements are governed by the law of Curaçao. Ansary et al. contends that the assignment agreements are too indeterminate and that notification of the assignment was wrongly only made by Reply (by submitting the agreement).

5.2. Pursuant to Article 3:94(1) of the Civil Code, the transfer of a claim requires a deed intended for that purpose, in which the claim to be transferred must be sufficiently specific. It is sufficient for that purpose that the deed contains such information that, possibly afterwards and supplemented by objective data, it can be determined what claim is involved. The fact that the deed does not state the exact claim does not preclude the claim from being sufficiently specific. ECII Luxemburg was established for tax reasons (only) for the benefit of the S&S transactions, so it is clear that the claim can only pertain to this and therefore there a sufficiently determinable claim is involved. The same applies to Energy Equipment, from which undertaking the oil rigs were purchased. Furthermore, in the event of a public assignment, the deed of assignment must be notified to the debtor by the assignor or assignee. The assignments have (also) been made known to Ansary et al. The fact that this could possibly have been done earlier does not prevent the assignments from being legally valid. Therefore, there are two legally valid assignments, so that Ennia Investments could bring the claims against Ansary et al.

**The assessment frameworks**

*law and articles of association*

5.3.    A peculiarity of this case is that, as also emphasised by Ansary et al., in essence it involves proceedings in which Ansary's own companies are suing Ansary (among others) for damages and that any amounts to be awarded against Ansary would accrue to those same companies, and thus indirectly to Ansary himself. Another peculiarity is that Ennia et al. now accuses the defendants of matters that were often initiated by and/or had the consent of directors, supervisory directors and shareholders of Ennia et al. However, these peculiarities do not detract from the fact that, in so far as relevant to the claims and accusations in question, the provisions of the articles of association and the law that apply to, among other things, decision-making within legal entities, apply in full. The special nature of the business of Ennia et al. also plays a role in this context.

*the (nature of the) business*

5.4. The insurers (Ennia Schade, Ennia Zorg and Ennia Leven) are supervised by the Central Bank on the basis of the LTV. Article 34 of the LTV states, *inter alia*, that an insurer is obliged to maintain adequate technical provisions. Paragraph 2 of that article goes on to state:

> The technical provisions must be fully covered by assets. The Bank may object to the nature and valuation of these assets, which objection the insurer shall meet.

The Explanatory Memorandum to this article states, *inter alia*:

> A mandatory requirement to conduct a technically sound insurance policy is the establishment of adequate technical provisions. The supervision of these insurance companies should therefore focus, to a large extent, on the correct calculation of these provisions. Technical provisions represent the value of the present and future liabilities arising from existing insurance contracts. These liabilities must be fully secured by matching assets (...).

5.5. Regarding the solvency margin, Article 36 LTV states that a life insurer must have a solvency margin of at least four per cent of the provision for persons subject to compulsory insurance. A non-life insurer must have a solvency margin of at least 15 per cent of the gross premium written in the preceding financial year. In Article 36(3) and (4) LTV go on to say:

> 3.  However, the solvency margin shall be at least an amount to be determined for life insurers and non-life insurers respectively by national decree laying down general measures.
> 4.  In a model statement to be established pursuant to Article 26(6) it is



case numbers: CUR201903842/3843/3796/3844/3845/3846          page 40
date of judgment: 29 November 2021
_____

> determined which assets are eligible for the solvency margin, which assets are to
> be deducted in this context, and the extent to which and the conditions under
> which all this takes place. The Bank may object to the valuation of the assets (...)

The Explanatory Memorandum to this Article states, *inter alia*:

> In addition to the technical provisions, the insurer must have a buffer reserve, the
> so-called solvency margin. This concept is also used internationally (...) and
> indicates that it involves a necessary safeguard that an insurer must have.

Article 54 LTV states:

> An insurer whose solvency margin does not satisfy the requirements referred to in
> Article 36(1)-(3) shall notify the Bank within the period and in the manner as
> determined by the Bank of the assets referred to in Article 35. It shall immediately
> inform the Bank in writing of any subsequent change in these assets.

5.6. The insurers have a large local market share, namely 50% of the insurance
market in Curaçao, Sint Maarten, Aruba and Bonaire and 80% of the private pension
market in Curaçao. This means that many people depend on the insurers for their
benefits. The insurers must therefore ensure that sufficient financial resources are
available both for the short term (liquidity) and for the long term (solvency) in order
to pay out insured benefits. This also follows from the (Explanatory Memorandum
to the) LTV, which includes the principle of the protection of the interests of the
insured and other beneficiaries of insurance benefits.

5.7. The increased standard of care to be observed when it comes to a business such
as a (bank or) insurance company also follows from case law. In a decision of the
Enterprise Chamber in Amsterdam of 12 October 2016
(ECLI:NL:GHAMS:2016:4056, *Delta Lloyd*), the Enterprise Chamber held that Delta
Lloyd's position that its insured and policyholders are among the most important
stakeholders and that Delta Lloyd therefore has to take into account not only the
interests of the shareholders, does not demonstrate an incorrect understanding of
the interests to be taken into account by the management board in the performance
of its duties. A decision by the Enterprise Chamber of 5 April 2012
(ECLI:NL:GHAMS:2012:BW0991, *Fortis*) also states that the Fortis management
board had to take into account the interests of those who had entrusted their
interests to Fortis. Furthermore, the decision stated, *inter alia*:

> 4.3. (...) The freedom of the management board (...) is also influenced by the
> nature of the business and the extent to which the various stakeholders and - in
> some cases - society as a whole have an interest in the results of that policy. In view
> of the nature of the business conducted by Fortis, including that of a bank, and in
> view of the interests involved, the management board has a special duty of care to
> always carefully and adequately monitor, assess and include these risks in its
> policy considerations, decision-making and actions.

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 41
date of judgment: 29 November 2021

(...)
4.5. (...) The greater the responsibility resting on a legal entity or person (in a
particular area), the more closely he will also have to pay attention, so that he
does not miss any facts and circumstances that are relevant for the pursuit of a
responsible policy, and he will therefore have to base his decision-making on the
careful provision of information, analysis and assessment (...). The above-
mentioned social interest (...) significantly raises the standard for what could
be expected of such legal entity and its bodies in this regard in the context of
prudent management and risk control.

5.8. Ennia Investments was incorporated with the aim of concentrating its direct
investments and indirect investments in one entity. The investment funds came
largely from the insurers, resulting in intercompany receivables between Ennia
Investments and the insurers. In view of this, the insurers were dependent on Ennia
Holding and Ennia Investments for their financial position. Ennia Investments is not
an insurance company as such and was therefore, in principle, not supervised by the
Central Bank. The same applies to Ennia Holding. Both entities were nevertheless
placed under the emergency regulations. The following was ruled on in this Court's
decision of 4 July 2018 (ECLI:NL:OGEAC:2018:160):

3.10. (...) It has become plausible that Ennia's insurance business is carried out
jointly by all the defendants, with [Ennia Investments] acting as an entity into which
the underlying assets (largely derived from contributions paid by policyholders)
have been transferred, and with [Ennia Investments and Ennia Holding] managing
the funds and assets for the benefit of policyholders, insured persons or other
beneficiaries of benefits.
It is uncontested that 82% of the assets of [Ennia Leven, Ennia Zorg and Ennia
Schade] consist of loans to and receivables from affiliated entities, totalling
approximately NAf 1.5 billion. The Central Bank argued that the primary purpose of
the emergency regulations was to restructure Ennia and thereby restore its solvency.
According to the Central Bank, this is only possible if the Central Bank is put in a
position to undo the present indirect investment arrangement and have the
underlying assets of the insurance business at its disposal. It has become plausible
that emergency regulations without [Ennia Investments and Ennia Holding] would
hardly serve the interests of Ennia's joint creditors (...)

5.9. In the judgment in preliminary relief proceedings of 31 January 2019
(ECLI:NL:OGEAC:2019:15) between Parman International and the Central Bank, the
Court addressed Parman International's contention that the emergency regulations
were wrongly also imposed on Ennia Holding and Ennia Investments, as these are
not entities under the Central Bank's supervision and the Central Bank would not be
able to derive powers from the LTV vis-à-vis them. In preliminary relief proceedings



case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 42
date of judgment: 29 November 2021

it was held that Ennia Holding and Ennia Investments were also to be regarded as insurers to which the emergency regulations could be declared applicable. The Court agrees with the relevant considerations, quoted below.

> 4.21. According to Article 60(1) LTV, [the Central Bank] may request the application of the emergency regulations in relation to an "insurer", i.e. "any person who conducts insurance business" (Article 1(1)(g) LTV). The [Central Bank's] powers of supervision are focused on the protection of the joint policyholders (or other creditors). On the basis of this rationale, the Court considers that the term "insurer" is a substantive concept, in the sense that any undertaking which is effectively engaged in insurance business must be considered an "insurer" within the meaning of the LTV. This means that an organisation divided into several legal entities may be considered to be a single insurer if it is established that these legal entities jointly conduct insurance business. (...)
>
> 4.22. In the present case, the Ennia Group is structured in such a way that the vast majority of the Insurers' assets consist of receivables from [Ennia Leven] and [Ennia Investments] and that the latter are entrusted with the management of the assets entrusted to them. It is not disputed - as [Parman International] itself has repeatedly emphasised in these proceedings - that without such asset management an insurer cannot operate its business in an economically sound manner. It follows that the activities of the Insurers cannot be seen separately from those of [Ennia Holding and Ennia Investments]. This means that the Insurers and [Ennia Holding and Ennia Investments] must jointly be regarded as "insurer" within the meaning of the LTV.

5.10 In conjunction with this, the Court holds that Ennia Investments and Ennia Holding had a special duty of care comparable to that of the insurers.

5.11. In summary, therefore, while Ennia et al. is a commercial undertaking, as emphasised by Ansary et al., given the nature of the business and its social importance, it has to exercise a higher standard of care. The standard for what could be expected from Ennia et al. and its bodies in this respect in terms of prudent management and risk control is thereby raised. Ansary et al.'s assumption that a director of Ennia et al. should exercise the same degree of care as a director of a "small supermarket" (hereafter: the supermarket defence) is therefore entirely incorrect.

*the directors*

5.12. Ansary, Van Doorn, Andraous and Palm have all been involved with Ennia as directors. The law imposes a number of (general) obligations on directors. Book 2 of the Civil Code was amended on 1 January 2021. This amendment is therefore not applicable to the directors in this case; therefore to the extent reference is made to



articles of law, the reference pertains to the provisions of law previously in force.

5.13. Ansary, Van Doorn, Andraous and Palm, in their capacity of directors, were charged with the management of the legal entity (Article 2:8(2) of the Civil Code) and were in that capacity responsible for the strategic and financial policy to be pursued, the risk policy, keeping proper records and compliance with regulations, including the solvency requirements (as these follow from the LTV) and the guidelines and instructions of the Central Bank. As directors, they were required to perform their duties in the interests of Ennia et al. (Article 2:8(3) of the Civil Code). This means that, as directors, they (also) had to take into account the interests of, *inter alia*, the policyholders and the public interest, given the nature of the business. In a judgment of 4 April 2014 (ECLI:NL:HR:2014:799, *Cancun Holding II*), the Supreme Court considered, *inter alia*, that:

> 4.2.1. In the performance of their duties the directors shall be guided by the interests of the company and its business (...). What that interest entails depends on the circumstances of the case. If a business is linked to the company, the company's interest is usually determined primarily by the promotion of the continuing success of that business. (...)
> 4.2.2. In the performance of their duties, directors must furthermore, partly by virtue of the provisions of Article 2:8 of the Civil Code [NL], exercise due care in respect of the interests of all those involved in the company and its business. (...) This duty of care may require directors, when serving the interests of the company, to ensure that the interests of all those involved in the company or its business are not unduly or disproportionately harmed as a result.
> 4.2.3. Each director is obliged to act in accordance with the interests of the company and its business and to exercise due care towards all those involved in the company and its business, regardless of whether a director is appointed by or on the recommendation of the meeting of shareholders of a certain type or designation.

5.14. Each director is bound towards the legal entity to properly fulfil his task within the scope of his employment (Article 2:14(1) of the Civil Code). The articles of association of Ennia et al. do not contain any provisions on the basis of which certain management tasks are assigned to one or more directors. This means that the directors were responsible for all management tasks pursuant to Article 2:14(2) of the Civil Code, which also follows from Article 2:14(3) of the Civil Code. This article also states that every director is obliged to contribute as much as possible to averting the consequences of an act that causes damage. Pursuant to Article 2:14(4) of the Civil Code, all directors are jointly and severally liable. However, a director who proves that he cannot be seriously blamed for the improper performance of his duties, also in view of the scope of his employment and the period during which he was in office, and that he was not negligent in taking measures to avert the

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 44
date of judgment: 29 November 2021

consequences thereof, is not liable.

5.15. In assessing whether serious misconduct is involved, the circumstances of the case are relevant, which may include the nature of the activities carried out by the legal entity, the risks arising from them in general, the division of tasks within the board, any guidelines applicable to the board, the information which the director had or should have had at the time of the decisions or conduct for which he is criticised, and the understanding and care which may be expected of a director who is capable of doing his job and performs it conscientiously. Liability arises if no right thinking director - under the same circumstances - would have acted in this way. In a ruling of the Supreme Court of 29 November 2002 (ECLI:NL:HR:2002:AE7011, *Schwandt v. Berghuizer Papierfabriek*), it was considered, *inter alia*, with regard to acting in conflict with the articles of association:

> 3.4.5 (...). For liability under Article 2:9 of the Civil Code [NL], it must be possible to attribute serious blame to the director. Whether serious blame is involved must be assessed in the light of all the circumstances of the case. The circumstance that the director acted contrary to provisions in the articles of association that are intended to protect the legal entity should be regarded as a serious circumstance in this context, which in principle establishes the director's liability. However, if the director thus challenged has put forward facts and circumstances on the basis of which it could be assumed that the challenged conduct contrary to the provisions of the articles of association does not constitute serious blame, the court must expressly take these facts and circumstances into account in its assessment. (...)

5.16. In Article 8(10) and (11) of Ennia Holding's articles of association it is provided that the board requires the prior approval of the supervisory board for a number of specifically mentioned decisions, including decisions to participate in the capital of other companies for more than 5%, to conduct all transactions involving a financial interest of 5% or more of the company's assets and to contract loans for the account of the company.

5.17. A director can also be liable towards others than the legal entity of which he is director, for example in case of a culpable act or omission towards a third party by the director which can be considered as an unlawful act within the meaning of Article 6:162 of the Civil Code. In that case, too, the criterion for directors' liability is whether it is possible to attribute sufficiently serious blame to the director (personally).



case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 45
date of judgment: 29 November 2021

*the de facto director(s)*

5.18. Article 2:138 of the Civil Code (for a public limited company (*NV*)) and Article
2:238 of the Civil Code (for a private limited company (*BV*)) provide that a person
who, without being a member of the board, for a certain period or under certain
circumstances, whether or not by virtue of a regulation applicable to the company,
determines or co-determines the policy of the company as if he were a member of
the board, shall be deemed to be a member of the board with regard to such action
and with regard to his obligations towards the company and third parties, as well as
for the application of Article 9. The Explanatory Memorandum to Article 2:138 of the
Civil Code includes the following:

> Article 138 is derived from Article 49 LBV [National Ordinance on the Private
> Limited Company]. The word 'acts' in the first paragraph of Article 49 LBV has
> been replaced by "determines or co-determines the policy of the company" in
> order to be consistent with the terminology of Article 16(9). A person who meets the
> criterion of Article 138 falls a fortiori under Article 16(9), and thus under Article 16 as
> a whole. Meanwhile, the text of Article 138 shows that he can be a director even
> outside the case of bankruptcy referred to in Article 16. As explained in the
> Explanatory Memorandum to Article 16, a person who enforces a certain policy by
> giving instructions may also be considered a policymaker within the meaning of the
> ninth paragraph of that Article. That is also true here. (...)

Article 2:16 of the Civil Code, mentioned in the Explanatory Memorandum, contains
the provisions relating to the bankruptcy of the legal entity. The provisions of Article
2:16 of the Civil Code are largely identical to the provisions of Articles 2:138 and
2:238 of the Civil Code [NL].

5.19. It therefore follows from the text of (and the Explanatory Memorandum to)
Articles 2:138 and 2:238 of the Civil Code that the person who, as if he were a
director, (co-)determines the policy of the company is considered to be a director.
Unlike in Dutch law, this designation as a director is not limited to the situation in
which the legal entity has gone bankrupt. This means that a person who acts as if he
were a director (described by Ennia et al. as a quasi-director, hereinafter to be
referred to by the Court as: de facto director) should be subject to the legal rules for
directors. In view of this, a de facto director, like the formal director(s), is obliged to
properly perform his duties and is (jointly and severally) liable in case it is possible
to attribute serious blame to him.

5.20. Ennia et al. has claimed that Ansary and Andraous and Palm acted as
de facto directors outside the period(s) in which they were appointed as
formal directors.

5.21. Ansary was a director of Ennia Investments in the period from July 2006 up to
and including April 2007. Ansary disputes that he can be considered a de facto
director outside that period. He argued that he had always acted within the formal
roles he had within Ennia et al., namely as chairman of the Supervisory Board and as
chairman of the investment committee.

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 46
date of judgment: 29 November 2021

5.22. It is uncontested between the parties that the investment committee set up by the Supervisory Board was given the power to take all decisions regarding investments of Ennia Holding and the insurers. Regardless of the question whether the Supervisory Board was authorised to take this decision, it follows from this decision that the investment committee gained significant control of the financial situation at Ennia et al. After all, Ennia's policies were largely determined by its direct investment and indirect investment decisions. Ansary has disputed that any blame can be attributed to him in this regard. However, Ansary did not dispute (with reasons) that, as stated by the legal counsel, he consulted daily with the chairman of the board of Ennia et al. and that Ansary gave instructions to the board. Van Doorn confirmed this course of events and stated that Ansary determined the policy of Ennia et al. Supervisory Board member De Paus also mentioned this in the conversation with the Central Bank in November 2016, of which minutes have been submitted.

5.23. Particularly in view of the far-reaching powers assigned to the investment committee and the fact that Ansary acted as chairman and as such actively pursued the policy of Ennia et al., Ansary (thereby) determined the policy of Ennia et al. as if he were a director. He should therefore be regarded as a de facto director. The investment committee has been active from its establishment in May 2006 until the pronouncement of the emergency regulations, so that Ansary has acted as a de facto director throughout the relevant period.

5.24. Andraous was a director of Ennia et al. from February/March 2011. In the preceding period, he was involved in Ennia et al. as a member of the investment committee. It was considered above that the investment committee played an important role in determining the (investment) policy of Ennia et al. At the same time, the documents show that Ansary had a casting vote within the investment committee and in effect determined the policy. That, as stated by Ennia et al., Andraous was seen as a director 'by everyone within Ennia et al.', has not been sufficiently further substantiated and set out in concrete terms. Andraous' actions will therefore be assessed over the period when he was formally appointed as a director.

5.25. Ennia et al. furthermore argued that Palm was already involved as an adviser before he became a director. According to Ennia et al. he played an important role in the takeover of Ennia et al. and subsequently attended a number of meetings of the Ennia Holding Supervisory Board. According to Ennia et al. he was also involved in restructuring Ennia and structuring its investments. Ennia et al. argues that Palm acted very carelessly in this respect and can therefore be held liable for the damage caused (by this advice). Palm disputed that he had had such a (major) role at Ennia et al. prior to his appointment as director. That Palm, as adviser to Ennia et al. had such a role that he can be regarded as a (co-)policymaker for decisions taken (apparently based on that advice) by the board, has been insufficiently substantiated

case numbers: CUR201903842/3843/3796/3844/3845/3846          page 47
date of judgment: 29 November 2021

by Ennia et al. Palm's actions will therefore be assessed over the period in which he was formally appointed as a director.

5.26. With regard to Van Doorn, Ennia et al. argued that he could (also) be held liable for damage that arose after his resignation as director, because it was foreseeable to Van Doorn that Ennia et al., with Ansary as de facto director, would continue the policy it had adopted and that this would (possibly) lead to damage for Ennia et al. The Court does not follow Ennia et al. in this. A director's liability ends, in principle, when he ceases to be a director. There is no reason to assess this any differently in this case, all the more since the conduct attributed to Ansary et al. after Van Doorn's resignation as a director cannot be easily traced back to the policy initiated (in part) by Van Doorn. Nor can Ennia et al. be followed in its assertion that Van Doorn could not have resigned 'just like that', but that he should, for example, have contacted the regulator or filed a report with the police. Van Doorn resigned twice from Ennia et al. and the Central Bank was aware of this. This fact could have been a signal. Moreover, the documents show that, *inter alia*, Ennia et al.'s solvency had already attracted the attention of the Central Bank for some time. In any case, Van Doorn's refraining from further actions after his departure as director does not, as such, create liability for actions by the other defendants.

5.27. In summary, Ansary acted as a (de facto) director of Ennia et al. throughout the entire period. Van Doorn, Andraous and Palm are at all times to be considered directors during the period(s) of their directorship under the articles of association. The directors had a special duty of care in view of the nature of the business and the related (social) interests, in particular the interests of the (pension) policyholders.

5.28. The periods of (de facto) directorship are shown schematically below.

| (de facto) directorship | | | | |
|------|-------|-----------|----------|------|
|  | Ansary | Van Doorn | Andraous | Palm |
| 2006 | x | x | | |
| 2007 | x | x | | |
| 2008 | x | x (up to 16 June) | | |
| 2009 | x | x (from 25 June) | | |
| 2010 | x | x | | |
| 2011 | x | x (up to 1 April) | x (from 9 February) | x (from 26 March) |
| 2012 | x | | x | x |
| 2013 | x | | x | x |



case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 48
date of judgment: 29 November 2021

| 2014 | x | | x | x |
|------|---|---|---|---|
| 2015 | x | | x | x |
| 2016 | x | | x | x |
| 2017 | x | | x | x |
| 2018 | x | | x | x |

*the supervisory directors*

5.29. Ansary and Nina Ansary have been involved with Ennia et al. as supervisory directors. Ansary was chairman of the Supervisory Board of Ennia Holding from January 2006 until the pronouncement of the emergency regulations in July 2018. Nina Ansary was a member of the Supervisory Board from 20 May 2009 until the pronouncement of the emergency regulations.

5.30. Article 2:19(1) of the Civil Code provides that the articles of association of a legal entity may provide that there is or can be a supervisory board. The articles of association then define the task of the supervisory directors. That task shall in any case include the supervision of the management board. Article 2:19(6) of the Civil Code provides that (*inter alia*) Article 2:14 of the Civil Code applies by analogy, so that the Supervisory Board involves collegiate supervision. Article 2:19(7) of the Civil Code provides that the Supervisory Board shall focus its duties on the interests of the legal entity and its business.

5.31. The LTV also contains provisions relating to the Supervisory Board. Article 16 LTV states, *inter alia*:

> (...)
> 3.  An insurer that has the legal form of a public limited company or private limited company shall have a supervisory board consisting of three or more natural persons.
> 4.  The supervisory board referred to in the third paragraph shall have the task of supervising the policy of the management board of the insurer and the general course of events in the company and its business. It shall advise the management board. In the performance of their duties, the supervisory directors shall be guided by the interests of the company and its business.
> 5.  The articles of association of the insurer may contain additional provisions regarding the duties and powers of the supervisory board and its members. (...)



5.32. The Central Bank has further elaborated the role of the supervisory board in *Guidance notes for the supervisory board of supervised financial institutions*, applicable since 2001. These state, *inter alia*:

> IV. THE RESPONSIBILITIES OF THE SUPERVISORY BOARD AND ITS MEMBERS
> Besides the collective responsibilities of the Supervisory Board, each member has his individual responsibilities.
> The responsibilities of the Supervisory Board as a whole can be sub-divided in the following seven distinct areas:

a) ensure competent management on an ongoing basis;
b) ensure appropriate plans and policies for the institution;
c) monitor operations to ensure compliance and adequate control;
d) oversee business performance;
e) ensure that the institution serves the (credit, insurance or investment) needs of the community well;
f) ensure that the individuals involved in the daily management and operation of the institution are of professional, social and moral integrity; and
g) ensure that timely and accurate disclosure is made on all material
matters regarding the institution.

(...)

**IV.2 Individual Responsibilities of a Member of the Supervisory Board**
Supervisory Board membership serves as an opportunity for the individual member to contribute to the growth and development of the local economy. Furthermore, it provides an invaluable business education to the members of the Supervisory Board. The job brings with it distinct duties, responsibilities, but also liabilities. Generally, the individual responsibilities of a member of the Supervisory Board are to:
a) be aware of the institution's operating environment;
b) be diligent in performing the job;
c) exercise independent judgment; and
d) be loyal to the institution's interests.

5.33. Article 10 of Ennia Holding's articles of association (as in force until September 2009) states:

SUPERVISORY BOARD
Article 10
1. Supervising the management conducted by the management board and advising the management board is entrusted to a Supervisory Board consisting of a number of supervisory directors to be determined by the meeting of holders of priority shares A of at least three (...)
13. At least twice a year the management board and the Supervisory Board shall meet in a joint meeting. (...)

The articles of association in force since September 2009 are identical in this respect.

5.34. In summary, as chairman and member of the Supervisory Board, Ansary and Nina Ansary were required to act in the interests of Ennia et al. and, in that capacity, to supervise and advise the management board. They also had a special duty of care in that respect, which is inherent to the nature of the business and the related (social) interests, in particular the interests of the (pension) policyholders. If they have been guilty of serious misconduct in the exercise of their supervisory functions, or if they have authorised certain transactions erroneously or too lightly, they may be liable to the legal entity if serious blame can be attributed to them.

*the shareholder*

5.35. Parman International is a shareholder of Ennia Holding. The shareholder of a company is in principle not liable for more than the amount paid up on shares. A shareholder may nevertheless be liable vis-à-vis the company or third parties on the basis of an unlawful act. In a ruling of the Supreme Court of 8 November 1991 (ECLI:NL:HR:1991:ZC0401, *Nimox*) it was held, *inter alia*:

> (...)
> 3.3.2. Specific subground for Supreme Court appeal (a) argues that Nimox cannot have acted unlawfully by casting its vote in favour of the dividend resolution because the resolution was challenged in vain and must therefore be regarded as legally valid. This argument is incorrect. Even if the validity of the resolution as such must be assumed in the absence of annulment by judicial decision on the basis of Article 2:11 of the Civil Code [NL], it does not follow that implementation of the resolution cannot be unlawful vis-à-vis third parties such as creditors of the company, nor that effectuating the realisation of the resolution by exercising the voting right cannot be unlawful vis-à-vis third parties. (...)

**The general accusations**

5.36. Ennia et al. generally accuses the defendants of having no longer had the interests of Ennia et al. and its policyholders at heart since the takeover by Ansary, but other (own) interests. This general accusation will be assessed first and then the specific accusations made by Ennia et al. will be addressed, with the aforementioned frameworks forming the starting point for the assessment.

5.37. Before the takeover, Ennia applied an investment policy that was drawn up following an asset-liability management (ALM) study. Based on this investment policy, investments were made mainly in fixed income securities (mainly deposits, bonds and mortgage loans) and for a small part in equities, real estate and liquid assets. This investment policy is mainly aimed at maintaining solvency and corresponds to the policy that was and is pursued by Dutch insurers.

5.38. After the takeover, Ansary first made a capital contribution by way of shares in SunResorts. This capital was later contributed to the Ennia Investments entity set up by Ansary, making it an investment (at least at the time). Ennia Investments was incorporated with the aim of concentrating its direct investments and indirect investments in one entity. The investment funds came largely from the insurers, resulting in intercompany receivables between Ennia Investments and the insurers. The investment policy was in effect determined by the investment committee, of which Ansary was the chairman. Following a decision by the Supervisory Board of Ennia Holding, this investment committee could take all decisions concerning investments by Ennia Holding and the insurers, and indeed did so.

5.39. It is not disputed by the parties that the investment policy of Ennia et al. subsequently changed significantly. The aforementioned investments were largely liquidated and converted into Ansary-affiliated investments in, notably, S&S and SunResorts (Mullet Bay). The investments in S&S and Mullet Bay together represented 82.7% of the insurers' assets. This led to high concentration risk, as it made insurers largely dependent on (the valuation of) these two investments. The fact that, as highlighted by Ansary et al., Ennia Investments acted as a buffer for the insurers and the intercompany receivables provided the insurers with a fixed return does not change that. Firstly, this is not the case because the actual return was still dependent on the underlying assets. Secondly, this is not the case because the return was not actually paid out, but was added as a new loan to the existing intercompany receivables.

5.40. Since October 2006, Ennia et al. has been warned several times by the Central Bank and other internal and external supervisors and stakeholders. The warnings included Ansary's undesirable degree of involvement in both Ennia et al. and companies affiliated with him, the concentration risk of the investments, the low rating of S&S and the associated high risk of this investment, the unpaid interest on the intercompany receivables and the solvency. These warnings have not led to any changes in the (investment) policy of Ennia et al. The investment in S&S even increased further and with it the intercompany receivables. In addition, the value of Mullet Bay was increasing (at least on paper), so that it represented an increasing proportion of the value of the insurers' assets.

5.41. Ansary et al. argued that the warnings given often came from people about whom opinions within the organisation differed, or from people who went beyond their task or role. However, this does not detract from the content of the warnings given and, moreover, Ansary et al. thus fails to acknowledge that the warnings came from various quarters and were not isolated. Ansary et al. also argued that in a letter to the insurers in 2008, the Central Bank expressed a positive opinion on the solvency of the insurers, among other things. Based on this (single) letter, it cannot be concluded, in light of the various warnings, indications and instructions given before and after it, that there was no reason for Ennia et al. to change its policy. The same applies to the fact that the Central Bank waited a long time before taking more far-reaching measures against Ennia et al. After all, whether or not the regulator took (more intensive) action does not in any way release the defendants from their duty of care. Ansary et al. also repeatedly stated that Ennia Investments as such was not subject to supervision by the Central Bank and therefore did not have to comply



case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 52
date of judgment: 29 November 2021

with the guidelines applicable to insurers. That assumption is wrong. As the Court
held above (at 5.10), Ennia Investments also had a special duty of care.

5.42. In 2015, the Central Bank's solvency guidelines were amended. This change
was not unexpected, as it had been planned since 2011 and Ennia et al. was aware of
this. During that period, the Central Bank issued several instructions aimed at
resolving the solvency deficit and concentration risks. It is not disputed by the
parties that Ennia et al. did not satisfy the solvency requirements when the
emergency regulations were pronounced. The other instructions of the Central Bank
were also not followed or not followed sufficiently. Moreover, it has been
established that shortly before the revocation of the insurer's licence, an amount of
USD 100 million was transferred from Ennia Investments to S&S. In view of all this,
the Court does not see the slightest basis for Ansary et al.'s assertion that the
emergency regulations should not have been pronounced.

5.43. In conclusion, the corporate structure and investment policies of Ennia et al.
changed after the takeover by Ansary et al. in such a way that the interests of
Ennia et al. and its policy holders were no longer paramount. The special duty of
care that applies to the directors and supervisory directors of a (life) insurance
company has to a large extent been neglected, notwithstanding very critical
observations from within their own ranks (Voigt, Couperus, De Paus) and
repeated warnings and urging from the regulator (the Central Bank).

5.44. However, the foregoing does not (automatically) mean that the defendants are
liable for the damage alleged by Ennia et al. What is (always) important is whether
they have exceeded the standard applicable to the defendants in the specific
accusations made by Ennia et al. and whether this has (subsequently) resulted in
damage.

5.45. Ennia et al. primarily used a calculation of damage based on a comparison of
the solvency position with and without (alleged) breaches of standards by the
defendants. A large number of accusations have been made in this regard. By
amendment of the claim, this principal calculation of damage was abandoned and
Ennia et al. claimed the concrete damage resulting from the individual alleged
conduct of the defendants.

**Group liability**

5.46. Ennia et al. takes the position that the defendants, in view of the general
accusations to be made against them and the specific accusations to be discussed
below, are liable towards it as a group for the damage alleged by Ennia et al. The
Court does not follow Ennia et al. in this. Article 6:166(1) of the Civil Code
provides that if one of the persons belonging to a group unlawfully causes

damage and the risk of causing damage should have dissuaded these persons from acting in a group, they shall be jointly and severally liable if this conduct can be imputed to them. There is no question of acting in a group as referred to in this provision, both with regard to the defendants' overall conduct and their conduct in the specific acts and transactions highlighted by Ennia et al. In addition, in the case of directors' and officers' liability there is already a separate form of collective liability provided for by law, namely the collegiate liability of members of a management board or supervisory board in the event of mismanagement or undue supervision (Article 2:14(4) of the Civil Code and 2:19(6) of the Civil Code).

5.47. The question as to the defendants' liability will therefore always be assessed in respect of each of them on the basis of their formal responsibility and their own conduct or omissions.

**The allegation with regard to S&S**

*the assertions of Ennia et al.*

5.48. Ennia et al. argued that the defendants had acted unlawfully and in a grossly culpable way by exposing Ennia et al. to the major risks of the S&S investment. Subsequently, Ennia et al. has hardly contributed to the increase in value of S&S, as this has largely benefited Ansary. These assertions of Ennia et al. are substantiated as follows.

5.49. S&S raised USD 70 million in equity capital in early 2006. BdC Investments contributed USD 65 million against 6,500 preferred shares without voting rights or entitlements to profit. Ansary, or at least Parman Capital, contributed USD 5 million against 5,000 common shares. In October 2006, 6,000 preferred shares were transferred to Ennia Investments against a payment by Ennia Leven of USD 60 million. In November 2006, Ennia's 6,000 preferred shares (and 500 shares of BdC Investments) were converted into (only) 1,667 common shares. Ennia's stake at the time was 25% and increased to 40% in 2009 with the purchase of additional shares in S&S. In 2014, Ennia's entire stake in S&S was sold to Parman Capital for a mere USD 133 million. In return, Ennia received a promissory note, which prevented it from benefiting from any appreciation in value. Subsequently, the promissory note was converted into preferred units 2 in September 2015. In the intervening period (2008-2011), Ennia et al. also purchased bonds from S&S at a yield of 10%, which were given an increasingly lower credit rating and were warned against. That did not stop the defendants from continuing to buy bonds from S&S. In March 2014, the bonds were converted to preferred units 1 at a yield of up to 6% per annum. S&S saw a debt/loan of USD 150 million turn into additional equity capital of

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 54
date of judgment: 29 November 2021

USD 141.96 million. Ultimately, S&S was sold to Kirby and Ennia et al. received only 38% of the total proceeds. This is disproportionate to the contribution of equity capital. Ansary and the entities affiliated with him played an important and decisive role in all transactions.

5.50. Given the (original) contribution by Ennia et al. the realised capital should also have accrued to Ennia Investments or Ennia Leven in that ratio. However, this did not happen and therefore the defendants are liable on the basis of an unlawful act. Ennia et al. was exposed to an irresponsibly risky investment, in which Ansary et al. had a considerable personal interest that ran counter to Ennia et al.'s interest. The damage suffered by Ennia et al. as a result can be estimated at the profit that Ansary enjoyed as a result of the unlawful conduct.

*the defences of Ansary et al. and Van Doorn*

5.51. Ansary et al. disputed the accusations made by Ennia et al., including the alleged ratio between the contribution and the ultimate yield. In this regard, Ansary et al. has put forward that Ansary purchased the assets of S&S Inc in cash. In order to complete this transaction, S&S was incorporated. The final purchase agreement was signed on 25 January 2006 for the amount of USD 277 million. Of this amount, USD 212 million was provided by means of a loan and credit facility (debt capital) from JP Morgan Chase to Ansary, and USD 5 million was contributed by Ansary as equity capital. This must be taken into account when assessing the ratio of the contribution. Ansary was after all (personally) liable for its repayment. In addition, Ansary guaranteed the USD 65 million contribution (ultimately, after the purchase of the shares of BdC Investments) made by Ennia Investments.

5.52. Ansary et al. further argued that the S&S transaction had produced a positive result for Ennia et al. The company was sold to Kirby, with payment being made partly in Kirby shares. These shares have further increased in value after the sale. That Ennia et al. ran a risk with the investment in S&S is not (or no longer) relevant, as the risk never materialised. No damage has been suffered as a result of this transaction; on the contrary, according to Ansary et al.

5.53. Van Doorn argued against the Ennia et al.'s accusations that the restructuring in the S&S investment and the withholding of the upside of the investment from Ennia et al. took place after Van Doorn offered his resignation. He is therefore not to blame and cannot be held liable for the damage allegedly suffered by Ennia et al., according to Van Doorn.

case numbers: CUR201903842/3843/3796/3844/3845/3846                     page 55
date of judgment: 29 November 2021

*assessment*

  *the nature of the investment and concentration risk*

5.54. It is not in dispute between the parties that the investment in S&S was a risky investment. In 2006, S&S was rated B2 by Moody's, which means that it has a high risk profile. S&S bonds were assigned a credit rating of B3 by Moody's in 2006, which means that it is a bond that is considered speculative with a high credit risk. Standard & Poor's set the credit rating of the bonds at B at the beginning of 2009 and lowered it to CCC+ at the end of 2009. In 2010, Moody's assigned the bonds a credit rating of Caa2, which means that they are low-quality speculative bonds with a very high credit risk.

5.55. The low (credit) ratings have been criticised by persons involved at Ennia et al. In a memo to Ennia's management board in February 2010, Voigt writes that there is reason to assume that the investment of policyholders' assets does not merit the description of prudence. In July 2010, Couperus also mentioned the low rating of S&S. A 2012 Central Bank report on Ennia Leven indicates that only investments with a rating of BBB (S&P) or BAA (Moody's) or higher can be reported as permissible assets. Thus, the investment in S&S did not meet this requirement.

5.56. The increasing investment in S&S (both in equities and bonds) also increased the concentration risk. After all, the investment became an increasingly large proportion of the total investments. The S&S investment amounted to 28% of the insurers' total investments in 2010.

5.57. The defendants have been made aware of the concentration risk that had arisen on several occasions. Couperus indicated in the email referred to above in July 2010 that the concentration risk needed to be reduced. This led to a board resolution on 13 October 2010, which stated that the concentration risk would be reduced. This decision was reversed in January 2011, after Ansary, according to Van Doorn's report, 'made it very clear that he would continue to make the investment decisions himself'. The 2011 report by Buck Consultants states, among other things, that there is a '*high concentration of assets*' and further that the '*investment focus is primarily on group level and structured from a fiscal point of view. Too little attention for the specific requirements of a life insurer*'. Almost as soon as he took office as a supervisory director in 2016, De Paus expressed his incomprehension of the direct and indirect investments policy, both towards de facto director Ansary and towards directors under the articles of association Palm and Andraous. Lastly, the Central Bank has consistently highlighted the unacceptably high concentration risk and the need to change this.

case numbers: CUR201903842/3843/3796/3844/3845/3846      page 56
date of judgment: 29 November 2021

5.58. The increasing risks of the investment in S&S and the (increasing) concentration risk of that investment and the warnings against it have not caused the defendants to reduce Ennia et al.'s interest in S&S. On the contrary, the interest in S&S has only increased over the years. After the investment in preferred shares in S&S in October 2006 and the conversion into common shares in November 2006, new shares were bought in March 2009, a 15% interest in S&S. In addition, new bonds were bought continuously in the period 2008-2011, while the credit rating of S&S was downgraded in that very period. An overview of the transactions is given below.

| Transactions: | |
| --- | --- |
| 2006 (January) | issuance of 5,000 common shares to Parman Capital<br><br>issuance of 6,500 preferred shares to BdC Investments |
| 2006 (October) | transfer of 6,000 preferred shares by BdC Investments to Ennia Investments for USD 60 million (from Ennia Leven) |
| 2006 (November) | conversion of the 500 (BdC Investments) and 6,000 (Ennia Investments) preferred shares into 1,667 common shares |
| 2009 | Acquisition of 15% stake in common shares of Ansary by Ennia for USD 26.967 million |
| 2008-2011 | Purchase of 141,960 S&S bonds |
| 2013 | Conversion of bonds into *preferred Units 1* |
| 2014 | Sale of 40% interest in common shares for promissory note Parman Capital |
| 2015 | Termination of promissory note against issue of preferred Units 2 |
| 2017 | Sale to Kirby |

5.59. It can be established that the defendants did not sufficiently consider the interests of Ennia et al. and its policy holders. They have taken an unacceptably high risk with the S&S investment, both because of the nature of the investment itself and because of the high concentration risk. The fact that the S&S investment ultimately led to a positive result does not detract from this serious accusation.

*the investment and subsequent conversions and transactions*

5.60. The question at issue, however, irrespective of the foregoing, is whether the defendants have structured the investment in S&S in such a way that it was not

Ennia et al. but entities affiliated with Ansary that wrongfully received the highest returns. After all, that is the accusation for which the defendants in their capacity of (de facto) (supervisory) director and/or shareholder are held liable and on the basis of which Ennia et al. claims damages. In this connection, the Court considers the following.

5.61. The purchase of the assets of S&S Inc has taken place through the contribution of both debt capital and equity capital to S&S, the entity set up to effect the purchase, of which Ansary has been chairman of the board since November 2005. Ansary et al. has emphasised that it is to his personal credit that he was able to secure a substantial loan and a credit facility from JP Morgan Chase for the benefit of S&S. This made the purchase of the assets of S&S Inc. possible. This purchase could not have been realised by Ennia et al. Ansary believes that he has actually allowed Ennia et al. to benefit from this investment. According to Ansary et al. the USD 65 million contribution by BdC Investments, which was later taken over by Ennia Investments, should not be set off against the USD 5 million equity capital by Ansary (Parman Capital), but against the transaction as a whole, including the debt capital contributed by JP Morgan Chase.
The Court does not follow Ansary et al. in this. It is true that Ansary has provided a considerable part of the funding. However, this debt cannot be equated with or added to the (risk-bearing) equity capital contributed by, among others, Ennia Investments. This is all the more true given that Ansary has realised at least a large part of the (re)payment of the debt capital through the issue of bonds purchased by Ennia. The fact that, as argued by Ansary et al., the contribution by Ennia Investments was intended to allow Ennia Investments to benefit from the investment by Ansary is irrelevant. Apart from the fact that it exposed Ennia Investments and indirectly the insurers to major risks, this does not mean that the contribution of Ennia Investments is proportionally smaller or should be approached differently. Lastly, it has not been established that, as argued by Ansary et al., Ansary personally guaranteed the contribution of USD 65 million by Ennia Investments, so that for that reason too there is no reason to value the contribution of equity capital by Ennia Investments differently. This means that the assessment is based on the fact that on the part of Ansary USD 5 million (7.1%) was contributed as equity capital and on the part of BdC Investments (shortly afterwards on the part of Ennia Investments) an amount of USD 65 million (92.9%). BdC Investments thereby acquired 6,500 preferred shares at a nominal value of USD 10,000 each, Parman Capital acquired 5,000 common shares at a nominal value of USD 1,000 each.



5.62. It is not in dispute between the parties that the assets of S&S were sold to Kirby for USD 744.5 million at the end of 2017. Ennia has received 38% of this, entities affiliated with Ansary 62%. In itself, it is conceivable that the ratio of the contribution by different entities (in this case 92.9% vis-à-vis 7.1%) may not produce results in exactly the same proportion. After all, different types of shares are involved, there are developments in the market and within the context of these developments, choices are made that may turn out to be good or not so good. However, this case involves several conversions with respect to which it was or should have been clear beforehand that they would be unfavourable to Ennia et al. and favourable to the entities affiliated with Ansary. No plausible explanation for this has been given by Ansary et al.

5.63. In October 2006, 6,000 shares of BdC Investments were transferred to Ennia Investments against payment of the nominal value of the preferred shares, totalling USD 60 million. Subsequently, these 6,000 preferred shares (together with the remaining 500 preferred shares of BdC Investments) were converted into 1,667 common shares. Parman Capital held 5,000 common shares. This means that Ennia Investments' stake in S&S thus amounted to (only) 25%. Ansary's stake (at least Parman Capital's) came to 75%.
In addition, Parman Capital's shares were so-called class b shares, which had 10 voting rights per share, compared to 1 voting right per share for Ennia Investments' shares. It is clear that Ansary, or at least Parman Capital, therefore had de facto control over S&S. No justification whatsoever has been given for this conversion, nor has it been made plausible that Ennia et al. had an interest in the conversion. Ansary et al. argued in this respect that Ennia Investments and BdC Investments had exercised their 'right of option'. The fact is, however, that, as found above, Ansary was the de facto director of Ennia Investments, so that this choice was (partly) made by Ansary himself. Van Doorn was also involved in this conversion on the part of Ennia Investments. Van Doorn has not argued either on what basis this - at first sight very disadvantageous - conversion could nevertheless be or become in the interest of Ennia et al. It is plausible that in the event of a sale of S&S, this conversion would result in a considerably smaller part of the proceeds accruing to Ennia et al. than would have been reasonable in view of the initial investment. In view of this, the conversion of preferred shares into common shares is not in the interest of Ennia et al. to such an extent that the (de facto) directors and the Supervisory Board, which by resolution of 19 February 2007 approved all investment decisions taken up to that time, can be seriously blamed.

5.64. In March 2009, Ennia Investments acquired another 15% of the shares in S&S from Parman Capital for USD 26.7 million. This amount was paid to Parman International and subsequently paid out to the shareholders of Parman International. This agreement includes a repurchase option, whereby the shares can be

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 59
date of judgment: 29 November 2021

repurchased within two years at the price paid for the shares plus a mark-up. Although this repurchase option allowed Parman Capital to benefit from any increase in the value of the shares (at the expense of Ennia Investments), this potential risk for Ennia Investments did not materialise because Parman Capital did not make use of this option.

5.65. The sale of Ennia Investments' 40% stake in S&S took place in June 2014. The 40% stake was sold for USD 133.4 million. In return, Ennia Investments received a promissory note from Parman Capital. Ennia's annual report for 2014 shows that this promissory note is not secured by collateral. KPMG also mentions in the 2014 (*early warnings*) report that the effective interest rate on this promissory note must be disclosed and that the creditworthiness of Parman Capital must be demonstrated. As a result of this sale, Ennia Investments has therefore lost all participation in S&S. Ennia Investments could also no longer benefit from any increases in the value of S&S. The promissory note received in return for the sale was not secured. It is impossible to see how this transaction was in the interests of Ennia et al. In so far as this transaction was prompted by the wish of, among others, the Central Bank to reduce the investment in S&S, the following applies. All reports prepared at the request of S&S over the years (2011, 2014 and 2016) regarding the value of S&S indicate an equity value of approximately twice (or more) the amount for which Ennia Investments' stake was sold. In addition, the purchase price of USD 133.4 million was not actually paid, but an unsecured promissory note was issued. Ansary, Palm and Andraous were involved in this transaction as (de facto) directors. Nina Ansary had meanwhile taken up her position as a supervisory director. This transaction, like the conversion of preferred shares into common shares, was not in the interest of Ennia et al. to such an extent that it would be possible to attribute serious blame to the (de facto) directors and the Supervisory Board.

5.66. In September 2015, the promissory note was converted into the 140,993 '*preferred units 2*' at a (nominal) value of USD 140.093 million. This (nominal) value was ultimately paid to Ennia Investments when the assets were sold to Kirby.

### the liability of the defendants

5.67. It follows from the above that, at least on two occasions after the purchase of the preferred shares, such changes took place that the interests of Ennia Investments (and therefore of the insurers) were seriously prejudiced. Ansary not only acted as a de facto director on the part of Ennia et al., but also had (full) control of S&S, which



case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 60
date of judgment: 29 November 2021

clearly constitutes a conflict of interests. In no way whatsoever has it become
apparent that Ansary has taken into account the interests of (the policyholders of)
Ennia et al. in this context. In this respect, serious blame can be attributed to him.

5.68. With respect to this accusation, the directors Van Doorn, Palm and Andraous
did not comply with their obligation to properly perform the duties within their
scope of employment during the period in which they were involved as directors
with Ennia et al., as a result of which serious blame can be attributed to them. They
should have been particularly careful in assessing the conversions and transactions
subsequently executed due to the risks of the investment itself and the increasing
size of the investment. There is no evidence whatsoever that they have allowed the
interests of Ennia et al. to prevail in this respect. Nor has it become apparent that
they, as director(s), criticised the letters drafted in the name of Ansary (on behalf of
various entities) by adviser Henze in which the transactions were included. Van
Doorn, Palm and Andraous were both directors of Ennia Investments and of the
insurers. They were therefore obliged to perform their tasks within the scope of
their employment in a proper manner in respect of each separate legal entity. To the
extent that the actions of the Ennia Investments directors towards the insurers
should be considered as acting towards a third party, in view of the above they
have acted in breach of the standard of care as referred to in Article 6:162 of the
Civil Code and as such serious blame can be attributed to them personally.

5.69. Ansary and Nina Ansary are also found to have seriously failed in their
supervisory role as members of the Supervisory Board. They have wrongly and too
lightly given their consent to the above transactions and as such serious blame can
be attributed to them. It is not relevant in this context, as Ansary et al. has argued,
that Nina Ansary (in addition to Ansary) is the only member of the Supervisory
Board involved as a defendant in these proceedings. Nor is it relevant whether Nina
Ansary, had she been critical of the policy being pursued, would have been
followed in this by the other supervisory directors. Nina Ansary has her own
responsibility to take on her supervisory role. Ansary et al. did not allege or submit
anything from which it can be inferred that Nina Ansary even attempted to assume
such responsibility.

5.70. It has not been sufficiently argued or shown that Parman International, as
shareholder, can be blamed in this respect on the basis of which Parman
International could be held liable for payment of the alleged damage suffered.

5.71. In summary, Ansary, Van Doorn, Palm and Andraous can, in principle, be
held jointly and severally liable for the damage (in so far as it has been caused

during their term of office) as a result of the S&S transaction(s). Nina Ansary as a supervisory director can also be held liable for this.

*discharge*

5.72. The defendants invoked the discharge granted to them. They took the position that, in view of this, Ennia et al. no longer had any possibility of suing them on the basis of directors' and officers' liability. Ennia et al. argued that, in so far as discharge has been granted, this does not preclude the granting of the claim.

5.73. It follows from Article 17(2) of the articles of association of Ennia Investments that, by adopting the balance sheet and the profit and loss account by the general meeting of shareholders, the directors have been discharged of liability for their management over the past financial year and the supervisory directors for their supervision. Similar articles are included in the articles of association of Ennia Holding and the insurers. However, as Ennia et al. has stated without contestation, there are no resolutions regarding the adoption of the financial statements (and thus no automatic discharge) of Ennia Investments for the years 2006 up to and including 2012 or from 2015 onwards. For Ennia Leven, only the financial statements for 2009-2011, 2013, 2015 and 2016 have been adopted.

5.74. In addition, any discharge granted does not extend to information that is not apparent from the financial statements or that was not otherwise disclosed to the general meeting of shareholders before it adopted the financial statements, as considered by the Supreme Court in its rulings of 10 January 1997 (ECLI:NL:HR:1997:ZC2243, *Staleman v. Van de Ven*) and 25 June 2010 (ECLI:NL:HR:2010:BM2332, *De Rouw v. Dingemans q.q.*), among other things. The information must be readily and directly derivable from the financial statements and, in the event of improper acts of management, the management board must ensure that this is explicitly and unambiguously apparent from the financial statements.

5.75. The financial statements of Ennia Investments only show that various transactions have taken place at various times in relation to S&S. In no way do the financial statements show what the directors are now blamed for, namely that they have seriously harmed the interests of Ennia et al. In fact, the financial statements do not include the consequences of the various transactions for, for example, voting rights and profit entitlements. Ennia Leven's financial statements do not mention anything whatsoever about the S&S transaction, therefore no discharge can have been granted in this respect.

5.76. Therefore, even if any discharges were involved, they do not lead to discharge of liability for the improper performance of duties established.

*the damage resulting from the unlawful conduct*

5.77. Pursuant to Article 6:97 of the Civil Code, the Court shall estimate the damage in the manner most in keeping with its nature. Article 6:98 of the Civil Code provides that the only damage that can be considered for compensation is damage that has such a connection with the event on which the debtor's liability is based, that it can be attributed to him as a result of this event, also considering the nature of the liability and of the damage. Pursuant to Article 6:100 of the Civil Code, any advantage gained by the event to the aggrieved party must be taken into account, in so far as it is reasonable, when determining the damage to be compensated.

5.78. Article 6:104 of the Civil Code provides that if someone who is liable to another person by virtue of an unlawful act has enjoyed a profit from that act, the court can, at the request of that other person, assess the damage at the amount of that profit or a part thereof. This provision lends itself to application in cases where the extent of the damage actually suffered cannot be determined. In view of the non-punitive nature of Article 6:104 of the Civil Code, the court should observe restraint to the extent that, if it is plausible that the financial advantage gained by the debtor considerably exceeds the presumed amount of the damage, the court will estimate the damage, in principle, at a proportion of the profit to be determined by the court (see Supreme Court 18 June 2010, ECLI:NL:HR:2010:BM0893, *Doerga v. Stichting Ymere*).

5.79. As regards Ansary and Nina Ansary, who are also directors and shareholders of Parman Capital, it must be held that damage to be compensated by them in this form is involved. Ansary and Nina Ansary, together with Van Doorn, Palm and Andraous, not only had a hand in the conduct characterised as unlawful vis-à-vis Ennia et al. with regard to the investments in S&S, but also realised the value transferred to Parman Capital as a result of this conduct upon the sale to Kirby. They did not return the (extra) revenues to Ennia et al., but kept them for themselves. These circumstances, added to Ansary's dominant role in the set of actions, justify that, as claimed by Ennia et al., Ennia Investments is compensated for the (additional) profit made by Ansary and Nina Ansary on the sale of assets that should have belonged to Ennia.

5.80. This is different as far as Van Doorn, Palm and Andraous are concerned. With regard to them, the Court concludes that as far as the S&S transaction is concerned, there is no damage attributable to their actions that is eligible for compensation. The Court takes into account in particular the fact that the entire investment from Ennia in S&S, both in shares and in bonds, ultimately flowed back to Ennia et al., with a

reasonable return assessed according to objective criteria (and leaving aside the high risk of the investments). If that investment had been lost altogether, it would seem that the obligation of these directors to compensate would not have extended beyond the amount of that investment, plus a reasonable return that was lost out on in that case. In the case of the damage claimed by Ennia Investments (in the form of profits foregone by Ennia Investments and enjoyed by Ansary and Nina Ansary), it is also relevant to note that it has neither been argued, nor has it become evident that they, as directors, shared in the profits of the assets and profits transferred from the Ennia investment to Parman Capital.

5.81. The additional profit made by Ansary and Nina Ansary can be set at the difference between the amount received by Ennia Investments (or at least ECII Luxemburg) on the sale, in so far as it related to the initial investment, and the amount that Ennia Investments would have received if the proceeds from the sale had been divided pro rata. This amounts to an amount of USD 415.61 million. The calculation is as follows.
- the total proceeds from the sale to Kirby were USD 744.5 million. Of this amount, USD 142.98 million related to preferred units 1 (the original bonds). In respect of these bonds, Ennia Investments allegedly failed to have communicated any surplus value. This amount is therefore disregarded, leaving an amount of USD 601.52 million;
- of the amount of USD 601.52, an amount of USD 143.2 million was received by ECII Luxemburg;
- based on the initial investment by Ennia Investments of USD 65 million, which is 92.9% of the total equity capital contribution of S&S, 92.9% of the proceeds would amount to USD 558.81 million;
- Thus, the difference between the amount received by ECII Luxemburg and the amount that would have been received upon payment of 92.9% of the sale proceeds is USD 415.61 million.
The amount of USD 415.61 million has been converted into NAf 743.94 million.

*prescription*

5.82. Ansary et al.'s reliance on prescription of the claims prior to November 2013 does not apply. Pursuant to Article 3:310 of the Civil Code, the prescription period is five years from the time the aggrieved party becomes aware of the damage and the person responsible for it. In this case, the aggrieved party is primarily the legal entity Ennia Investments. Ennia et al. rightly argued that it did not become aware of the damage until after the emergency regulations were pronounced on 4 July 2018. Whether a legal entity is aware of certain facts depends on the awareness of the facts of officers within the legal entity. Before the pronouncement of the emergency regulations, the defendants were the (de facto) directors and supervisory directors

case numbers: CUR201903842/3843/3796/3844/3845/3846    page 64
date of judgment: 29 November 2021

of Ennia et al. As a rule, the knowledge of directors of a legal entity is deemed to be knowledge of the legal entity itself. However, there is an exception in this regard when it comes to the knowledge of damage caused to the company by the directors themselves. This was held, *inter alia*, in the ruling of the Supreme Court of 11 September 2020 (ECLI:NL:HR:2020:1413, *Treston v. HDI*), in which it was considered, inter alia, that the opinion of the Court of Appeal that, in the relationship between HDI and Treston, the knowledge by the officers concerned of their own interests, which conflict with the interests of the company, and of Treston's unlawful conduct, cannot be regarded as knowledge of HDI, does not show an incorrect interpretation of the law.

5.83. In this case, it cannot be held that Ennia Investments was aware of the damage before 4 July 2018, so that only from that moment on did the prescription period start to run and the claim has not become prescribed.

*conclusion*

5.84. In summary, Ansary and Nina Ansary will be jointly and severally ordered to pay Ennia Investments the sum of NAf 743.94 million in respect of the S&S transaction. With regard to the other defendants, the claim for damages in respect of S&S will be dismissed.

**The accusation with regard to the oil rigs**

*the assertions of Ennia et al.*

5.85. In 2009, Energy Equipment (first a subsidiary of BdC Investments and subsequently of Ennia Investments) purchased a total of six mobile oil rigs from S&S. Ennia et al. accuses the defendants that this purchase only served the (cash flow) interests of S&S. The oil rigs have not left the production facility of S&S and have not yielded any return for Ennia et al. Moreover, it is not logical for an insurer to invest in oil rigs. This was also pointed out to Ennia et al. by the CEO of Banco di Caribe, who indicated at the time of payment that this investment was in breach of Central Bank regulations. The oil rigs were largely resold at a loss to S&S. The defendants must pay compensation for the damage suffered as a result, according to Ennia et al.

*the defences of Ansary et al. and of Van Doorn*

5.86. Ansary et al. has argued against this that the investment in the oil rigs indeed was not profitable, but that this does not constitute an accusation against Ansary et al. First of all this is not the case because of the fact that of the defendants involved in these proceedings only Van Doorn was involved in this purchase and thus not

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 65
date of judgment: 29 November 2021

Ansary et al. Further, Ansary et al. asserts that the mere fact that an investment is
unsuccessful does not lead to liability. There is no reason whatsoever why Ennia et
al. could not invest in oil rigs.

5.87. Van Doorn argued against the claim that there was nothing wrong with the
choice of the investment. Insurers invest more often in, for example, solar or wind
energy parks or biomass power plants. Moreover, in the run-up to Curaçao's new
status, there were hardly any government bonds available, so that it was also
necessary to find a different composition of the investments. The fact that some of
the oil rigs were sold at a loss cannot lead to liability. Moreover, Van Doorn was not
involved in the resale of the oil rigs, according to Van Doorn.

*the assessment*

5.88. It is an established fact that some of the oil rigs were sold at a loss, totalling an
amount of USD 11,032,776. That fact alone is insufficient to justify the conclusion that
the defendants are liable for the damage suffered by Ennia et al. For that to happen,
it must be established that serious blame can be attributed to them. The assertions
put forward by Ennia et al. in this connection do not result in this assessment. First
of all, Ennia et al. did not state sufficient grounds as to why the investment in
question would be so unusual for an insurer that the defendants should have
refrained from making the investment for that reason. Furthermore, Van Doorn also
brought forward (which is uncontested) that in the period in question, it was
difficult to obtain government bonds, for example, so that alternatives had to be
sought. In addition, it has not been asserted and substantiated from what it could be
concluded that the investment in oil rigs by definition would not or could not be in
the interest of Ennia et al. The fact that the oil rigs have not left the production
facility of S&S is in any case insufficient for this purpose. For example, it has not
been stated or demonstrated that Energy Equipment paid an (excessively) high price
for the rigs at the time of purchase and/or that an unreasonably low price was paid
at the time of sale. It must therefore be considered that Energy Equipment, after the
first two rigs were sold at a profit, subsequently was not able to benefit (anymore)
from a possible return on the installations. Ennia et al. also pointed out that the CEO
of Banco di Caribe had issued a warning at the time of payment of the oil rigs. This
warning was given after the purchase and relates in particular to the ratio of the
investment to the equity capital and not to the investment itself. This does not alter
the fact that blame can be attributed to the defendants from the point of view of
concentration risks for making a relatively (too) large investment in the oil rigs.

5.89
However, in view of all the circumstances, there is no serious blame to be directed at the

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 66
date of judgment: 29 November 2021

defendants based on which they could be held liable for the damage suffered by
Ennia et al. as a result of the purchase and resale. This part of the claim of
Ennia et al. will therefore be dismissed. The remaining defences need no
further discussion.

**The accusation with regard to the (dividend) distributions**

*the assertions of Ennia et al.*

5.90. Ennia et al. takes the position that the defendants wrongly withdrew NAf 223
million from Ennia et al. in the period 2009 up to and including 2015 in the form of
dividend distributions, capital withdrawals and other distributions to shareholders.
Parman International has had distributions made on shares held by it in (first) Banco
di Caribe and (subsequently) Ennia Holding. In many cases, the requirements set out
in Ennia Holding's articles of association for making such distributions have not
been met. In view of this, Ennia Holding may recover the dividends paid from
Parman International or other persons entitled to profits on grounds of undue
payment.

5.91. According to Ennia et al. the defendants knew, or at least should have known,
that the financial situation of Ennia et al. did not permit such withdrawals, partly
due to the excessive valuation of Mullet Bay and as a result of the SunResorts shares.
The SunResorts shares contributed by Ansary are recorded in the free reserves in the
financial statements of Ennia et al. As a result, Ennia et al. had large reserves on
paper, on the basis of which the defendants made distributions to themselves
through Parman International. Moreover, in respect of various distributions, the
defendants deliberately circumvented Ennia Holding's articles of association by
giving the distributions different names, according to Ennia et al. The financial scope
for making (dividend) distributions depended to a large extent on the valuation of
Mullet Bay. Based on the valuations prepared by Ennia et al., there was scope for
dividend distributions only in the years 2009 and 2010. Therefore, all distributions
made after 2011 were in any case made wrongly. Due to the unlawful nature of the
distributions, all withdrawals must be repaid by the defendants, according to Ennia
et al.

*Ansary et al.'s defences*

5.92. Ansary et al. has argued that the distributions were not made contrary to the
articles of association. The financial statements show that there has never been a
negative equity capital. The financial statements have not been revised after the
emergency regulations either, so they must be presumed to be correct. Moreover,
the dividend distributions were made after the financial scope for doing so had
been determined by external auditors. It was up to Ennia et al., as it is up to every
company, to decide what to do with the financial resources available.

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 67
date of judgment: 29 November 2021

5.93. Ansary et al. disputes that the valuation of Mullet Bay was too high. On the occasion of the oral arguments, Ansary et al. asserted that in May 2019, a dividend distribution in kind was made by Banco di Caribe to Ennia Holding in the amount of NAf 62.5 million. This distribution was made by transferring the share that BdC Investments held in Caribe Resorts. Caribe Resorts has a number of plots located on the Mullet Bay site. This distribution was made at the time when Ennia et al. and the Central Bank took the view that the entire Mullet Bay site should be valued at USD 50 million. In view of the amount of the dividend distribution involving the Central Bank, it would appear that the value is nevertheless assumed as advocated by Ansary et al. Therefore, Ansary et al. therefore cannot be blamed for making dividend distributions on the basis of this valuation. Ansary et al. further asserts that Ennia et al. has not made a clear calculation of the alleged withdrawals, so that the claimed amount cannot not be awarded for that reason either.

5.94. Van Doorn has asserted that the alleged withdrawals and distributions which, according to Ennia et al. have led to deficits and damage, did not take place until after Van Doorn's resignation. Even if Mullet Bay were to be valued at the lowest appraised value, there was scope for making dividend distributions during the period that Van Doorn was a director. (Serious) blame therefore cannot be attributed to Van Doorn in this respect, according to Van Doorn.

*the assessment*

   *the statutory provisions and provisions contained in the articles of association*

5.95. Article 2:118 of the Civil Code contains rules relating to the (profit) distribution of a company. It states, among other things:
> 1.  In immediate conjunction with the approval of the financial statements, the general meeting or another body designated by the articles of association shall decide on the distribution or withholding of the profit shown in those financial statements and on the making of other distributions from the equity capital shown in those financial statements.
> 2.  The general meeting or another body designated by the articles of association may resolve to make interim distributions chargeable to a current financial year or to a closed financial year of which the financial statements have not yet been approved.
> 3.  Unless otherwise stipulated in the articles of association, each share shall for each distribution be entitled to an equal amount and each sub-share shall be entitled to the corresponding fraction of that amount. The articles of association may stipulate that the shares held by the company itself shall be included in the calculation of the allocation of distributions. The articles of association may leave the allocation of distributions in whole or in part up to a body designated for that purpose.
> (...)

case numbers: CUR201903842/3843/3796/3844/3845/3846          page 68
date of judgment: 29 November 2021

5. Distributions to shareholders and other persons entitled to receive payments may not be made if the company's equity capital is negative or would become negative as a result of such a distribution. A decision to make such a distribution has no legal effect. Article 22(2) shall not apply unless the distribution is made to the lawful holder of a bearer certificate or of a share or a right related thereto which is traded on a stock exchange.

6. A distribution as referred to in this article shall be presumed to have been made contrary to the first sentence of the fifth paragraph if the financial statements for the financial year against which the distribution is made, taking this distribution into account, show a negative equity capital. If it concerns a distribution as referred to in the first paragraph, the presumption is irrefutable.

7. If the company has a nominal capital, the amount thereof shall be taken into account as the lower limit for the application of the fifth paragraph.

5.96. It follows from this, first of all, that there must be a *resolution* to distribute dividends and that this resolution must be adopted in immediate connection with the approval of the financial statements. The starting point is that the general meeting of shareholders adopts this resolution, but the articles of association may contain a different arrangement. A resolution to make distributions while the company's equity capital is, or will become, negative as a result of the distribution has no legal effect. In this case, an undue payment as referred to in article 6:203 of the Civil Code is involved. There may also be interim distributions. In that case, it also applies that this may not cause these distributions to lead to a negative equity capital. The term distribution includes cash dividends as well as distributions in shares or other gains capable of being expressed in monetary terms.

5.97. Ennia Holding's articles of association contain, in brief, the following on the making of (profit) distributions. The Supervisory Board determines which part of the profit and loss account is to be reserved. The remaining positive balance is considered as profit to be distributed. Resolutions concerning the retained earnings may only be adopted at the general meeting of shareholders in which all holders of issued priority shares A are represented and a vote has been cast for all priority shares A for such a reservation. The management board may, subject to prior approval of the meeting of holders of priority shares A, make interim dividend distributions in anticipation of expected profits. A profit distribution can only take place if it follows from the established profit and loss account for a financial year that no loss has been incurred that has not yet been cleared.

*the distributions made and the preceding resolutions*

5.98. Ennia et al. submitted by application an overview of the (dividend) distributions made to Parman International, according to Ennia et al. This



case numbers: CUR201903842/3843/3796/3844/3845/3846                                  page 69
date of judgment: 29 November 2021

overview comes to a total amount of NAf 223,447,905, of which
NAf 84,858,000 in dividend distributions and NAf 138,589,905 in other payments.
These amounts are based on the cash flows from Ennia Holding to Parman
International. Ansary et al. contested these amounts, but did not substantiate this
contestation in any way whatsoever, not even after Ansary et al. had been given
the opportunity to inspect the documents (records) and after the financial
statements had been submitted. In view of this, the overview provided by Ennia et
al. will be taken as starting point.

| Year | dividend | other distributions on shares | result Ennia Holding |
|------|----------|-------------------------------|----------------------|
| 2009 | - | 6,962,841 | 13,255,000 |
| 2010 | 23,114,000 | 4,395,095 | 6,413,000 |
| 2011 | 26,616,000 | 213,998 | - 25,619,000 |
| 2012 | 35,128,000 | 1,428,971 | 26,652,000 |
| 2013 | - | 83,001,000 | - 9,078,000 |
| 2014 | - | 11,830,000 | - 4,050,000 |
| 2015 | - | 30,758,000 | - 113,314,000 |
| total | **84,858,000** | **138,589,905** | - 99,790,000 |

5.99. Ennia et al. also submitted a number of resolutions in its Reply (reproduced at
2.87.). Ennia et al. has argued that it has not been able to find more resolutions and
that this seems to be in line with the management board's intention, in view of,
among other things, an email from Andraous to the secretary of Ennia Holding
(2.88.), in which Andraous responds to a question from the secretary about missing
resolutions by saying that it is better that there are no resolutions. Ansary et al., even
after being given the opportunity to inspect the physical and digital records of Ennia
et al., did not add any resolutions to those submitted by Ennia et al. Ansary et al.
merely argued in its Rejoinder only that the sum of the amounts mentioned in the
resolutions do not correspond to the amount of distributions claimed by Ennia et al.
However, that is precisely one of the accusations that Ennia et al. makes to Ansary et
al., namely that not all distributions are accompanied by a preceding resolution as
required by law and the articles of association. The Court therefore takes the
resolutions submitted by Ennia et al. as its starting point for its assessment. That
there are more or other resolutions has not been sufficiently stated or demonstrated.

*the distributions in relation to (the value of) Mullet Bay*

5.100. In so far as the distributions made are provided with a preceding resolution,
Ennia et al. alleges that these distributions should nevertheless not have been made
due to the overvaluation of Mullet Bay and the resultant much worse financial
situation than projected by the defendants. In this connection, the Court considers
the following.

case numbers: CUR201903842/3843/3796/3844/3845/3846          page 70
date of judgment: 29 November 2021

5.101. The value of Mullet Bay determined a significant (and increasingly important) part of the financial position of Ennia et al. In October 2010, Mullet Bay represented 55% of the value of the insurers' total assets. The defendants were warned in this context about the high concentration risk. In July 2010, the defendants were warned of this by Couperus. Voigt also warned in November 2010 about the large percentage of intercompany loans (70%) without sufficient collateral and with real estate companies affiliated with Ansary. Voigt also explicitly warned against paying out an interim dividend when the consolidated result would be marginal or even negative due to the effects of Hurricane Tomas. External actuary Buck Consultants also mentions the high concentration risk of Mullet Bay. This also applies to the Central Bank, which issued instructions relating to Mullet Bay on several occasions, including the instruction that Mullet Bay should be sold, partly in view of the concentration risk.

5.102. Under these circumstances, the importance of a correct valuation of Mullet Bay was therefore particularly high. Therefore, in the interest of Ennia et al. and the policyholders, the defendants had to ensure that Mullet Bay was not given the highest possible valuation, but the most realistic one. However, it is not at all clear from the documents submitted that the defendants had this in mind. Indeed, these show just the opposite. First of all, it was decided that the valuations would almost always be carried out by the same agency (IEB), in the person of Mr Valkenburg. He valued Mullet Bay at USD 251 million in March 2006. The report in question explicitly states that it is a superficial study and that no aspect was studied in depth. The report also states that due to the limited time available, the documentation received and information from the land registry and VROM (translator: Ministry of Housing, Spatial Planning and the Environment) were not studied in detail. The latter notifications are not mentioned in the successive reports, but their contents do not indicate that a closer study has taken place. Nevertheless, Mullet Bay was valued by IEB three times in the period from March 2006 to December 2006, with the value rising from USD 251 million to USD 337 million. No explanation is given in IEB's reports for this remarkable increase in value in a limited number of months. This also applies to the increase in value to USD 386 million (USD 565 per m2) in January 2009. In this report, IEB did mention that the global financial crisis might have a negative impact on the value in the coming years, but it is not clear how this fact was reflected in the valuation.

5.103. In addition, KPMG, at the time the auditor of Ennia et al., asked questions in April 2009 about the valuation of Mullet Bay. It follows from the response to the questions by PWC (auditor of SunResorts) that Andraous suggested to Valkenburg to value Mullet Bay at USD 1,000 per m2. It is important to note in this context that after Valkenburg's valuation in January 2009, in March 2009 new SunResorts shares

were contributed to Ennia Holding. There is nothing to show that the ever-higher valuations by IEB, at a time of a global financial crisis, caused the defendants to take a critical or more critical look. On the contrary, there is a clear indication that Andraous suggested to IEB to arrive at an even higher valuation.

5.104. In 2014, another superficial valuation was carried out by IEB, with a valuation of USD 422 million. Subsequently, a valuation was carried out by CBRE. In its draft report, CBRE arrived at a drastically lower valuation of Mullet Bay. This valuation led to the withdrawal of the assignment to CBRE and no final report being prepared. The CEI agency engaged subsequently indicated in its report that it had taken as a starting point fully buildable land. This starting point is demonstrably incorrect, so that the defendants were indeed not entitled to rely on the valuation issued by CEI, apart from the fact that CEI (as well as Valkenburg) has indicated that Andraous gave guiding directions regarding the valuation he wanted. KPMG's urgent advice in 2016 to have an independent agency look at the differing valuations by IEB, CBRE and CEI was not followed by the defendants.

5.105. It can be concluded from the above that, on the one hand, the defendants uncritically relied on the superficial valuations by IEB and, on the other hand, actively objected to the lower valuation by CBRE and subsequently instructed CEI to arrive at a valuation equivalent to IEB, whereby CEI was wrongly required to assume fully buildable land. There is nothing to show that the defendants actually made an effort to arrive at a valuation that was as realistic as possible, even though there should have been every reason for those concerned - at least - to doubt the value assigned to Mullet Bay in the books and as a result to the equity capital of Ennia et al.

5.106. The reasonable doubt as to the value attributed to Mullet Bay and therefore to the equity capital of Ennia et al. should have prevented the defendants from making millions in distributions to the shareholders. Especially now that, as the overview presented at 5.97 shows, various distributions were made in years in which Ennia Holding made losses and moreover that, as already determined above, in a (large) number of cases proper decision-making was lacking. Whether and to what extent Mullet Bay was actually overvalued is not decisive in this assessment. Nor is it decisive, as Ansary et al. argued, that the financial statements and the distributions based on them were always approved by the auditor. First of all, this is irrelevant because it does not relieve the defendants of their own responsibility. In addition, the auditor KPMG indeed also gave clear signals that there were reasons to doubt the valuation (or manner of valuation) of Mullet Bay.

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 72
date of judgment: 29 November 2021

5.107. Finally, the Court considers that the fact that in May 2019, Banco di Caribe made a dividend payment in kind to Ennia Holding in the amount of NAf 62.5 million, with the payment taking place through the transfer of BdC Investments' stake in Caribe Resorts, does not provide a reason for the assumed value of Mullet Bay. Ennia et al. argued in this context that this was (merely) a balance sheet adjustment, which did not involve any substantive assessment. In addition, as considered above, the question is not so much what value can ultimately be attributed to Mullet Bay, but whether the defendants could base their decisions to distribute to the shareholders on the (at least) questionable valuations that were available, given all the risks involved.

*liability of defendants, undue payment and unlawful conduct*

5.108. As Van Doorn rightly argued, with regard to the distributions in the years 2009 and 2010, Ennia Holding's equity capital was positive, even assuming the lowest valuation of Mullet Bay. This means that distributions made in that period did not or could not lead to negative equity capital. Therefore these distributions will not be considered. This also means that Van Doorn, who did not in effect work for Ennia et al. from January 2011, cannot be blamed in this respect.

5.109. In all other respects, the distributions made from 2011 onwards are regarded as unlawful withdrawals from Ennia Holding's equity capital. For the period from 2011 up to and including 2015, this concerns a total amount of NAf 188,975,969 (NAf 223,447,905 minus (NAf 6,962,841 + NAf 23,114,000 + NAf 4,395,095)).

5.110. As for Parman International, it received the amount of NAf 188,975,969 as a shareholder. As the Supreme Court held in *Nimox*, even if the validity of a resolution to pay dividend must be assumed as such, it does not follow that the implementation of the resolution cannot be unlawful vis-à-vis third parties (the insurers), nor that effecting the realisation of the resolution by exercising the voting right cannot be unlawful vis-à-vis third parties. In this case, to the extent that the distributions were based on a legally valid resolution in the first place (and the absence of such a resolution not already implying, in view of the provisions of Article 2:118(5) of the Civil Code, that undue payment is involved), Parman International has nevertheless acted unlawfully by taking receipt of the amounts under the circumstances as described above. This means that Parman International must pay the damage suffered by Ennia Holding in this connection, in the amount of the sums awarded to Parman International. The same applies to Ansary, Nina Ansary and Andraous. As shareholders of Parman International, they are

entitled to profit and, as Ennia et al. have argued without contestation, have received the dividends. That is unlawful, since they knew, or at least should have known, that the distributions at the expense of Ennia Holding should not have been made.

5.111. Ansary, Andraous and Palm, as (de facto) directors, are moreover jointly and severally liable for the payment of this amount by way of compensation as a result of the unlawful conduct of them as directors of Ennia et al. Ansary, Andraous and Palm took and signed various decisions on the basis of which large sums were paid to Parman International (and thus largely to Ansary himself) even though this was not justified, particularly in view of what was considered above regarding the value of Mullet Bay. They should have taken serious account of the fact that Mullet Bay was overvalued and that this had a major impact on Ennia Holding's equity capital. Andraous and Palm, as directors, also acted contrary to the articles of association by making distributions that were not based on an adequate resolution. By disregarding the interests of Ennia Holding in this regard, they acted contrary to the insight and due care that may be expected of a director who is up to his task and performs it conscientiously. It is a case of improper performance of duties and serious blame can be attributed to them in this respect.

*discharge*

5.112. Ansary, Nina Ansary, Andraous and Palm also invoked the discharge granted to them in respect of this accusation. This does not hold. It follows from article 15(2) of Ennia Holding's articles of association, valid from September 2009, that the adoption of the balance sheet and profit and loss account by the general meeting of shareholders discharged the directors from liability for their management over the past financial year and the supervisory directors from liability for their supervision. However, as Ennia et al. argued without contestation, there are no decisions regarding the adoption of the financial statements (and thus no automatic discharge) for the years 2011 up to and including 2015 of Ennia Holding. In addition, it does not follow from the financial statements that the distributions were based on the valuation of Mullet Bay, in respect of which the Court previously ruled that the directors could not and should not base themselves on that value and, on that basis, could not and should not have made distributions (or have had distributions made).

5.113. Therefore, even if any discharges were involved, they do not lead to discharge of liability for the improper performance of duties established.

case numbers: CUR201903842/3843/3796/3844/3845/3846    page 74
date of judgment: 29 November 2021

*prescription*

5.114. Ansary, Nina Ansary, Andraous and Palm also took the position that all claims originating before November 2013 have become prescribed. As found above at 5.81 and 5.82, the reliance on prescription cannot succeed.

*conclusion*

5.115. Parman International, Ansary, Nina Ansary, Andraous and Palm will be jointly and severally ordered to pay the amount of NAf 188,975,969. With regard to Van Doorn, the claim for compensation in respect of the (dividend) distributions will be dismissed.

**The accusation in respect of excessive expenditure**

*general assertions Ennia et al.*

5.116. Ennia et al. accuses the defendants of paying a total amount of NAf 140,468,624 on excessive expenditure unrelated to Ennia's business operations. This expenditure is divided into seven categories, as shown below.

|  | category | total (NAf) | chargeable to Ennia Holding (NAf) | chargeable to Ennia Investments (NAf) |
|---|---|---|---|---|
| i | donations | 20,791,970 |  | 20,791,970 |
| ii | costs of advisers | 6,136,250 |  | 6,136,250 |
| iii | salaries to persons not employed by Ennia and/or excessively paid | 10,805,610 | 6,144,224 | 2,026,578 |
| iv | remuneration of supervisory | 14,234,309 | 14,234,309 |  |
| v | travel, accommodation and business entertainment expenses | 3,812,203 | 161,822 | 3,650,381 |
| vi | buy-out of owners apartments Mullet Bay | 56,966,000 |  | 56,966,000 |
| vii | NetJets | 27,722,282 |  | 27,722,282 |
| total |  | **140,468,624** | **20,540,355** | **117,293,461** |

*general defences of Ansary et al. and Van Doorn*

5.117  Ansary et al. contests the existence of excessive costs. Ansary et al. argue that there were sufficient financial means to pay creditors and make payments to policyholders. This

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 75
date of judgment: 29 November 2021

made it possible to maintain a certain cost pattern. Ennia et al., like any other
company, had to ensure that it could pay its creditors and make the necessary
provisions for this. It is then up to the company to determine what to do with the
remaining financial resources, according to Ansary et al.

5.118. Van Doorn has argued that he cannot be blamed for all the costs that were
charged to Ennia et al. after January 2011. Van Doorn cannot be blamed in this
respect, indeed nor has he ever profited from it himself.

*assessment*

   *general*

5.119. In assessing the alleged excessive expenditure, the Court notes first and
foremost that Ennia et al. is an insurance company. As was considered above under
the assessment frameworks, this entails a special duty of care for directors,
supervisory directors and shareholders. This duty goes beyond the mere
'providing for the creditors and ensuring that the necessary provisions are made
for this', as stated by Ansary et al. It is to be expected of directors and supervisory
directors of a company like Ennia et al. that, even when the financial situation is
assumed to be positive, they handle the company's funds with care, because in
effect the funds come from policyholders, who are dependent on the same
company for their payments (often in the long term). This applies all the more in
this case, since the basis on which the defendants assumed that the financial
position was favourable, was particularly shaky. As found above, the defendants
should have been aware of this and in that respect serious blame can be attributed
to them. Ansary et al.'s supermarket defence therefore does not hold. In assessing
the alleged disproportionality of the expenditure, it is also important to note that
while Ennia, with approximately 50,000 policyholders, was a large insurer by
Curaçao standards, it was however a very small insurer by American or Dutch
standards, for example.

   *i. donations*

5.120. This case is not about whether it is logical for Ennia et al., as a locally large
insurer, to engage in sponsorship and/or donations to some extent. It is obvious
that Ennia et al. is fulfilling its social role in this respect. This case concerns the fact
that in the period from 2010 up to and including 2014, over NAf 20 million in
donations were made to causes that on the face of it have no connection whatsoever
with Ennia et al. or the region in which Ennia et al. operates. These are mainly
causes in the United States. The payment of these donations was (invariably) done

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 76
date of judgment: 29 November 2021

from Ennia Investments. The donations were therefore not visible to the insurers'
supervisors. In view of the email that Van Doorn sent to the secretary of Ennia
Holding (shown at 2.91), this seems to be a very conscious choice. It is also very
remarkable that it was said in respect of this donation not to reveal any further
details. The defendants have left this unexplained in these proceedings.

5.121. The defendants have not brought forward anything against Ennia et al.'s
assertions that, in view of their size and the fact that they are not linked to Ennia et
al., these donations are to be considered excessive and unlawful vis-à-vis Ennia et
al. In no way whatsoever was it explained by the defendants, for example, why
these donations would be (indirectly) related to Ennia et al. Ansary et al. has only
argued that it is up to the company what it spends money on. As already stated
above, the supermarket defence cannot be followed. It is seriously culpable that Van
Doorn, Palm and Andraous as directors and Ansary as de facto director allowed
such extravagant payments to be made from Ennia et al. Moreover, the causes are to
a large extent clearly linked to Ansary himself. These for example include the
donation of millions to the Peace Institute, after which the peace dove on the roof of
the institute was named the "Ansary peace dove", the foundation named after
Ansary, and the donations to President Bush. Ansary used money from Ennia et al.
as if it were (directly) his own money, as if Ennia were indeed a supermarket (in the
form of a one-man business). As a result of this unlawful conduct, Ennia
Investments has suffered damage in the amount of the donations.

5.122. Van Doorn, Andraous and Palm are liable to the extent that the donations
were made during their term of office. As regards Van Doorn, he stated without
contestation that, although he was employed until 1 April 2011, he de facto no
longer performed any work for Ennia et al. from January 2011, so that he is being
held liable to the extent that the donations were made up to and including the year
2010. Van Doorn, Andraous and Palm have put forward that they have never
benefited from these expenditures themselves. However, this is not decisive when
assessing whether they are liable as directors.

5.123. As regards Nina Ansary, Ennia et al. has not substantiated sufficiently why
she, as a supervisory director of Ennia Holding, was aware of the donations paid
from Ennia Investments and which were not (directly) visible in the financial
statements, so that it can also not be established that serious blame can be
attributed to her in this respect for the supervision she exercised. The arguments
put forward by Ennia et al. cannot support its claim on this point.



case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 77
date of judgment: 29 November 2021

5.124. The foregoing means that Van Doorn and Ansary are jointly and severally liable for the donations made during Van Doorn's active term of office, and that Andraous, Palm and Ansary are jointly and severally liable for the donations made during their term of office.

| Liability for donations | | | |
|---|---|---|---|
| Van Doorn and Ansary: | | Andraous, Palm and Ansary: | |
| **Payment made to** | **Amount (in NAf)** | **Payment made to** | **Amount (in NAf)** |
| US Peace Institute | 5,460,000 | US Peace Institute | 6,370,000 |
| Museum of Fine Arts | 2,184,000 | Bush Legacy | 910,000 |
| President Bush | 910,000 | Points of Light Institute | 1,456,000 |
| Taking Charge Foundation | 728,000 | James Baker Peace | 455,000 |
| Pentagon Memorial Fund | 546,000 | Int. Crisis Group | 455,000 |
| James Baker Peace Institute | 546,000 | Ansary Foundation/ Meal Packages | 389,470 |
| Cesar Foundation | 200,500 | Cesar Foundation | 182,000 |
| **Total** | **10,574,500** | **Total** | **10,217,470** |

> *ii. costs of advisers*

5.125. Ennia et al. states that in the period from 2006 up to and including 2017, an amount of NAf 6,136,250 was paid to advisers of Ansary and Parman International. Ennia et al. states that these costs were in no way whatsoever related to its business operations. Ansary et al. has contested this in general terms.

5.126. The costs of advisers alleged by Ennia et al. can be subdivided into three parts:
   a) payment to PwC Houston in the period 2007-2017 for tax advisory services rendered on behalf of Parman International and S&S for an amount of NAf 1.7 million in total;
   b) payment of a sum of NAf 3,640,000 to Mr A. Petrello, supervisory director of S&S;
   c) payment of a total amount of NAf 796,250 to Henze.

5.127. Without further explanation from Ansary et al., which is lacking, it is impossible to see why Ennia et al. should reasonably have to pay these costs. It would have been up to Ansary et al. to substantiate why these costs should nevertheless be borne by Ennia et al. With regard to these payments too,

case numbers: CUR201903842/3843/3796/3844/3845/3846        sheet 78
date of judgment: 29 November 2021

no reasonable director would - under the same circumstances - have made payments for work that benefited not Ennia et al. but other companies, such as S&S, with interests that moreover conflicted with those of Ennia et al. Serious blame can be attributed to the directors in this respect.

5.128. As regards the payments under (a) to PwC, it is not sufficiently clear which amounts were paid in which year, so that it cannot be determined which director under the articles of association, in addition to Ansary as a de facto director, can be held liable for which amount. Ansary is therefore liable for these payments, which, incidentally, were argued without contestation to have been forwarded within Ennia et al. by Ansary himself.

5.129. In respect of the payments under (b) to Petrello, three cheques of USD 1 million each were signed by Andraous on behalf of Ennia Investments on 13 January 2014, 10 February 2014 and 24 February 2014. The description of all cheques is 'consulting'. Ansary et al. have in no way whatsoever demonstrated that there was indeed, or had been, any consultancy work, let alone that Petrello should have been remunerated for this work by Ennia Investments to such an amount. The invoices were forwarded to Andraous via Ansary. Ennia et al. claims payment of the amounts of two of the three cheques, amounting to NAf 3,640,000. This amount will be awarded. During this period, Palm and Andraous were directors under the articles of association and Ansary was a de facto director. They are therefore jointly and severally liable.

5.130. As for the payments under (c) to Henze, Henze was Ansary's attorney. It follows from the facts that in that capacity he drafted several letters and supervised transactions, including transactions concerning S&S. Ennia et al. submitted an overview showing that in the period from 14 October 2016 up to and including 25 April 2018, an amount of USD 62,500 was transferred to Henze seven times from Ennia Investments. Ansary et al. did not put forward any defence against Ennia et al.'s assertions that Henze did not serve the interests of Ennia et al. but the interests of other companies affiliated with Ansary, and that it is therefore unclear why Ennia Investments should pay for this consultancy work. Palm, Andraous and Ansary are jointly and severally liable as (de facto) directors.

5.131. As regards payments to advisers, Ennia et al. has not argued sufficiently to justify the conclusion that Nina Ansary, as a supervisory director, could or should have known about these transactions. In view of this, it cannot be ruled either that Nina Ansary, in her capacity as supervisory director, can be criticised for failing to exercise adequate supervision in this respect, so that the claim against her in this context will be dismissed.

5.132. In summary, Ansary will be ordered to pay the amount of NAf 1,700,000 and Ansary, Andraous and Palm jointly and severally to pay the amount of NAf 4,436,250 (NAf 3,640,000 plus NAf 796,250).

> *iii. salaries to persons who were not employed by Ennia and/or were paid*
> *excessively*

5.133. Ennia et al. has stated that a number of persons were on the payroll of Ennia et al., but did not work for Ennia et al. These persons worked for or on behalf of Ansary. In its Reply, Ennia et al. submitted the payroll tax cards from which it could be deduced what amounts had been paid to them by Ennia Investments and Ennia Holding. Ennia et al. has claimed that the persons concerned did not go through an application procedure and that no employment contract was drawn up. Some of the persons are personal assistants of Ansary. Ansary et al. argued against this that Ennia et al. had not made it sufficiently clear who had instructed the HR department to pay the individuals, so that it was also not clear who could explain the situation. As for Ansary's personal assistants, Ansary et al. argued that he himself received no remuneration for his work, so that it was only reasonable that his assistants should be paid.

5.134. In the period from 2008-2018, a total of NAf 10,805,610 was paid to Andy Wescot, Clarence Derby and Evan Tromp. With regard to Andy Wescot, the payments made to him were made from the National Investment Bank. There is no evidence that these payments have been borne by Ennia Investments. The claim will therefore be dismissed in this respect.

5.135. With regard to Clarence Derby and Evan Tromp, Ennia et al. has stated without contestation that no (employment) agreements were concluded with them. That in itself does not mean that these persons, if they were indeed demonstrably working for Ennia et al., should not be paid for this. However, it is then up to the defendants to argue and substantiate this. The defendants failed to do so. They have only put forward that it is not clear to them who instructed the people of HR. In this context it is also relevant that Ansary et al., after the requested and granted inspection of the (physical) records of Ennia et al., apparently chose not to investigate these records.

5.136. Payments were also made to Ansary's personal assistants between January 2011 and November 2017, in respect of which it has been stated without contestation that these persons played no role whatsoever within Ennia et al. It is impossible to see why these persons were nevertheless paid by Ennia et al. The payments are at any rate not justified by the argument that Ansary himself was

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 80
date of judgment: 29 November 2021

not paid for his work and that it would therefore be reasonable to pay his
assistants.

5.137. In conclusion, no reasonable director would - under the same circumstances -
have made payments for activities that did not benefit Ennia et al. but other entities
or persons. In this respect serious blame can be attributed to them. Palm has also
claimed that he was not aware, for example, of the (high) payments and other
allowances to Evan Tromp and that Andraous had given these instructions.
However, this does not release him of his (joint and several) liability within the
board. The directors are always (jointly and severally) liable to the extent that the
payments were made during their term of office. Ennia et al. did not specify when
exactly the payments to various persons took place. In view of this, Van Doorn,
Andraous and Palm will only be held liable for payments in the years in which they
were appointed as directors under the articles of association for the full year.
Ansary, as de facto director, is liable for the entire period and Nina Ansary is not
liable because not enough has been put forward to justify the conclusion that she, as
a supervisory director, can be blamed in this respect. This results in the following
amounts the defendants will be ordered, in each case based on the payments
evidenced by the payroll tax cards submitted and rounded off to whole Naf:
-    for the year 2010: Ansary and Van Doorn (jointly and severally) to pay a
     total of NAf 608,363 (NAf 361,925 (Derby) plus NAf 246,438 (Tromp))
-    for the year 2011: Ansary to pay the amount of NAf 788,429 in total
     (NAf 99,972 (Cyrus) plus NAf 392,102 (Derby) plus NAf 63,831 (Leos) plus
     NAf 232,524 (Trump);
-    for the years 2012-2018: Ansary, Andraous and Palm (jointly and
     severally) to pay the total amount of NAf 4,237,392 (NAf 127,444
     (Tavallaly) plus NAf 140,184 (Archie) plus NAf 133,839 (Cyrus) plus
     NAf 2,313,870 (Derby) plus NAf 101,390 (Leos) plus NAf 1,185,336
     (Trump) plus NAf 235,329 (Clifford).

5.138. In all other respects, the claim by Ennia et al. will be dismissed for lack
of sufficient substantiation.

     iv. remuneration of supervisory directors

5.139. In its claim of NAf 14,234,309 in remuneration to supervisory directors, Ennia
et al. took as its starting point that a remuneration of NAf 52,780 per supervisory
director per annum at Ennia was 'standard' and acceptable. That this standard
amount is too low has not been argued by the defendants and does not appear to
the Court to be the case. The defendants' uncontested overview of the remuneration

case numbers: CUR201903842/3843/3796/3844/3845/3846　　　　　　　　page 81
date of judgment: 29 November 2021

paid to supervisory directors, however, shows that some of them have been amounts several times higher than these, often hundreds of thousands each year. Especially considering the small number of meetings (2 to 3 per year), this raises questions about the rationale and justification for these remunerations. The defendants have not put forward anything in that regard, other than the supermarket defence which has already been rejected. Nor is it evident from the documents that any special efforts were made by supervisory directors - with the exception of De Paus. As far as Nina Ansary is concerned, there is no evidence at all of any activity on behalf of Ennia. Therefore, it can only be concluded that also with regard to the supervisory directors' remunerations, excessive, non-arm's length expenditure was involved, Against the background of warnings from, among others, the Central Bank and the high concentration risk, described above, no reasonably acting director well-equipped for their duties could have made these excessive payments, leaving aside the question of whether the independence expected of a supervisory board was not jeopardised by doing so. Serious blame can be attributed to the directors in this respect. This also applies to Nina Ansary in her capacity as a supervisory director, who was, after all, aware of the excessive remuneration.

**Excessive remuneration to supervisory directors**

| | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 | Total remuneration in NAf |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Nina Ansary* | | | | | | | | | | | | | | |
| Paid | 58,619 | 117,237 | 117,237 | 119,401 | 121,996 | 218,739 | 232,489 | 53,225 | 235,498 | 26,938 | - | - | - | 1,301,380 |
| Excessive | 5,839 | 64,457 | 64,457 | 66,621 | 69,216 | 165,959 | 179,709 | 445 | 182,718 | 548 | - | - | - | 799,970 |
| *Frank Carlucci* | | | | | | | | | | | | | | |
| Paid | 57,789 | 115,577 | 115,577 | 117,723 | 120,318 | 217,177 | 231,181 | 51,948 | 234,247 | 52,664 | 153,976 | 52,780 | 52,780 | 1,573,738 |
| Excessive | 5,009 | 62,797 | 62,797 | 64,943 | 67,538 | 164,397 | 178,401 | - | 181,467 | - | 101,196 | - | - | 888,546 |
| *James Crystal* | | | | | | | | | | | | | | |
| Paid | 57,789 | 115,577 | 115,577 | 117,723 | 120,318 | 217,177 | 231,181 | 51,948 | 234,247 | 52,664 | 153,976 | 52,780 | 52,780 | 1,573,738 |
| Excessive | 5,009 | 62,797 | 62,797 | 64,943 | 67,538 | 164,397 | 178,401 | - | 181,467 | - | 101,196 | - | - | 888,546 |
| *Robert de Paus* | | | | | | | | | | | | | | |
| Paid | - | - | 67,420 | - | - | - | - | - | - | - | - | - | - | 67,420 |
| Excessive | - | - | 41,030 | - | - | - | - | - | - | - | - | - | - | 41,030 |
| *Richard Gibson* | | | | | | | | | | | | | | |
| Paid | 495,177 | - | - | - | 2,045,024 | 1,115,222 | 1,113,891 | 860,291 | 659,132 | 484,277 | 603,349 | 368,550 | 26,390 | 7,771,303 |
| Excessive | 442,397 | - | - | - | 1,992,244 | 1,062,442 | 1,061,111 | 807,511 | 606,352 | 431,497 | 550,569 | 315,770 | - | 7,269,893 |
| *C. Gomes Casseres* | | | | | | | | | | | | | | |
| Paid | 57,789 | 85,248 | 115,577 | 117,723 | 120,318 | 228,077 | 231,181 | 51,948 | 233,613 | 52,577 | 266,099 | | | 1,560,150 |
| Excessive | 5,009 | 32,468 | 62,797 | 64,943 | 67,538 | 175,297 | 178,401 | - | 180,833 | - | 213,319 | - | | 980,605 |
| *Jack Kemp* | | | | | | | | | | | | | | |
| Paid | - | - | - | - | - | - | - | | 21,944 | 153,976 | 52,780 | 52,780 | | 281,479 |
| Excessive | - | - | - | - | - | - | - | | - | 101,196 | - | - | | 101,196 |
| *John Macomber* | | | | | | | | | | | | | | |
| Paid | 57,789 | 115,577 | 115,577 | 117,723 | 120,318 | 217,177 | 231,181 | 51,948 | 234,247 | 52,664 | 153,976 | 52,780 | 52,780 | 1,573,738 |
| Excessive | 5,009 | 62,797 | 62,797 | 64,943 | 67,538 | 164,397 | 178,401 | - | 181,467 | - | 101,196 | - | | 888,546 |
| *Jaime Saleh* | | | | | | | | | | | | | | |
| Paid | 57,789 | 405,653 | 405,653 | 417,836 | 425,628 | 218,433 | 305,305 | 125,889 | 275,850 | 57,175 | 261,346 | - | - | 2,956,557 |
| Excessive | 5,009 | 352,873 | 352,873 | 365.056. | 372,848 | 165,653 | 252,525 | 73,109 | 223,070 | 4,395 | 208,566 | - | - | 2,375,977 |
| | | | | | | | | | | | | | | |
| Total paid | 842,739 | 954,870 | 1,052,620 | 1,008,130 | 3,073,921 | 2,432,003 | 2,576,410 | 1,247,196 | 2,106,834 | 800,904 | 1,746,698 | 579,670 | 237,510 | 18,659,504 |
| Total excessive | 473,279 | 638,190 | 709,550 | 691,450 | 2,704,461 | 2,062,543 | 2,206,950 | 881,064 | 1,737,374 | 436,440 | 1,377,238 | 315,770 | - | 14,234,309 |

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 82
date of judgment: 29 November 2021

5.140. The foregoing implies that Van Doorn, as director under the articles of association, is liable for the excessive payments made to the supervisory directors during his term(s) on the management board. Palm and Andraous, as directors under the articles of association, are liable for the excessive payments during the period of their directorship. Ennia et al. did not specify when exactly the payments to the supervisory directors took place. In view of this, Van Doorn, Andraous and Palm will only be held liable for excessive payments in the years in which they were appointed as directors under the articles of association for the full year. Ansary, as de facto director, is liable for the entire period and Nina Ansary is liable for all payments made after she took office in 2009.

This results in the following amounts that the defendants will be ordered to pay.

-    for the year 2007: Ansary and Van Doorn (jointly and severally) to pay the amount of NAf 315,770;
-    for the year 2008: Ansary to pay the amount of NAf 1,377,238;
-    for the year 2009: Ansary and Nina Ansary (jointly and severally) to pay the amount of NAf 436,440;
-    for the year 2010: Ansary, Van Doorn and Nina Ansary (jointly and severally) to pay the amount of NAf 1,737,374;
-    for the year 2011: Ansary and Nina Ansary (jointly and severally) to pay the amount of NAf 881,064;
-    for the years 2012-2017: Ansary, Andraous, Palm and Nina Ansary (jointly and severally) to pay the amount of NAf 9,486,423.

*v. travel, accommodation and business entertainment expenses*

5.141. Ennia et al. also claimed that excessive amounts had been spent on travel, accommodation and business entertainment expenses of the supervisory directors (NAf 3,128,203 over a period of 12.5 years). However, the Court considers that what Ennia et al. have put forward in support of this argument is insufficient to find that the defendants can be seriously blamed in this respect. This part of the claim will therefore be dismissed.

*vi. buy-out of owners Mullet Bay apartments*

5.142. The claims regarding the buy-out of apartment owners by SunResorts and the buy-off of the entitlements to profit of Resorts Caribe for a total of NAf 56,966,000 will also be dismissed. The payments made from Ennia Investments were offset (indirectly) by the acquisition of approximately 49,000 m2 of land on which the apartments stood, without any further obligations to apartment owners and/or Resorts Caribe. In Ennia et al.'s substantiation of this part of its claim, the Court sees insufficient points of reference to conclude that these transactions were evidently

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 83
date of judgment: 29 November 2021

unfavourable to Ennia and that serious blame can be attributed to the
defendants for these transactions having been undertaken by Ennia
Investments.

    *vii. NetJets*

5.143. Ennia et al. argued that the defendants had acted in a seriously culpable
manner by allowing the excessive costs of NetJets to be borne by Ennia et al. It takes
the position that the use of private aircraft is not logical for a Dutch Caribbean
insurer. Ennia et al. claims from NetJets (i) the difference between the purchase and
sale price of the NetJets in the amount of NAf 8,088,785 and (ii) the annual cost of
using the aircraft in the amount of NAf 19,633,497.

5.144. The documents submitted by Ennia et al. lead to no other conclusion than that
millions in non-arm's length, excessive expenditure has been incurred at the
expense of Ennia Investments It has neither been argued nor shown that the use of
private aircraft was at any time important to the business operations of Ennia et al.
The fact that Ansary is a shareholder residing in the United States is in any event
insufficient ground for this. In addition, various flights have been made between the
United States and (sunny) destinations in Europe, which in any case have no
connection whatsoever with Ennia et al.'s business operations, and which were
apparently made by Ansary and/or his wife. Although Ansary has claimed that he
paid for these flights himself, he has not provided any evidence of this. Even if
Ansary paid for the private flights himself, this does not alter the fact that Ennia
Investments was in any case paying unnecessarily high sums of money to use, and
for opportunity to use, the private aircraft. In the Court's opinion, no reasonably
acting director well-equipped for their duties could have made these excessive
payments, considering the nature of the business. It follows from the flight
overview submitted by Ennia et al. that the supervisory directors also used the
aircraft. However, it cannot be automatically inferred from this that Nina Ansary
was also aware of this (multi-million) cost item. The Court does not see sufficient
grounds to also attribute serious blame on Nina Ansary, as supervisor, in this
respect.

5.145. Van Doorn, Andraous and Palm are held liable for excessive payments in
respect of NetJets in the years in which they were directors under the articles of
association for the entire year. Ansary, as de facto director, is liable for the entire
period. This results in the following amounts that the defendants will be
ordered to pay.
    - for the year 2008: Ansary to pay the amount of NAf 1,727,365;
    - for the year 2009: Ansary to pay the amount of NAf 1,910,625;
    - for the year 2010: Ansary and Van Doorn (jointly and severally) to pay the
      amount of NAf 2,319,730;
    - for the year 2011: Ansary to pay the amount of NAf 1,884,791;

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 84
date of judgment: 29 November 2021

- for the years 2012-2018: Ansary, Andraous and Palm (jointly and severally) to pay the amount of NAf 19,879,770 (NAf 11,790,985 plus NAf 8,088,785).

*discharge and prescription in relation to excessive expenditure*

5.146. Also with regard to the excessive expenditure, the defendants took the position that they can rely on the discharge granted to them. As found above at 5.72. to 5.76. and 5.111. to 5.113., the reliance on discharge does not hold. In so far as any discharge has been granted in the first place, the payments in question are not mentioned in the financial statements of Ennia Investments and are therefore not covered by the discharge.

5.147. This also applies to the reliance on prescription as made by Ansary, Nina Ansary, Andraous and Palm. As found above at 5.81. and 5.82., the reliance on prescription cannot succeed.

**Conclusion**

5.148. The first thirty pages of this judgment set out the facts on the basis of which the Court concluded that the defendants had caused damage to Ennia et al. and that they are liable to pay compensation to Ennia et al. It was then established that after the takeover by Ansary et al., Ennia et al.'s corporate structure and investment policy had changed in such a way that the interests of Ennia et al. and its policy holders were no longer paramount. To a large extent, the special duty of care that directors and supervisory directors of a (life) insurance company have, has been neglected, despite very critical observations from Ennia et al.'s own ranks and repeated warnings and urging from the regulator, the Central Bank. The specific accusations made by Ennia et al. against the defendants - which in essence always come down to effecting or permitting withdrawals from Ennia et al.'s assets for which there was no reasonable objective reason - are partly founded. In particular, the course of events surrounding Ennia et al.'s investments in S&S has been very detrimental to Ennia et al., since the results to be achieved - to the tune of NAf 743.94 million - have largely been transferred to (other entities of) Ansary and Nina Ansary. Ennia et al.'s accusations regarding (dividend) payments and excessive and non-arm's length expenditure on, *inter alia*, donations, remuneration of supervisory directors, private jets and payments to persons not working for Ennia et al., are also justified. The defendants' defences, including their reliance on prescription and discharge, do not succeed on these points. The question of the defendants' liability has always been assessed on the basis of each party's formal responsibility and each party's own acts or omissions.

case numbers: CUR201903842/3843/3796/3844/3845/3846          page 85
date of judgment: 29 November 2021

5.149. On the basis of the foregoing, the defendants, partly jointly and severally, are liable to pay the following principal sums in compensation:

| Ansary | |
|---|---|
| **with regard to** | **amount (in NAf)** |
| S&S | 743,940,000 |
| (dividend) distributions | 188,975,969 |
| donations | 20,791,970 |
| costs of advisers | 6,136,250 |
| salaries to persons who were not employed | 5,634,184 |
| Supervisory Board | 14,234,309 |
| NetJets | 27,722,282 |
| **total** | **1,007,434,964** |

| Parman International | |
|---|---|
| **with regard to** | **amount (in NAf)** |
| (dividend) distributions | 188,975,969 |
| **total** | **188,975,969** |

| Nina Ansary | |
|---|---|
| **with regard to** | **amount (in NAf)** |
| S&S | 743,940,000 |
| (dividend) distributions | 188,975,969 |
| Supervisory Board | 12,541,301 |
| **total** | **945,457,270** |

| Van Doorn | |
|---|---|
| **with regard to** | **amount (in NAf)** |
| donations | 10,574,500 |
| salaries to persons who were not employed | 608,363 |
| Supervisory Board | 2,053,144 |
| NetJets | 2,319,730 |
| **total** | **15,555,737** |

| Andraous | |
|---|---|
| **with regard to** | **amount (in NAf)** |
| (dividend) distributions | 188,975,969 |
| donations | 10,217,470 |
| costs of advisers | 4,436,250 |
| salaries to persons who were not employed | 4,237,392 |
| Supervisory Board | 9,486,423 |
| NetJets | 19,879,770 |
| **total** | **237,233,274** |

case numbers: CUR201903842/3843/3796/3844/3845/3846    page 86
date of judgment: 29 November 2021

| Palm | |
|---|---|
| **with regard to** | **amount (in NAf)** |
| (dividend) distributions | 188,975,969 |
| donations | 10,217,470 |
| costs of advisers | 4,436,250 |
| salaries to persons who were not employed | 4,237,392 |
| Supervisory Board | 9,486,423 |
| NetJets | 19,879,770 |
| **total** | **237,233,274** |

5.150. In the operative part of this judgment, the components of the total principal sum will be awarded separately, each time indicating the extent to which joint and several liability is involved (in the sense that payment by one party will release the other). The statutory interest, against which the defendants have not put forward a specific defence of any relevance, will be awarded from the starting dates included in Ennia et al.'s claim.

5.151. In view of the outcome of these proceedings, Ennia et al. no longer has a separate interest in the declaratory decision sought, so that that part of the claim will be dismissed.

5.152. The judgment will be declared provisionally enforceable in accordance with the main rule. The Court sees no reason to deviate from this main rule. In view of what has been argued in this connection, there is also insufficient reason for the provision of security.

**Costs of the proceedings and extrajudicial costs**

5.153. Ansary and Nina Ansary, as the largely unsuccessful party, will be ordered to pay the costs of the proceedings incurred by Ennia et al. including the court fees paid by Ennia et al. in respect of each of them. In view of the scope and the financial interest of the case, the remuneration of the representatives ad litem will be estimated at NAf 25,000 per point, in derogation from the court-approved scale of costs.

5.154. With regard to the other defendants, in view of what has been claimed and what is admissible, the parties are found partially in the right and partially in the wrong. A setoff of the costs of the proceedings is appropriate.

5.155. Ennia et al. did not quantify and specify its claim for compensation of extrajudicial collection costs in these proceedings, whereas it had every opportunity to do so. The fact that such costs were incurred is, however, evident. The Court will estimate these costs in this judgment in accordance with Article 126(III) of the

case numbers: CUR201903842/3843/3796/3844/3845/3846                    page 87
date of judgment: 29 November 2021

Rules of Procedure for Civil Actions in respect of each of Ansary and Nina
Ansary at NAf 37,500 (one and a half points x applied rate) and for the other
defendants at NAf 9,000 each.

## 6.    The decision

The Court:

*with regard to*

*S&S*

6.1. orders Ansary and Nina Ansary, jointly and severally, to pay to Ennia
Investments NAf 743,940,000 plus statutory interest from 13 September 2017
until the day of payment in full;

*with regard to (dividend) distributions*

6.2. orders Ansary, Parman International, Nina Ansary, Andraous and Palm, jointly
and severally, to pay to Ennia Holding NAf 188,975,969 plus statutory interest from
the date of payment of the separate (dividend) distributions to Parman International
until the day of payment in full;

*with regard to donations*

6.3. orders Ansary and Van Doorn, jointly and severally, to pay Ennia et al. NAf
10,574,500 and Ansary, Andraous and Palm, jointly and severally, to pay Ennia
Investments NAf 10,217,470 plus statutory interest from the date of payment of
the donations in question until the day of payment in full;

*with regard to advisers' fees*

6.4. orders Ansary and Andraous, jointly and severally to pay to Ennia
Investments NAf 4,436,250 and Ansary, furthermore, to pay NAf 1,700,000 plus
statutory interest from the time of payment of the relevant costs until the day of
payment in full;

*with regard to salaries of persons who were not employed*

6.5. orders Ansary and Van Doorn jointly and severally, to pay to Ennia et al. NAf
608,363, and Ansary, furthermore, to pay NAf 788,429 and Ansary, Andraous and
Palm, furthermore, jointly and severally, to pay NAf 4,237,392 plus statutory interest
from the time of payment of the costs concerned until the day of payment in full;

case numbers: CUR201903842/3843/3796/3844/3845/3846       page 88
date of judgment: 29 November 2021

*with regard to remuneration of supervisory directors*

6.6. orders Ansary and Van Doorn, jointly and severally, to pay to Ennia et al. NAf 315,770, and Ansary, furthermore, to pay NAf 1,377,238, and Ansary and Nina Ansary, furthermore, jointly and severally, to pay NAf 436,440, and Ansary, Van Doorn and Nina Ansary, furthermore, jointly and severally, to pay NAf 1,737,374, and Ansary and Nina Ansary, furthermore, jointly and severally, to pay NAf 881,064, and Ansary, Andraous, Palm and Nina Ansary, furthermore, jointly and severally, to pay NAf 9,486,423 plus statutory interest from the date of payment of the relevant remuneration until the date of payment in full;

*with regard to NetJets*

6.7. orders Ansary to pay to Ennia Investments NAf 5,522,781, and Ansary and Van Doorn, furthermore, jointly and severally, to pay NAf 2,319,730, and Ansary, Andraous and Palm, furthermore, jointly and severally, to pay NAf 19,879,770 plus statutory interest from the date of payment of the costs in question until the date of payment in full;

*with regard to extrajudicial costs and costs of the proceedings*

6.8. orders Ansary and Nina Ansary each to pay NAf 37,500 to Ennia et al. and each of the other defendants to pay NAf 9,000;

6.9. orders Ansary and Nina Ansary, jointly and severally, to pay the costs of the proceedings incurred by Ennia et al. until this day estimated at NAf 15,000 in court registry fees, NAf 1,418.92 in costs of service and NAf 100,000 in representatives ad litem's fees to be increased by subsequent costs of NAf 250 without service and NAf 400 with service, all amounts to be increased by statutory interest from the fifteenth day after pronouncement of this judgment if payment not be forthcoming;

6.10. for the remainder, offsetting the costs of the proceedings such that each party will bear its own costs;

6.11. declares this judgment provisionally

enforceable; 6.12. dismisses all other applications.

This judgment has been rendered by C.E.M. Nootenboom-Lock, Judge, and pronounced in open court on 29 November 2021, in the presence of the court clerk.

I, D.E. Jansen, residing at The Hague, the Netherlands, certify the above to be a true and full translation from Dutch into English of the original document seen by me.

Wbtv no. 23881

# vonnis

**GERECHT IN EERSTE AANLEG VAN CURAÇAO**

Zaaknummers: CUR201903842/3843/3796/3844/3845/3846

Vonnis van 29 november 2021

inzake

**1. de naamloze vennootschap ENNIA CARIBE HOLDING N.V.,**
**2. de naamloze vennootschap ENNIA CARIBE LEVEN N.V.,**
**3. de naamloze vennootschap ENNIA CARIBE SCHADE N.V.,**
**4. de naamloze vennootschap ENNIA CARIBE ZORG N.V.,**
**5. de besloten vennootschap EC INVESTMENTS B.V.,**
alle gevestigd te Curaçao,
gemachtigden: mrs. S.M. Altena, K.D. Keizer en M.D. van den Brink,

eiseressen,

tegen

**1. Hushang ANSARY,**
wonend in Houston, Texas, Verenigde Staten,
**2. de besloten vennootschap PARMAN INTERNATIONAL B.V.,**
gevestigd in Curaçao,
**3. Nina ANSARY,**
wonend in Los Angeles, Californië, Verenigde Staten,
**4. Abdallah ANDRAOUS,**
wonend in Sint Maarten,
**5. Ralph PALM,**
wonend in Curaçao,
gemachtigden: mrs. M.F. Murray en K.A. Doekhi,
en
**6. Gijsbert VAN DOORN,**
wonend in Curaçao,
gemachtigden: mrs. J.A. de Baar en U. van Bemmelen,



gedaagden.

Eiseressen zullen hierna Ennia Holding, Ennia Leven, Ennia Schade, Ennia Zorg en
Ennia Investments worden genoemd. Eiseressen gezamenlijk zullen (in enkelvoud)
worden aangeduid als Ennia c.s.
Gedaagden zullen hierna Ansary, Parman International, Nina Ansary, Andraous,
Palm en Van Doorn worden genoemd. Gedaagden sub 1 tot en met 5 zullen
gezamenlijk (in enkelvoud) worden aangeduid als Ansary c.s.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                 blad 2
datum uitspraak: 29 november 2021

**Inleiding**

Deze zaak volgt op de intrekking van de verzekeraarsvergunning van Ennia c.s.
door de Centrale Bank in juli 2018 en het uitspreken van de noodregeling ten
aanzien van Ennia c.s. De Centrale Bank staat sindsdien aan het roer bij Ennia c.s. In
deze zaak spreekt Ennia c.s. een aantal van haar (voormalige) bestuurders,
commissarissen en aandeelhouders aan tot schadevergoeding, door Ennia c.s.
begroot op ruim NAf 1,1 miljard. Volgens Ennia c.s. is sprake geweest van
onrechtmatig handelen (in groepsverband), onbehoorlijk bestuur en onbehoorlijk
toezicht, waarbij gedaagden de belangen van Ennia c.s. en haar polishouders
hebben geschaad en andere (eigen) belangen voorop hebben gesteld. Gedaagden
bestrijden dat daarvan sprake is geweest en weerspreken de door Ennia c.s. aan hen
gemaakte verwijten.

Dit vonnis heeft de volgende inhoud:

1.  Het procesverloop
2.  De feiten
    -   *Feiten m.b.t. de bij de procedure (indirect) betrokken partijen en entiteiten*
    -   *Feiten m.b.t. de situatie bij Ennia c.s. vanaf de overname door Ansary in 2005/2006 tot na het uitspreken van de noodregeling*
    -   *Feiten m.b.t. de afzonderlijk door Ennia c.s. aan gedaagden verweten gedragingen*
3.  De vorderingen
4.  De grondslagen van de vorderingen en het verweer van gedaagden
5.  De beoordeling
    -   *De vorderingsgerechtigdheid van Ennia c.s.*
    -   *De toetsingskaders*
    -   *De algemene verwijten*
    -   *Groepsaansprakelijkheid*
    -   *Het verwijt terzake S&S*
    -   *Het verwijt terzake de olieplatforms*
    -   *Het verwijt terzake de (dividend)uitkeringen*
    -   *Het verwijt terzake excessieve uitgaven*
    -   *Slotsom*
    -   *De proceskosten en de buitengerechtelijke kosten*
6.  De beslissing

**1.      Het procesverloop**

1.1     Het procesverloop blijkt uit:

-   de rolbeschikking tot wederoproeping van 20 april 2020;
-   het vonnis in het incident tot vrijwaring van 14 september 2020;



zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 3
datum uitspraak: 29 november 2021

- het vonnis in de incidenten tot zaaksvoeging en tot inzage en in de hoofdzaak van 26 oktober 2020;
- het proces-verbaal van de comparitie van partijen van 2 december 2020;
- het vonnis in het incident tot inzage en in de hoofdzaak van 18 januari 2021;
- de conclusie van repliek van Ennia c.s. van 22 maart 2021;
- de conclusie van dupliek van Ansary c.s. van 31 mei 2021;
- de conclusie van dupliek van Van Doorn van 31 mei 2021;
- de akte uitlating producties van Ennia c.s. van 28 juni 2021;
- het proces-verbaal van de pleidooien, gehouden op 14 en 15 oktober 2021.

1.2.    Vonnis is bepaald op vandaag.

**2.     De feiten**

2.1.    De feiten zijn onderverdeeld in
- feiten met betrekking tot de bij de procedure betrokken partijen en entiteiten;
- feiten met betrekking tot de situatie bij Ennia c.s. vanaf de overname door Ansary in 2005/2006 tot na het uitspreken van de noodregeling;
- feiten met betrekking tot de afzonderlijke door Ennia c.s. aan gedaagden verweten gedragingen.

*Feiten met betrekking tot de bij de procedure (indirect) betrokken partijen en entiteiten*

2.2.    De Ennia-groep (hierna: Ennia), waarvan Ennia c.s. deel uitmaakt, bestaat naast haar uit Banco di Caribe N.V. (hierna: Banco di Caribe) en een aantal groepsmaatschappijen. Ennia Leven, Ennia Zorg en Ennia Schade vormen samen de verzekeraars. De verzekeraars hebben ongeveer 50.000 polishouders, waarvan 30.000 pensioenpolishouders. In 2018 bedienden de verzekeraars 50% van de verzekeringsmarkt in Curaçao, Sint Maarten, Aruba en Bonaire en 80% van de private pensioenmarkt in Curaçao. De aandelen van de verzekeraars, Ennia Investments en Banco di Caribe zijn in handen van Ennia Holding.

2.3.    Op basis van de Landsverordening Toezicht Verzekeringsbedrijf (LTV) staan de verzekeraars onder toezicht van (voorheen) de Bank Nederlandse Antillen en (thans) de Centrale Bank van Curaçao en Sint Maarten (hierna in beide gevallen: de Centrale Bank).

2.4.    De vennootschappen waaruit Ennia c.s. bestaat zijn dochtervennootschappen van Parman International. De aandeelhouders van Parman International zijn blijkens het aandeelhoudersregister van 31 december 2017 onder meer Ansary (77,1%), Nina Ansary (15,9%) en Andraous (1%).

2.5.    Ansary is onder meer grootaandeelhouder van Parman International en van Parman Capital Group LLC (hierna: Parman Capital). In de periode 15 december

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 4
datum uitspraak: 29 november 2021

2005 tot 8 oktober 2012 was hij tevens bestuurder van beide vennootschappen.
Ansary was van 25 januari 2006 tot 4 juli 2018 voorzitter van de raad van
commissarissen van Ennia Holding en voorzitter van het *investment committee* van
Ennia Holding. Ansary is daarnaast grootaandeelhouder en bestuurder van
SunResorts Ltd N.V. (hierna: SunResorts). Het belangrijkste actief van SunResorts
betreft Mullet Bay, een (voormalig) resort op Sint Maarten. Sinds 23 november 2005
is Ansary tevens voorzitter van het bestuur en van het *executive committee* van
Stewart & Stevenson LLC (hierna: S&S). Ansary is sinds 21 juli 2006 bestuurder van
Resorts Caribe B.V. (hierna: Resorts Caribe).

| Ansary: | | |
|---|---|---|
| **Entiteit** | **Functie(s)** | **Periode** |
| Parman Capital | bestuurder<br>grootaandeelhouder | 15/12/2005 – 08/10/2012<br>vanaf overname Ennia –<br>heden |
| Parman International | bestuurder<br>grootaandeelhouder | 15/12/2005 – 08/10/2012<br>vanaf overname Ennia –<br>heden |
| Ennia Holding | voorzitter RvC<br>voorzitter *investment committee* | 25/01/2006 – 04/07/2018<br>19/05/2006 – 04/07/2018 |
| Ennia Investments | bestuurder | 20/07/2006 – 27/04/2007 |
| S&S | voorzitter bestuur<br>voorzitter *executive committee* | 23/11/2005 – heden<br>23/11/2005 – heden |
| SunResorts | bestuurder | vanaf overname Ennia –<br>heden |
| Resorts Caribe | bestuurder | 21/07/2006 – heden |

2.6.    Nina Ansary is bestuurder en aandeelhouder van Parman Capital. Tevens is
zij aandeelhouder en sinds 15 december 2015 bestuurder van Parman International.
In de periode 20 mei 2009 tot 4 juli 2018 was zij commissaris van Ennia Holding.
Daarnaast is zij bestuurder van S&S.

| Nina Ansary: | | |
|---|---|---|
| **Entiteit** | **Functie(s)** | **Periode** |
| Parman Capital | bestuurder<br><br>aandeelhouder | vanaf overname Ennia – heden<br>vanaf overname Ennia – heden |
| Parman International | bestuurder<br>aandeelhouder | 15/12/2005 – heden<br>vanaf overname Ennia – heden |
| Ennia Holding | commissaris | 20/05/2009 – 04/07/2018 |
| S&S | bestuurder | vanaf overname Ennia – heden |

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                      blad 5
datum uitspraak: 29 november 2021

2.7.     Andraous is CFO bij Parman Capital. Sinds 7 juli 2005 is hij bestuurder van
Parman International. In de periode 9 februari 2011 tot april 2018 was hij bestuurder
van Ennia Holding en lid van het *investment committee*. Tevens was Andraous in de
periode van 4 mei 2017 tot 4 juli 2018 bestuurder van Ennia Investments en van 26
maart 2011 tot 4 juli 2018 bestuurder van de verzekeraars. Daarnaast is hij onder
meer bestuurder van Resorts Caribe.

| *Andraous:* | | |
|---|---|---|
| **Entiteit** | **Functie(s)** | **Periode** |
| Parman Capital | chief financial officer (CFO) | vanaf overname Ennia-heden |
| Parman International | bestuurder | 07/07/2005 – heden |
| | aandeelhouder | vanaf overname Ennia-heden |
| Ennia Holding | bestuurder | 09/02/2011 – 04/2018 |
| | lid *investment committee* | 19/05/2006 – 04/07/2018 |
| Ennia Investments | bestuurder | 04/05/2017 – 04/07/2018 |
| Ennia Zorg | bestuurder | 26/03/2011 – 04/07/2018 |
| Ennia Leven | bestuurder | 26/03/2011 – 04/07/2018 |
| Ennia Schade | bestuurder | 26/03/2011 – 04/07/2018 |
| Resorts Caribe | bestuurder | 21/07/2006 – heden |

2.8.     Van Doorn is in twee perioden werkzaam geweest bij Ennia c.s. Van 14
maart 2005 tot 16 juni 2008 en van 25 juni 2009 tot 30 april 2011 was hij bestuurder
(CEO) van Ennia Holding en de verzekeraars en lid van het *investment committee*.
Daarnaast was hij van 20 juli 2006 tot 1 mei 2009 bestuurder van Ennia Investments.

| *Van Doorn:* | | |
|---|---|---|
| **Entiteit** | **Functie(s)** | **Periode** |
| Ennia Holding | bestuurder | 14/03/2005 – 16/06/2008 |
| | | 25/06/2009 – 30/04/2011 |
| | lid *investment committee* | 14/03/2005 – 16/06/2008 |
| | | 25/06/2009 – 30/04/2011 |
| Ennia Investments | bestuurder | 20/07/2006 – 01/05/2009 |
| Ennia Zorg | bestuurder | 14/03/2005 – 16/06/2008 |
| | | 25/06/2009 – 30/04/2011 |
| Ennia Leven | bestuurder | 14/03/2005 – 16/06/2008 |
| | | 25/06/2009 – 30/04/2011 |
| Ennia Schade | bestuurder | 14/03/2005 – 16/06/2008 |
| | | 25/06/2009 – 30/04/2011 |
| Resorts Caribe | bestuurder | 31/07/2006 – 01/02/2011 |

2.9.     Palm heeft in maart 2011 de functie van CEO overgenomen van Van Doorn.
Van 9 februari 2011 tot 4 juli 2018 was hij bestuurder van Ennia Holding en lid van
het *investment committee*. Van 26 maart 2011 tot 4 juli 2018 was hij bestuurder van de

zaaknummers: CUR201903842/3843/3796/3844/3845/3846        blad 6
datum uitspraak: 29 november 2021

verzekeraars en van 1 januari 2012 tot 4 juli 2018 bestuurder van Ennia Investments.

| Palm: | | |
|---|---|---|
| **Entiteit** | **Functie(s)** | **Periode** |
| Ennia Holding | bestuurder | 09/02/2011 – 04/07/2018 |
| | lid *investment committee* | 19/05/2006 – 04/07/2018 |
| Ennia Investments | bestuurder | 01/02/2012 – 04/07/2018 |
| Ennia Zorg | bestuurder | 26/03/2011 – 04/07/2018 |
| Ennia Leven | bestuurder | 26/03/2011 – 04/07/2018 |
| Ennia Schade | bestuurder | 26/03/2011 – 04/07/2018 |
| Resorts Caribe | bestuurder | 19/08/2011 – heden |

*Feiten met betrekking tot de situatie bij Ennia c.s. vanaf de overname door Ansary in 2005/2006 tot na het uitspreken van de noodregeling*

2.10.     Tot de overname van Ennia door Ansary waren de aandelen van Ennia Holding grotendeels in handen van Delta Lloyd Antillen N.V. (hierna: Delta Lloyd). Ennia Holding hield (indirect) alle aandelen in de verzekeraars. De verzekeraars beschikten over een vergunning en stonden onder toezicht van de Centrale Bank. In dat kader dienden zij jaarlijks inzicht te geven in hun financiële positie. De aandelen in Banco di Caribe waren in handen van een aantal personen.

2.11.     Op 20 mei 2005 is tussen Delta Lloyd en Ansary een overeenkomst gesloten inzake de koop van Ennia Holding door Ansary. In de koopovereenkomst staat (in artikel 10.1):

> As from Completion, Purchaser will procure that the solvency of the Group Companies will be and remain to the satisfaction of the competent Governmental Bodies.

2.12.     Op 20 december 2005 is 50,1% van de aandelen in Banco di Caribe geleverd aan Parman International. Tijdens een buitengewone aandeelhoudersvergadering van Banco di Caribe op 20 december 2005 is door Ansary onder meer het volgende meegedeeld:

> In order to grow and expand it is the intention of the Parman Group to invest one hundred million guilders in the Bank, in tranches, subject to the decision of the management and in accordance with the articles of incorporation.

2.13.     De aandelen in Ennia Holding zijn op 5 januari 2006 door Delta Lloyd geleverd aan Banco di Caribe.

2.14.     Op 25 januari 2006 heeft een buitengewone aandeelhoudersvergadering plaatsgevonden van Ennia Holding. Tijdens deze vergadering heeft Ansary aangegeven een kapitaalinjectie te willen doen van NAf 100 miljoen door middel van het verhogen van het aandelenkapitaal van Ennia Holding. De aandeelhouders

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 7
datum uitspraak: 29 november 2021

hebben tijdens deze vergadering ingestemd met deze verhoging van het
aandelenkapitaal.

2.15.    Op 22 december 2005 en in december 2006 is door Parman International
kapitaal ingebracht in Banco di Caribe. Parman International heeft dit gedaan in de
vorm van aandelen in SunResorts voor een (papieren) waarde van NAf 98,5 miljoen.
Na deze inbreng en de daarmee samenhangende uitgifte van aandelen in Banco di
Caribe hield Parman International 79,88% van de aandelen in Banco di Caribe.
Vervolgens heeft Banco di Caribe voor een (papieren) waarde van NAf 100 miljoen
aandelen SunResorts aan Ennia Holding geleverd. Het ging daarbij in totaal om een
belang van 22,5% in SunResorts.

2.16.    Ansary is na de overname van Banco di Caribe en Ennia Holding benoemd
tot voorzitter van de raad van commissarissen (RvC) van zowel Banco di Caribe als
Ennia Holding, waarbij in januari 2006 door de RvC aan Ansary de bevoegdheid is
gegeven tot het doen van (alle) investeringen ten behoeve van Banco di Caribe.

2.17.    Op 19 mei 2006 is door de RvC van Ennia Holding besloten tot het instellen
van een *investment committee*. Ansary is benoemd tot voorzitter. Het *investment
committee* kreeg van de RvC de bevoegdheid tot het nemen van besluiten ter zake
van investeringen van Ennia Holding en de verzekeraars.

2.18.    Op 20 juli 2006 is Ennia Investments (als dochtermaatschappij van Ennia
Holding) opgericht. Ennia Investments werd verantwoordelijk voor alle
investeringen van Ennia c.s. De voor de overname van Ennia c.s. bestaande
beleggingsportefeuille werd gewijzigd, waarbij bestaande beleggingen werden
geliquideerd en nieuwe investeringen werden gedaan. Deze investeringen vonden
plaats vanuit Ennia Investments met geldmiddelen van de verzekeraars, waardoor
intercompany-vorderingen ontstonden tussen de verzekeraars en Ennia Investments
(dan wel Ennia Holding).

2.19.    De Centrale Bank heeft bij brief van 22 augustus 2006 aan Banco di Caribe
(destijds de moedermaatschappij van Ennia c.s.) bericht dat tekortkomingen zijn
geconstateerd, waaronder een solvabiliteitstekort. In deze brief worden de
investeringen in S&S en SunResorts genoemd.

2.20.    Bij besluit van de RvC van Ennia Holding van 19 februari 2007 zijn alle tot op
dat moment genomen investeringsbeslissingen goedgekeurd. Eveneens op 19
februari 2007 is eenzelfde besluit genomen door de RvC van Banco di Caribe. Het
gaat daarbij onder meer om investeringen in S&S en Resorts Caribe (Mullet Bay).

2.21.    Resorts Caribe is op 21 juli 2006 opgericht door Parman International en
heeft een deel van Mullet Bay in eigendom verkregen (ongeveer 49.000 m2).

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 8
datum uitspraak: 29 november 2021

2.22.    Op 24 juli 2008 is door de Centrale Bank een onderzoeksrapport uitgebracht
ten aanzien van Ennia Leven over de periode december 2006 tot mei 2008. Daarin is
opgenomen dat de investeringen die door Ennia Holding en Ennia Investments zijn
gedaan, niet kunnen worden meegenomen bij de beoordeling van de solvabiliteit
van Ennia Leven.

2.23.    Bij brief de Centrale Bank aan Ennia Schade van 23 september 2008 wordt
door de Centrale Bank aangegeven dat onderzoek is gedaan naar Ennia Schade. In
de brief staat verder:
> Based on our examination we wish to inform you that Ennia Caribe Schade N.V. is in
> compliance with our rules and regulations. Since the acquisition of Ennia by the
> Parman Group, the management of the company has recorded impressive progress.
> Thanks to the investments decisions made by the group and additional capital
> infusion the company is now not only solvent but in a much stronger position.

Een brief met dezelfde inhoud is toegezonden aan Ennia Zorg.

2.24.    De vennootschapsstructuur van Banco di Caribe en Ennia is op verzoek van
de Centrale Bank gewijzigd. In een brief van 11 maart 2009, gericht aan Banco di
Caribe staat onder meer:
> From a supervisory perspective it is imperative to increase the transparency within
> the [Banco di Caribe]-group. Therefore you should restructure [Banco di Caribe]-
> group by separating the banking entities, the insurance entities, and the non-
> banking/insurance entities from each other. This means that [Ennia Holding] is no
> longer allowed to be a subsidiary of [Banco di Caribe] (…).
> The capital of the (immediate) parent company of the separated entities must at all
> times equal the sum of the capital of all its immediate subsidiaries. Furthermore, all
> supervised subsidiaries must be adequately capitalized and meet all our supervisory
> guidelines at all times. (…)

2.25.    De structuur is vervolgens gewijzigd in die zin, dat Ennia Holding de
moedermaatschappij werd met de verzekeraars en Banco di Caribe als
dochtermaatschappijen. Tevens is Ennia Investments als dochtermaatschappij van
Ennia Holding opgenomen in de vennootschapsstructuur. Onderstaand is de
vennootschapsstructuur (in beperkte vorm) schematisch weergegeven.



zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 9
datum uitspraak: 29 november 2021

2.26.    In een memo van 10 februari 2010 van jurist L. Voigt (hierna: Voigt), legal
counsel bij Ennia c.s., gericht aan de directie van Ennia, staat onder meer het
volgende:

> Aansluitend op mijn eerdere berichten c.q. meldingen treft u hieronder een, niet
> limitatieve, opsomming aan van door mij geconstateerde kwesties die strijdig zijn
> met vigerende regelgeving en/of dringend om aandacht vragen.
> (…)
> In de praktijk besluit de RvC van [Ennia Holding], waarbij de directie van de [Ennia
> Leven] en [Ennia Schade] worden geïnformeerd en geïnstrueerd om besluiten uit te
> voeren. Mij is bekend dat de directie meermaals heeft geprobeerd deze problematiek
> met de RvC van [Ennia Schade], [Ennia Zorg] en [Ennia Leven] bespreekbaar te
> maken.
> (…)
> In confesso is dat op dagbasis er overleg is tussen de voorzitter van de directie en de
> aandeelhouder, waarbij daarna bepaalde beslissingen transacties worden genomen.
> Vanuit prudentieel oogpunt is een dergelijk frequent overleg ongewenst.
> (…)
> Melding van de Centrale Bank (…) dat ENNIA <u>in grote mate, zo niet hoofdzakelijk,</u>
> in strijd handelt met vigerende compliance wetgeving.
> (…)
> Beleggingen zijn door de RvC van de holding (?) aan een aantal personen
> gedelegeerd. De legaliteit van dat besluit is m.i. dubieus en moet aangepast worden.
> Bovendien is ook hier sprake van conflicterende belangen, nu het niet om gelden van
> de vennootschap gaat, doch om gelden van derden (polishouders). De
> toezichtwetgeving en de *Guidance notes* van de centrale bank vereisen prudente
> beleggingen. <u>Er is reden te veronderstellen dat de belegging van de huidige</u>
> <u>vermogenswaarden van de polishouders niet de kwalificatie prudent verdient</u> (zie
> de notitie van Spigthoff blz. 3).
> (…)
> Veel transacties missen mijns inziens de statutair vereiste goedkeuring van de
> directie en worden toch uitgevoerd. Zo ook donaties, leningen en betalingen aan
> derden. (…)

2.27.    Per e-mail van 8 juli 2010 heeft de interne actuaris van de verzekeraars, de
heer H. Couperus, aan het bestuur te kennen gegeven zich zorgen te maken over de
structuur van aansturing bij Ennia Leven en het bestaande concentratierisico wat
betreft de investeringen. Hij schrijft onder meer:

> (…)
> Ennia Leven Aruba is op orde (…)
> Ennia Leven zelf niet: te groot aandeel in Land op SXM en [S&S] waarbij S&S ook
> nog eens een CCC rating heeft. De interest op de verstrekte leningen wordt niet
> betaald. (…) er moet wel op dit vlak ingegrepen worden: terugbrengen van het
> concentratierisico (dus verkoop gedeelte SXM en S&S), betalen van de interesten en
> alles onder control van het leven bedrijf. En uiteraard moet de solvabiliteit van
> [Ennia Leven] aangevuld worden. (…)

2.28.    Naar aanleiding van een daarop volgend overleg is door de bestuurders van



zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 10
datum uitspraak: 29 november 2021

de verzekeraars op 13 oktober 2010 een besluit vastgelegd waarin onder meer is
opgenomen dat de intercompany-vorderingen niet verder mogen toenemen, dat de
overeengekomen rente zal worden betaald en dat het concentratierisico zal worden
teruggedrongen.

2.29.    Bij memo van 24 november 2010 heeft Voigt onder meer het volgende
bericht:

> In mijn hoedanigheid van Legal Counsel heb ik een (beperkt) onderzoek gedaan
> naar de gang van de gang van zaken binnen ENNIA.
> Centraal in mijn onderzoek stond de vraag of de rechten van verzekerden bij ENNIA
> (Leven dan wel Zorg) voldoende gewaarborgd zijn.
> Mijn bevindingen geven mijns inziens aanleiding om te spreken van een zeer
> ernstige, zorgelijke en alarmerende situatie. Hieronder een opsomming van een
> aantal vastgestelde feiten.
>    1.   Ruim 70% van het belegd vermogen van ENNIA Leven is als lening
>         verstrekt aan [Ennia Investments], c.q. aan de Parmangroep gerelateerde
>         waarden. Er is geen sprake van enige mate van zekerheid. Naar verluidt zou
>         [Ennia Investments] de gelden hebben benut om te participeren in
>         onroerend goed ondernemingen gelieerd aan de Parmangroep en effecten in
>         Steward en Stevenson. Van de laatste onderneming is twijfelachtig wat de
>         waarde is.
>    2.   De rentebetalingen op de leningen vindt niet plaats en er is een deficit van
>         62 mio.
>    3.   Vrijgevige substantiële donaties zonder enig aanwijsbaar doel voor de
>         samenleving waarin ENNIA opereert of voor ENNIA.
>    4.   Betaling van substantiële kosten die niet ENNIA gerelateerd zijn.
>    5.   Twijfelachtige leningen, waaronder 19 mio aan EVDA zonder dat zekerheid
>         is verstrekt. Inmiddels blijkt ook dat van terugbetaling geen sprake is en
>         enige aktie vanuit ENNIA uitblijft.
>    6.   Voorstellen voor Interim-dividend (en mogelijk uitbetaling) van USD 2.5,
>         respectievelijk 1.5 MIO, in een situatie waarbij bekend is dat vanwege de
>         schade door Tomas het geconsolideerd resultaat marginaal of zelfs negatief
>         zal zijn.
>    7.   Het niet inkopen van adequate herverzekering.
> Het beeld is ontstaan van zeer dominante functionarissen van Parman International
> c.q. van de voorzitter van de RvC die financiële transacties zonder enige baat voor
> ENNIA initiëren, waarbij de directie zonder slag of stoot volgt. Volwaar een zeer
> verontrustende ontwikkeling.
> Gezien de ernst van de door mij geschetste situatie wens ik op korte termijn, in ieder
> geval nog voor 1 december 2010 de kwestie met de gehele directie te bespreken
> teneinde vast te stellen of er een herstelplan bestaat, en zo ja, welke garanties zijn
> ingebouwd om de rechten van de polishouders te garanderen. (…)

2.30.    Op 18 januari 2011 heeft een overleg plaatsgevonden waarbij de bestuurders
van Ennia c.s. (Andraous, Gibson, Van Doorn, Martina, Curiel en Meuleman) en
Ansary aanwezig waren. In het door Van Doorn opgemaakte verslag van dit overleg
staat onder meer:



zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 11
datum uitspraak: 29 november 2021

> De uitkomst van de meeting was dat:
> - De heer Ansary uitermate duidelijk aangaf zelf de beleggingsbeslissingen te zullen
> blijven nemen, en dat wij daar als statutaire directie geen enkele rol in spelen.
> - De noodzaak tot het afbouwen van de posities in IC leningen door hem niet werd
> onderschreven.

Van Doorn heeft vanaf eind januari 2011 geen werkzaamheden meer verricht bij
Ennia c.s. en is in april 2011 formeel uit dienst getreden.

2.31.    In de hierop volgende periode zijn door zowel interne als externe
toezichthouders (kritische) opmerkingen geplaatst over de wijze waarop en door
wie binnen Ennia c.s. beslissingen worden genomen, over de intercompany-
vorderingen en onderliggende investeringen (S&S en Mullet Bay) en over de
solvabiliteit.

2.32.    In een rapport van 10 maart 2011 van de externe actuaris van Ennia c.s., Buck
Consultants, staat onder meer:

> As agreed in our meeting of March 4, 2011 at the office of KPMG in Willemstad,
> Curaçao, we hereby provide you with our findings regarding the Liability Adequacy
> Test (hereafter: LAT) of [Ennia Leven] as per December 31, 2010. We acknowledge
> that the deficit resulting from the LAT for [Ennia Leven] is NAF 40 to 60 million.
> The cause for this deficit is the mismatch in assets and insurance liabilities of [Ennia
> Leven]. In our belief surplus or deficit of the LAT is the outcome of a management
> decision process. We therefore perceive the following current situation.
> **Current situation**
> 1. Too small amount (approximately NAF 200 million) has been invested in
>    fixed income assets with a duration of more than 5 years.
> 2. High concentration of assets. More than NAF 650 million of the assets in
>    only two investments (S&S bonds NAF 139 million, S&S share NAF 218
>    million and Sun Resorts NAF 321 million).
> 3. Investment focus is primarily on group level and structured from a fiscal
>    point of view. Too little attention for the specific requirements of a life
>    insurer.
> 4. No clear and simple structure for loans to [Ennia Holding] and/or [Ennia
>    Investments] within the loan portfolio of [Ennia Leven].
> 5. NAF 75 million of (yet) unpaid interest by [Ennia Investments] and [Ennia
>    Holding] to [Ennia Leven]
> 6. NAF 73 million of intercompany balances between [Ennia Leven] and [Ennia
>    Holding]
> 7. NAF 90 million of shares **(CITI),** which are by nature not yielding a fixed
>    income
> 8. No defined and applied strategic [Ennia Leven] investment policy



2.33.    De Centrale Bank heeft in april 2012 een onderzoeksrapport uitgebracht over
Ennia Leven over de periode 2010-2012. In dit rapport wordt door de Centrale Bank
geconcludeerd dat de investeringen van Ennia Leven in strijd zijn met het (eigen)
beleggingsbeleid en de beginselen van prudente beleggingen. In het rapport staat

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 12
datum uitspraak: 29 november 2021

onder meer:

> During our review of the investment plan we determined that [Ennia Leven] does
> not comply with the investment mix indicated in the plan, specifically the allocation
> of fixed income securities. The plan mentions a bandwith of 5-10 % for investments
> in loans of affiliates. We determined however, that [Ennia Leven] had invested 81%
> of the fixed income securities, in loans of affiliates. The granting of these loans by
> [Ennia Leven] to an affiliated company are in the bank's opinion in conflict with its
> own investment plan and prudent investments practices and exposes [Ennia Leven]
> to an unacceptable level of concentration risk.
> The Bank is in process of finalizing its valuation guidelines which should be used for
> the completion of the ARAS filings in the future. In this guideline:
> - Loans granted to affiliates are subject to admissibility by the Bank. If any
>   combination of loans to affiliates exceeds greater of 10% of all other
>   admissible assets or 25% of the previous year's Net Equity Unassigned that
>   is reported in ARAS File 106, Line 8, then the excess must be reported and
>   deducted as an excess loan.
> - Investments with a rating of BBB (S&P) or BAA (Moody's) or higher can be
>   reported as admissible assets.

Daarnaast is in het rapport opgenomen dat sprake is van een onacceptabel groot
concentratierisico. Over de belegging door Ennia c.s. in obligaties van S&S, die 58%
van het totaal van Ennia's investeringen betreffen, stelt de Centrale Bank dat S&S
een CCC (S&P) rating heeft. De Centrale Bank vervolgt dan:

> Based on the provisions in article 34 of the Insurance Supervision Ordinance the
> Bank disapproves the reporting of these investments on [Ennia Leven]'s balance
> sheet as assets to cover the technical provisions. Only investments with at least a
> rating of BBB (S&P) or BAA (Moody's) will be allowed to be reported as admissible
> assets in future ARAS filings.

Over de rol van Ansary bij Ennia c.s. stelt de Centrale Bank dat zij afkeurend staat
tegenover het feit dat Ansary zowel meerderheidsaandeelhouder is van Ennia
Leven als voorzitter van de RvC en het *investment committee* van Ennia Investments.

2.34.    Eind 2012 heeft Ennia Investments twee nieuwe entiteiten opgericht, die
organisatorisch onder Ennia Investments kwamen te hangen, te weten EC
International Cy Ltd op Cyprus en EC Investments International S.a.r.l. in
Luxemburg (hierna: ECII Luxemburg), die laatste met een US Branch in de
Verenigde Staten.

2.35.    Bij brief van 23 december 2013 heeft de Centrale Bank aan Ennia Schade
bericht dat de financiële cijfers over 2012 zijn ontvangen en dat er nog een aantal
vragen is. Verder staat in de brief onder meer:

> (…) Finally we refer you to the Valuation Guidelines developed by the Bank which
> were presented to the sector in December of 2011 and subsequently discussed with
> the sector which contains guidelines as to how assets reported in the ARAS filings
> should be valued.
> We also refer you to article 34 paragraph 2 of the National Ordinance Insurance
> Supervision (N.G. 1990, nr. 77) which stipulates that the technical provisions

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 13
datum uitspraak: 29 november 2021

reported by an insurance company must be fully covered by assets and that the Bank
can object to the nature and appraisal of the assets, whereupon the insurer shall take
steps to meet the Bank's requirements. (…) It concerns in particular the affiliated
loans and receivables reported by [Ennia Schade] on its balance sheet. (…)

2.36.    In reactie op de brief van de Centrale Bank van 23 december 2013 heeft Palm
namens Ennia Schade in een brief gedateerd 30 december 2013 onder meer het
volgende geschreven:
> We are aware of the several drafts of the Valuation Guidelines and the possible
> impact on [Ennia Schade] once the guidelines are formally issued. We are also aware
> that we need to take steps between now and issuance of the final Valuation
> Guidelines to meet the revised solvency requirements. In the meantime we are in
> compliance with the solvency requirements as confirmed in your letter dated August
> 14, 2013.

2.37.    In een brief van de Centrale Bank aan Ennia Leven van 10 maart 2014 staat
onder meer dat er geen additionele leningen door Ennia Leven aan Ennia Holding
of Ennia Investments mogen worden verstrekt en dat de bestaande leningen op hun
vervaldata niet mogen worden verlengd. Verder is opnieuw vastgesteld dat de
activa op de balans van Ennia Investments grotendeels uit beleggingen in S&S en
SunResorts bestaan en dat ook daar het concentratierisico aanwezig is. In dat kader
wordt verzocht de jaarrekeningen van de betreffende vennootschappen te
overleggen.

2.38.    Bij brief van 5 januari 2015 bericht de Centrale Bank aan Ennia Leven onder
meer:
> De bank heeft u herhaaldelijk erop geattendeerd dat de concentratie van beleggingen
> van [Ennia Leven] bij de geaffilieerde entiteiten niet acceptabel is voor de Bank. De
> Bank heeft er bij u op aangedrongen om stappen te ondernemen teneinde te komen
> tot een situatie waarbij het concentratierisico tot een minimum wordt teruggebracht.
> (…) In tegenstelling tot uw bevestiging (…) blijkt uit de jaarrekening van 2013 van
> [Ennia Investments] dat de leningsovereenkomst met [Ennia Investments] voor het
> bedrag van NAf 565.259.725 (vertegenwoordigt 43% van de totale activa per 31
> december 2013 van [Ennia Leven]) met 23 jaren is verlengd. (…) De Bank tolereert
> dit niet en benadrukt dat de verlenging van deze overeenkomst (…) niet acceptabel
> is voor de Bank. (…)
> In onze brief van 10 maart 2014 hebben wij u voor het laatst aangegeven dat de Bank
> de op de 2013 balans van [Ennia Leven] te rapporteren leningen aan geaffilieerde
> entiteiten/vordering op geaffilieerde entiteiten zal beoordelen. De Bank had u
> geïnstrueerd om hiervoor de jaarrekeningen 2013 van [Ennia Investments], [S&S],
> SunResorts Ltd en [Ennia Holding] uiterlijk 1 juli 2014 aan de Bank te verstrekken.
> De consequenties van het niet nakomen hiervan heeft de Bank verschillende keren
> aan u medegedeeld, namelijk dat de Bank niet zal toelaten ("non-admissable") dat
> deze leningen op de balans van [Ennia Investments] worden gerapporteerd. Ook aan
> deze instructie heeft u geen gehoor gegeven. (…)



Vervolgens geeft de Centrale Bank aan Ennia Leven opnieuw een aantal instructies.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                  blad 14
datum uitspraak: 29 november 2021

2.39.    Bij brief van 25 juni 2015 van de Centrale Bank aan de verzekeraars wordt
vastgesteld dat niet aan de instructies wordt voldaan en worden de instructies
herhaald.

2.40.    In september 2015 heeft de Centrale Bank de solvabiliteitsvereisten
gewijzigd. De gewijzigde regels zijn opgenomen in de *General insurance annual
statement composition and valuation guidelines non-life ensurance aras v 2.7.* (hierna:
General Valuation Guidelines). Daarin staat onder meer:

> This guide sets forth a compilation of the accounting practices and procedures
> prescribed by the Bank relative to the Annual Statement submitted by the licenses
> insurance companies transacting business in or from Curacao and Sint Maarten.

Gelet op de gewijzigde richtlijnen konden intercompany-vorderingen in beginsel
niet langer worden meegenomen bij de berekening van de solvabiliteitsratio.

2.41.    In de brief van 6 oktober 2015 van de Centrale Bank aan de verzekeraars
wordt benoemd dat sprake is van een solvabiliteitstekort doordat nog steeds sprake
is van een toename van het aantal niet toegestane beleggingen en vorderingen op
geaffilieerde entiteiten, die door de Centrale Bank als niet toegestane activa worden
aangemerkt.

2.42.    De Centrale Bank schrijft in een brief van 4 augustus 2016 gericht aan de
verzekeraars onder meer:

> (…) Gebaseerd op de evaluatie van de door Ennia voorgestelde maatregelen en ter
> waarborging van de verplichtingen jegens de polishouders dringt de Bank erop aan
> dat Ennia de volgende punten tot uitvoering brengt: (…)

Vervolgens volgen tien punten/aanwijzingen, waaronder de aanwijzing dat verdere
leningen aan en vorderingen op geaffilieerde entiteiten niet meer zijn toegestaan en
dat bestaande leningen binnen een periode van maximaal drie jaar dienen te
worden afgelost dan wel gereduceerd. Daarnaast diende Ennia te bewerkstelligen
dat Mullet Bay en de aandelen van S&S binnen een termijn van maximaal drie jaar
zouden worden verkocht en dat de opbrengst zou worden aangewend voor door de
Centrale Bank toegestane beleggingen zoals bepaald in de waarderingsgrondslagen.
Ook is een aantal maatregelen opgenomen ter versterking van de liquiditeitspositie.

2.43.    In een brief van de Centrale Bank van 22 september 2016 gericht aan de
verzekeraars herhaalt de Centrale Bank bovengenoemde punten en geeft daarbij aan
wat de status is. Vervolgens staat in deze brief:

> Voorts is de Bank van mening dat Ennia, gezien de per datum van dit schrijven nog
> openstaande punten, onvoldoende gevolg heeft gegeven aan haar aanwijzingen. In
> het licht hiervan acht de Bank de maatregel op grond van artikel 31 lid 3, sub a van
> de Ltv (zoals gewijzigd) noodzakelijk. (…)

2.44.    Bij brief van de Centrale Bank van 29 september 2016 heeft de Centrale Bank
Ennia Leven aangezegd dat met ingang van 1 oktober 2016 de maatregel als bedoeld
in artikel 31 lid 3 sub a LTV van kracht wordt. In de brief staat verder:

zaaknummers: CUR201903842/3843/3796/3844/3845/3846　　　　　　　　　blad 15
datum uitspraak: 29 november 2021

Het vorenstaande impliceert dat met ingang van dat tijdstip de directie van Ennia haar bevoegdheden slechts mag uitoefenen na goedkeuring van de door de Bank aangewezen personen.

Er worden door de Centrale Bank twee personen (als stille curatoren) benoemd.

2.45.　　Op 11 november 2016 heeft accountant R. de Paus (hierna: De Paus) een e-mail gestuurd aan Ansary, cc aan Palm, Andraous en RvC-leden Saleh en Gomes Casseres. De Paus is in maart 2016 aangetreden als lid van de RvC van Ennia Holding. In de e-mail staat onder meer:

(…)

It is not a pleasure or an honor to be part of this at all. It is a daily headache and it is very damaging for my reputation. I do not need all this and I do not want it. I am about to offer you my resignation right now unless we would be able to solve the majority of the problems on very short notice.

(…)

We are having whistleblowers, major issues with all the supervising Central Banks, rulings by the Central Banks, major issues with the external auditor, very unhappy local management that is spending a lot of time fighting all these issues instead of being busy doing business and making money etc etc.

(…)

What I want us to do to solve this situation is:

- We give local KPMG everything that they ask for and have them finalize the 2015 accounts before the end of the year. I know they can do it. Please let us handle this.
- We give the supervising Central Banks what they ask for and we prevent that they will be imposing an emergency ruling on us. Please let us handle this.
- You find another way to finance S&S (bank loans, another unitholder, increase your personal investment or whatever) and make S&S (or another party) repay or take over one serie of perpetual units within a couple of weeks from now or preferably sooner. This investment in S&S is by far the biggest problem that we have to solve in order to return to a normal situation for an Insurance company and a bank. Please do that without further delay. We have to show our good intentions.
- As long as we have a stake in S&S, local management has to receive monthly financial updates from them. (Balance sheets, profit and loss statements and statements of shareholders equity). Up to now local management has not the faintest idea how our most important investment of NAf 500 million is performing and neither do we. That is absolutely absurd. Please let us have the most recent financial information from them today or tomorrow.
- Hopefully not, but in case the Ennia Companies would not meet the solvency requirements (after impairments) the company needs additional funding. Hopefully you can arrange for that if necessary.

(…)



2.46.　　Op 16 november 2016 heeft een bespreking plaatsgevonden tussen de Centrale Bank en Ennia Leven. Namens Ennia Leven waren daarbij aanwezig de

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 16
datum uitspraak: 29 november 2021

heer G. Martina en De Paus. Onder agendapunt 6 (positie tot dusver van de Raad
van Commissarissen over de huidige situatie) staat in de notulen van dit overleg
vermeld:

> [De Paus] geeft een toelichting over zijn betrokkenheid bij ENNIA. Hij deelt mede
> dat de procedure voor zijn benoeming in maart is gestart maar dat hij pas sinds 20
> september betrokken is. Hij stelt erg geschrokken te zijn hoe ENNIA en BDC er voor
> staan. Er hebben volgens hem vreemde beleggingen plaatsgevonden, Ansary laat
> mensen dingen doen die ze niet willen. Hij vraagt zich af hoe dit mogelijk is. Al het
> vermogen is belegd in 2 assets, tegen alle fatsoensnormen in hoewel destijds niet in
> strijd met regelgeving. Hij vraagt zich af waarom hij niet is tegengehouden door het
> bestuur en de RvC? (…)

2.47.    De Paus heeft eind november 2016 zijn ontslag als commissaris ingediend.

2.48.    Op 22 juni 2018 is een overeenkomst opgesteld. In deze overeenkomst,
getekend door Gibson en Andraous namens Ennia Investments en Ansary namens
S&S, staat onder meer:

> This Investment Management Agreement (…) is by and between [Ennia
> Investments] and [S&S] (the "IM"). The parties hereto agree as follows:
> 1. [S&S] will accept and manage the investment of US$ 250 million, of which US$ 100
> million of [Ennia Investments] funds be transferred now and the balance at later
> dates.
> 2. [S&S] guarantees a return on investment of funds deposited with it of 6.5% per
> annum from the date of the receipt of each tranche by [S&S], such guaranteed return
> to be payable semi-annually.
> 3. (…)

Vanuit Ennia Investments is diezelfde dag het bedrag van USD 100 miljoen
overgemaakt naar S&S.

2.49.    Op 3 juli 2018 heeft de Centrale Bank de vergunning van de verzekeraars
ingetrokken. Het verzoek van de verzekeraars tot schorsing van het besluit tot
intrekking is door dit gerecht afgewezen.

2.50.    Bij beschikking van het gerecht van 4 juli 2018 (ECLI:NL:OGEAC:2018:160)
is op verzoek van de Centrale Bank de noodregeling als bedoeld in artikel 60 LTV
uitgesproken ten aanzien van Ennia c.s. de Centrale Bank is gemachtigd conform het
bepaalde in artikel 60 lid 2 LTV ten aanzien van alle onder de noodregeling
geplaatste verweersters. De machtiging betreft de vereffening van het geheel of een
gedeelte van de portefeuille van de verzekeraar, overdracht van alle of van een deel
van de rechten en plichten uit of krachtens overeenkomsten van verzekering, of
herstructurering van het bedrijf van de verzekeraar. De machtiging strekt mede tot
vereffening van het vermogen van de onderneming van de verzekeraar.

2.51.    Op 5 juli 2018, na het uitspreken van de noodregeling, is het (onder 2.48
bedoelde) bedrag van USD 100 miljoen (terug)geboekt aan Ennia Leven. De helft

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                         blad 17
datum uitspraak: 29 november 2021

van dit bedrag is overgemaakt vanuit S&S, de andere helft vanuit een privérekening
van Ansary.

2.52.    Op 25 september 2018 heeft de Centrale Bank in New York een zogenoemde
*Chapter 15* procedure aanhangig gemaakt, waarbij is verzocht de noodregeling te
erkennen in de Verenigde Staten. Daartegen heeft Parman International op 24
oktober 2018 een *Objection* ingediend. Op 20 december 2018 is door de rechtbank in
New York geoordeeld dat de noodregeling wordt erkend. Op 29 januari 2019 is door
de rechtbank in New York op verzoek van de Centrale Bank een voorziening
toegekend om beschikking te krijgen over activa van Ennia c.s. in de Verenigde
Staten op rekeningen bij de Merrill Lynch bank.

2.53.    Op 31 januari 2019 is door dit gerecht vonnis in kort geding gewezen in een
zaak tussen Parman International en de Centrale Bank (ECLI:NL:OGEAC:2019:15).
Kort samengevat heeft Parman International in deze zaak gevorderd de Centrale
Bank te bevelen de noodregeling in te trekken en de al genomen maatregelen en
besluiten te schorsen en de Centrale Bank te bevelen om met Parman International
in overleg te treden met als doel een voor alle partijen acceptabele herstructurering
van Ennia overeen te komen. De vorderingen van Parman International zijn
afgewezen. In het vonnis is onder meer geoordeeld:

> 4.19.    Al het voorgaande brengt het gerecht tot de conclusie dat niet aannemelijk is
> dat de bodemrechter tot het oordeel zal komen dat [de Centrale Bank] onrechtmatig
> heeft gehandeld door over te gaan tot indiening van het verzoek ex artikel 60 lid 1
> LTV. Ook is niet aannemelijk dat de bodemrechter oordelend op een rechtsmiddel,
> (…) tot het oordeel zal komen dat de noodregeling niet moet worden uitgesproken.
> De situatie is, samenvattend, immers aldus dat Verzekeraars al lange tijd niet
> voldoen aan de geldende regels op het gebied van solvabiliteit, dat hierin geen
> verbetering is opgetreden ondanks instructies van [de Centrale Bank], dat een laatste
> plan is geblokkeerd door de (uiteindelijke) aandeelhouder en dat in plaats daarvan
> juist een substantieel bedrag uit de groep wordt gehaald. In die omstandigheden is
> aannemelijk dat (ook) een bodemrechter tot het oordeel zal komen dat het belang
> van de gezamenlijke schuldeisers ingrijpen door de toezichthouder vordert en dat
> dit ingrijpen in de vorm van de noodregeling moet plaatsvinden. (…)
> 4.24.    Het gerecht komt al met al tot het voorlopige oordeel dat de Ennia-
> vennootschappen gezamenlijk als "verzekeraar" in de zin van de LTV moeten
> worden beschouwd. [De Centrale Bank] was dus bevoegd om ook ten aanzien van
> [Ennia Leven] en [Ennia Investments] om toepassing van de noodregeling te
> verzoeken. (…)



2.54.    Op 9 oktober 2019 is tussen ECII Luxemburg en Ennia Investments een
overeenkomst van cessie gesloten, waarin is opgenomen dat ECII Luxemburg haar
in de periode 2005- 2018 ontstane vorderingen op -onder meer- de directe en
indirecte aandeelhouders van Ennia Holding cedeert aan Ennia Investments. Op 19
maart 2021 is een soortgelijke overeenkomst van cessie gesloten tussen Energy
Equipment International Ltd (hierna Energy Equipment) en Ennia Investments.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 18
datum uitspraak: 29 november 2021

*Feiten met betrekking tot de afzonderlijk door Ennia c.s. aan gedaagden verweten gedragingen*

S&S

> *Verwijten Ennia c.s.: de investering bracht te grote (concentratie)risico's met zich, er hebben voor Ennia c.s. ongunstige transacties en conversies plaatsgevonden en Ennia c.s. heeft ten onrechte niet volledig meegedeeld in de winst*

2.55.    S&S Inc is een Amerikaanse onderneming die zich richt op de olie- en gasindustrie. S&S Inc produceert en distribueert apparatuur voor deze industrie. Tussen S&S Inc en Ansary zijn op 27 september 2005 en 24 oktober 2005 twee overeenkomsten tot stand gekomen ter zake van de koop van alle activa van S&S Inc voor een bedrag van USD 277 miljoen. In dat verband is op 29 november 2005 S&S opgericht door Ansary. De *operating agreement* van S&S dateert van 23 januari 2006.

2.56.    Ansary is vanaf de oprichting van S&S tot en met de verkoop van S&S de voorzitter van het bestuur en de *executive committee* van S&S geweest. Aandeelhouders van S&S waren Parman Capital en (verschillende entiteiten van) Ennia, waaronder BdC Investments B.V. (hierna: BdC Investments). Ansary is grootaandeelhouder van Parman Capital. In januari 2006 heeft de RvC van Banco di Caribe aan Ansary de vrijheid verleend om ter zake van alle investeringen alle besluiten te nemen. Op 19 mei 2006 heeft de RvC van Ennia Holding een vergelijkbare bevoegdheid gegeven aan het *investment committee* van Ennia Holding.

2.57.    De koopprijs van USD 277 miljoen voor de activa van S&S Inc is voldaan door het aantrekken door Ansary van vreemd vermogen van USD 250 miljoen (een lening en kredietfaciliteit bij JP Morgan Chase) en de inbreng van eigen vermogen van USD 70 miljoen. Van deze USD 70 miljoen is USD 5 miljoen (7,1%) ingebracht door Parman Capital tegen uitgifte van 5.000 '*common shares*' in S&S met een nominale waarde van USD 1.000 per aandeel. De *common shares* boden stemrecht en winstrecht. USD 65 miljoen (92,9%) is ingebracht door BdC Investments, tegen uitgifte van 6.500 '*preferred shares, non convertible*' in S&S met een nominale waarde van USD 10.000 per aandeel. De *preferred shares* boden recht op een tot 8% per jaar gemaximeerd rendement. Aan de aandelen was geen stemrecht of winstrecht verbonden.

2.58.    Op 17 oktober 2006 heeft BdC Investments 6.000 *preferred shares* in S&S overgedragen aan Ennia Investments tegen betaling van USD 60 miljoen. De betaling is ten laste gekomen van Ennia Leven. In dat kader zijn door Ennia Leven spaardeposito's ter waarde van USD 62 miljoen opgezegd.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 19
datum uitspraak: 29 november 2021

2.59.    Op 9 november 2006 zijn de 500 door BdC Investments en de 6.000 door
Ennia Investments gehouden *preferred shares* geconverteerd naar 1.667 *common
shares*. Na deze conversie was het aandelenbelang van BdC Investments en Ennia
Investments in S&S gezamenlijk 25%. Het aandelenbelang van Parman Capital in
S&S beliep toen 75%. De door Parman Capital gehouden *common shares* waren
aangeduid als *Class B common shares*. Deze aandelen gaven tien stemrechten per
aandeel en konden uitsluitend door bepaalde in de statuten aangewezen personen
worden gehouden, onder wie Ansary, zijn vrouw en zijn nakomelingen in rechte
lijn, evenals trusts en rechtspersonen in eigendom van deze personen. De common
shares van BdC Investments en Ennia Investments hadden één stemrecht per
aandeel.

2.60.    Op 5 september 2007 heeft een splitsing plaatsgevonden van de common
shares in S&S. De aandelenverhoudingen zijn daardoor niet gewijzigd. Na splitsing
hielden BdC Investments en Ennia Investments ongeveer 25 miljoen aandelen in
S&S en Parman Capital ongeveer 75 miljoen *Class B*-aandelen.

2.61.    Op 16 maart 2009 heeft Ennia Investments met Parman International
(handelend namens Parman Capital) een overeenkomst gesloten inzake de koop
door Ennia Investments van extra aandelen (15%) in S&S tegen een bedrag van
USD 26,7 miljoen. In deze overeenkomst is een terugkoopoptie opgenomen, waarbij
Parman Capital het 15% aandelenbelang binnen twee jaar zou kunnen terugkopen
tegen betaling van de nominale waarde (USD 26,7 miljoen), vermeerderd met een
opslag van 12% per jaar.

2.62.    Het bedrag van USD 26,7 miljoen is overgemaakt op de rekening van
Parman International. Van dit bedrag is vanuit Parman International USD 3 miljoen
overgemaakt aan Nina Ansary, USD 21,4 miljoen aan Ansary en USD 2,3 miljoen
aan mede-aandeelhouder F. Carlucci.

2.63.    Eveneens op 16 maart 2009 heeft Ennia Investment de resterende aandelen
van BdC Investments overgenomen. De koopsom kwam ten laste van Ennia Leven,
waardoor een intercompany-vordering ontstond van Ennia Leven op Ennia
Investments. Met deze tweede koopovereenkomst van 16 maart 2009 kwam het
belang van Ennia Investments in S&S uit op 40%.

2.64.    In 2011 is door Goldman Sachs een waardering van de *equity value*
(aandelenwaarde) van S&S uitgevoerd. In het rapport van 5 april 2011 is de *equity
value* op een bandbreedte van USD 780 miljoen – USD 1,7 miljard gewaardeerd. In
een rapport van Wells Fargo van 7 april 2011 komt de *equity value* van S&S uit op
een bedrag tussen USD 1,16 miljard – USD 1,44 miljard.

2.65.    Ennia heeft in de periode van 2008 tot 2011 voor een bedrag van (ongeveer)
USD 127 miljoen obligaties gekocht in S&S. De obligaties hadden een looptijd tot

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 20
datum uitspraak: 29 november 2021

2014 en S&S was over het nominale bedrag van de obligaties een rente van 10% per jaar verschuldigd. De obligaties zijn in 2013 omgezet in aandelen aangeduid als *adjustable rate non-cumulative perpetual preferred units – series 1,* (hierna: *preferred units 1*), tegen een nominale waarde van USD 141,96 miljoen en een tot 6% per jaar gemaximeerd rendement. De *preferred units 1* hebben een onbepaalde looptijd. Er is geen sprake van stemrecht of recht op winstdeling boven de bepaalde rentevoet. Overdracht is enkel mogelijk na goedkeuring door de houders van common shares.

2.66.    Op 17 december 2012, nadat door Ennia Investment de twee nieuwe entiteiten EC International Cy Ltd en ECII Luxemburg waren opgericht (zie ook onder 2.34), heeft Ennia Investment alle door S&S uitgegeven aandelen en obligaties ingebracht in EC International Cy Ltd. Daarna zijn deze activa verplaatst naar ECII Luxemburg en op 21 december 2012 naar de US Branch van ECII Luxemburg.

2.67.    Op 22 mei 2014 heeft de CFO van Ennia Holding, de heer R. Breedijk (hierna: Breedijk) een notitie opgesteld voor Palm en Andraous over de waardering van de S&S *common units*. In deze notitie staat onder meer:
> **Impairment test fiscal 2013** – As per the January 31, 2014 audited S&S financial statements the fair value of the S&S Common Units were determined to be US$ 11 per common unit by an independent, third party valuation of S&S in connection with a share-based compensation plan. Based on the above and the total S&S Common Units outstanding of 56,025,210, [ECII Luxemburg] share of 40% results in a valuation of US$ 247 million.

2.68.    Op 26 juni 2014 is het gehele belang van ECII Luxemburg in S&S (40%) verkocht aan Parman Capital voor een bedrag van USD 133,4 miljoen, in ruil waarvoor ECII Luxemburg een schuldbekentenis (*promissory note*) ontving. De rente over de schuldbekentenis bedroeg 4% per jaar en de looptijd tien jaren met een mogelijkheid tot eerdere aflossing. Voorafgaand aan deze transactie is via e-mail gecorrespondeerd tussen Andraous en de heer W.F. Henze (hierna: Henze). Henze was in de betreffende periode werkzaam als advocaat bij het kantoor Jones Day. Henze was (tevens) adviseur van het bestuur van S&S. In een e-mail van 28 april 2014, met als onderwerp 'draft promissory note', staat het volgende:
> Here's a draft of a note that could serve to be consideration for the transfer by [ECII Luxemburg] of its 40% of the S&S common units to Parman (Delaware).
> I assumed that this needs to look and feel like a bona fide enforceable instrument. Accordingly, it contains the general terms and conditions that one would expect to find in a transaction between unrelated parties.
> (…)

2.69.    Op 4 september 2015 heeft Henze een e-mail gestuurd aan Palm over de omzetting van de *promissory note* in *preferred units*. Daarin staat onder meer:
> At Mr. Ansary's request, attached is a draft letter from [ECII Luxemburg] to S&S pursuant to which [ECII Luxemburg] offers to exchange that certain promissory note dated June 26, 2014 in the original principal amount of $ 133,411,778, (together with

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 21
datum uitspraak: 29 november 2021

> (i) a refund of the cash interest paid thereon, $ 5,336,472, and (ii) interest accrued
> thereon through September 26, 2015 (the effective date of the exchange) for 140,093
> Preferred Units -Series 2.

De door Henze opgestelde conceptbrief is, nadat deze is gezien door Palm en
Andraous, ongewijzigd op 16 september 2015 verzonden door ECII Luxemburg US
Branch aan S&S.

2.70.    De *promissory note* is op 26 september 2015 beëindigd tegen uitgifte van
140.093 preferente aandelen (*adjustable rate non-cumulative preferred units- series 2*,
hierna: *preferred units 2*) in S&S tegen een nominale waarde van USD 140,093
miljoen. De *preferred units 2* hebben een onbepaalde looptijd. Er is geen sprake van
stemrecht of recht op winstdeling boven de bepaalde rentevoet. De rentevoet
bedraagt maximaal 6% per jaar. Overdracht is (enkel) mogelijk na goedkeuring door
de houders van common shares. In een door KPMG in september 2016 opgemaakt
rapport wordt een aantal aan de *preferred units 2* verbonden nadelen benoemd.

2.71.    Op 26 april 2016 is door PWC een waarderingsrapport ten aanzien van S&S
uitgebracht. De *equity value* van S&S is per 30 juni 2015 geschat op USD 690-770
miljoen. Uitgaande van deze waardering zou een belang van 40% een waarde
vertegenwoordigen van USD 219-252 miljoen.

2.72.    Eind 2017 heeft S&S haar activa verkocht aan Kirby Corporation (hierna
Kirby) voor een bedrag van USD 744,5 miljoen. Van dit bedrag heeft Ennia een
bedrag van in totaal USD 286 miljoen ontvangen (38% van de opbrengst): op 13
september 2017 een bedrag van USD 145 miljoen en op 26 oktober 2017 2.262.883
aandelen in Kirby, die op het moment van de activa-verkoop een waarde
vertegenwoordigden van USD 141 miljoen. Het bedrag van USD 286 miljoen was
gebaseerd op de nominale waarde van de *preferred units 1* (USD 141,96 miljoen), de
nominale waarde van de *preferred units 2* (USD 140,09 miljoen) en de opgebouwde
interest over *preferred units 1 en 2* (respectievelijk USD 1,02 miljoen en USD 3,11
miljoen).

*Olieplatforms*

> *Verwijten Ennia c.s.: deze investering was enkel in het belang van S&S en Ennia*
> *c.s. heeft bij de verkoop verlies geleden*

2.73.    In 2009 heeft Energy Equipment (eerst een dochtermaatschappij van BdC
Investments en daarna van Ennia Investments, zie ook onder 2.54) een aantal
mobiele olieplatforms (*oil rigs*) gekocht bij S&S. Op 11 november 2009 zijn drie
olieplatforms gekocht voor een bedrag van USD 16.492.308. Op diezelfde dag zijn
nogmaals drie olieplatforms aangekocht voor een bedrag van USD 20.976.924. Beide
overeenkomsten zijn namens Energy Equipment getekend door Van Doorn. De
betaling is verricht vanuit Banco di Caribe. De CEO van Banco di Caribe heeft in een

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 22
datum uitspraak: 29 november 2021

e-mail van 13 december 2010, in het kader van de betaling van de olieplatforms, het volgende geschreven aan Andraous, Van Doorn en Steve Graybill:

> I will make the payments
> However, I want to make sure that everyone understands that this is violation with Central Bank Regulations which states that we may not invest for more than ANG 22 mln (10% of equity) in any one vehicle (and they consider oil rigs as an investment since it is not "banking" related and it is consolidated). We are already at ANG 33 mln. They will be making a point of this in our on site inspection report. (…)

2.74.    In juli 2011 is door Energy Equipment een olieplatform verkocht voor een bedrag van USD 7.444.148. In juni 2013 is een olieplatform verkocht voor USD 6.992.308. In september 2017 zijn de resterende vier olieplatforms verkocht voor een totaalbedrag van USD 12 miljoen. De verkoopovereenkomst is namens Energy Equipment getekend door Palm. Alle olieplatforms zijn terugverkocht aan S&S.

*Mullet Bay*

> *Verwijten Ennia c.s.: Mullet Bay is bewust overgewaardeerd en het concentratierisico was te groot*

2.75.    Mullet Bay is een in Sint Maarten gelegen perceel van ongeveer 67,7 hectare, waarvan 40 hectare golfterrein. Mullet Bay is ondergebracht in SunResorts. Mullet Bay was een golfresort en *timeshare* locatie en is in de jaren '80 aangekocht door onder anderen Ansary. In 1995 is Mullet Bay aangetast door de orkaan Luis, met schade aan de bebouwing. Het Towers Hotel is overgebleven en nog in gebruik. Voor het overige is het terrein grotendeels niet verder (her)ontwikkeld.

2.76.    In 2005 en 2009 heeft Ansary via Parman International aandelen SunResorts ondergebracht in Banco di Caribe en Ennia Holding.

2.77.    Ten aanzien van Mullet Bay zijn verschillende taxatierapporten uitgebracht.
   a)   In mei 2002 heeft een waardering plaatsgevonden door Independent Consulting Engineers N.V. (hierna: ICE). ICE heeft de waarde van het land en bijbehorende voorzieningen getaxeerd op USD 68,3 miljoen, waarbij het land op USD 54,7 miljoen werd gewaardeerd (USD 75/m²).
   b)   In juni 2005 is Mullet Bay getaxeerd door de heer David Morrison. De waarde van het land is getaxeerd op USD 242,5 miljoen (USD 337/m²).
   c)   In maart 2006 heeft een taxatie plaatsgevonden door de heer Toon Valkenburg vanuit zijn bedrijf Independent Expertise Bureau N.V. (hierna: IEB). IEB komt uit op een (markt)waardebepaling van USD 250,8 miljoen (USD 365/m²). In het rapport staat vermeld:
> (…) This survey is superficial in its nature. No aspect of any building or structure were studied in depth. (…) Due to the limited time available, none of the documentation and information received from either the cadastre or VROM was studied in detail. (…)

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 23
datum uitspraak: 29 november 2021

d) Op 1 december 2006 heeft IEB Mullet Bay getaxeerd op een marktwaarde van USD 292 miljoen (USD 426,5/m²).

e) Op 28 december 2006 heeft IEB Mullet Bay getaxeerd op een marktwaarde van USD 337 miljoen (USD 492,50/m²).

f) In januari 2009 heeft IEB Mullet Bay gewaardeerd op een marktwaarde van USD 386 miljoen (USD 565/m²).

g) Op 24 oktober 2011 heeft IEB Mullet Bay getaxeerd op USD 400 miljoen (USD 595/m²).

h) Op 1 december 2014 heeft IEB Mullet Bay gewaardeerd op USD 417 miljoen (USD 620/m²).

i) Op 29 september 2016 is een conceptrapport uitgebracht door vastgoedbureau CBRE. In dit rapport is Mullet Bay getaxeerd op USD 35,4 miljoen (USD 53/m²).

j) Op 30 november 2016 heeft het bureau Conseils Evaluations Immobilieres (CEI) een taxatierapport uitgebracht. In dit rapport is uitgegaan van de veronderstelling dat het gehele perceel (inclusief de golfbaan) bebouwbaar is. Mullet Bay is getaxeerd op een waarde van USD 436 miljoen (USD 620/m²).

k) Op 11 juni 2018 heeft IEB Mullet Bay gewaardeerd op het bedrag van USD 419 miljoen (USD 620/m²).

l) In opdracht van de Centrale Bank is Mullet Bay op 27 september 2018 door Cushman & Wakefield getaxeerd en gewaardeerd op USD 50 miljoen (USD 75,52/m²).

m) Op 27 januari 2021 is Mullet Bay in opdracht van de Centrale Bank getaxeerd door JLL op een bedrag van USD 96,4 miljoen.

2.78. De waarderingen zijn door Ennia c.s. in onderstaand overzicht opgenomen.



Overzicht waarderingen Mullet Bay, in US$ miljoen



zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 24
datum uitspraak: 29 november 2021

2.79.    In de jaarrekening van SunResorts is Mullet Bay in het boekjaar dat eindigde
op 31 augustus 2005 opgenomen voor een bedrag van USD 2,2 miljoen. Daarbij is de
waarderingsgrondslag gebruikt waarbij wordt uitgegaan van het bedrag waarvoor
Mullet Bay oorspronkelijk is aangekocht. Voor de jaarrekening 2005/2006 van
SunResorts is een waarderingsgrondslag gebruikt waarbij wordt uitgegaan van de
marktwaarde. In het boekjaar dat eindigde op 31 augustus 2006 is Mullet Bay
opgenomen voor een bedrag van USD 337 miljoen.

2.80.    Zoals hiervoor onder 2.15 opgenomen is op 22 december 2005 en in
december 2006 door Ansary via Parman International aandelenkapitaal ingebracht
in Banco di Caribe. Parman International heeft dit gedaan in de vorm van aandelen
in SunResorts voor een (papieren) waarde van NAf 98,5 miljoen. Na deze inbreng
hield Parman International 79,88% van de aandelen in Banco di Caribe. Vervolgens
heeft Banco di Caribe voor een (papieren) waarde van NAf 100 miljoen aandelen
SunResorts aan Ennia Holding geleverd. Het ging daarbij in totaal om een belang
van 22,5% in SunResorts.

2.81.    Na de waardering van Mullet Bay in januari 2009 door IEB zijn in maart 2009
via Parman International aandelen SunResorts ingebracht tegen uitgifte van
aandelen Ennia Holding voor een waarde van NAf 150 miljoen. In oktober 2010 is
voor een bedrag van NAf 348,89 miljoen aan aandelen SunResorts ingebracht. Na
deze inbreng had Ennia Holding 93,3% van de aandelen in SunResorts. Mullet Bay
vertegenwoordigde op dat moment 55% van de waarde van de totale activa van de
verzekeraars.

2.82.    Op 23 april 2009 heeft KPMG, destijds de huisaccountant van Ennia c.s., een
memo opgesteld over de waarde van Mullet Bay. KPMG heeft daarover contact
gehad met PWC, de externe accountant van SunResorts. In het memo staat onder
meer:

(…)
To get comfort with the revaluation of the land [Mullet Bay] KPMG (Marit Beishuizen)
had a meeting with PWC (Ton van Kooten) to discuss how they came to the conclusion
during their audit that the new value of the land is correct. Below you will find the
questions and answers:

1)   To evaluate the external expert's professional competence, did you consider
     whether the external expert:
 •   has professional certification or licensing by, or membership in, an appropriate
     professional body, and
 •   has experience and reputation in the field for which we are seeking audit
     evidence.

*The external expert (Ton Valkenburg) has no license, because it is not needed in St. Maarten. It is
a 'vrij beroep. PWC knows that this expert is doing a lot of work for the banks and insurers on St.
Maarten. These companies like to do business with him. PWC knows this expert and he performed
also valuations with other big projects in Cupecoy (Trade Win I/II) and Divi Little Bay. So he has
experience with big projects.*

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 25
datum uitspraak: 29 november 2021

*He told PWC, that [Andraous] asked him to value the land for USD 1000 per M2, but he*
*remained objective and finally to USD 565 per M2.*
(…)

2.83.    Na het uitbrengen van het conceptrapport door CBRE (2.77 onder i) heeft
Breedijk in reactie op dit rapport aan CBRE gevraagd of de taxatie alleen The
Towers betreft, of het gehele terrein inclusief golfbaan, nu de getaxeerde waarde
10% betreft van de eerdere taxaties. CBRE antwoordt daarop dat het de taxatie van
het gehele terrein betreft. Op 27 oktober 2016 vraagt Breedijk per e-mail aan
Andraous, Palm en Martina wat hij aan CBRE kan vertellen. In reactie daarop
antwoordt Andraous aan (alleen) Palm:

> *I didnt copy the others. The Ambassador doesn't want to use them. He wants to*
> *choose the firm* (…)

"Ambassador" was een benaming en aanspreektitel die bestuurders en
commissarissen van Ennia c.s. bezigden voor Ansary.

2.84.    Vervolgens is het bureau CEI ingeschakeld (2.77 onder j). CEI heeft Mullet
Bay getaxeerd op USD 436 miljoen. In het op 30 november 2016 uitgebrachte rapport
staat vermeld:

> The analyses of the market value is based on the assumption of the sale of a building
> land to developers and investors. (…) The valuation assignment includes the present
> value of the Golf Course as a buildable land.

In reactie op dit rapport heeft Martina op 27 januari 2017 aan CEI een e-mail
gestuurd waarin onder meer staat:

> Our auditor wants to understand more in depth besides the valuation report how
> the appraisal was performed an how the market value of $ 436.1 million was
> determined.

In reactie daarop heeft CEI diezelfde dag bericht:

> (…)
> We are kind of surprised that you did not explain this yourself to your auditor.
> Indeed, as you well know, we were asked (likewise with the former local valuer) to
> consider this large & magnificent piece of land (70 ha) as fully buildable provided
> that building permits for many big constructions (for instance: 45 m high) are easily
> to obtain. It was also mentioned that negotiations with Chinese investors + club Med
> (major shareholder is Fosun) were on the way…
> Because as it is today: a golf course loosing money, the value would be near zero. As
> we told you & your advisor Accuracy since day one. (…)

Op 26 maart 2017 heeft een gesprek plaatsgevonden tussen vertegenwoordigers van
KPMG, CEI en Ennia over het door CEI uitgebrachte rapport. In het daarvan
opgemaakte memo staat als opmerking van CEI onder meer opgenomen:

> If considered that the 400 million to a fully develop land and the building permits
> spent by the city of St. Maarten, it could be worth 400 million.
> But if used with a discount value of 5% per year, the value will be USD 200 million.
> We were told to be in line with the former local valuer.
> The value is what can be built on it, even though it is beautiful and big. It was
> unusual, and feel uncomfortable with the word present. Unsure about this.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 26
datum uitspraak: 29 november 2021

2.85.    KPMG heeft op 22 maart 2017 aan de RvC en het bestuur van Ennia c.s. een
brief gestuurd in verband met de accountantscontrole over de jaren 2014 en 2015.
Daarin staat over Mullet Bay onder meer:

(…) Regretfully, we have not seen sufficient concrete progress and resolutions on the
remaining significant outstanding matters, which are critical for our audit procedures
and finalization of the 2014 and 2015 audits and which are the following:

- Clarity on the information provided to us pertaining to the underlying valuation
  assumptions used for the valuation of the Investment Property in Sint Maarten
  and the effect thereof on the available valuation reports. There is a significant
  difference in valuation between the draft CBRE report and those reports of both
  CEI en IEB; (…)

KPMG stelt dan het volgende voor:

- A formal conclusion on the valuation of the land at Mullet Bay which is the most
  significant asset covering the outstanding exposure of [Ennia Leven], [Ennia
  Schade] en [Ennia Zorg]. Due to the significant valuation difference between the
  3 valuators hired by Ennia, we have proposed to the Management Board of
  Ennia to arrange a process in which the three current valuator will receive the
  same relevant information, documentation and assumptions (timeline of the
  sale, premises, cadastral recherché, time horizon of sale or development, sale in
  bulk, or in pieces of land etc.) and under guidance of an independent
  knowledgeable party come to a well-supported fair market value of the land at
  Mullet Bay; (…)

Het voorstel van KPMG is niet uitgevoerd. De controleopdracht aan KPMG is
ingetrokken.

*Dividenduitkeringen*

> *Verwijten Ennia c.s.: de uitkeringen hadden niet kunnen en mogen plaatsvinden bij
> een juiste waardering van Mullet Bay, de benodigde besluiten zijn niet altijd
> genomen zoals vereist in de statuten*

2.86.    Parman International heeft in de periode 2009 tot 2015 onttrekkingen uit
Ennia c.s. gedaan door middel van het laten doen van (dividend)uitkeringen op
door haar gehouden aandelen in (eerst) Banco di Caribe en (vervolgens) Ennia
Holding. In de statuten van Ennia Holding is over het doen van (dividend)
uitkeringen onder meer het volgende opgenomen:

Article 12

1. Annually such amount may be written off from the assets of the corporation
   and/or may such amount or amounts be reserved for special purposes, as shall
   be deemed advisable by the managing board subject to the approval of the
   Supervisory Board.
2. The Supervisory Board shall determine which portion of a surplus balance of the
   profit and loss account the company profits shall be added to the reserves.
3. The then remaining surplus balance of the profit and loss account shall be
   considered as profits available for distribution.
4. (..)



zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 27
datum uitspraak: 29 november 2021

7. Resolutions concerning an addition of profits to the reserves in whole or in part, shall only be adopted in a General Shareholders' Meeting at which all outstanding priority shares A are represented and provided that on all-such shares vote was cast in favour of the proposal, unless the preferential dividend of nine percent (9%) of the year concerned and all the previous years was distributed on the priority shares A.

8. The managing board is authorized after prior approval form the meeting of the holders of the priority shares A, to distribute interim dividends as an advance payment in anticipation of the profits to be expected, such with due observance of the preferential rights of the holders of the priority shares A.

(…)

Article 14

If it appears from the confirmed and adopted profit and loss account in any given year, that the corporation sustained a loss in said financial year, which cannot be covered from the reserves, or be redeemed in any other way, no dividends shall be distributed in the subsequent years, until such loss has been cleared off.

(…)

2.87.    In de periode van 2011 tot en met 2015 is een aantal aandeelhoudersbesluiten dan wel bestuursbesluiten genomen met betrekking tot verschillende (vormen van) uitkeringen aan de aandeelhouder van Ennia Holding. De besluiten betreffen uitkeringen tot een totaal van NAf 33 miljoen en USD 76.406.343.

2.88.    Op 27 juli 2012 hebben de heer R. Beaujon, secretaris van Ennia Holding, (hierna: Beaujon) en Andraous via e-mail contact met elkaar gehad. Beaujon stuurt allereerst:

(…) With my apologies for possibly spoiling your day, there are no 2012 shareholders' resolutions signed by the (Priority A) or Common (B) shareholder [Parman International].
However:
Attached is the April 2012 resolution authorizing the tax distribution signed by the Management Board.
*This should be (should have been) preceded by pre-approval of the general meeting of shareholder A according to article 11 paragraph 8 of the articles of incorporation. Note that the articles do not explicity mention that said approval should be by resolution.*
and:
again with my apologies for being repetitious, we still do not have a resolution by the shareholder approving the 2011 Financial Statements of [Ennia Holding] and other related items (appointment Directors, appointment Auditor, etc.) (…)

Andraous:

(…) Thi[s] is even better (…)

Beaujon:

I don't understand!?

Andraous:

It is better that there are no resolutions



zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 28
datum uitspraak: 29 november 2021

2.89.    Bij e-mail van 2 april 2014 is door Breedijk aan (onder meer) Andraous en
Palm het volgende bericht over het uitkeren van dividend:

> All, I consulted with Miranda yesterday. According to her the dividend is in conflict
> with the articles of incorporation. The law is not specific about this matter.
> She recommended to take a new resolution in which the attached dividend is
> annulled and that the $10M is distributed as a return of share premium.
> (…)

*Donaties*

> *Verwijten Ennia c.s.: de donaties zijn buitensporig en hebben geen enkel raakvlak
> met Ennia c.s. of de regio waarin Ennia c.s. actief is*

2.90.    In de jaren 2010, 2011, 2013 en 2014 zijn voor een bedrag van in totaal
NAf 20.791.679 donaties gedaan vanuit Ennia Investments en Ennia Holding. Het
gaat om donaties aan het United Peace Institute (NAf 11.830.000), Museum of Fine
Arts (Naf 2.184.000), Points of Light (NAf 1.456.000), Taking Charge Foundation
(NAf 728.000), Pentagon Memorial Fund (NAf 546.000), James Baker Institute
(NAf 1.001.000), International Crises Group (NAf 455.000), Ansary Foundation
(NAf 389.470) en de Cesar Foundation (NAf 382.500). De betreffende (goede) doelen
zijn, met uitzondering van de (Sint Maartense) Cesar Foundation, gevestigd in de
Verenigde Staten. Daarnaast zijn donaties gedaan aan president G.W. Bush jr (NAf
1.820.000).

2.91.    Met betrekking tot een donatie aan de Cesar Foundation van NAf 45.500
heeft Van Doorn per e-mail van 25 februari 2010 aan Beaujon bericht:

> Wil je deze donatie in gang zetten zonder de verdere details te onthullen (dus niet
> deze mail doorsturen)? Op [Ennia Investments] uiteraard. (…)

*Betalingen niet voor Ennia werkzame adviseurs en personen*

> *Verwijten Ennia c.s.: Ennia c.s. heeft ten onrechte betaald voor adviseurs en andere
> personen die niet in het belang van of voor Ennia c.s. werkten*

2.92.    Vanuit verschillende entiteiten van Ennia c.s. zijn in de jaren 2006 tot en met
2017 bedragen betaald aan adviseurs van Ansary en Parman International. De
facturen van de betreffende adviseurs (onder wie Henze) werden door Ansary
doorgeleid aan Andraous. De betaling werd in de meeste gevallen vanuit Ennia
Investments verricht. Het gaat in totaal om een bedrag van NAf 6.136.250.

2.93.    In de periode 2008 tot en met 2018 is door (verschillende entiteiten van)
Ennia c.s. een bedrag van NAf 10.805.610 betaald aan salarissen van personen die
geen arbeidsovereenkomst met Ennia c.s. hadden. Deze personen waren veelal
verbonden aan (andere bedrijven van) Ansary.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 29
datum uitspraak: 29 november 2021

2.94.    Vanuit voornamelijk Ennia Holding en Ennia Investments zijn in de periode
januari 2011 tot november 2017 daarnaast bedragen betaald aan (persoonlijk)
assistenten van Ansary. In totaal gaat het om een bedrag van NAf 901.980.

2.95.    In totaal is voor een bedrag van NAf 17.843.840 betaald aan adviseurs en
personen die niet voor Ennia entiteiten werkzaam waren, zoals weergegeven in
onderstaande tabel.

| Begunstigde | periode | betaald door | totale betaling (NAf) |
|---|---|---|---|
| PWC Houston | 2007-2017 | Ennia Investments | 1.700.000 |
| A. Petrello | 2014 | Ennia Investments | 3.640.000 |
| Henze | 2016-2018 | Ennia Investments | 796.250 |
| Andy Wescot | 2008-2018 | NIB | 3.513.078 |
| Clarence Derby | 2008-2018 | Ennia Investments Ennia Holding | 3.845.575 |
| Evan Tromp | 2010-2017 | Ennia Investments Ennia Holding | 2.544.977 |
| Kelly Cifford | 2011-2017 | Ennia Investments Ennia Holding | 235.320 |
| Aghili Cyrus | 2011-2017 | Ennia Investments Ennia Holding | 233.811 |
| Elisabeth Leos | 2011-2017 | Ennia Investments Ennia Holding | 165.221 |
| Chris Archie | 2011-2017 | Ennia Investments Ennia Holding | 140.184 |
| Caspian Tavalli | 2011-2017 | Ennia Investments Ennia Holding | 127.444 |

*Beloningen RvC en reis- en verblijfkosten*

*Verwijten Ennia c.s.: de vergoedingen en de reis- en verblijfkosten van de RvC van
Ennia c.s. zijn buitenproportioneel*

2.96.    De (standaard)vergoeding voor commissarissen bij Ennia c.s. bedroeg
rondom de overname van Ennia in 2005/2006 bruto NAf 52.780 per jaar. In een
memo over de commissarisvergoedingen over het jaar 2006 staat vermeld dat de
bestaande commissarissen, evenals de nieuwe commissarissen, een bedrag dienen te
ontvangen van netto USD 6.250 (NAf 11.375) per kwartaal.

2.97.    In de periode 2006 tot en met 2018 zijn aan (een aantal van) de
commissarissen van de RvC van Ennia Holding naast de vergoedingen bonussen
toegekend. In totaal is aan commissarissen aan vergoedingen en bonussen een
bedrag van NAf 18.659.504 toegekend, zoals weergegeven in onderstaande tabel.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 30
datum uitspraak: 29 november 2021

| Commissaris | periode | totale beloning (NAf) |
| --- | --- | --- |
| Nina Ansary | 2009-2018 | 1.301.380 |
| Frank Carlucci | 2006-2018 | 1.573.738 |
| James Crystal | 2006-2018 | 1.573.738 |
| Robert de Paus | 2016 | 67.420 |
| Richard Gibson | 2006-2014 en 2018 | 7.771.303 |
| Clark Gomes Casseres | 2008-2016 | 1.560.150 |
| Jack Kemp | 2006-2009 | 281.479 |
| John Macomber | 2006-2018 | 1.573.738 |
| Jaime Saleh | 2008-2018 | 2.956.557 |

2.98.    De reis- en verblijfkosten en kosten van bijeenkomsten van de RvC van
Ennia Holding bedragen over de periode 2006 tot 2018 ongeveer NAf 4.437.203.

2.99.    De frequentie van vergaderen was twee à drie keer per jaar.

*Uitkoop eigenaren van verwoeste Mullet Bay appartementen*

> *Verwijten Ennia c.s.: mede gelet op de waarde van Mullet Bay is voor de uitkoop een
> te hoog bedrag ten laste van Ennia c.s. gebracht*

2.100.    Op 20 juli 2006 is tussen Resorts Caribe, SunResorts en Ennia Investments
een overeenkomst gesloten op basis waarvan de rechten van SunResorts uit een
schikkingsovereenkomst (tussen SunResorts en appartementseigenaren van wie de
appartementen waren verwoest door orkaan Luis in 1995) worden overgedragen
aan Resorts Caribe. SunResorts zou jaarlijks recht hebben op 20% van de pre-taks
winst van Resorts Caribe. De hiervoor genoemde schikkingsovereenkomst hield
onder meer in dat de appartementseigenaren hun appartementsrechten verkochten.

2.101.    Op 29 september 2006 heeft Resorts Caribe de koopsom van USD 31.714.000
voldaan, waardoor zij het economisch eigendom verkreeg van de appartementen en
de bijbehorende grond. Eveneens op 29 september 2006 is door Ennia Investments
een bedrag van USD 35 miljoen overgemaakt aan Resorts Caribe. Het resterende
geld, evenals een uitkering van de verzekeraar van USD 6 miljoen, is op 12 maart
2007 gebruikt om het recht van SunResorts op 20% van de winst af te kopen voor
een bedrag van USD 8,5 miljoen.

*NetJets*



> *Verwijten Ennia c.s.: het gebruik van privévliegtuigen is onnodig voor een
> verzekeraar als Ennia c.s. en de kosten zijn te hoog, Ansary heeft bovendien privé
> gebruik gemaakt van de vliegtuigen*

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 31
datum uitspraak: 29 november 2021

2.102.   In 2007 en 2008 heeft Ennia Investments geparticipeerd in twee vliegtuigen
uit de NetJets-vloot. NetJets is een Amerikaanse luchtvaartmaatschappij die zich
richt op het verzorgen van privévluchten. Ennia Investments heeft daarvoor een
bedrag betaald van NAf 9.168.250. Op 31 januari 2014 is een overeenkomst getekend
tussen Ennia Investments en (entiteiten uit) de NetJets-groep strekkende tot de koop
van 12,5% van de rechten met betrekking tot  een Cessna en 12,5% van de rechten
met betrekking tot een Bombardier. Hiervoor is op 10 december 2014 een koopprijs
van NAf 4.649.792 betaald (na inruil van de oude aandelen). De waarborgsom ter
hoogte van NAf 728.000 voor de oude vliegtuigen is teruggestort aan Ennia
Investments. In de hiervoor genoemde overeenkomst is aan de zijde van de NetJets-
groep Ansary opgenomen als '*owner's principle contact*' .

2.103.   Ennia Investments heeft in de periode 2007 tot 2017 gemiddeld ongeveer
NAf 2.000.000 per jaar betaald voor het gebruik van de vliegtuigen.

**3.       De vorderingen**

3.1.      Bij verzoekschrift heeft Ennia c.s. in eerste instantie -samengevat- gevorderd
voor recht te verklaren dat alle gedaagden dan wel alle volgens het gerecht daartoe
in aanmerking komende gedaagden hoofdelijk (dan wel individueel) aansprakelijk
zijn voor de door Ennia c.s. als gevolg van het onrechtmatig handelen van die
gedaagden geleden en nog te lijden schade, met verwijzing naar de
schadestaatprocedure.

3.2.      Bij repliek is de schade geconcretiseerd en is de eis gewijzigd, waarbij de
primaire schadeberekening is gebaseerd op een vergelijking van de
solvabiliteitspositie van Ennia c.s. met en zonder normschendingen van gedaagden.
De subsidiaire schadeberekening is gebaseerd op concrete schade die volgens Ennia
c.s. voortvloeit uit de afzonderlijke verweten gedragingen.

3.3.      Voorafgaand aan de pleidooien is een eiswijziging ingediend in die zin, dat
Ennia c.s. heeft verzocht de primaire schadeberekening terzijde te laten. Ten slotte is
voorafgaand aan de pleidooien een akte van vermindering van eis ingediend, in die
zin dat op de gevorderde (subsidiaire) schadeberekening een correctie/
vermindering is toegepast van NAf 166.714.613.

3.4.      De wijzigingen van eis zijn ter zitting van 14 en 15 oktober 2021 genomen en
toegestaan. De hieronder geformuleerde vorderingen zijn de vorderingen zoals deze
na de wijzigingen luiden.



zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 32
datum uitspraak: 29 november 2021

3.5.    Ennia c.s. vordert dat het gerecht bij vonnis, uitvoerbaar bij voorraad,

I

*primair*
   a)   voor recht verklaart dat alle gedaagden, dan wel alle volgens het gerecht
        daartoe in aanmerking komende gedaagden, hoofdelijk aansprakelijk zijn
        voor de schade die Ennia c.s. als gevolg van het onrechtmatig handelen van
        die gedaagden heeft geleden en nog zal lijden;

   b)   gedaagden hoofdelijk veroordeelt
        i.   tot betaling aan Ennia c.s. van schadevergoeding, en de omvang van de
             te vergoeden schade vaststelt op de som van concrete schadeposten,
             zoals omschreven in paragraaf 8.3 van de conclusie van repliek, welke
             som NAf 1.128.710.198 althans NAf 912.051.306 of minimaal
             NAf 600.591.305 bedraagt; te vermeerderen met de wettelijke rente zoals
             omschreven in paragraaf 8.4 van de conclusie van repliek, althans
        ii.  tot betaling aan Ennia c.s. van schadevergoeding op te maken bij staat en
             te vereffenen volgens de wet;

*subsidiair, voor het geval dat het primair gevorderde niet, althans niet jegens iedere*
*individuele gedaagde wordt toegewezen,*

   a)   voor recht verklaart dat iedere gedaagde (ieder voor zich) aansprakelijk is
        voor de schade die Ennia c.s. als gevolg van het onrechtmatig handelen heeft
        geleden en nog zal lijden; en

   b)   Ansary veroordeelt tot betaling aan Ennia c.s. van schadevergoeding, en de
        omvang van de te vergoeden schade vaststelt op:
        i.   de som van concrete schadeposten, zoals omschreven in paragraaf 8.3.
             van de conclusie van repliek, welke som NAf 1.128.710.198 althans
             NAf 912.051.306 of minimaal NAf 600.591.305 bedraagt; te vermeerderen
             met de wettelijke rente zoals omschreven in paragraaf 8.4 van de
             conclusie van repliek, althans
        ii.  tot betaling aan Ennia c.s. van schadevergoeding op te maken bij staat en
             te vereffenen volgens de wet; en

   c)   de overige gedaagden (ieder voor zich) veroordeelt tot betaling aan Ennia
        c.s. van schadevergoeding, op te maken bij staat en te vereffenen volgens de
        wet;

zaaknummers: CUR201903842/3843/3796/3844/3845/3846     blad 33
datum uitspraak: 29 november 2021

Ennia Holding vordert voorts dat het gerecht, voor zover mogelijk uitvoerbaar bij voorraad:

*meer subsidiair, indien en voor zover het primair en subsidiair gevorderde wordt afgewezen of toewijzing van het hiervoor onder primair en subsidiair gevorderde niet leidt tot aansprakelijkheid van gedaagden (hoofdelijk, dan wel ieder voor zich) voor het gehele bedrag van de onttrekkingen zoals bedoeld in paragraaf 4.4 van het verzoekschrift en paragraaf 8.3.2 van de conclusie van repliek,*

Parman International en de overige gedaagden - voor zover zij aandeelhouder zijn van Parman International - (ieder voor zich) op grond van ongerechtvaardigde verrijking dan wel onverschuldigde betaling veroordeelt tot (terug)betaling aan Ennia Holding van een bedrag ter grootte van het deel van die onttrekkingen dat niet op grond van de primaire en subsidiaire vordering voor vergoeding in aanmerking komt, te vermeerderen met de wettelijke rente zoals omschreven in paragraaf 8.4. van de conclusie van repliek;

II

a)   gedaagden hoofdelijk veroordeelt in de kosten die Ennia c.s. heeft gemaakt ter voorkoming of beperking van de schade, op te maken bij staat en te vereffenen volgens de wet; en

b)   gedaagden hoofdelijk veroordeelt in de kosten die Ennia c.s. heeft gemaakt ter vaststelling van schade en aansprakelijkheid, op te maken bij staat en te vereffenen volgens de wet;

zowel a) als b) te vermeerderen met wettelijke rente zoals omschreven in paragraaf 8.4 van de conclusie van repliek, en



c)   gedaagden hoofdelijk veroordeelt in de kosten van deze procedure, met bepaling dat de proceskosten binnen twee weken na dagtekening van het eindvonnis moeten worden betaald, alsmede in de gebruikelijke nakosten, te vermeerderen met de wettelijke rente als bedoeld in artikel 6:119 BW vanaf twee weken na dagtekening van het vonnis.

**4.     De grondslagen van de vorderingen en het verweer van gedaagden**

*feitelijke grondslagen*

4.1.    Ennia c.s. verwijt gedaagden kort samengevat dat zij niet de belangen van Ennia c.s. en die van de polishouders voor ogen hebben gehad, maar andere (eigen) belangen. In de eerste plaats wordt aan gedaagden verweten dat Ansary het

zaaknummers: CUR201903842/3843/3796/3844/3845/3846      blad 34
datum uitspraak: 29 november 2021

kapitaal van Ennia c.s. niet heeft versterkt maar verzwakt, doordat bij Ennia c.s. een (beleggings)beleid is gevoerd dat niet past bij een verzekeraar; doordat Ansary vanaf zijn aantreden in 2006 samen met Van Doorn, Andraous en Palm de controle over de activa heeft overgenomen en doordat zij door wijzigingen in de *governance*- en vennootschapsstructuur deze activa vervolgens hebben onttrokken aan de zeggenschap van de verzekeraars en de controle door de interne en externe toezichthouders. De activa zijn van de verzekeraars verplaatst naar Ennia Holding en Ennia Investments waardoor omvangrijke intercompany-vorderingen ontstonden die vaak niet (voldoende) waren gedekt, mede gelet op het niveau van de beleggingen. In de tweede plaats wordt gedaagden verweten dat de beleggingen van gedaagden te riskant en niet passend voor een verzekeraar waren. De belegging in Mullet Bay is structureel (kunstmatig) overgewaardeerd en leverde bovendien geen dividend of rente op. Bovendien werd de financiering (en daarmee het risico) van de beleggingen door Ennia c.s. gedragen, terwijl de voordelen, bijvoorbeeld bij de S&S-transactie, grotendeels aan Ennia c.s. werden onthouden en naar Ansary en aan hem gelieerde partijen vloeiden. Daarnaast werden door Ansary c.s. grote bedragen aan Ennia c.s. onttrokken in de vorm van dividenden en andere kapitaalonttrekkingen. Afgezien daarvan werden diverse uitgaven ten onrechte ten laste gebracht van Ennia c.s., zoals het doen van substantiële donaties aan doelen die niets van doen hadden met Ennia c.s.

*juridische grondslagen*

4.2.     Ennia c.s. heeft aan de vorderingen primair ten grondslag gelegd dat gedaagden in groepsverband onrechtmatig jegens Ennia c.s. hebben gehandeld en op grond van artikel 6:166 BW (groepsaansprakelijkheid) hoofdelijk aansprakelijk zijn voor de schade die Ennia c.s. als gevolg van de verweten gedragingen heeft geleden. Alle gedaagden hebben op hun eigen wijze bijgedragen aan de verweten gedragingen die gevaar van schade voor Ennia c.s. hebben doen ontstaan en tussen de gedragingen bestond een bewuste samenhang. Er bestond een kans dat de gedragingen zouden leiden tot schade aan Ennia c.s. en die kans had gedaagden van hun gedragingen moeten weerhouden. De deelname aan het handelen in groepsverband kan als onrechtmatige daad aan iedere individuele gedaagde worden toegerekend, aldus Ennia c.s. De door Ennia c.s. geleden schade was bovendien het gevolg van het onrechtmatige handelen van (minimaal) één van de groepsleden, zodat aan alle vereisten voor groepsaansprakelijkheid is voldaan.

4.3.     Subsidiair is volgens Ennia c.s. sprake van onrechtmatige daad en onbehoorlijk bestuur en toezicht. Gedaagden hebben gehandeld in verschillende hoedanigheden, te weten die van feitelijk bestuurder, statutair bestuurder, commissaris en/of aandeelhouder. De verweten gedragingen van gedaagden zijn van zodanige aard en ernst dat zij, ongeacht de toe te passen maatstaf, aansprakelijk zijn jegens Ennia c.s. Ten aanzien van de afzonderlijke gedaagden stelt Ennia c.s. het volgende.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 35
datum uitspraak: 29 november 2021

- Ansary heeft gedurende de gehele periode als quasi-bestuurder van Ennia
  c.s. gehandeld en is in die hoedanigheid en als bestuurder van Ennia
  Investments en voorzitter van het *investment committee* jegens Ennia c.s.
  aansprakelijk. Ansary is daarnaast aansprakelijk omdat hij zijn taak als
  commissaris onbehoorlijk heeft vervuld. Gelet op de mate van zijn invloed
  en betrokkenheid is hij ook op grond van de algemene norm van artikel
  6:162 BW aansprakelijk.
- Nina Ansary was onder meer commissaris bij Ennia Holding. Van haar
  mocht worden verwacht dat zij zich zou richten naar het belang van Ennia
  c.s. Zij is gelet op het uitgangspunt van collegiaal toezicht aansprakelijk voor
  de onbehoorlijke taakvervulling door de raad van commissarissen.
- Parman International heeft bijgedragen aan het onrechtmatig bevorderen
  van het belang van Ansary c.s. ten koste van Ennia c.s. Parman International
  heeft niet alleen onrechtmatig gehandeld jegens Ennia Holding aan wie de
  bedragen rechtstreeks werden onttrokken, maar ook jegens de verzekeraars,
  die door de onttrekkingen zijn achtergebleven met oninbare vorderingen.
  Parman International is daarom in ieder geval aansprakelijk op grond van de
  algemene zorgvuldigheidsnorm als bedoeld in artikel 6:162 BW.
- Andraous is als formeel bestuurder, als quasi-bestuurder en als lid van het
  *investment committee* aansprakelijk jegens Ennia c.s. Mocht zijn handelen niet
  worden beschouwd als handelen van een bestuurder, dan moeten de
  gedragingen van Andraous niet worden getoetst aan de maatstaf van ernstig
  verwijtbaar handelen, maar aan de algemene zorgvuldigheidsnorm van
  artikel 6:162 BW.
- Palm was vanaf 2011 statutair bestuurder van Ennia Holding en de
  verzekeraars en vanaf 2012 ook van Ennia Investments. Hij was tevens lid
  van het *investment committee*. Voordat hij bestuurder werd was hij als
  adviseur betrokken bij Ennia c.s. In al deze hoedanigheden is Palm
  aansprakelijk.
- Van Doorn is als voorzitter van het bestuur van Ennia Holding, Ennia
  Investments en de verzekeraars en als lid van het *investment committee*
  aansprakelijk jegens Ennia c.s. De aan gedaagden verweten gedragingen zijn
  grotendeels ingezet in de periode dat Van Doorn bestuurder was. Van Doorn
  heeft ernstig verwijtbaar gehandeld omdat hij het belang van Ennia c.s. niet
  voorop heeft gesteld. Hij is daarom jegens alle eisers aansprakelijk voor de
  geleden schade.

4.4.    Ennia Holding heeft aan haar meer subsidiaire vordering ten opzichte van
Parman International ten grondslag gelegd dat het bedrag van de onttrekkingen
dient te worden (terug)betaald op grond van onverschuldigde betaling dan wel
ongerechtvaardigde verrijking. Ansary c.s., althans de (indirect) aandeelhouders
van Parman Capital en Parman International, zijn bovendien ongerechtvaardigd
verrijkt als gevolg van de onttrekkingen en de S&S-transactie.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 36
datum uitspraak: 29 november 2021

*de verweren van Ansary c.s.*

4.5.      Ansary c.s. voert tegen de stellingen van Ennia c.s. aan dat Ennia c.s. een
commerciële onderneming is en geen publiekrechtelijke instelling. Bij Ansary c.s.
was voldoende kennis en inzicht beschikbaar om een verzekeringsbedrijf te leiden
en de belangen van de polishouders hebben daarbij centraal gestaan. Door Ennia
Investments op te richten werden de verzekeraars behoed voor schommelingen in
de markt. Ennia Investment viel niet onder het toezicht van de Centrale Bank en
hoefde zich daarom ook niet te houden aan de richtlijnen zoals deze golden voor de
verzekeraars. Anders dan door Ennia c.s. is gesteld heeft Ansary c.s. het kapitaal
van Ennia c.s. wel degelijk versterkt met de inbreng van het Mullet Bay perceel.
Zelfs indien geen sprake zou zijn van kapitaalversterking leidt dat niet tot
aansprakelijkheid, nu de inbreng een vrijwillige keuze was van Ansary. Ansary c.s.
heeft de controle over de activa genomen via de structuren die een adequaat
corporate governance en vennootschapsrechtelijk beleid voorschrijft. Het
beleggingsbeleid van Ansary c.s. was doordacht en verstandig. Ennia c.s. heeft
volgens Ansary c.s. bovendien niet afdoende duidelijk gemaakt in welk opzicht het
beleggingsbeleid niet zou voldoen en welke maatstaf daarvoor zou (moeten)
worden gehanteerd, zodat het beleid van Ansary c.s. daaraan niet kan worden
getoetst. Mullet Bay is diverse keren getaxeerd en de waardering werd niet
kunstmatig hoog gehouden. De waarde van Mullet Bay is evenmin gebruikt om op
basis daarvan onacceptabele onttrekkingen te doen of excessieve kosten te maken.
Ennia c.s. kon meer uitgeven omdat er meer rendabele beleggingen waren. Anders
dan door Ennia c.s. is gesteld heeft Ennia c.s. naar rato geprofiteerd van de
belegging in S&S. Ook daarin is aan Ansary c.s. dus geen verwijt te maken.

4.6.      Ansary c.s. voert verder aan dat geen sprake kan zijn van
groepsaansprakelijkheid, nu niet is voldaan aan het vereiste van handelen in
groepsverband. Iedere gedaagde heeft een eigen afdoende omschreven en
gedefinieerde rol gehad binnen Ennia c.s., waarbij in wisselende samenstelling is
samengewerkt. Er is geen sprake geweest van een groep als bedoeld in artikel 6:166
BW.

4.7.      Met betrekking tot het door Ennia c.s. gestelde onrechtmatig handelen en
onbehoorlijk bestuur en toezicht stelt Ansary c.s. zich allereerst op het standpunt dat
Ennia c.s. slechts een selectief deel van de bestuurders en commissarissen heeft
betrokken in de procedure en daarbij tevens ten onrechte vanuit Ennia c.s. als groep
de vorderingen heeft ingesteld, zonder per entiteit uit te splitsen welke schade door
welk handelen of nalaten zou zijn geleden. Ansary c.s. voert het volgende verweer
tegen de door Ennia c.s. gestelde rollen van de verschillende gedaagden.
-        Ansary heeft niet gehandeld als quasi-bestuurder en is niet aansprakelijk.
         Ansary heeft als voorzitter van de RvC en als voorzitter van het *investment*
         *committee* gehandeld binnen de bevoegdheden die hij in dat kader had. Aan
         Ansary is geen verwijt te maken nu hij niet in strijd met de belangen van

zaaknummers: CUR201903842/3843/3796/3844/3845/3846     blad 37
datum uitspraak: 29 november 2021

Ennia c.s. heeft gehandeld, zichzelf niet ongerechtvaardigd heeft verrijkt en al helemaal niet heeft gehandeld met het doel om Ennia c.s. schade toe te brengen.
- Nina Ansary heeft niet gehandeld vanuit een tegenstrijdig belang en haar valt evenmin een verwijt te maken.
- Parman International heeft als aandeelhouder voldoende zorgvuldigheid betracht. Het feit dat de bestuurders van Parman International ook vanuit andere hoedanigheden kennis hadden van de financiële omstandigheden van Ennia c.s. maakt niet dat Parman International onzorgvuldig heeft gehandeld. Alle onttrekkingen zijn gebaseerd op bestuurs- of aandeelhoudersbesluiten en de dividenden zijn geaccordeerd door de accountant. Er is geen sprake van onrechtmatig handelen.
- Andraous is in verschillende hoedanigheden betrokken geweest bij Ennia c.s., maar dat maakt hem geen quasi-bestuurder. Andraous heeft zich als lid van het *investment committee* bezig gehouden met het beleggingsbeleid. Hij heeft zijn taken als bestuurder nauwlettend en naar behoren uitgevoerd en betwist iedere aansprakelijkheid.
- Palm is pas in 2011 als bestuurder aangetreden bij Ennia c.s. Dat Palm eerder betrokken zou zijn geweest bij Ennia c.s. als adviseur maakt hem niet aansprakelijk voor de in die periode genomen beslissingen door de zittende bestuurders. Palm is nooit begunstigd door de gestelde onttrekkingen en gemaakte kosten en hij heeft zijn taak als bestuurder zorgvuldig uitgevoerd zodat hem geen verwijt treft, in welke hoedanigheid en op welke grond dan ook.



*de verweren van Van Doorn*

4.8.     Van Doorn betwist dat hij onrechtmatig heeft gehandeld jegens Ennia c.s. Hij stelt zich op het standpunt dat hij door Ennia c.s. ten onrechte wordt betrokken in de procedure, die volgens Van Doorn feitelijk is gericht tegen Ansary. Van Doorn is op meerdere momenten de confrontatie met Ansary aangegaan en heeft (tevergeefs) geprobeerd zijn zienswijze op het gebied van onder meer beleggingen en solvabiliteit aan de orde te stellen. Van Doorn kan niet worden verweten dat Ansary de beloofde kapitaalinjectie heeft uitgevoerd middels de inbreng van aandelen. In de perioden waarin Van Doorn bestuurder was van Ennia c.s. heeft het eigen vermogen steeds een positief saldo gehad, zelfs als wordt uitgegaan van een lagere waarde van Mullet Bay.

4.9.     Van Doorn voert verder aan dat hij niet is betrokken bij de wijzigingen in de structuur die volgens Ennia c.s. zouden hebben geleid tot schade en tekorten. Het instellen van het *investment committee* was een beslissing van de RvC met medeweten van de Centrale Bank. Datzelfde geldt voor de oprichting van Ennia Investments. Dat een aantal van de beleggingen een verhoogd concentratierisico

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 38
datum uitspraak: 29 november 2021

had, heeft op zichzelf niet geleid tot schade. De door Ennia c.s. gestelde geleden
schade is ontstaan doordat het rendement uit de deelname in S&S grotendeels niet
bij Ennia c.s. is terechtgekomen. Daarin kan aan Van Doorn geen verwijt worden
gemaakt. Datzelfde geldt voor de door Ennia c.s. gestelde onttrekkingen en andere
kosten. Dat heeft plaatsgevonden nadat Van Doorn (voor de tweede keer) is
afgetreden als bestuurder. Aan Van Doorn is voor zijn functioneren als bestuurder
steeds decharge verleend.

4.10.    Op de stellingen en verweren van partijen wordt hierna, voor zover van
belang voor de beoordeling, nader ingegaan.

**5.    De beoordeling**

**De vorderingsgerechtigdheid van Ennia c.s.**

5.1.    Ennia c.s. heeft bij repliek twee overeenkomsten van cessie overgelegd.
Daaruit volgt dat op 9 oktober 2019 tussen ECII Luxemburg en Ennia Investments is
overeengekomen dat ECII Luxemburg haar in de periode 2005- 2018 ontstane
vorderingen op -onder meer- de directe en indirecte aandeelhouders van Ennia
Holding cedeert aan Ennia Investments. Op 19 maart 2021 is een soortgelijke
overeenkomst van cessie gesloten tussen Energy Equipment International Ltd
(hierna Energy Equipment) en Ennia Investments. In de cessieaktes is opgenomen
dat de overeenkomsten worden beheerst door het recht van Curaçao. Ansary c.s.
stelt dat de overeenkomsten van cessie te onbepaald zijn en dat de mededeling van
cessie ten onrechte pas bij repliek (door overlegging van de overeenkomst) heeft
plaatsgevonden.

5.2.    Op grond van artikel 3:94 lid 1 BW vereist de overdracht van een vordering
een daartoe bestemde akte, waarin de te leveren vordering voldoende dient te zijn
bepaald. Daartoe is voldoende dat de akte zodanige gegevens bevat dat, eventueel
achteraf, aan de hand daarvan, aangevuld met objectieve gegevens, kan worden
vastgesteld om welke vordering het gaat. De omstandigheid dat de akte niet de
precieze vordering vermeldt, staat niet aan de bepaaldheid van de vordering in de
weg. ECII Luxemburg is om fiscale redenen opgericht (enkel) ten behoeve van de
S&S- transacties, zodat duidelijk is dat de vordering enkel hierop kan zien en er dus
sprake is van een voldoende bepaalbare vordering. Datzelfde geldt voor Energy
Equipment, vanuit welke onderneming de olieplatforms zijn gekocht. De akte van
cessie dient voorts in geval van een openbare cessie door de cedent of cessionaris
aan de schuldenaar te worden medegedeeld. De cessies zijn (ook) aan Ansary c.s.
bekend gemaakt. Dat dit mogelijk eerder had gekund, staat aan de rechtsgeldigheid
van de cessies niet in de weg. Er is dus sprake van twee rechtsgeldige cessies, zodat
Ennia Investments de vorderingen tegen Ansary c.s. kon instellen.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 39
datum uitspraak: 29 november 2021

**De toetsingskaders**

*wet en statuten*

5.3.    Een bijzonderheid aan deze zaak is dat, zoals ook door Ansary c.s. is
benadrukt, het in wezen een procedure betreft waarin Ansary's eigen
vennootschappen (onder anderen) Ansary aanspreken tot schadevergoeding en dat
eventueel ten laste van Ansary toe te wijzen bedragen ten goede zouden komen aan
diezelfde vennootschappen, en daarmee indirect aan Ansary zelf. Een bijzonderheid
is voorts dat Ennia c.s. gedaagden thans zaken verwijt, die veelal zijn geïnitieerd
door en/of de instemming hadden van zowel bestuurders, commissarissen en
aandeelhouders van Ennia c.s. Deze bijzonderheden nemen echter niet weg dat,
voor zover relevant voor de desbetreffende vorderingen en verwijten, de statutaire
en wettelijke bepalingen die gelden voor onder meer de besluitvorming in
rechtspersonen, onverkort gelden. De bijzondere aard van de onderneming van
Ennia c.s. speelt daarbij bovendien een rol.

*de (aard van de) onderneming*

5.4.    De verzekeraars (Ennia Schade, Ennia Zorg en Ennia Leven) staan op grond
van de LTV onder toezicht van de Centrale Bank. In artikel 34 van de LTV is onder
meer opgenomen dat een verzekeraar verplicht is toereikende technische
voorzieningen aan te houden. In 2 van dat artikel staat verder:
> De technische voorzieningen dienen volledig door waarden te zijn gedekt. De Bank
> kan tegen de aard en de waardering van deze waarden bezwaar maken, aan welk
> bezwaar de verzekeraar dient tegemoet te komen.

In de memorie van toelichting bij dit artikel staat onder meer:
> Dwingend vereiste voor het voeren van een technisch verantwoord
> verzekeringsbeleid is de vorming van toereikende technische voorzieningen. De
> controle op deze verzekeringsondernemingen dient dan ook in belangrijke mate te
> zijn gericht op de juiste berekening van deze voorzieningen. De technische
> voorzieningen vertegenwoordigen de waarde en de tegenwoordige en toekomstige
> verplichtingen uit de bestaande overeenkomsten van verzekering. Deze
> verplichtingen dienen volledig te zijn gedekt door congruente activa (…).

5.5.    Over de solvabiliteitsmarge is in artikel 36 LTV opgenomen dat een
levensverzekeraar dient te beschikken over een solvabiliteitsmarge van ten minste
vier procent van de voorziening voor verzekeringsplichtigen. Een
schadeverzekeraar dient te beschikken over een solvabiliteitsmarge die tenminste
vijftien procent van de in het voorgaande boekjaar geboekte bruto premie beloopt.
In artikel 36 lid 3 en 4 LTV staat verder:
> 3. De solvabiliteitsmarge beloopt evenwel tenminste een bij landsbesluit, houdende
> algemene maatregelen, voor levensverzekeraars onderscheidenlijk
> schadeverzekeraars vast te stellen bedrag.
> 4. In een krachtens artikel 26, zesde lid, vast te stellen model van een staat wordt

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 40
datum uitspraak: 29 november 2021

bepaald welke vermogensbestanddelen de solvabiliteitsmarge kunnen vormen,
welke vermogensbestanddelen daarbij een aftrek dienen te vormen, alsmede de
mate waarin en in de voorwaarden waaronder een en ander geschiedt. De Bank kan
tegen de waardering van de vermogensbestanddelen bezwaar maken. (…)

In de memorie van toelichting bij dit artikel is onder meer opgenomen:

In aanvulling op de technische voorzieningen dient de verzekeraar te beschikken
over bufferreserve, de z.g. solvabiliteitsmarge. Dit begrip wordt ook internationaal
gebezigd (…) en geeft aan dat het hier gaat om een noodzakelijke waarborg
waarover een verzekeraar dient te beschikken.

In artikel 54 LTV is bepaald:

Een verzekeraar wiens solvabiliteitsmarge niet voldoet aan de in artikel 36, eerste tot
en met derde lid, gestelde eisen, doet aan de Bank binnen de door deze te bepalen
termijn en op de door deze te bepalen wijze opgave van de in artikel 35 bedoelde
waarden. Van elke wijziging die vervolgens in deze waarden wordt aangebracht,
doet hij terstond schriftelijk mededeling aan de Bank.

5.6.     Voor de verzekeraars geldt dat zij een groot lokaal marktaandeel hebben, te
weten 50% van de verzekeringsmarkt in Curaçao, Sint Maarten, Aruba en Bonaire
en 80% van de private pensioenmarkt in Curaçao. Dat betekent dat veel mensen
voor hun uitkering(en) afhankelijk zijn van de verzekeraars. De verzekeraars dienen
er dus voor zorg te dragen dat zowel voor de korte termijn (liquiditeit) als voor de
lange termijn (solvabiliteit) voldoende financiële middelen beschikbaar zijn om
verzekerde uitkeringen te kunnen doen. Dat volgt ook uit de (memorie van
toelichting bij de) LTV, waarin de bescherming van de belangen van de verzekerden
en andere gerechtigden op verzekeringsuitkeringen als uitgangspunt is opgenomen.

5.7.     De verhoogde in acht te nemen zorgvuldigheid als het gaat om een
onderneming zoals een (bank of) verzekeringsbedrijf volgt daarnaast uit de
rechtspraak. In een beschikking van de Ondernemingskamer in Amsterdam van 12
oktober 2016 (ECLI:NL:GHAMS:2016:4056, *Delta Lloyd*) heeft de
Ondernemingskamer geoordeeld dat het standpunt van Delta Lloyd dat haar
verzekerden en polishouders behoren tot de belangrijkste stakeholders en dat Delta
Lloyd daarom niet alleen de belangen van de aandeelhouders in acht heeft te
nemen, geen blijk geeft van een onjuiste opvatting over de door het bestuur bij de
vervulling van haar taak in acht te nemen belangen. In een beschikking van de
Ondernemingskamer van 5 april 2012 (ECLI:NL:GHAMS:2012:BW0991, *Fortis*) staat
eveneens dat het bestuur van Fortis rekening moest houden met de belangen van
degenen die hun belangen aan Fortis hadden toevertrouwd. Verder staat in de
beschikking onder meer:

4.3. (…) De vrijheid die het bestuur (…) heeft wordt mede beïnvloed door de aard
van de onderneming en de mate waarin de diverse stakeholders en – in sommige
gevallen – de samenleving als geheel bij de resultaten van dat beleid belang hebben.
Gelet op de aard van de door Fortis gedreven onderneming, (onder meer) een bank,
en gelet op de voormelde daarbij betrokken belangen rust op het bestuur een
bijzondere zorgplicht die risico's steeds zorgvuldig en adequaat in het oog te
houden, te beoordelen en bij zijn beleidsafwegingen, besluitvorming en optreden te

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                     blad 41
datum uitspraak: 29 november 2021

betrekken.
(…)
4.5. (…) Naarmate op een (rechts)persoon (op een bepaald terrein) een zwaardere
verantwoordelijkheid rust, zal hij ook scherper moeten opletten, opdat hem geen
voor het voeren van een verantwoord beleid relevante feiten en omstandigheden
ontgaan, en zal hij zijn besluitvorming – dan ook – moeten doen berusten op een
zorgvuldige informatievoorziening, analyse en beoordeling. (…) Het hiervoor
genoemde maatschappelijk belang (…) scherpt de norm voor hetgeen op dit punt
van haar en haar organen in het kader van zorgvuldig bestuur en beheersing van
risico's kon worden verwacht, belangrijk aan.

5.8.    Ennia Investments is opgericht met het doel om de beleggingen en
investeringen te concentreren in één entiteit. De investeringsgelden kwamen
grotendeels vanuit de verzekeraars, zodat intercompany-vorderingen ontstonden
tussen Ennia Investments en de verzekeraars. Gelet daarop waren de verzekeraars
voor hun financiële positie dus afhankelijk van Ennia Holding en Ennia
Investments. Ennia Investments is als zodanig geen verzekeringsbedrijf en stond
dus in beginsel niet onder toezicht van de Centrale Bank. Datzelfde geldt voor Ennia
Holding. Beide entiteiten zijn niettemin onder de noodregeling geplaatst. Daarover
is in de beschikking van dit gerecht van 4 juli 2018 (ECLI:NL:OGEAC:2018:160)
geoordeeld:

    3.10.    (…) Aannemelijk is geworden dat het verzekeringsbedrijf van Ennia wordt
    uitgeoefend door alle verweersters gezamenlijk, waarbij [Ennia Investments]
    fungeert als een entiteit waarin de onderliggende activa (goeddeels afkomstig uit
    door verzekeringnemers afgedragen premies) zijn ondergebracht, en waarbij [Ennia
    Investments en Ennia Holding] zich bezighouden met het beheer van de gelden en
    activa ten behoeve van de verzekeringnemers, verzekerden of andere gerechtigden
    op uitkeringen.
    Onbetwist is dat de activa van [Ennia Leven, Ennia Zorg en Ennia Schade] voor 82%
    bestaan uit leningen aan en vorderingen op gelieerde entiteiten, welke leningen en
    vorderingen in totaal circa NAf 1,5 miljard bedragen. De Centrale Bank heeft
    aangevoerd dat zij met de noodregeling primair tot een herstructurering wil komen,
    om daarmee de solvabiliteit van Ennia te herstellen. Dat is volgens de Centrale Bank
    slechts mogelijk indien de Centrale Bank in de positie wordt gebracht dat zij de
    thans bestaande constructie van middellijk beleggen ongedaan kan maken en kan
    beschikken over de onderliggende activa van het verzekeringsbedrijf. Aannemelijk is
    geworden dat een noodregeling zonder [Ennia Investments en Ennia Holding], de
    belangen van de gezamenlijke schuldeisers van Ennia niet of nauwelijks zal kunnen
    dienen. (…)



5.9.    In het vonnis in kort geding van 31 januari 2019 (ECLI:NL:OGEAC:2019:15)
tussen Parman International en de Centrale Bank is door het gerecht ingegaan op de
stelling van Parman International dat de noodregeling ten onrechte ook is
uitgesproken over Ennia Holding en Ennia Investments, omdat het hier niet gaat om
entiteiten die onder toezicht van de Centrale Bank staan en de Centrale Bank jegens
die entiteiten geen bevoegdheden aan de LTV zou kunnen ontlenen. In kort geding

zaaknummers: CUR201903842/3843/3796/3844/3845/3846    blad 42
datum uitspraak: 29 november 2021

is geoordeeld dat ook Ennia Holding en Ennia Investments als verzekeraar zijn te beschouwen waarop de noodregeling van toepassing kon worden verklaard. Het gerecht sluit zich bij de desbetreffende overwegingen, hieronder geciteerd, aan.

4.21.    Op grond van artikel 60 lid 1 LTV kan [de Centrale Bank] een verzoek tot toepassing van de noodregeling indienen ten aanzien van een "verzekeraar", dat wil zeggen "ieder die het verzekeringsbedrijf uitoefent" (artikel 1 lid 1 sub g LTV). De bevoegdheden van [de Centrale Bank] als toezichthouder staan in de sleutel van de bescherming van de gezamenlijke polishouders (of andere schuldeisers). Op grond van die ratio moet naar het oordeel van het gerecht worden aangenomen dat het begrip "verzekeraar" een materieel begrip is, in die zin dat iedere onderneming die zich feitelijk bezig houdt met de uitoefening van het verzekeringsbedrijf als "verzekeraar" in de zin van de LTV moet worden beschouwd. Dit betekent dat een organisatie die is verdeeld over verschillende rechtspersonen gezamenlijk als één verzekeraar kan worden beschouwd, indien moet worden vastgesteld dat die rechtspersonen tezamen het verzekeringsbedrijf uitoefenen. (…)



4.22.    In het onderhavige geval is de Ennia-groep zo vorm gegeven dat de activa van Verzekeraars voor veruit het grootste deel bestaan uit vorderingen op [Ennia Leven] en [Ennia Investments] en dat laatstgenoemden zijn belast met het beheer van het hun toevertrouwde vermogen. Niet ter discussie staat – [Parman International] heeft dat zelf herhaaldelijk in deze procedure benadrukt – dat een verzekeraar zijn bedrijf zonder dergelijk vermogensbeheer niet op een economisch gezonde manier kan uitoefenen. Hieruit volgt dat de activiteiten van Verzekeraars niet los van die van [Ennia Holding en Ennia Investments] kunnen worden gezien. Dat betekent dat Verzekeraars en [Ennia Holding en Ennia Investments] gezamenlijk als "verzekeraar" in de zin van de LTV moeten worden beschouwd.

5.10    In samenhang hiermee is het gerecht van oordeel dat op Ennia Investments en op Ennia Holding een vergelijkbare bijzondere zorgplicht rustte als op de verzekeraars.

5.11.    Samenvattend is Ennia c.s. dus weliswaar een commerciële onderneming, zoals door Ansary c.s. is benadrukt, maar heeft zij, gelet op de aard van de onderneming en haar maatschappelijke belang, een hogere mate van zorgvuldigheid te betrachten. De norm voor hetgeen op dit punt van Ennia c.s. en haar organen in het kader van zorgvuldig bestuur en beheersing van risico's kon worden verwacht, wordt daarmee aangescherpt. Geheel onjuist is daarom de veronderstelling van Ansary c.s. dat een bestuurder van Ennia c.s. een zelfde mate van zorgvuldigheid zou moet betrachten als een bestuurder van een 'kleine supermarkt' (hierna: het supermarkt-verweer).

*de bestuurders*

5.12.    Ansary, Van Doorn, Andraous en Palm zijn allen bij Ennia betrokken geweest als bestuurder. Uit de wet volgt een aantal (algemene) verplichtingen voor bestuurders. Boek 2 van het Burgerlijk Wetboek is gewijzigd per 1 januari 2021. Deze wijziging is dus niet van toepassing op de bestuurders in deze zaak, zodat,

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 43
datum uitspraak: 29 november 2021

voor zover wordt verwezen naar wetsartikelen, de verwijzing ziet op de voorheen
geldende wetsbepalingen.

5.13.    Ansary, Van Doorn, Andraous en Palm waren in hun hoedanigheid van
bestuurder belast met het besturen van de rechtspersoon (artikel 2:8 lid 2 BW) en
waren in dat verband verantwoordelijk voor het te voeren strategisch en financieel
beleid, het risicobeleid, het voeren van een goede administratie en de naleving van
regelgeving, waaronder de solvabiliteitseisen (zoals deze volgen uit de LTV) en de
richtlijnen en aanwijzingen van de Centrale Bank. Zij dienden zich als bestuurder bij
de vervulling van hun taak te richten naar het belang van Ennia c.s (artikel 2:8 lid lid
3 BW). Dit betekent dat zij als bestuurder (ook) rekening dienden te houden met de
belangen van onder meer de polishouders en de maatschappelijke belangen, gelet
op de aard van de onderneming. Daarover heeft de Hoge Raad in een arrest van 4
april 2014 (ECLI:NL:HR:2014:799, *Cancun Holding II*) onder meer overwogen:

> 4.2.1.    Bij de vervulling van hun taak dienen de bestuurders zich naar het belang
> van de vennootschap en de met haar verbonden onderneming te richten (…). Wat
> dat belang inhoudt, hangt af van de omstandigheden van het geval. Indien aan de
> vennootschap een onderneming is verbonden, wordt het vennootschapsbelang in de
> regel vooral bepaald door het bevorderen van het bestendige succes van deze
> onderneming. (…)
>
> 4.2.2.    Bij de vervulling van hun taak dienen bestuurders voorts, mede op grond
> van het bepaalde in art. 2:8 BW [NL], zorgvuldigheid te betrachten met betrekking
> tot de belangen van al degenen die bij de vennootschap en haar onderneming zijn
> betrokken. (…) Deze zorgvuldigheidsverplichting kan meebrengen dat bestuurders
> bij het dienen van het vennootschapsbelang ervoor zorgen dat daardoor de belangen
> van al degenen die bij de vennootschap of haar onderneming zijn betrokken niet
> onnodig of onevenredig worden geschaad.
>
> 4.2.3.    Elke bestuurder is gehouden om zich te richten naar het belang van de
> vennootschap en de met haar verbonden onderneming en om zorgvuldigheid te
> betrachten jegens al degenen die bij de vennootschap en haar onderneming zijn
> betrokken, ongeacht of een bestuurder is benoemd door of op voordracht van de
> vergadering van aandeelhouders van een bepaalde soort of aanduiding.



5.14.    Iedere bestuurder is tegenover de rechtspersoon gehouden tot een
behoorlijke vervulling van de binnen zijn werkkring gelegen taak (artikel 2:14 lid 1
BW). In de statuten van Ennia c.s. zijn geen bepalingen opgenomen op basis
waarvan bepaalde bestuurstaken worden toebedeeld aan een of meer bestuurders.
Dat betekent dat de bestuurders op grond van artikel 2:14 lid 2 BW
verantwoordelijk waren voor alle bestuurstaken, wat ook volgt uit artikel 2:14 lid 3
BW. Daarin is ook opgenomen dat iedere bestuurder is gehouden zoveel mogelijk
bij te dragen tot het afwenden van de gevolgen van een schade toebrengend feit. Op
grond van artikel 2:14 lid 4 BW zijn alle bestuurders hoofdelijk aansprakelijk. Niet
aansprakelijk is echter de bestuurder die bewijst dat hem terzake de onbehoorlijke
taakvervulling mede gelet zijn werkkring en de periode gedurende welke hij in
functie is geweest, geen ernstig verwijt kan worden gemaakt, dat de onbehoorlijke

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 44
datum uitspraak: 29 november 2021

taakvervulling niet aan hem te wijten is en dat hij niet nalatig is geweest in het
treffen van maatregelen om de gevolgen daarvan af te wenden.

5.15.    Bij de beoordeling van de vraag of sprake is van een ernstig verwijt zijn de
omstandigheden van het geval van belang, waarbij het onder meer kan gaan om de
aard van de door de rechtspersoon uitgeoefende activiteiten, de in het algemeen
daaruit voortvloeiende risico's, de taakverdeling binnen het bestuur, de eventueel
voor het bestuur geldende richtlijnen, de gegevens waarover de bestuurder
beschikte of behoorde te beschikken ten tijde van de aan hem verweten beslissingen
of gedragingen, en het inzicht en de zorgvuldigheid die mogen worden verwacht
van een bestuurder die voor zijn taak berekend is en deze nauwgezet vervult.
Aansprakelijkheid is aan de orde indien geen redelijk denkend bestuurder – onder
dezelfde omstandigheden – zo gehandeld zou hebben.
In een arrest van de Hoge Raad van 29 november 2002 (ECLI:NL:HR:2002:AE7011,
*Schwandt/Berghuizer Papierfabriek*) is met betrekking tot handelen in strijd met de
statuten onder meer overwogen:

> 3.4.5 (…). Voor aansprakelijkheid op de voet van art. 2:9 BW [NL] is vereist dat aan
> de bestuurder een ernstig verwijt kan worden gemaakt. Of van een ernstig verwijt
> sprake is, dient te worden beoordeeld aan de hand van alle omstandigheden van het
> geval. De omstandigheid dat gehandeld is in strijd met statutaire bepalingen die de
> rechtspersoon beogen te beschermen, moet in dit verband als een zwaarwegende
> omstandigheid worden aangemerkt, die in beginsel de aansprakelijkheid van de
> bestuurder vestigt. Indien de aldus aangesproken bestuurder echter feiten en
> omstandigheden heeft aangevoerd op grond waarvan zou kunnen worden
> aangenomen dat het gewraakte handelen in strijd met de statutaire bepalingen niet
> een ernstig verwijt oplevert, dient de rechter deze feiten en omstandigheden
> uitdrukkelijk in zijn oordeel te betrekken. (…)

5.16.    In artikel 8 onder 10 en 11 van de statuten van Ennia Holding is opgenomen
dat het bestuur voor een aantal specifiek genoemde besluiten de voorafgaande
goedkeuring door de RvC nodig heeft, waaronder besluiten met betrekking tot het
deelnemen voor meer dan 5% in het kapitaal van andere vennootschappen, het
verrichten van alle transacties waarvan het op geld waardeerbare belang 5% of meer
bedraagt van de activa van de vennootschap en het aangaan van geldleningen ten
laste van de vennootschap.

5.17.    Een bestuurder kan ook aansprakelijk zijn jegens anderen dan de
rechtspersoon waarvan hij bestuurder is, bijvoorbeeld in geval van een door de
bestuurder verwijtbaar doen of nalaten ten opzichte van een derde dat kan worden
aangemerkt als onrechtmatig handelen in de zin van artikel 6:162 BW. Ook in dat
geval geldt dat de maatstaf voor bestuurdersaansprakelijkheid is of de bestuurder
(persoonlijk) een voldoende ernstig verwijt kan worden gemaakt.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 45
datum uitspraak: 29 november 2021

*de feitelijk bestuurder(s)*

5.18.    In artikel 2:138 BW (voor een NV) en artikel 2:238 BW (voor een BV) is
bepaald dat hij die, zonder deel uit te maken van het bestuur, voor zekere tijd of
onder zekere omstandigheden, al dan niet krachtens een voor de vennootschap
geldende regeling, het beleid van de vennootschap bepaalt of mede bepaalt als ware
hij bestuurder, ter zake van dat optreden, voor wat zijn verplichtingen ten opzichte
van de vennootschap en van derden betreft, alsmede voor de toepassing van artikel
9, als bestuurder wordt aangemerkt. In de memorie van toelichting bij artikel 2:138
BW is onder meer opgenomen:



> Artikel 138 is ontleend is ontleend aan artikel 49 LBV [Landsverordening Besloten
> Vennootschap]. Het woord 'optreedt' in het eerste lid van artikel 49 LBV is
> vervangen door "het beleid van de vennootschap bepaalt of mede bepaalt" om aan
> te sluiten bij de terminologie van artikel 16, negende lid. Een persoon die aan het
> criterium van artikel 138 voldoet valt a fortiori onder artikel 16, negende lid en
> daarmee onder artikel 16 in zijn geheel. Intussen blijkt uit de tekst van artikel 138 dat
> hij ook buiten het in artikel 16 bedoelde geval van faillissement als bestuurder kan
> gelden. Zoals in de toelichting op artikel 16 is uiteengezet kan ook degene die door
> het geven van instructies een bepaald beleid afdwingt als beleidsbepaler in de zin
> van het negende lid van dat artikel gelden. Dat geldt ook hier. (…)

In het in de MvT genoemde artikel 2:16 BW zijn de bepalingen opgenomen die
betrekking hebben op het faillissement van de rechtspersoon. De bepalingen van
artikel 2:16 BW zijn grotendeels gelijk aan de in Nederland geldende bepalingen van
de artikelen 2:138 en 2:238 BW NL.

5.19.    Uit de tekst (en de toelichting) van de artikelen 2:138 en 2:238 BW volgt dus
dat degene die, als ware hij bestuurder, het beleid van de vennootschap (mede)
bepaalt, als bestuurder wordt aangemerkt. Anders dan in de Nederlandse
wetgeving is dat aanmerken als bestuurder niet beperkt tot de situatie waarin
sprake is van faillissement van de rechtspersoon. Dat betekent dat voor een persoon
die handelt als ware hij bestuurder (door Ennia c.s. aangemerkt als quasi-
bestuurder, hierna door het gerecht te noemen: feitelijk bestuurder) de wettelijke
regels voor bestuurders dienen te gelden. Een feitelijk bestuurder is gelet daarop,
evenals de formele bestuurder(s), gehouden tot een behoorlijke taakvervulling en is
(hoofdelijk) aansprakelijk in geval hem een ernstig verwijt kan worden gemaakt.

5.20.    Ennia c.s. heeft gesteld dat Ansary en Andraous en Palm buiten de
periode(n) waarin zij als formeel bestuurder waren aangesteld, als feitelijk
bestuurder hebben opgetreden.

5.21.    Ansary was bestuurder van Ennia Investments in de periode van juli 2006 tot
en met april 2007. Ansary betwist dat hij buiten die periode om als feitelijk
bestuurder kan worden aangemerkt. Hij voert aan dat hij steeds heeft gehandeld
binnen de formele rollen die hij binnen Ennia c.s. had, te weten als voorzitter van de
RvC en als voorzitter van het *investment committee*.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 46
datum uitspraak: 29 november 2021

5.22.    Tussen partijen staat vast dat het door de RvC ingestelde *investment committee* de bevoegdheid kreeg tot het nemen van alle besluiten ter zake van investeringen van Ennia Holding en de verzekeraars. Nog los van de vraag of de RvC bevoegd was om dit besluit te nemen, volgt uit deze beslissing dat het *investment committee* belangrijke zeggenschap kreeg over de financiële situatie bij Ennia c.s. Het beleid van Ennia werd immers in belangrijke mate bepaald door de investerings- en beleggingsbeslissingen. Door Ansary is betwist dat hem in dat verband iets te verwijten is. Door Ansary is echter niet (gemotiveerd) betwist dat hij, zoals door de legal counsel is opgemerkt, dagelijks overleg voerde met de voorzitter van het bestuur van Ennia c.s. en dat door Ansary instructies werden gegeven aan het bestuur. Van Doorn bevestigt deze gang van zaken en stelt dat Ansary het beleid van Ennia c.s. bepaalde. RvC-lid De Paus benoemt dit eveneens in het gesprek met de Centrale Bank in november 2016, waarvan notulen zijn overgelegd.

5.23.    In het bijzonder gelet op de vergaande bevoegdheden die aan het *investment committee* waren toebedeeld en gelet op het feit dat Ansary daarin als voorzitter optrad en als zodanig ook actief handelde, geldt dat Ansary (daarmee) het beleid van Ennia c.s. bepaalde als ware hij bestuurder. Hij dient dan ook als feitelijk bestuurder te worden aangemerkt. Het *investment committee* is vanaf het instellen ervan in mei 2006 tot aan het uitspreken van de noodregeling actief geweest, zodat Ansary over de gehele relevante periode als feitelijk bestuurder heeft gehandeld.

5.24.    Andraous was bestuurder bij Ennia c.s. vanaf februari/maart 2011. In de periode daaraan voorafgaand was hij betrokken bij Ennia c.s. als lid van het *investment committee.* Hiervoor is overwogen dat het *investment committee* een belangrijke rol speelde bij het bepalen van het (beleggings)beleid van Ennia c.s. Tegelijkertijd is uit de stukken op te maken dat Ansary binnen het *investment committee* een doorslaggevende stem had en feitelijk het beleid bepaalde. Dat, zoals door Ennia c.s. is gesteld, Andraous 'door iedereen binnen Ennia c.s.' werd gezien als bestuurder, is onvoldoende nader gemotiveerd en geconcretiseerd. Het handelen van Andraous zal daarom worden beoordeeld over de periode waarin hij formeel als bestuurder was aangesteld.

5.25.    Ennia c.s. heeft verder gesteld dat Palm al voor zijn aantreden als bestuurder betrokken was als adviseur. Hij heeft volgens Ennia c.s. een belangrijke rol gespeeld bij de overname van Ennia c.s. en heeft daarna een aantal vergaderingen van de RvC van Ennia Holding bijgewoond. Hij was volgens Ennia c.s. verder ook betrokken bij de herstructurering van Ennia en de structurering van de beleggingen. Ennia c.s. stelt dat Palm hierin zeer onzorgvuldig heeft gehandeld en daarom aansprakelijk kan worden gehouden voor de (door deze advisering) veroorzaakte schade. Door Palm is betwist dat hij een dergelijke (grote) rol heeft gehad bij Ennia c.s. voorafgaand aan zijn aanstelling als bestuurder. Dat Palm als adviseur van Ennia c.s. een zodanige rol had dat hij als (mede)beleidsbepaler kan worden aangemerkt voor (kennelijk op grond van die adviezen) door het bestuur genomen beslissingen,

zaaknummers: CUR201903842/3843/3796/3844/3845/3846      blad 47
datum uitspraak: 29 november 2021

is door Ennia c.s. onvoldoende onderbouwd. Het handelen van Palm zal daarom worden beoordeeld over de periode waarin hij formeel als bestuurder was aangesteld.

5.26.      Met betrekking tot Van Doorn heeft Ennia c.s. gesteld dat hij (ook) aansprakelijk kan worden gehouden voor schade die is ontstaan na zijn aftreden als bestuurder, omdat het voor Van Doorn voorzienbaar was dat Ennia c.s., met Ansary als feitelijk bestuurder, het ingezette beleid zou voortzetten en dat dit (mogelijk) tot schade voor Ennia c.s. zou leiden. Daarin volgt het gerecht Ennia c.s. niet. De aansprakelijkheid van een bestuurder eindigt in beginsel bij het beëindigen van het bestuurderschap. Er is geen aanleiding om daar in deze zaak anders over te oordelen, te meer niet nu de aan Ansary c.s. verweten gedragingen van na het aftreden van Van Doorn als bestuurder niet zonder meer zijn te herleiden tot het (mede) door Van Doorn ingezette beleid. Ennia c.s. kan evenmin worden gevolgd in haar stelling dat Van Doorn niet 'zomaar' kon aftreden, maar dat hij bijvoorbeeld naar de toezichthouder had moeten stappen of aangifte had moeten doen. Van Doorn heeft tweemaal zijn ontslag ingediend bij Ennia c.s. en daarvan was de Centrale Bank op de hoogte. Dit gegeven had een signaal kunnen zijn. Bovendien blijkt uit de stukken dat onder meer de solvabiliteit van Ennia c.s. al langer de aandacht had van de Centrale Bank. In ieder geval creëert het afzien van verdere acties door Van Doorn na zijn vertrek als bestuurder als zodanig geen aansprakelijkheid voor handelen door de andere gedaagden.

5.27.      Samenvattend geldt dat Ansary gedurende de gehele periode als (feitelijk) bestuurder van Ennia c.s. heeft gehandeld. Van Doorn, Andraous en Palm hebben steeds als bestuurder te gelden gedurende de periode(n) van hun statutair bestuurderschap. Voor de bestuurders gold een bijzondere zorgplicht gelet op de aard van de onderneming en de daarmee samenhangende (maatschappelijke) belangen, in het bijzonder de belangen van de (pensioen)polishouders.

5.28.      De perioden van het (feitelijk) bestuurderschap zijn hieronder schematisch weergegeven.

| (feitelijk) bestuurderschap | | | | |
|---|---|---|---|---|
| | Ansary | Van Doorn | Andraous | Palm |
| 2006 | x | x | | |
| 2007 | x | x | | |
| 2008 | x | x (tot 16/6) | | |
| 2009 | x | x (vanaf 25/06) | | |
| 2010 | x | x | | |
| 2011 | x | x (tot 1/4) | x (vanaf 9/2) | x (vanaf 26/3) |
| 2012 | x | | x | x |
| 2013 | x | | x | x |

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 48
datum uitspraak: 29 november 2021

| 2014 | x | | x | x |
|---|---|---|---|---|
| 2015 | x | | x | x |
| 2016 | x | | x | x |
| 2017 | x | | x | x |
| 2018 | x | | x | x |

*de commissarissen*

5.29.    Ansary en Nina Ansary zijn als commissaris betrokken geweest bij Ennia c.s. Ansary was voorzitter van de RvC van Ennia Holding in de periode vanaf januari 2006 tot het uitspreken van de noodregeling in juli 2018. Nina Ansary was lid van de RvC vanaf 20 mei 2009 tot aan het uitspreken van de noodregeling.

5.30.    In artikel 2:19 lid 1 BW is bepaald dat de statuten van een rechtspersoon kunnen bepalen dat er een raad van commissarissen is of kan zijn. De statuten omschrijven dan de taak van de commissarissen. Tot die taak behoort in ieder geval het houden van toezicht op het bestuur. In artikel 2:19 lid 6 BW is bepaald dat (onder meer) artikel 2:14 BW van overeenkomstige toepassing is, zodat bij de RvC sprake is van collegiaal toezicht. In artikel 2:19 lid 7 BW is bepaald dat de RvC zich bij zijn taak richt naar het belang van de rechtspersoon en de met deze verbonden onderneming.

5.31.    In de LTV zijn eveneens bepalingen opgenomen die betrekking hebben op de RvC. In artikel 16 LTV staat onder meer:
(…)
3. Een verzekeraar die de rechtsvorm van naamloze vennootschap of besloten vennootschap bezit, heeft een raad van commissarissen, die uit drie of meer natuurlijke personen bestaat.
4. De in het derde lid bedoelde raad van commissarissen heeft tot taak toezicht te houden op het beleid van het bestuur van de verzekeraar en op de algemene gang van zaken in de vennootschap en de met haar verbonden onderneming. Hij staat het bestuur met raad terzijde. Bij de vervulling van hun taak richten de commissarissen zich naar het belang van de vennootschap en de met haar verbonden onderneming.
5. Omtrent de taak en de bevoegdheid van de raad van commissarissen en zijn leden kunnen de statuten van de verzekeraar aanvullende bepalingen bevatten. (…)

5.32.    Door de Centrale Bank is de rol van de RvC nader uitgewerkt in een leidraad voor de RvC van financiële instellingen (*Guidance notes for the supervisory board of supervised financial institutions*), die vanaf 2001 van toepassing is. Daarin staat onder meer:
IV. THE RESPONSIBILITIES OF THE SUPERVISORY BOARD AND ITS MEMBERS
Besides the collective responsibilities of the Supervisory Board, each member has his individual responsibilities.
The responsibilities of the Supervisory Board as a whole can be sub-divided in the following seven distinct areas:



zaaknummers: CUR201903842/3843/3796/3844/3845/3846                   blad 49
datum uitspraak: 29 november 2021

a) ensure competent management on an ongoing basis;
b) ensure appropriate plans and policies for the institution;
c) monitor operations to ensure compliance and adequate control;
d) oversee business performance;
e) ensure that the institution serves the (credit, insurance or investment) needs of the
community well;
f) ensure that the individuals involved in the daily management and operation of the
institution are of professional, social and moral integrity; and
g) ensure that timely and accurate disclosure is made on all material matters
regarding the institution.
(…)
**IV.2 Individual Responsibilities of a Member of the Supervisory Board**
Supervisory Board membership serves as an opportunity for the individual member
to contribute to the growth and development of the local economy. Furthermore, it
provides an invaluable business education to the members of the Supervisory Board.
The job brings with it distinct duties, responsibilities, but also liabilities. Generally,
the individual responsibilities of a member of the Supervisory Board are to:
a) be aware of the institution's operating environment;
b) be diligent in performing the job;
c) exercise independent judgment; and
d) be loyal to the institution's interests.

5.33.    In artikel 10 van de statuten van Ennia Holding (zoals deze golden tot
september 2009) is opgenomen:

RAAD VAN COMMISSARISSEN
Artikel 10



1. Het uitoefen van het toezicht op het door de directie gevoerde bestuur en het
geven van adviezen aan de directie is opgedragen aan een Raad van
Commissarissen, bestaande uit een door de vergadering van houders van
prioriteitsaandelen A te bepalen aantal van tenminste drie commissarissen
(…)
13. Ten minste twee maal per jaar komen de directie en de Raad van Commissarissen
in gezamenlijke vergadering bijeen. (…)
De vanaf september 2009 geldende statuten zijn op dit punt gelijkluidend.

5.34.    Samenvattend dienden Ansary en Nina Ansary zich als voorzitter en lid van
de RvC te richten naar het belang van Ennia c.s. en dienden zij in dat verband
toezicht uit te oefenen en het bestuur van adviezen te voorzien. Ook voor hen gold
in dat verband een bijzondere zorgplicht, die eigen is aan de aard van de
onderneming en de daarmee samenhangende (maatschappelijke) belangen, in het
bijzonder de belangen van de (pensioen)polishouders. Als zij ernstig tekort zijn
geschoten in de toezichtstaak of indien zij ten onrechte of te lichtvaardig
toestemming hebben gegeven voor bepaalde transacties, kunnen zij aansprakelijk
zijn jegens de rechtspersoon als aan hen een ernstig verwijt kan worden gemaakt.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 50
datum uitspraak: 29 november 2021

*de aandeelhouder*

5.35.    Parman International is aandeelhouder van Ennia Holding. De
aandeelhouder van een vennootschap is in beginsel niet aansprakelijk voor meer
dan het gestorte bedrag op aandelen. Een aandeelhouder kan desondanks
aansprakelijk zijn jegens de vennootschap of derden op grond van onrechtmatige
daad. In een arrest van de Hoge Raad van 8 november 1991
(ECLI:NL:HR:1991:ZC0401, *Nimox*) is onder meer geoordeeld:



> (...)
> 3.3.2.    Subonderdeel a betoogt dat Nimox door het uitbrengen van haar stem voor
> het dividendbesluit niet onrechtmatig kan hebben gehandeld omdat het besluit
> tevergeefs is aangevochten en dus als rechtsgeldig moet worden beschouwd.
> Dit betoog is onjuist. Ook indien van de geldigheid van het besluit als zodanig moet
> worden uitgegaan bij gebreke van vernietiging bij rechterlijk vonnis op de voet van
> art. 2:11 BW [NL], volgt hieruit niet dat uitvoering van het besluit tegenover derden
> zoals schuldeisers van de vennootschap niet onrechtmatig kan zijn, noch dat het
> door uitoefening van het stemrecht bewerkstelligen van de totstandkoming van het
> besluit tegenover derden niet onrechtmatig kan zijn. (…)

**De algemene verwijten**

5.36.    Ennia c.s. verwijt gedaagden in algemene zin dat zij vanaf de overname door
Ansary niet langer de belangen van Ennia c.s. en haar polishouders voor ogen
hebben gehad, maar andere (eigen) belangen. Dit algemene verwijt wordt allereerst
beoordeeld en vervolgens zal worden ingegaan op de specifieke verwijten die door
Ennia c.s. zijn gemaakt, waarbij de hiervoor genoemde kaders het uitgangspunt
vormen bij de beoordeling.

5.37.    Voor de overname hanteerde Ennia een beleggingsbeleid dat was opgesteld
naar aanleiding van een *asset-liability management* (ALM) onderzoek. Op basis van
dit beleggingsbeleid werd voornamelijk geïnvesteerd in vastrentende effecten (met
name deposito's, obligaties en hypothecaire leningen) en voor een klein gedeelte in
aandelen, vastgoed en liquide activa. Dit beleggingsbeleid is met name gericht op
het behoud van solvabiliteit en komt overeen met het beleid dat door de
Nederlandse verzekeraars werd en wordt gevoerd.

5.38.    Na de overname is door Ansary allereerst een kapitaalinbreng gedaan door
middel van aandelen in SunResorts. Dit kapitaal is later ingebracht in de door
Ansary opgerichte entiteit Ennia Investments, waarmee het (toen in ieder geval) een
investering werd. Ennia Investments is opgericht met het doel om de beleggingen
en investeringen te concentreren in één entiteit. De investeringsgelden kwamen
grotendeels vanuit de verzekeraars, zodat intercompany-vorderingen ontstonden
tussen Ennia Investments en de verzekeraars. Het beleggingsbeleid werd feitelijk
bepaald door het *investment committee*, waarvan Ansary de voorzitter was. Dit
*investment committee* kon, na een beslissing daartoe door de RvC van Ennia Holding,
ter zake van alle investeringen van Ennia Holding en de verzekeraars alle besluiten

zaaknummers: CUR201903842/3843/3796/3844/3845/3846       blad 51
datum uitspraak: 29 november 2021

nemen, en deed dat ook.

5.39.    Het is tussen partijen niet in geschil dat het beleggingsbeleid van Ennia c.s. vervolgens aanzienlijk is gewijzigd. De hiervoor genoemde beleggingen werden grotendeels geliquideerd en omgezet in aan Ansary gelieerde investeringen in, met name, S&S en SunResorts (Mullet Bay). De beleggingen in S&S en Mullet Bay samen vertegenwoordigden 82,7% van de bezittingen van de verzekeraars. Dit leidde tot een groot concentratierisico, omdat de verzekeraars hierdoor grotendeels afhankelijk werden van (de waardering van) deze twee investeringen. Dat, zoals door Ansary c.s. is benadrukt, Ennia Investments als een buffer fungeerde voor de verzekeraars en de intercompany-vorderingen de verzekeraars van een vast rendement voorzagen, maakt dat niet anders. Allereerst niet omdat het daadwerkelijke rendement alsnog afhankelijk was van de onderliggende activa. In de tweede plaats niet omdat het rendement niet daadwerkelijk werd uitbetaald, maar als nieuwe lening werd toegevoegd aan de bestaande intercompany-vorderingen.

5.40.    Ennia c.s. is vanaf oktober 2006 diverse malen door de Centrale Bank en andere interne en externe toezichthouders en betrokkenen gewaarschuwd. Daarbij is onder meer gewezen op de onwenselijke mate van betrokkenheid van Ansary bij zowel Ennia c.s. als de aan hem gelieerde ondernemingen, het concentratierisico van de beleggingen, de lage rating van S&S en het daarmee verband houdende hoge risico van deze investering, de niet uitbetaalde rente over de intercompany-vorderingen en de solvabiliteit. Deze waarschuwingen hebben er niet toe geleid dat het (beleggings)beleid van Ennia c.s. is gewijzigd. De investering in S&S nam zelfs verder toe en daarmee ook de intercompany-vorderingen. Bovendien steeg de waarde van Mullet Bay (in ieder geval op papier), zodat deze een steeds groter gedeelte van de waarde van de bezittingen van de verzekeraars vertegenwoordigde.

5.41.    Ansary c.s. heeft daartegen aangevoerd dat de gegeven waarschuwingen veelal kwamen van mensen over wie binnen de organisatie wisselend werd gedacht, dan wel van mensen die daarmee hun taak of rol te buiten gingen. Dat doet echter niets af aan de inhoud van de gegeven waarschuwingen en bovendien miskent Ansary c.s. daarmee dat de waarschuwingen vanuit diverse geledingen kwamen en niet op zichzelf stonden. Ansary c.s. heeft ook aangevoerd dat de Centrale Bank zich in een brief aan de verzekeraars in 2008 positief uit over onder meer de solvabiliteit van de verzekeraars. Op basis van deze (enkele) brief kan, in het licht van de diverse daarvoor en daarna gegeven waarschuwingen, aanwijzingen en instructies niet worden afgeleid dat er voor Ennia c.s. geen aanleiding bestond tot beleidswijziging. Datzelfde geldt voor het gegeven dat de Centrale Bank lange tijd heeft gewacht met het nemen van verdergaande maatregelen tegen Ennia c.s. Het al dan niet (intensiever) optreden door de toezichthouder ontslaat gedaagden immers op geen enkele manier van hun zorgplicht. Ansary c.s. heeft verder meermalen naar voren gebracht dat Ennia Investments als zodanig niet onder toezicht stond van de

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                     blad 52
datum uitspraak: 29 november 2021

Centrale Bank en zich dus niet hoefde te houden aan de voor de verzekeraars
geldende richtlijnen. Dat uitgangspunt is onjuist. Zoals het gerecht hiervoor (onder
5.10.) heeft geoordeeld, gold ook voor Ennia Investments een bijzondere zorgplicht.

5.42.    In 2015 zijn de solvabiliteitsrichtlijnen van de Centrale Bank gewijzigd. Deze
wijziging kwam niet onverwacht, aangezien daar al vanaf 2011 op werd
aangestuurd en Ennia c.s. daarvan op de hoogte was. In die periode zijn door de
Centrale Bank diverse aanwijzingen gegeven die moesten leiden tot het oplossen
van het solvabiliteitstekort en de concentratierisico's. Tussen partijen is niet in
geschil dat Ennia c.s. ten tijde van het uitspreken van de noodregeling niet voldeed
aan de solvabiliteitseisen. Ook de overige aanwijzingen van de Centrale Bank
werden niet of niet voldoende opgevolgd. Bovendien staat vast dat korte tijd voor
het intrekken van de verzekeraarsvergunning een bedrag van USD 100 miljoen
vanuit Ennia Investments is overgemaakt naar S&S. Gelet op dit alles ziet het
gerecht niet de minste basis voor de stelling van Ansary c.s. dat de noodregeling
niet uitgesproken had mogen worden.

5.43.    Samenvattend kan in het algemeen worden vastgesteld dat de
vennootschapsstructuur en het beleggingsbeleid van Ennia c.s. na de overname
door Ansary c.s. zodanig zijn gewijzigd, dat het belang van Ennia c.s. en de
polishouders niet langer centraal stond. Er is in belangrijke mate niet voldaan aan
de bijzondere zorgplicht die geldt voor bestuurders en toezichthouders van een
(levens)verzekeraar, zulks nota bene in weerwil van zeer kritische observaties
vanuit de eigen gelederen (Voigt, Couperus, De Paus) en herhaalde
waarschuwingen en aansporingen van de toezichthouder (de Centrale Bank).

5.44.    Het voorgaande betekent echter niet (zonder meer) dat gedaagden
aansprakelijk zijn voor de door Ennia c.s. gestelde schade. Daarvoor is (steeds) van
belang of zij in de specifiek door Ennia c.s. gemaakte verwijten de voor gedaagden
geldende norm hebben overschreden en of dit (vervolgens) heeft geleid tot schade.

5.45.    Ennia c.s. heeft in eerste instantie primair een schadeberekening gehanteerd
die is gebaseerd op een vergelijking van de solvabiliteitspositie met en zonder
(gestelde) normschendingen door gedaagden. In dat verband is een groot aantal
verwijten genoemd. Bij wijziging van eis is deze primaire schadeberekening
losgelaten en heeft Ennia c.s. de concrete schade die voortvloeit uit de afzonderlijke
verweten gedragingen van gedaagden gevorderd.

**Groepsaansprakelijkheid**

5.46.    Ennia c.s. stelt zich op het standpunt dat gedaagden gelet op de aan hen te
maken algemene verwijten en de hierna te bespreken specifieke verwijten jegens
haar als groep aansprakelijk zijn voor de door Ennia c.s. gestelde schade. Het
gerecht volgt Ennia c.s. daarin niet. Artikel 6:166 lid 1 BW bepaalt dat indien één

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 53
datum uitspraak: 29 november 2021

van tot een groep behorende personen onrechtmatig schade toebrengt en de kans op
het aldus toebrengen van schade deze personen had behoren te weerhouden van
hun gedragingen in groepsverband, zij hoofdelijk aansprakelijk zijn indien deze
gedragingen hun kunnen worden toegerekend. Van handelen in groepsverband
zoals bedoeld in deze bepaling is, zowel wat betreft het algehele optreden van
gedaagden als hun optreden bij de door Ennia c.s. uitgelichte specifieke handelingen
en transacties, geen sprake. Daarbij komt dat bij bestuurdersaansprakelijkheid al
sprake is van een afzonderlijk in de wet geregelde vorm van collectieve
aansprakelijkheid, te weten de collegiale aansprakelijkheid van leden van een
bestuur of raad van commissarissen in geval van onbehoorlijk bestuur of toezicht
(artikel 2:14 lid 4 BW en 2:19 lid 6 BW).

5.47.    De vraag naar de aansprakelijkheid van gedaagden zal dan ook steeds ten
aanzien van ieder van hen worden beoordeeld op basis van ieders formele
verantwoordelijkheid en ieders eigen gedragingen of nalaten.

**Het verwijt terzake S&S**

*de stellingen van Ennia c.s.*

5.48.    Ennia c.s. stelt dat gedaagden onrechtmatig en ernstig verwijtbaar hebben
gehandeld door Ennia c.s. bloot te stellen aan de grote risico's van de S&S
investering. Vervolgens heeft Ennia c.s. nauwelijks meegedeeld in de waardestijging
van S&S, nu deze grotendeels ten goede is gekomen aan Ansary. Die stellingen van
Ennia c.s. zijn als volgt onderbouwd.

5.49.    S&S heeft begin 2006 voor USD 70 miljoen aan eigen vermogen
aangetrokken. BdC Investments heeft daarvan USD 65 miljoen ingebracht tegen
6.500 preferente aandelen zonder stemrecht en winstrecht. Ansary, althans Parman
Capital, heeft USD 5 miljoen ingebracht tegen 5.000 gewone aandelen. In oktober
2006 zijn 6.000 preferente aandelen overgedragen aan Ennia Investments tegen
betaling door Ennia Leven van USD 60 miljoen. In november 2006 zijn de 6.000
preferente aandelen van Ennia (en 500 aandelen van BdC Investments) omgezet in
(slechts) 1.667 gewone aandelen. Het belang van Ennia was toen 25% en nam in 2009
toe tot 40% met de aankoop van extra aandelen in S&S. In 2014 werd het gehele
belang van Ennia in S&S verkocht aan Parman Capital voor een bedrag van slechts
USD 133 miljoen. In ruil daarvoor ontving Ennia een *promissory note,* waardoor
Ennia niet kon profiteren van eventuele waardestijgingen. Vervolgens is de
*promissory note* in september 2015 omgezet in *preferred units 2.* In de tussenliggende
periode (2008-2011) zijn door Ennia c.s. ook obligaties van S&S aangeschaft tegen
een rendement van 10%, die een steeds lagere credit rating kregen en waartegen
werd gewaarschuwd. Dat weerhield gedaagden er niet van om desondanks
obligaties van S&S te blijven kopen. In maart 2014 zijn de obligaties omgezet naar
*preferred units 1* tegen een rendement van maximaal 6% per jaar. S&S zag een

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 54
datum uitspraak: 29 november 2021

schuld/lening van USD 150 miljoen daarmee veranderen in een aanvullend eigen vermogen van USD 141,96 miljoen. Uiteindelijk is S&S verkocht aan Kirby en heeft Ennia c.s. slechts 38% van de totale opbrengst ontvangen. Dat staat niet in verhouding tot de inbreng aan eigen vermogen. Bij alle transacties speelden Ansary en de aan hem gelieerde entiteiten een belangrijke, beslissende rol.

5.50.    Gelet op de (oorspronkelijke) inleg door Ennia c.s. zou het gerealiseerde vermogen ook in die verhouding ten goede van Ennia Investments of Ennia Leven hebben moeten komen. Dat is echter niet gebeurd en daarom zijn gedaagden aansprakelijk op grond van onrechtmatige daad. Ennia c.s. is blootgesteld aan een onverantwoord risicovolle investering, waarbij Ansary c.s. een aanzienlijk persoonlijk belang had dat tegengesteld was aan het belang van Ennia c.s. De door Ennia c.s. als gevolg daarvan geleden schade kan worden begroot op de winst die Ansary als gevolg van de onrechtmatige gedragingen heeft genoten.

*de verweren van Ansary c.s. en Van Doorn*

5.51.    Ansary c.s. betwist de door Ennia c.s. gemaakte verwijten, waaronder de gestelde verhouding tussen de inbreng en de uiteindelijke opbrengst. In dat verband heeft Ansary c.s. naar voren gebracht dat Ansary de activa van S&S Inc in contanten heeft aangekocht. Om deze transactie te voltooien is S&S opgericht. De uiteindelijke koopovereenkomst is getekend op 25 januari 2006 voor een bedrag van USD 277 miljoen. Van dit bedrag is een bedrag van USD 212 miljoen verschaft middels een lening en een kredietfaciliteit (vreemd vermogen) van JP Morgan Chase aan Ansary en is USD 5 miljoen aan eigen vermogen ingebracht door Ansary. Daarmee moet rekening worden gehouden bij de beoordeling van de verhouding van de inbreng. Ansary was immers (persoonlijk) aansprakelijk voor de terugbetaling daarvan. Bovendien stond Ansary garant voor het (uiteindelijk, na de aankoop van de aandelen van BdC Investments) door Ennia Investments ingebrachte bedrag van USD 65 miljoen.

5.52.    Ansary c.s. voert verder aan dat de S&S-transactie een positief resultaat heeft opgeleverd voor Ennia c.s. Het bedrijf is verkocht aan Kirby, waarbij de betaling deels in aandelen Kirby is gedaan. Deze aandelen zijn na de verkoop nog verder in waarde gestegen. Dat Ennia c.s. risico heeft gelopen met de investering in S&S is niet (langer) relevant, omdat het risico zich nooit heeft verwezenlijkt. Er is geen schade geleden als gevolg van deze transactie, integendeel, aldus Ansary c.s.

5.53.    Van Doorn heeft tegen de verwijten van Ennia c.s. aangevoerd dat de herstructurering in de S&S investering en het onthouden van de upside van de investering aan Ennia c.s. heeft plaatsgehad nadat Van Doorn zijn ontslag heeft aangeboden. Hem treft daarom ook geen verwijt en hij kan niet aansprakelijk worden gehouden voor de door Ennia c.s. gestelde geleden schade, aldus Van Doorn.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 55
datum uitspraak: 29 november 2021

*beoordeling*

  *de aard van de investering en het concentratierisico*

5.54. Tussen partijen is op zichzelf niet in geschil dat de investering in S&S een risicovolle belegging betrof. In 2006 is aan S&S door Moody's een rating toegekend van B2, wat betekent dat sprake is van een hoog risicoprofiel. Aan de obligaties van S&S is door Moody's in 2006 een creditrating toegekend van B3, wat betekent dat sprake is van een obligatie die als speculatief wordt gezien met een hoog kredietrisico. Standard & Poor's heeft de creditrating van de obligaties begin 2009 op B vastgesteld en dit eind 2009 verlaagd naar CCC+. In 2010 werd door Moody's aan de obligaties een credit rating van Caa2 toegekend, wat betekent dat sprake is van speculatieve obligaties van lage kwaliteit met een zeer hoog kredietrisico.

5.55. Over de lage (credit) ratings zijn kritische opmerkingen geplaatst door betrokkenen bij Ennia c.s. Voigt schrijft in een memo aan de directie van Ennia in februari 2010 dat er reden is om te veronderstellen dat de belegging van de vermogenswaarden van de polishouders niet de kwalificatie prudent verdient. In juli 2010 benoemt Couperus eveneens de lage rating van S&S. Uit een rapport van de Centrale Bank van 2012 over Ennia Leven volgt dat alleen beleggingen met een rating van BBB (S&P) of BAA (Moody's) of hoger als toelaatbare activa kunnen worden gerapporteerd. De belegging in S&S voldeed daar dus niet aan.

5.56. Door de toenemende investering in S&S (zowel in aandelen als in obligaties) nam eveneens het concentratierisico toe. De investering ging in verhouding immers een steeds groter onderdeel uitmaken van de totale investeringen. De S&S investering bedroeg in 2010 28% van het totaal aan beleggingen van de verzekeraars.

5.57. Gedaagden zijn meerdere keren gewezen op het ontstane concentratierisico. Couperus heeft in de eerder aangehaalde e-mail in juli 2010 te kennen gegeven dat het concentratierisico teruggebracht moest worden. Dit heeft geleid tot een bestuursbesluit van 13 oktober 2010, waarin is opgenomen dat het concentratierisico zal worden teruggedrongen. Dit besluit is in januari 2011 teruggedraaid, nadat Ansary, blijkens het verslag van Van Doorn, 'uitermate duidelijk aangaf zelf de beleggingsbeslissingen te zullen blijven nemen'. In het rapport van Buck Consultants uit 2011 is onder meer opgenomen dat sprake is van een 'high concentration of assets' en verder dat de 'investment focus is primarily on group level and structured from a fiscal point of view. Too little attention for the specific requirements of a life insurer'. De Paus heeft vrijwel direct na zijn aantreden als commissaris in 2016 zijn onbegrip uitgesproken over het beleggings- en investeringsbeleid, zowel richting feitelijk bestuurder Ansary als richting statutair bestuurders Palm en Andraous. De Centrale Bank ten slotte heeft voortdurend gewezen op het onacceptabel hoge concentratierisico en de noodzaak om daarin wijzigingen aan te

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 56
datum uitspraak: 29 november 2021

brengen.

5.58.    De toenemende risico's van de belegging in S&S en het (toenemende)
concentratierisico van die belegging en de waarschuwingen daartegen hebben er
niet toe geleid dat gedaagden het belang van Ennia c.s. in S&S hebben laten
afnemen. Integendeel, het belang in S&S is in de loop van de jaren alleen maar
groter geworden. Na de investering in preferente aandelen in S&S in oktober 2006
en de conversie naar gewone aandelen in november 2006 zijn in maart 2009 nieuwe
aandelen gekocht, een belang van 15% in S&S. Daarnaast zijn in de periode 2008-
2011 doorlopend nieuwe obligaties gekocht, terwijl juist in die periode de
creditrating van S&S naar beneden werd bijgesteld. Onderstaand is een overzicht
van de transacties opgenomen.

| Transacties: | |
|---|---|
| 2006 (januari) | uitgifte 5.000 *common shares* aan Parman Capital<br><br>uitgifte 6.500 *preferred shares* aan BdC Investments |
| 2006 (oktober) | overdracht 6.000 *preferred shares* door BdC Investments aan Ennia Investments voor USD 60 miljoen (van Ennia Leven) |
| 2006 (november) | conversie van de 500 (BdC Investments) en 6.000 (Ennia Investments) *preferred shares* in 1.667 common shares |
| 2009 | Aankoop 15%-belang common shares van Ansary door Ennia voor USD 26,967 miljoen |
| 2008–2011 | Aankoop van 141.960 S&S-obligaties |
| 2013 | Omzetting obligaties in *preferred Units 1* |
| 2014 | Verkoop 40%-belang *common shares* voor promissory note Parman Capital |
| 2015 | Beeindiging promissory note tegen uitgifte *preferred Units 2* |
| 2017 | Verkoop aan Kirby |

5.59.    Vastgesteld kan worden dat gedaagden de belangen van Ennia c.s. en haar
polishouders volstrekt onvoldoende voor ogen hebben gehad. Zij hebben met de
S&S investering een onaanvaardbaar groot risico genomen, zowel vanwege de aard
van de investering zelf als vanwege het hoge concentratierisico. Dat de S&S
investering uiteindelijk heeft geleid tot een positief resultaat, doet aan dat ernstige
verwijt niets af.

*de investering en de nadien gevolgde conversies en transacties*

5.60.    Aan de orde is echter de vraag of gedaagden, los van het voorgaande, de

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 57
datum uitspraak: 29 november 2021

investering in S&S zodanig hebben vormgegeven dat niet Ennia c.s., maar aan
Ansary gelieerde entiteiten daarvan ten onrechte de hoogste opbrengsten hebben
ontvangen. Dat is immers het verwijt waarvoor gedaagden in hun hoedanigheid
van (feitelijk) bestuurder, commissaris en/of aandeelhouder, aansprakelijk worden
gehouden en op grond waarvan door Ennia c.s. schade wordt gevorderd. In dat
verband overweegt het gerecht het volgende.

5.61.    De koop van de activa van S&S Inc heeft plaatsgevonden middels de inbreng
van zowel vreemd vermogen als eigen vermogen in S&S, de entiteit die is opgericht
om de koop te realiseren en van welke entiteit Ansary sinds november 2005
voorzitter van het bestuur is. Ansary c.s. heeft benadrukt dat het zijn persoonlijke
verdienste is dat hij in staat werd gesteld om ten behoeve van S&S bij JP Morgan
Chase een aanzienlijke lening en kredietfaciliteit af te sluiten. Daarmee werd de
koop van de activa van S&S Inc mogelijk. Deze koop had niet kunnen worden
gerealiseerd door Ennia c.s. Ansary vindt dat hij Ennia c.s. juist heeft laten
meeprofiteren van deze investering. De inbreng van 65 miljoen door BdC
Investments, die later is overgenomen door Ennia Investments, moet volgens
Ansary c.s. niet worden afgezet tegen de inbreng in het eigen vermogen door
Ansary (Parman Capital) van USD 5 miljoen, maar tegen de transactie als geheel,
waaronder het ingebrachte vreemd vermogen van JP Morgan Chase.
Daarin volgt het gerecht Ansary c.s. niet. Het is juist dat Ansary voor een aanzienlijk
deel van de financiering heeft zorggedragen. Dit vreemd vermogen kan echter niet
worden gelijkgesteld met of bijgeteld bij het ingebrachte (risicodragende) eigen
vermogen door onder meer Ennia Investments. Dit geldt te meer nu Ansary de
(terug) betaling van het vreemd vermogen voor in ieder geval een groot gedeelte
heeft gerealiseerd middels de uitgifte van obligaties die door Ennia zijn gekocht.
Dat, zoals door Ansary c.s. is betoogd, de inbreng door Ennia Investments was
bedoeld om Ennia Investments mee te laten profiteren van de investering door
Ansary is daarbij niet relevant. Nog afgezien van feit dat Ennia Investments en
indirect de verzekeraars daarmee werden blootgesteld aan grote risico's, betekent
dat niet dat de inbreng door Ennia Investments daarmee in verhouding kleiner
wordt of anders zou moeten worden benaderd. Ten slotte is niet komen vast te staan
dat, zoals door Ansary c.s. is betoogd, door Ansary een persoonlijke garantstelling is
afgegeven voor de inbreng door Ennia Investments van USD 65 miljoen, zodat ook
om die reden geen aanleiding bestaat om de inbreng van eigen vermogen door
Ennia Investments anders te waarderen. Dit betekent dat bij de beoordeling als
uitgangspunt wordt genomen dat van de zijde van Ansary een bedrag van USD 5
miljoen (7,1%) is ingebracht als eigen vermogen en van de zijde van BdC
Investments (korte tijd later van Ennia Investments) een bedrag van
USD 65 miljoen (92,9%). BdC Investments verwierf daarmee 6.500 preferente
aandelen tegen een nominale waarde van USD 10.000 per stuk, Parman Capital
verwierf 5.000 gewone aandelen tegen een nominale waarde van USD 1.000 per
stuk.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                      blad 58
datum uitspraak: 29 november 2021

5.62.    Tussen partijen is niet in geschil dat de activa van S&S eind 2017 aan Kirby zijn verkocht voor een bedrag van USD 744,5 miljoen. Ennia heeft daarvan 38% ontvangen, aan Ansary gelieerde entiteiten 62%. Op zichzelf is denkbaar dat de verhouding van de inbreng door verschillende entiteiten (in dit geval 92,9% ten opzichte van 7,1%) niet in precies diezelfde verhouding tot resultaat leidt. Er is immers sprake van verschillende type aandelen, er vinden ontwikkelingen plaats in de markt en daarbinnen worden keuzes gemaakt die goed of minder goed kunnen uitvallen. In deze zaak is echter sprake van diverse conversies waarvan op voorhand duidelijk was of moest zijn dat deze onvoordelig zouden uitpakken voor Ennia c.s. en positief voor de aan Ansary gelieerde entiteiten. Daarvoor is geen enkele plausibele verklaring gegeven door Ansary c.s.

5.63.    In oktober 2006 zijn 6.000 aandelen van BdC Investments overgedragen aan Ennia Investments tegen betaling van de nominale waarde van de preferente aandelen, in totaal USD 60 miljoen. Vervolgens zijn deze 6.000 preferente aandelen (samen met de resterende 500 preferente aandelen van BdC Investments) omgezet in 1.667 gewone aandelen. Parman Capital hield 5.000 gewone aandelen. Dit betekent dat het belang van Ennia Investments in S&S daarmee uitkwam op (slechts) 25%. Het belang van Ansary (althans Parman Capital) kwam uit op 75%.
Daar komt nog bij dat de aandelen van Parman Capital zogenoemde class b aandelen waren, die per aandeel 10 stemrechten hadden, tegenover 1 stemrecht per aandeel voor de aandelen van Ennia Investments. Het is duidelijk dat Ansary, althans Parman Capital, daarmee de feitelijke zeggenschap had over S&S. Op geen enkele wijze is een rechtvaardiging gegeven voor deze omzetting of is aannemelijk gemaakt dat Ennia c.s. belang had bij deze omzetting. Ansary c.s. heeft in dit verband aangevoerd dat Ennia Investments en BdC Investments hun 'keuzerecht' hebben uitgeoefend. Feit is echter dat, zoals hiervoor is geoordeeld, Ansary de feitelijk bestuurder was van Ennia Investments, zodat Ansary zelf deze keuze (mede) heeft gemaakt. Van de zijde van Ennia Investments was verder Van Doorn betrokken bij deze conversie. Ook van Doorn heeft niets aangevoerd op grond waarvan deze -op het oog zeer nadelige- conversie desalniettemin in het belang zou kunnen zijn of worden voor Ennia c.s. Het is aannemelijk dat deze conversie er bij een verkoop van S&S toe zou leiden dat een aanzienlijk kleiner deel van de opbrengst ten goede zou komen aan Ennia c.s. dan gelet op de initiële investering in de rede lag. De omzetting van preferente aandelen naar gewone aandelen is gelet daarop zodanig niet in het belang van Ennia c.s. dat in dit verband een ernstig verwijt is te maken aan de (feitelijk) bestuurders en de toezichthoudende RvC die bij besluit van 19 februari 2007 alle tot dat moment genomen investeringsbeslissingen heeft goedgekeurd.

5.64.    In maart 2009 heeft Ennia Investments voor een bedrag van USD 26,7 miljoen nog 15% van de aandelen in S&S overgenomen van Parman Capital. Dit bedrag is betaald aan Parman International en vervolgens uitbetaald aan de aandeelhouders van Parman International. In deze overeenkomst is een terugkoopoptie opgenomen,

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 59
datum uitspraak: 29 november 2021

waarbij de aandelen binnen twee jaar kunnen worden teruggekocht tegen het
betaalde bedrag voor de aandelen, vermeerderd met een opslag. Hoewel deze
terugkoopoptie Parman Capital de gelegenheid bood om van een eventuele
waardestijging van de aandelen te profiteren (ten koste van Ennia Investments),
heeft dit potentiële risico voor Ennia Investments zich niet verwezenlijkt omdat
Parman Capital geen gebruik heeft gemaakt van deze mogelijkheid.

5.65.    De verkoop van het 40% belang van Ennia Investments in S&S heeft
plaatsgevonden in juni 2014. Het 40% belang is verkocht voor een bedrag van
USD 133,4 miljoen. In ruil daarvoor ontving Ennia Investments een
schuldbekentenis van Parman Capital. Uit het jaarverslag van Ennia over het jaar
2014 volgt dat deze schuldbekentenis niet is gedekt door zekerheden. KPMG
benoemt in het (*early warnings*) rapport uit 2014 bovendien dat de effectieve rente op
deze schuldbekentenis openbaar moet worden gemaakt en dat de
kredietwaardigheid van Parman Capital moet worden aangetoond. Als gevolg van
deze verkoop is Ennia Investments dus alle inspraak in S&S kwijtgeraakt. Ennia
Investments kon ook niet meer profiteren van eventuele waardestijgingen van S&S.
De in ruil voor de verkoop ontvangen schuldbekentenis was niet gedekt. Niet valt in
te zien op welke wijze deze transactie in het belang was van Ennia c.s. Voor zover
deze transactie is ingegeven door de wens van onder meer de Centrale Bank om de
investering in S&S af te bouwen, geldt het volgende. Alle op verzoek van S&S in de
loop van de jaren (2011, 2014 en 2016) opgemaakte rapporten betreffende de waarde
van S&S komen uit op een waarde (*equity value*) van ongeveer twee keer (of meer)
het bedrag waarvoor het belang van Ennia Investments is verkocht. Daar komt nog
bij dat de koopprijs van USD 133,4 miljoen dus niet daadwerkelijk is betaald, maar
dat daarvoor een ongedekte schuldbekentenis is afgegeven. Vanuit Ennia c.s. waren
Ansary, Palm en Andraous als (feitelijk) bestuurders bij deze transactie betrokken.
Nina Ansary was inmiddels als commissaris aangetreden. Voor deze transactie
geldt, evenals voor de conversie van preferente aandelen naar gewone aandelen, dat
deze zodanig niet in het belang van Ennia c.s. was dat in dit verband een ernstig
verwijt is te maken aan de (feitelijk) bestuurders en de toezichthoudende RvC.

5.66.    In september 2015 is de promissory note omgezet in de 140.993 '*preferred
units 2*' tegen een (nominale) waarde van USD 140,093 miljoen. Deze (nominale)
waarde heeft Ennia Investments uiteindelijk uitgekeerd gekregen bij verkoop van de
activa aan Kirby.

*de aansprakelijkheid van gedaagden*

5.67.    Uit het voorgaande volgt dat op in ieder geval twee momenten na de
aankoop van de preferente aandelen zodanige wijzigingen hebben plaatsgevonden
dat daarmee het belang van Ennia Investments (en dus ook de verzekeraars) ernstig
tekort is gedaan. Voor Ansary geldt dat hij niet alleen als feitelijk bestuurder heeft
gehandeld aan de zijde van Ennia c.s, maar ook dat hij de (volledige) zeggenschap

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                           blad 60
datum uitspraak: 29 november 2021

had over S&S waarmee evident sprake is van een tegenstrijdig belang. Op geen
enkele wijze is gebleken dat Ansary zich daarbij rekenschap heeft gegeven van de
belangen van (de polishouders van) Ennia c.s. Aan hem is in dat verband een ernstig
verwijt te maken.

5.68.    De bestuurders Van Doorn, Palm en Andraous hebben zich in de periode
waarin zij als bestuurder betrokken waren bij Ennia c.s. ten aanzien van dit verwijt
niet gehouden aan hun verplichting tot een behoorlijke vervulling van de binnen
hun werkkring gelegen taak en daarin is aan hen een ernstig verwijt te maken. Zij
hadden vanwege de risico's van de investering zelf en de toenemende omvang van
de investering extra zorgvuldig moeten zijn bij de beoordeling van de vervolgens
uitgevoerde conversies en transacties. Op geen enkele wijze is gebleken dat zij
hierin de belangen van Ennia c.s. hebben laten prevaleren. Ook is niet gebleken dat
zij als bestuurder(s) kritische noten hebben geplaatst bij de uit naam van Ansary
(namens verschillende entiteiten) door adviseur Henze opgestelde brieven waarin
de transacties waren opgenomen. Van Doorn, Palm en Andraous waren zowel
bestuurder(s) van Ennia Investments als van de verzekeraars. Zij waren dus ten
opzichte van iedere afzonderlijke rechtspersoon gehouden tot een behoorlijke
vervulling van de binnen hun werkkring gelegen taak. Voor zover het handelen van
de bestuurders vanuit Ennia Investments ten opzichte van de verzekeraars dient te
worden aangemerkt als handelen jegens een derde geldt dat zij gezien het
voorgaande hebben gehandeld in strijd met de in artikel 6:162 BW bedoelde
zorgvuldigheidsnorm en dat aan hen in die zin een persoonlijk ernstig verwijt is te
maken.

5.69.    Voor Ansary en Nina Ansary geldt verder dat zij als commissaris ernstig
tekort zijn geschoten in hun toezichtstaak. Zij hebben ten onrechte en te lichtvaardig
toestemming gegeven voor de hiervoor genoemde transacties en daarin is aan hen
een ernstig verwijt te maken. Daarbij is niet relevant, zoals door Ansary c.s. is
betoogd, dat Nina Ansary (naast Ansary) als enige commissaris als gedaagde in
deze procedure is betrokken. Evenmin is relevant of Nina Ansary, indien zij kritisch
was geweest op het gevoerde beleid, daarin gevolgd zou zijn door de andere
commissarissen. Op Nina Ansary ligt een eigen verantwoordelijkheid om haar
toezichthoudende taak op zich te nemen. Ansary c.s. heeft niets aangevoerd of
overgelegd waaruit kan worden afgeleid dat Nina Ansary zelfs maar heeft gepoogd
die verantwoordelijkheid te nemen.

5.70.    Niet voldoende gesteld of gebleken is dat aan Parman International als
aandeelhouder in dit opzicht een verwijt is te maken op grond waarvan Parman
International aansprakelijk kan worden gehouden tot betaling van de gestelde
geleden schade.

5.71.    Samenvattend kunnen Ansary, Van Doorn, Palm en Andraous in beginsel
hoofdelijk aansprakelijk worden gehouden voor de schade (voor zover die is

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 61
datum uitspraak: 29 november 2021

ontstaan in hun bestuursperiode) als gevolg van de S&S-transactie(s). Ook Nina
Ansary als commissaris kan daarvoor aansprakelijk worden gehouden.

*decharge*

5.72.    Gedaagden hebben zich beroepen op de aan hen verleende decharge. Zij
stellen zich op het standpunt dat Ennia c.s. gelet daarop geen mogelijkheid meer
heeft om hen aan te spreken op grond van bestuurdersaansprakelijkheid. Ennia c.s.
heeft daartegen aangevoerd dat, voor zover decharge is verleend, dat niet in de weg
staat aan toewijzing van de vordering.

5.73.    Uit artikel 17 lid 2 van de statuten van Ennia Investments volgt dat door de
vaststelling van de balans en de winst- en verliesrekening door de algemene
vergadering van aandeelhouders, de directeuren voor hun beheer over het
afgelopen boekjaar zijn gedechargeerd en de commissarissen voor het door hen
gehouden toezicht. Gelijkluidende artikelen zijn opgenomen in de statuten van
Ennia Holding en de verzekeraars. Zoals Ennia c.s. echter onbetwist heeft gesteld
zijn er geen besluiten met betrekking tot de vaststelling van de jaarrekeningen (en
dus ook geen automatische decharge) van Ennia Investments over de jaren 2006 tot
en met 2012 en evenmin vanaf 2015. Voor Ennia Leven geldt dat alleen de
jaarrekeningen 2009-2011, 2013, 2015 en 2016 zijn vastgesteld.

5.74.    Daar komt bij dat een verleende décharge zich niet uitstrekt tot gegevens die
niet uit de jaarrekening blijken of niet anderszins aan de algemene vergadering van
aandeelhouders zijn bekendgemaakt voordat deze de jaarrekening vaststelde, zoals
onder meer is overwogen door de Hoge Raad in het arrest van 10 januari 1997
(ECLI:NL:HR:1997:ZC2243, *Staleman/Van de Ven*) en in het arrest van 25 juni 2010
(ECLI:NL:HR:2010:BM2332, *De Rouw/Dingemans q.q.*). De informatie moet zonder
meer en direct uit de jaarrekening kunnen worden afgeleid en als sprake is van
onbehoorlijke bestuurshandelingen moet het bestuur er voor zorgen dat deze
expliciet en ondubbelzinnig uit de jaarrekening blijken.

5.75.    Uit de jaarrekeningen van Ennia Investments volgt enkel dat op diverse
momenten diverse transacties hebben plaatsgevonden met betrekking tot S&S. Op
geen enkele wijze blijkt daaruit wat nu aan de bestuurders is verweten, te weten dat
zij daarmee de belangen van Ennia c.s. ernstig te kort hebben gedaan. Ook feitelijk is
daarin niet opgenomen welke gevolgen de verschillende transacties hebben (gehad)
voor bijvoorbeeld het stemrecht en winstrecht. Uit de jaarrekeningen van Ennia
Leven blijkt in het geheel niets van de S&S-transactie, zodat daarover evenmin
decharge kan zijn verleend.

5.76.    Voor zover er al sprake zou zijn van verleende décharges leiden deze dan
ook niet tot ontslag van aansprakelijkheid voor de vastgestelde onbehoorlijke
taakvervulling.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 62
datum uitspraak: 29 november 2021

    *de schade als gevolg van de onrechtmatige gedragingen*

5.77.    Ingevolge artikel 6:97 BW begroot de rechter de schade op de wijze die het meest met de aard ervan in overeenstemming is. Artikel 6:98 BW bepaalt dat slechts voor vergoeding in aanmerking komt schade die in zodanig verband staat met de gebeurtenis waarop de aansprakelijkheid van de schuldenaar berust, dat zij hem, mede gezien de aard van de aansprakelijkheid en van de schade, als gevolg van deze gebeurtenis kan worden toegerekend. Op grond van artikel 6:100 BW moet eventueel voordeel dat de gebeurtenis de benadeelde heeft opgeleverd, voor zover dat redelijk is, bij de vaststelling van de te vergoeden schade in rekening worden gebracht.

5.78.    Artikel 6:104 BW bepaalt dat indien iemand die op grond van onrechtmatige daad jegens een ander aansprakelijk is door die daad winst heeft genoten, de rechter op vordering van die ander de schade kan begroten op het bedrag van die winst of een gedeelte daarvan. Deze bepaling leent zich voor toepassing in gevallen waarin niet vastgesteld kan worden wat de omvang van de daadwerkelijk geleden schade is. Gelet op het niet-punitieve karakter van artikel 6:104 BW behoort het gerecht in zoverre terughoudendheid in acht te nemen dat, indien aannemelijk is dat het door de schuldenaar behaalde financiële voordeel de vermoedelijke omvang van de schade aanmerkelijk te boven gaat, de rechter de schade in beginsel begroot op een door hem te bepalen gedeelte van de winst (vergelijk Hoge Raad 18 juni 2010, ECLI:Nl:HR:2010:BM0893, *Doerga/Stichting Ymere*).

5.79.    Ten aanzien van Ansary en Nina Ansary, tevens bestuurders en aandeelhouders van Parman Capital, moet worden geoordeeld dat sprake is van door hen te vergoeden schade in deze vorm. Ansary en Nina Ansary hebben niet alleen met Van Doorn, Palm en Andraous de hand gehad in de jegens Ennia c.s. als onrechtmatig gekwalificeerde handelwijze bij de investeringen in S&S, maar hebben bovendien de als gevolg van die handelingen naar Parman Capital overgehevelde waarde, bij de verkoop aan Kirby, te gelde gemaakt. Zij hebben de (extra) revenuen niet laten terugkeren naar Ennia c.s., maar deze voor zichzelf behouden. Deze omstandigheden, gevoegd bij de dominante rol die Ansary zich bij het samenstel van handelingen heeft toegemeten, rechtvaardigt dat, zoals door Ennia c.s. gevorderd, de (extra) winst die Ansary en Nina Ansary hebben gemaakt met de verkoop van vermogensbestanddelen die van Ennia hadden behoren te zijn, door hen aan Ennia Investments wordt vergoed.

5.80.    Dat ligt anders bij Van Doorn, Palm en Andraous. Ten aanzien van hen komt het gerecht tot het oordeel dat wat betreft de S&S-transactie geen sprake is van aan hun handelen toe te rekenen schade die voor vergoeding in aanmerking komt. Daarbij betrekt het gerecht in het bijzonder de omstandigheid dat de gehele investering vanuit Ennia in S&S, zowel in aandelen als in obligaties, uiteindelijk geheel in Ennia c.s. is teruggevloeid, met een naar objectieve maatstaven beoordeeld

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 63
datum uitspraak: 29 november 2021

(en het hoge risico van de investeringen buiten beschouwing gelaten) redelijk rendement. Was die investering geheel verloren gegaan, dan zou de schadevergoedingsplicht van deze bestuurders zich naar het zich laat aanzien niet verder hebben uitgestrekt dan tot het bedrag van die investering, vermeerderd met een redelijk, in dat geval misgelopen, rendement. Bij de nu door Ennia Investments gevorderde schade (in de vorm van door Ennia Investments misgelopen winst die is genoten door Ansary en Nina Ansary) is voorts van belang dat gesteld noch gebleken is dat zij als bestuurders hebben meegeprofiteerd van de vanuit de Ennia-investering naar Parman Capital overgehevelde waardes en winsten.

5.81.    De extra winst die Ansary en Nina Ansary hebben gemaakt kan worden vastgesteld op het verschil tussen bedrag dat Ennia Investments (althans ECII Luxemburg) bij verkoop heeft ontvangen voor zover dat zag op de initiële investering en het bedrag dat Ennia Investments zou hebben ontvangen als de verkoopopbrengst naar rato was verdeeld. Dit komt uit op een bedrag van USD 415,61 miljoen. De berekening daarvan is als volgt.
   -   de totale verkoopopbrengst bij de verkoop aan Kirby bedroeg USD 744,5 miljoen. Van dit bedrag zag USD 142,98 miljoen op de *preferred units 1* (de oorspronkelijke obligaties). Ten aanzien van deze obligaties zou Ennia Investments niet hebben meegedeeld in een eventuele overwaarde. Dit bedrag wordt daarom buiten beschouwing gelaten, zodat een bedrag van USD 601,52 miljoen resteert;
   -   van het bedrag van USD 601,52 is een bedrag van USD 143,2 miljoen ontvangen door ECII Luxemburg;
   -   uitgaande van de initiële investering door Ennia Investments van USD 65 miljoen, zijnde 92,9% van de totale inbreng in het eigen vermogen van S&S, zou 92,9% van de opbrengst neerkomen op een bedrag van USD 558,81 miljoen;
   -   Het verschil tussen het door ECII Luxemburg ontvangen bedrag en het bedrag dat zou zijn ontvangen bij een betaling van 92,9% van de verkoopopbrengst bedraagt dus USD 415,61 miljoen.
Het bedrag van USD 415,61 miljoen is omgerekend in NAf 743,94 miljoen.

*verjaring*

5.82.    Het door Ansary c.s. gedane beroep op verjaring van de vorderingen van voor november 2013 gaat niet op. Op grond van artikel 3:310 BW beloopt de verjaringstermijn vijf jaar vanaf het moment dat de benadeelde bekend is geraakt met de schade en de daarvoor aansprakelijke persoon. De benadeelde is in dit geval primair de rechtspersoon Ennia Investments. Ennia c.s. heeft terecht gesteld dat zij pas na het uitspreken van de noodregeling op 4 juli 2018 bekend is geraakt met de schade. Of een rechtspersoon bekend is met bepaalde feiten, is afhankelijk van de bekendheid met de feiten van functionarissen binnen de rechtspersoon. Voor het uitspreken van de noodregeling waren gedaagden de (feitelijk) bestuurders en



zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 64
datum uitspraak: 29 november 2021

commissarissen van Ennia c.s. In de regel heeft te gelden dat de wetenschap van
bestuurders van een rechtspersoon geldt als wetenschap van de rechtspersoon zelf.
Er geldt in dit verband echter een uitzondering als het gaat om de wetenschap van
schade die door de bestuurders zelf aan de vennootschap wordt toegebracht. Dat is
onder meer geoordeeld in het arrest van de Hoge Raad van 11 september 2020
(ECLI:NL:HR:2020:1413, Treston/HDI), waarin onder meer is overwogen dat het
oordeel van het hof dat in de verhouding tussen HDI en Treston de wetenschap van
de betrokken functionarissen van hun eigen, met de belangen van de vennootschap
strijdige belangen en van het onrechtmatig handelen van Treston niet kan gelden als
wetenschap van HDI, geen blijk geeft van een onjuiste rechtsopvatting.

5.83.    In dit geval kan niet worden geoordeeld dat Ennia Investments voor 4 juli
2018 bekend was met de schade, zodat pas vanaf dat moment de verjaringstermijn is
gaan lopen en de vordering niet is verjaard.

*conclusie*

5.84.    Samenvattend zullen Ansary en Nina Ansary ter zake de S&S-transactie
hoofdelijk worden veroordeeld tot betaling aan Ennia Investments van het bedrag
van NAf 743,94 miljoen. Ten aanzien van de overige gedaagden zal de
schadevergoedingsvordering terzake S&S worden afgewezen.

**Het verwijt terzake de olieplatforms**

*de stellingen van Ennia c.s.*

5.85.    In 2009 zijn door Energy Equipment (eerst een dochtermaatschappij van BdC
Investments en daarna van Ennia Investments) in totaal zes mobiele olieplatforms
(*oil rigs*) gekocht bij S&S. Ennia c.s. verwijt gedaagden dat deze aankoop enkel het
(cash flow) belang van S&S diende. De olieplatforms hebben de productiefaciliteit
van S&S niet verlaten en hebben geen rendement opgeleverd voor Ennia c.s. Het ligt
bovendien niet in de rede dat een verzekeraar investeert in olieplatforms. Daar is
Ennia c.s. ook op gewezen door de CEO van Banco di Caribe, die bij de betaling
ervan heeft aangegeven dat deze investering in strijd was met de regelgeving van de
Centrale Bank. De olieplatforms zijn grotendeels met verlies terugverkocht aan S&S.
De daardoor geleden schade dient door gedaagden te worden vergoed, aldus Ennia
c.s.

*de verweren van Ansary c.s. en Van Doorn*

5.86.    Ansary c.s. heeft daartegen aangevoerd dat de investering in de
olieplatforms inderdaad niet rendabel is geweest, maar dat dit geen verwijt oplevert
jegens Ansary c.s. Allereerst niet omdat van de in deze procedure betrokken
gedaagden alleen Van Doorn bij deze aankoop betrokken is geweest en dus niet

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 65
datum uitspraak: 29 november 2021

Ansary c.s. Verder voert Ansary c.s. aan dat het enkele feit dat een investering niet
succesvol is niet tot aansprakelijkheid leidt. Er is geen enkele reden waarom Ennia
c.s. niet zou kunnen investeren in olieplatforms.

5.87.    Van Doorn heeft tegen de vordering aangevoerd dat met de keuze van de
investering niets mis is. Verzekeraars investeren vaker in bijvoorbeeld parken voor
zonne- of windenergie of biomassacentrales. Bovendien waren er in aanloop naar de
nieuwe status van Curaçao nauwelijks beschikbare overheidsobligaties, zodat het
ook nodig was om tot een andere invulling van de beleggingen te komen. Dat een
deel van de olieplatforms met verlies is verkocht, kan niet leiden tot
aansprakelijkheid. Van Doorn is bovendien niet betrokken geweest bij de
terugverkoop van de olieplatforms, aldus Van Doorn.

*de beoordeling*

5.88.    Het staat vast dat een deel van de olieplatforms met verlies is verkocht en
dat het daarbij gaat om een bedrag van in totaal USD 11.032.776. Dat enkele feit is
onvoldoende om de conclusie te rechtvaardigen dat gedaagden voor de door Ennia
c.s. geleden schade aansprakelijk zijn. Daarvoor dient te worden vastgesteld dat aan
hen een ernstig verwijt is te maken. De stellingen die Ennia c.s. in dat verband naar
voren heeft gebracht leiden niet tot dat oordeel. Allereerst heeft Ennia c.s.
onvoldoende gemotiveerd waarom de betreffende investering zodanig ongewoon
zou zijn voor een verzekeraar dat gedaagden om die reden hadden moeten afzien
van de investering. Van Doorn heeft daarbij nog (onbetwist) naar voren gebracht
dat het in de betreffende periode moeilijk was om aan, bijvoorbeeld,
overheidsobligaties te komen, zodat gezocht moest worden naar alternatieven. Daar
komt bij dat niet is gesteld en onderbouwd waaruit kan worden afgeleid dat de
investering in olieplatforms per definitie niet in belang van Ennia c.s. zou (kunnen)
zijn. Dat de olieplatforms de productiefaciliteit van S&S niet hebben verlaten is
daarvoor in ieder geval onvoldoende. Niet gesteld of gebleken is bijvoorbeeld dat
Energy Equipment bij de aankoop een (te) hoge prijs voor de platforms heeft betaald
en/of dat bij de verkoop juist een onredelijk lage prijs is betaald. Het moet er
daarom voor worden gehouden dat Energy Equipment, nadat de eerste twee
platforms met winst zijn verkocht, daarna niet (meer) heeft kunnen profiteren van
een mogelijk op de installaties te behalen rendement. Ennia c.s. heeft ook nog naar
voren gebracht dat de CEO van Banco di Caribe bij de betaling van de olieplatforms
heeft gewaarschuwd. Deze waarschuwing is na de aankoop gegeven en ziet met
name op de verhouding tussen de belegging en het eigen vermogen en niet op de
investering zelf. Dat neemt niet weg dat aan gedaagden vanuit het oogpunt van
concentratierisico's is te verwijten dat zij een relatief (te) grote investering deden in
de olieplatforms.

5.89.    Gelet op alle omstandigheden is echter niet sprake van een aan gedaagden te
maken ernstig verwijt op grond waarvan zij aansprakelijk kunnen worden

zaaknummers: CUR201903842/3843/3796/3844/3845/3846       blad 66
datum uitspraak: 29 november 2021

gehouden voor de door Ennia c.s. geleden schade als gevolg van de koop en
terugverkoop. Dit deel van de vordering van Ennia c.s. zal daarom worden
afgewezen. De overige verweren hebben geen bespreking meer nodig.

**Het verwijt terzake de (dividend)uitkeringen**

*de stellingen van Ennia c.s.*

5.90.      Ennia c.s. stelt zich op het standpunt dat gedaagden in de periode 2009 tot en
met 2015 ten onrechte voor een bedrag van NAf 223 miljoen hebben onttrokken aan
Ennia c.s. in de vorm van dividenduitkeringen, kapitaalonttrekkingen en andere
uitkeringen aan aandeelhouders. Parman International heeft uitkeringen laten doen
op de door haar gehouden aandelen in (eerst) Banco di Caribe en (vervolgens) Ennia
Holding. Daarbij is in veel gevallen niet voldaan aan de in de statuten van Ennia
Holding beschreven vereisten voor het doen van dergelijke uitkeringen. Gelet
daarop kan Ennia Holding de uitgekeerde dividenden terugvorderen van Parman
International of andere winstgerechtigden, op grond van onverschuldigde betaling.

5.91.      Volgens Ennia c.s. wisten gedaagden, althans hadden zij moeten weten, dat
de financiële situatie van Ennia c.s. dergelijke onttrekkingen niet toestond, mede
vanwege de veel te hoge waardering van Mullet Bay en daarmee van de aandelen
SunResorts. De door Ansary ingebrachte aandelen SunResorts zijn in de
jaarrekening van Ennia c.s. verantwoord onder de vrije reserves. Daardoor beschikte
Ennia c.s. op papier over grote reserves, op basis waarvan door gedaagden
uitkeringen werden gedaan aan zichzelf, via Parman International. Bij verschillende
uitkeringen hebben gedaagden bovendien bewust de statuten van Ennia Holding
omzeild, door andere benamingen te geven aan de uitkeringen, aldus Ennia c.s. De
financiële ruimte voor het doen van (dividend)uitkeringen hing in belangrijke mate
af van de waardering van Mullet Bay. Uitgaande van de door Ennia c.s. opgemaakte
taxaties, bestond er enkel in de jaren 2009 en 2010 ruimte voor het doen van
dividenduitkeringen. Alle na 2011 gedane uitkeringen zijn daarom hoe dan ook ten
onrechte verricht. Vanwege het onrechtmatige karakter van de uitkeringen, dienen
alle onttrekkingen door gedaagden te worden terugbetaald, aldus Ennia c.s.
*de verweren van Ansary c.s.*

5.92.      Ansary c.s. heeft daartegen aangevoerd dat de uitkeringen niet in strijd met
de statuten hebben plaatsgevonden. Uit de jaarrekeningen volgt dat nooit sprake is
geweest van een negatief eigen vermogen. De jaarrekeningen zijn ook niet herzien
na de noodregeling, zodat het ervoor moet worden gehouden dat deze juist zijn. De
dividenduitkeringen hebben bovendien plaatsgevonden nadat de financiële ruimte
daarvoor was bepaald door externe accountants. Het was aan Ennia c.s. om, net
zoals dat voor iedere vennootschap geldt, te bepalen wat zij deed met de financiële
middelen die er waren.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 67
datum uitspraak: 29 november 2021

5.93.    Ansary c.s. betwist dat de waardering van Mullet Bay te hoog was. Ter
gelegenheid van de pleidooien is door Ansary c.s. aangevoerd dat in mei 2019 door
Banco di Caribe een dividenduitkering in natura is gedaan aan Ennia Holding voor
een bedrag van NAf 62,5 miljoen. Deze uitkering vond plaats door de overdracht
van het aandeel dat BdC Investments hield in Caribe Resorts. Caribe Resorts heeft
een aantal op het terrein van Mullet Bay gelegen percelen. Deze uitkering werd
gedaan op het moment dat Ennia c.s. en de Centrale Bank zich op het standpunt
stelden dat het gehele terrein van Mullet Bay zou moeten worden getaxeerd op een
bedrag van USD 50 miljoen. Gelet op de hoogte van de dividenduitkering, waarbij
de Centrale Bank betrokken is, wordt kennelijk toch uitgegaan van de waarde zoals
door Ansary c.s. is bepleit. Aan Ansary c.s. kan dan niet worden tegengeworpen dat
zij op grond van deze waardebepaling dividenduitkeringen heeft gedaan. Ansary
c.s. stelt verder dat Ennia c.s. geen duidelijke berekening hebben gemaakt van de
gestelde onttrekkingen, zodat het gevorderde bedrag ook om die reden niet
toewijsbaar is.

5.94.    Van Doorn heeft aangevoerd dat de gestelde onttrekkingen en uitkeringen
die volgens Ennia c.s. hebben geleid tot tekorten en schade pas hebben
plaatsgevonden na het aftreden van Van Doorn. Zelfs als Mullet Bay zou worden
getaxeerd op de laagst getaxeerde waarde, bestond er in de periode dat Van Doorn
bestuurder was ruimte tot het doen van dividenduitkeringen. Aan Van Doorn kan
daarom in dit opzicht geen (ernstig) verwijt worden gemaakt, aldus Van Doorn.

*de beoordeling*

  *de wettelijke en statutaire bepalingen*

5.95.    In artikel 2:118 BW zijn regels opgenomen die betrekking hebben op de
(winst)uitkering van een vennootschap. Daarin is onder meer bepaald:
    1. In onmiddellijke samenhang met de goedkeuring van de jaarrekening, beslist de
    algemene vergadering of een ander bij de statuten aangewezen orgaan over de
    uitkering of inhouding van de uit die jaarrekening blijkende winst en over het doen
    van andere uitkeringen ten laste van het uit die jaarrekening blijkende eigen
    vermogen.
    2. De algemene vergadering of een ander bij de statuten aangewezen orgaan kan
    besluiten tot het doen van tussentijdse uitkeringen ten laste van een lopend boekjaar
    of ten laste van een afgesloten boekjaar, waarvan de jaarrekening nog niet is
    goedgekeurd.
    3. Voor zover de statuten niet anders bepalen geeft ieder aandeel bij iedere uitkering
    recht op een gelijk bedrag en geeft ieder onderaandeel recht op de
    dienovereenkomstige fractie van dat bedrag. De statuten kunnen bepalen dat de
    aandelen die de vennootschap zelf houdt meetellen bij de berekening van de
    verdeling van uitkeringen. De statuten kunnen de verdeling van uitkeringen geheel
    of gedeeltelijk overlaten aan een daartoe aangewezen orgaan.
    (…)



zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 68
datum uitspraak: 29 november 2021

5. Uitkeringen aan aandeelhouders en andere uitkeringsgerechtigden mogen niet worden gedaan indien het eigen vermogen van de vennootschap negatief is of door die uitkering negatief zou worden. Een besluit tot het doen van een zodanige uitkering heeft geen enkele rechtskracht. Artikel 22, tweede lid, is niet van toepassing, tenzij de uitkering is gedaan aan de regelmatige houder van een toonderbewijs, dan wel van een aandeel of daarmee verbonden recht dat op een beurs verhandeld wordt.
6. Een uitkering als bedoeld in dit artikel wordt vermoed te zijn gedaan in strijd met de eerste volzin van het vijfde lid, indien de jaarrekening van het boekjaar ten laste waarvan de uitkering wordt gedaan, met inachtneming van die uitkering een eigen vermogen toont dat negatief is. Betreft het een uitkering als bedoeld in het eerste lid dan is het vermoeden onweerlegbaar.
7. Heeft de vennootschap een nominaal kapitaal dan wordt bij de toepassing van het vijfde lid het bedrag daarvan als ondergrens in aanmerking genomen.

5.96.    Hieruit volgt allereerst dat sprake moet zijn van een *besluit* tot het doen van dividenduitkering en dat dit besluit moet worden genomen in onmiddellijke samenhang met de goedkeuring van de jaarrekening. Uitgangspunt is dat de algemene vergadering van aandeelhouders dit besluit neemt, maar de statuten kunnen een andere regeling bevatten. Een besluit tot het doen van uitkeringen terwijl het eigen vermogen van de vennootschap negatief is, of zal worden door de uitkering, heeft geen enkele rechtskracht. In dat geval is sprake van onverschuldigde betaling als bedoeld in artikel 6:203 BW. Er kan ook sprake zijn van tussentijdse uitkeringen. In dat geval geldt eveneens dat dit niet mag veroorzaken dat deze uitkeringen leiden tot een negatief eigen vermogen. Het begrip uitkering omvat zowel dividend in contanten als uitkeringen in aandelen of andere op geld waardeerbare voordelen.

5.97.    In de statuten van Ennia Holding is, samengevat, het volgende opgenomen over het doen van (winst)uitkeringen. De RvC bepaalt welk deel van de winst- en verliesrekening wordt gereserveerd. Het resterende positieve saldo wordt beschouwd als te verdelen winst. Besluiten betreffende reservering van de winst kunnen alleen worden genomen op de algemene vergadering van aandeelhouders, waarin alle houders van geplaatste prioriteitsaandelen A zijn vertegenwoordigd en voor alle prioriteitsaandelen A een stem is uitgebracht voor een dergelijke reservering. Het bestuur mag, na voorafgaande goedkeuring van de vergadering van houders van prioriteitsaandelen A, interim-dividenduitkeringen doen vooruitlopend op verwachte winsten. Een winstuitkering kan alleen plaatsvinden als uit de vastgestelde winst- en verliesrekening over een boekjaar volgt dat geen verlies is geleden dat nog niet is aangezuiverd.

*de gedane uitkeringen en de daaraan voorafgaande besluiten*

5.98.    Ennia c.s. heeft bij verzoekschrift een overzicht gegeven van de (dividend) uitkeringen die volgens Ennia c.s. aan Parman International zijn gedaan. Dit

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                 blad 69
datum uitspraak: 29 november 2021

overzicht komt uit op een totaal bedrag van NAf 223.447.905, waarvan
NAf 84.858.000 aan dividenduitkeringen en NAf 138.589.905 aan overige
uitkeringen. Deze bedragen zijn gebaseerd op de geldstromen van Ennia Holding
naar Parman International. Ansary c.s. heeft deze bedragen betwist, maar heeft die
betwisting op geen enkele wijze onderbouwd, ook niet nadat aan Ansary c.s. de
gelegenheid is gegeven tot inzage in de stukken (administratie) en nadat de
jaarrekeningen zijn overgelegd. Gelet daarop zal van het door Ennia c.s. verstrekte
overzicht worden uitgegaan.

| Jaar | dividend | overige uitkeringen op aandelen | resultaat Ennia Holding |
|------|----------|----------------------------------|-------------------------|
| 2009 | - | 6.962.841 | 13.255.000 |
| 2010 | 23.114.000 | 4.395.095 | 6.413.000 |
| 2011 | 26.616.000 | 213.998 | - 25.619.000 |
| 2012 | 35.128.000 | 1.428.971 | 26.652.000 |
| 2013 | - | 83.001.000 | - 9.078.000 |
| 2014 | - | 11.830.000 | - 4.050.000 |
| 2015 | - | 30.758.000 | - 113.314.000 |
| **totaal** | **84.858.000** | **138.589.905** | **- 99.790.000** |

5.99.    Ennia c.s. heeft bij repliek eveneens een aantal besluiten overgelegd
(weergegeven onder 2.87.). Ennia c.s. heeft daarbij aangevoerd dat zij niet meer
besluiten heeft kunnen vinden en dat dit in lijn lijkt te zijn met de bedoeling van het
bestuur, gelet op onder andere een e-mail van Andraous aan de secretaris van Ennia
Holding (2.88.), waarin Andraous op een vraag van de secretaris naar ontbrekende
besluiten reageert dat het beter is dat er geen besluiten zijn. Ansary c.s. heeft, ook
nadat zij in de gelegenheid is gesteld de fysieke en digitale administratie van Ennia
c.s. in te zien, geen enkel besluit aan de door Ennia c.s. overgelegde besluiten
toegevoegd. Ansary c.s. heeft bij dupliek enkel gesteld dat de optelsom van de in de
besluiten genoemde bedragen niet overeenkomt met het door Ennia c.s. gestelde
bedrag aan uitkeringen. Dat is echter precies een van de verwijten die Ennia c.s. aan
Ansary c.s. maakt, namelijk dat niet alle uitkeringen zijn voorzien van een daaraan
voorafgaand besluit zoals vereist in de wet en de statuten. Het gerecht neemt
daarom bij de beoordeling de door Ennia c.s. overgelegde besluiten als
uitgangspunt. Dat er meer of andere besluiten zijn is onvoldoende gesteld of
gebleken.

*de uitkeringen in relatie tot (de waarde van) Mullet Bay*

5.100.    Voor zover de gedane uitkeringen zijn voorzien van een daaraan
voorafgaand besluit, stelt Ennia c.s. dat deze uitkeringen desondanks niet hadden
mogen plaatsvinden, vanwege de overwaardering van Mullet Bay en de als gevolg
daarvan veel slechtere financiële situatie dan door gedaagden is voorgespiegeld. In
dat verband overweegt het gerecht als volgt.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 70
datum uitspraak: 29 november 2021

5.101.   De waarde van Mullet Bay bepaalde voor een belangrijk (en steeds
belangrijker wordend) deel de financiële positie van Ennia c.s. In oktober 2010
vertegenwoordigde Mullet Bay 55% van de waarde van de totale activa van de
verzekeraars. Gedaagden zijn in dat verband gewaarschuwd voor het hoge
concentratierisico. In juli 2010 zijn gedaagden daarvoor gewaarschuwd door
Couperus. Voigt waarschuwde in november 2010 eveneens voor het grote
percentage intercompany-leningen (70%) zonder voldoende zekerheden en met aan
Ansary gelieerde onroerend goed ondernemingen. Voigt waarschuwde ook expliciet
tegen het uitkeren van interim-dividend terwijl het geconsolideerd resultaat
marginaal of zelfs negatief zou zijn vanwege de gevolgen van orkaan Tomas.
Externe actuaris Buck Consultants noemt het hoge concentratierisico van Mullet Bay
eveneens. Dat geldt ook voor de Centrale Bank, die meerdere keren aanwijzingen
heeft gegeven die verband houden met Mullet Bay, waaronder de aanwijzing dat
Mullet Bay, mede gelet op het concentratierisico, moest worden verkocht.

5.102.   Onder die omstandigheden was het belang van een juiste waardering van
Mullet Bay dus bijzonder groot. Gedaagden dienden zich er in het belang van Ennia
c.s. en de polishouders dan ook van te vergewissen dat Mullet Bay niet van een zo
hoog mogelijke, maar van een zo reëel mogelijke taxatie zou worden voorzien. Dat
gedaagden dat voor ogen hebben gehouden blijkt echter in het geheel niet uit de
overgelegde stukken. Daaruit blijkt juist het tegendeel. Allereerst is ervoor gekozen
om de taxaties vrijwel steeds te laten uitvoeren door hetzelfde bureau (IEB), in de
persoon van de heer Valkenburg. Hij heeft Mullet Bay in maart 2006 getaxeerd voor
een bedrag van USD 251 miljoen. In het betreffende rapport wordt expliciet
aangegeven dat het een oppervlakkig onderzoek betreft en dat geen enkel aspect
diepgaand is bestudeerd.  Ook staat in het rapport vermeld dat vanwege de
beperkte tijd die beschikbaar was, de ontvangen documentatie en informatie van het
kadaster en VROM niet in detail zijn bestudeerd. Deze laatste meldingen staan niet
in de opvolgende rapporten vermeld, maar uit de inhoud daarvan blijkt niet dat wel
sprake is geweest van nadere bestudering. Desondanks wordt Mullet Bay in de
periode van maart 2006 tot en met december 2006 driemaal door IEB getaxeerd,
waarbij de waarde oploopt van USD 251 miljoen naar USD 337 miljoen. Een
verklaring voor deze opmerkelijke waardestijging in een beperkt aantal maanden
wordt niet gegeven in de rapporten van IEB. Dat geldt eveneens voor de
waardestijging naar USD 386 miljoen (USD 565 per m2) in januari 2009. Bij dit
rapport heeft IEB weliswaar vermeld dat de wereldwijde financiële crisis de
komende jaren mogelijk negatieve invloed heeft op de waarde, maar niet duidelijk
wordt hoe dit gegeven heeft doorgewerkt in de taxatie.

5.103.   Daar komt bij dat KPMG, destijds de accountant van Ennia c.s., in april 2009
vragen heeft gesteld over de waardebepaling van Mullet Bay. Uit de beantwoording
van de vragen door PWC (accountant van SunResorts) volgt dat Andraous aan
Valkenburg heeft gesuggereerd Mullet Bay te taxeren op USD 1.000 per m2. Daarbij
is van belang dat na de taxatie van Valkenburg in januari 2009, in maart 2009

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 71
datum uitspraak: 29 november 2021

nieuwe aandelen SunResorts zijn ingebracht in Ennia Holding. Uit niets volgt dat de steeds hoger wordende taxaties door IEB, in een periode dat sprake was van een wereldwijde financiële crisis, bij gedaagden hebben geleid tot een kritische(r) blik. Integendeel, er is een duidelijke aanwijzing dat Andraous IEB heeft gesuggereerd tot een nog hogere waardebepaling te komen.

5.104.   In 2014 wordt weer een oppervlakkige taxatie uitgevoerd door IEB, met een waardering van USD 422 miljoen. Daarna wordt een taxatie uitgevoerd door CBRE. CBRE komt in haar conceptrapport tot een drastisch lagere waardering van Mullet Bay. Deze waardering leidt ertoe dat de opdracht aan CBRE wordt ingetrokken en dat het niet komt tot een definitief rapport. Het daarna ingeschakelde bureau CEI heeft in het rapport aangegeven dat is uitgegaan van volledig bebouwbaar land. Dat uitgangspunt is aantoonbaar onjuist, zodat gedaagden ook niet af mochten gaan op de door CEI afgegeven waardering, nog daargelaten dat CEI (evenals Valkenburg) heeft aangegeven dat Andraous sturende aanwijzingen heeft gegeven betreffende de door hem gewenste waardering. Het dringende advies van KPMG in 2016 om het ertoe te leiden dat door een onafhankelijk bureau werd gekeken naar de uiteenlopende waarderingen door IEB, CBRE en CEI, is door gedaagden niet opgevolgd.

5.105.   Uit het voorgaande kan enerzijds worden geconcludeerd dat gedaagden kritiekloos zijn afgegaan op de oppervlakkige taxaties door IEB en anderzijds actief is geageerd tegen de lagere waardering door CBRE en dat vervolgens CEI is geïnstrueerd te komen tot een aan IEB gelijkwaardige waardebepaling, waarbij CEI ten onrechte moest uitgaan van volledig bebouwbaar land. Uit niets blijkt dat gedaagden zich daadwerkelijk hebben ingezet om tot een zo reëel mogelijke waardebepaling te komen, terwijl er voor betrokkenen alle aanleiding moest bestaan voor – minst genomen- twijfel over de aan Mullet Bay in de boeken toegekende waarde en daarmee aan het eigen vermogen van Ennia c.s.

5.106.   De gerede twijfel over de aan Mullet Bay toegekende waarde en dus aan het eigen vermogen van Ennia c.s. had gedaagden ervan moeten weerhouden miljoenen aan uitkeringen te doen aan de aandeelhouders. Dat geldt te meer nu, zoals uit het onder 5.97 weergegeven overzicht blijkt, diverse uitkeringen zijn gedaan in jaren waarin door Ennia Holding verliezen werden geleden en bovendien, zoals hiervoor al is geoordeeld, degelijke besluitvorming in een (groot) aantal gevallen ontbrak. Of en in hoeverre Mullet Bay daadwerkelijk overgewaardeerd was, is bij die beoordeling niet doorslaggevend. Eveneens is niet beslissend, zoals nog door Ansary c.s. is aangevoerd, dat de jaarrekeningen en de daarop gebaseerde uitkeringen steeds zijn goedgekeurd door de controlerend accountant. Allereerst is dit niet van belang omdat het gedaagden niet ontslaat van hun eigen verantwoordelijkheid. Daarnaast geldt dat juist ook vanuit de accountant KPMG duidelijke signalen zijn gekomen dat er redenen waren om te twijfelen aan de (wijze van) waardering van Mullet Bay.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 72
datum uitspraak: 29 november 2021

5.107.  Ten slotte overweegt het gerecht dat uit het gegeven dat in mei 2019 door Banco di Caribe een dividenduitkering in natura is gedaan aan Ennia Holding voor een bedrag van NAf 62,5 miljoen, waarbij de uitkering plaats vond door de overdracht van het aandeel dat BdC Investments hield in Caribe Resorts, niet redengevend is voor de veronderstelde waarde van Mullet Bay. Ennia c.s. heeft in dat verband aangevoerd dat het (enkel) om een balanscorrectie ging, waarbij geen inhoudelijke beoordeling heeft plaatsgevonden. Daar komt bij dat het, zoals hiervoor is overwogen, niet zozeer gaat om de vraag welke waarde uiteindelijk aan Mullet Bay kan worden toegekend, maar om de vraag of gedaagden hun beslissingen tot uitkering aan de aandeelhouders, gelet op alle risico's, konden baseren op de (minst genomen) twijfelachtige waardebepalingen die er lagen.

*aansprakelijkheid gedaagden, onverschuldigde betaling en onrechtmatig handelen*

5.108.  Zoals Van Doorn terecht heeft aangevoerd geldt voor de uitkeringen in de jaren 2009 en 2010 dat het eigen vermogen van Ennia Holding, zelfs uitgaande van de laagste waardering van Mullet Bay, positief was. Dat betekent dat uitkeringen die in die periode zijn gedaan niet hebben geleid of zouden hebben kunnen leiden tot een negatief eigen vermogen. Deze uitkeringen worden daarom buiten beschouwing gelaten. Dat betekent ook dat aan Van Doorn, die vanaf januari 2011 feitelijk niet meer werkzaam was bij Ennia c.s., in dit opzicht geen verwijt is te maken.

5.109.  Voor het overige geldt dat de uitkeringen die vanaf 2011 zijn gedaan worden aangemerkt als onrechtmatige onttrekkingen aan het eigen vermogen van Ennia Holding. Het gaat daarbij over de periode van 2011 tot en met 2015 om een bedrag van in totaal NAf 188.975.969 (NAf 223.447.905 minus (NAf 6.962.841 + NAf 23.114.000 + NAf 4.395.095)).

5.110.  Voor Parman International geldt zij het bedrag van NAf 188.975.969 als aandeelhouder heeft ontvangen. Zoals de Hoge Raad heeft overwogen in het Nimox-arrest, geldt dat, ook indien van de geldigheid van een besluit tot uitkering van dividend als zodanig moet worden uitgegaan, hieruit niet volgt dat uitvoering van het besluit tegenover derden (de verzekeraars) niet onrechtmatig kan zijn, noch dat het door uitoefening van het stemrecht bewerkstelligen van de totstandkoming van het besluit tegenover derden niet onrechtmatig kan zijn. In dit geval geldt dat, voor zover aan de uitkeringen al een rechtsgeldig besluit ten grondslag lag (en door het ontbreken daarvan niet al gelet op het bepaalde in artikel 2:118 lid 5 BW sprake is van onverschuldigde betaling), Parman International desondanks onrechtmatig heeft gehandeld door de bedragen in ontvangst te nemen onder de omstandigheden zoals hiervoor zijn weergegeven. Dat brengt met zich dat Parman International de door Ennia Holding geleden schade in dit verband, ter hoogte van de aan Parman International toegekende bedragen, dient te voldoen. Dat geldt ook voor Ansary, Nina Ansary en Andraous. Zij zijn als aandeelhouders van Parman International

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 73
datum uitspraak: 29 november 2021

winstgerechtigd en hebben, zoals door Ennia c.s. onbetwist is gesteld, de
dividenden ontvangen. Dat is onrechtmatig, nu zij er weet van hadden, althans van
hadden moeten hebben, dat de uitkeringen ten laste van Ennia Holding niet gedaan
hadden mogen worden.

5.111.   Ansary, Andraous en Palm zijn bovendien als (feitelijk) bestuurders
hoofdelijk aansprakelijk voor de betaling van dit bedrag ten titel van
schadevergoeding als gevolg van het onrechtmatig handelen door hen als
bestuurders van Ennia c.s. Ansary, Andraous en Palm hebben diverse besluiten
genomen en ondertekend op basis waarvan aan Parman International (en daarmee
dus grotendeels aan Ansary zelf) grote bedragen werden uitgekeerd terwijl dit, in
het bijzonder gelet op hetgeen hiervoor is overwogen over de waarde van Mullet
Bay, niet verantwoord was. Zij hadden er ernstig rekening mee moeten houden dat
Mullet Bay werd overgewaardeerd en dat dit grote gevolgen had voor het eigen
vermogen van Ennia Holding. Andraous en Palm hebben als bestuurders bovendien
gehandeld in strijd met de statuten door uitkeringen te doen waaraan geen
afdoende besluit ten grondslag lag. Door de belangen van Ennia Holding in dat
opzicht te veronachtzamen hebben zij gehandeld in strijd met het inzicht en de
zorgvuldigheid die mogen worden verwacht van een bestuurder die voor zijn taak
berekend is en deze nauwgezet vervult. Er is sprake van een onbehoorlijke
taakvervulling en aan hen is in dit opzicht een ernstig verwijt te maken.

*decharge*

5.112.   Ansary, Nina Ansary, Andraous en Palm hebben zich ook ten aanzien van
dit verwijt beroepen op de aan hen verleende decharge. Dat beroep gaat niet op.
Uit artikel 15 lid 2 van de statuten van Ennia Holding die gelding hebben vanaf
september 2009 volgt dat door de vaststelling van de balans en de winst- en
verliesrekening door de algemene vergadering van aandeelhouders, de directeuren
voor hun beheer over het afgelopen boekjaar zijn gedechargeerd en de
commissarissen voor het door hen gehouden toezicht. Zoals Ennia c.s. echter
onbetwist heeft gesteld zijn er geen besluiten met betrekking tot de vaststelling van
de jaarrekeningen (en dus ook geen automatische decharge) over de jaren 2011 tot
en met 2015 van Ennia Holding. Daar komt bij dat uit de jaarrekeningen niet volgt
dat de uitkeringen zijn gebaseerd op de waardering van Mullet Bay, waarvan het
gerecht hiervoor heeft geoordeeld dat de bestuurders zich niet op deze waarde
konden en mochten baseren en op basis daarvan geen uitkeringen konden en
mochten (laten) doen.

5.113.   Voor zover er al sprake zou zijn van verleende décharges leiden deze dan
ook niet tot ontslag van aansprakelijkheid voor de vastgestelde onbehoorlijke
taakvervulling.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 74
datum uitspraak: 29 november 2021

*verjaring*

5.114.   Ansary, Nina Ansary, Andraous en Palm hebben zich ook hier op het
standpunt gesteld dat alle vorderingen die hun oorsprong vinden voor november
2013, zijn verjaard. Zoals hiervoor onder 5.81 en 5.82. is geoordeeld, kan het beroep
op verjaring niet slagen.

*conclusie*

5.115.   Parman International, Ansary, Nina Ansary, Andraous en Palm zullen
hoofdelijk worden veroordeeld tot betaling van het bedrag van NAf 188.975.969.
Ten aanzien van Van Doorn zal de schadevergoedingsvordering terzake de
(dividend)uitkeringen worden afgewezen.

**Het verwijt terzake excessieve uitgaven**

*algemene stellingen Ennia c.s.*

5.116.   Ennia c.s. verwijt aan gedaagden dat een bedrag van in totaal NAf
140.468.624 is besteed aan excessieve uitgaven, die geen verband houden met de
bedrijfsvoering van Ennia. Deze uitgaven zijn onderverdeeld in zeven categorieën,
zoals hieronder weergegeven.

| | categorie | totaal (NAf) | ten laste van Ennia Holding (NAf) | ten laste van Ennia Investments (NAf) |
|---|---|---|---|---|
| i | donaties | 20.791.970 | | 20.791.970 |
| ii | kosten adviseurs | 6.136.250 | | 6.136.250 |
| iii | salarissen aan personen die niet in dienst waren bij Ennia en/of excessief werden betaald | 10.805.610 | 6.144.224 | 2.026.578 |
| iv | beloning commissarissen | 14.234.309 | 14.234.309 | |
| v | reis-verblijf- en representatiekosten | 3.812.203 | 161.822 | 3.650.381 |
| vi | uitkoop eigenaren appartementen Mullet Bay | 56.966.000 | | 56.966.000 |
| vii | NetJets | 27.722.282 | | 27.722.282 |
| **totaal** | | **140.468.624** | **20.540.355** | **117.293.461** |

*algemene verweren van Ansary c.s. en Van Doorn*

5.117.   Ansary c.s. betwist dat van excessieve kosten sprake is. Ansary c.s. voert aan
dat er voldoende financiële middelen waren om crediteuren te betalen en

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 75
datum uitspraak: 29 november 2021

polishouders uit te keren. Dit maakte het mogelijk om er een bepaald kostenpatroon op na te houden. Ennia c.s. diende er net als iedere vennootschap voor te zorgen dat zij haar schuldeisers kon betalen en daarvoor de nodige voorzieningen te treffen. Vervolgens is het aan de vennootschap om te bepalen wat zij met de overige financiële middelen doet, aldus Ansary c.s.

5.118.  Van Doorn heeft aangevoerd dat alle kosten die na januari 2011 ten laste van Ennia c.s. zijn gekomen, niet aan Van Doorn kunnen worden aangerekend. Aan Van Doorn is in dat opzicht geen verwijt te maken en hij heeft er ook nooit zelf van geprofiteerd.

*beoordeling*

  *algemeen*

5.119.  Het gerecht stelt bij de beoordeling van de gestelde excessieve uitgaven voorop dat Ennia c.s. een verzekeringsbedrijf is. Zoals hiervoor onder de toetsingskaders is overwogen brengt dat een bijzondere zorgplicht voor de bestuurders, commissarissen en aandeelhouders met zich mee. Die plicht gaat verder dan het enkele 'erin voorzien dat de schuldeisers en dat daarvoor de nodige voorzieningen zijn getroffen' zoals door Ansary c.s. gesteld. Van bestuurders en commissarissen van een onderneming als Ennia c.s. mag worden verwacht dat zij, zelfs als er vanuit wordt gegaan dat de financiële situatie positief is, zorgvuldig omgaan met de gelden van de vennootschap omdat het gaat om de gelden die afkomstig zijn van polishouders, die voor hun uitkering (vaak op de lange termijn) afhankelijk zijn van diezelfde vennootschap. Dat geldt in dit geval te meer, nu de basis waarop door gedaagden is verondersteld dat de financiële positie rooskleurig was, bijzonder wankel was. Zoals hiervoor is geoordeeld dienden gedaagden zich daarvan ook bewust te zijn en is in dat opzicht aan hen een ernstig verwijt te maken. Het supermarkt-verweer van Ansary c.s. gaat dus niet op. Bij de beoordeling van de gestelde buitensporigheid van de uitgaven is voorts van belang dat Ennia met circa 50.000 polishouders weliswaar voor Curaçaose begrippen een grote verzekeraar was, maar voor, bijvoorbeeld, Amerikaanse of Nederlandse begrippen een zeer kleine verzekeraar.

  *i. donaties*

5.120.  In deze zaak gaat het niet om de vraag of het in de rede ligt dat Ennia c.s., als lokaal grote verzekeraar, in enige mate aan sponsoring en/of donaties doet. Het ligt voor de hand dat Ennia c.s. in dat opzicht haar maatschappelijke rol vervult. In deze zaak gaat het om het feit dat in de periode van 2010 tot en met 2014 voor ruim NAf 20 miljoen aan donaties is gedaan aan doelen die op het eerste gezicht geen enkel raakvlak hebben met Ennia c.s. of met de regio waarin Ennia c.s. actief is. Het gaat voornamelijk om doelen in de Verenigde Staten. De betaling van deze donaties

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 76
datum uitspraak: 29 november 2021

is (steeds) gedaan vanuit Ennia Investments. De donaties waren daardoor niet
zichtbaar voor de toezichthouders van de verzekeraars. Dat lijkt, gelet op de e-mail
die Van Doorn aan de secretaris van Ennia Holding stuurde (weergegeven onder
2.91), een heel bewuste keuze. Ook is het zeer opmerkelijk dat van deze donatie
wordt gezegd dat geen verdere details moeten worden onthuld. Gedaagden hebben
dat in deze procedure onverklaard gelaten.

5.121.   Door gedaagden is niets ingebracht tegen de stellingen van Ennia c.s. dat
deze donaties, gelet op hun omvang en gelet op het niet aan Ennia c.s. gelinkte doel,
als buitensporig en onrechtmatig jegens Ennia c.s. moeten worden aangemerkt. Op
geen enkele wijze is bijvoorbeeld door gedaagden uitgelegd waarom deze donaties
(indirect) verband zouden houden met Ennia c.s. Ansary c.s. heeft enkel gesteld dat
het aan de vennootschap is waaraan zij geld uitgeeft. Zoals hiervoor al is geoordeeld
kan het supermarkt-verweer niet worden gevolgd. Het is ernstig verwijtbaar dat
Van Doorn, Palm en Andraous als bestuurders en Ansary als feitelijk bestuurder het
ertoe hebben geleid dat dergelijke buitenissige betalingen vanuit Ennia c.s. werden
gedaan. De doelen zijn bovendien voor een belangrijk deel duidelijk gekoppeld aan
Ansary zelf. Daarbij gaat het bijvoorbeeld om de donatie van miljoenen aan het
Peace Institute, waarna de vredesduif op het dak van het instituut de "Ansary peace
dove" werd genoemd, de naar Ansary genoemde foundation en de donaties aan
president Bush. Ansary heeft geld van Ennia c.s. gebruikt alsof het (rechtstreeks)
zijn eigen geld was, alsof Ennia inderdaad een supermarkt (in de vorm van een
eenmanszaak) betrof. Als gevolg van dit onrechtmatig handelen heeft Ennia
Investments schade geleden ter hoogte van de donaties.

5.122.   Voor Van Doorn, Andraous en Palm geldt dat zij aansprakelijk zijn voor
zover de donaties zijn gedaan in hun bestuursperiode. Voor Van Doorn geldt dat hij
onbetwist heeft gesteld dat hij weliswaar in dienst is geweest tot 1 april 2011, maar
dat hij feitelijk vanaf januari 2011 geen werkzaamheden meer heeft verricht voor
Ennia c.s., zodat hij aansprakelijk wordt gehouden voor zover de donaties zijn
verricht tot en met het jaar 2010. Van Doorn, Andraous en Palm hebben naar voren
gebracht dat zij nooit zelf hebben geprofiteerd van deze uitgaven. Dat is echter bij
de beoordeling van de vraag of zij aansprakelijk zijn als bestuurder niet
doorslaggevend.

5.123.   Ten aanzien van Nina Ansary geldt dat Ennia c.s. onvoldoende heeft
onderbouwd op grond waarvan zij, als commissaris van Ennia Holding, op de
hoogte was van de donaties die vanuit Ennia Investments werden betaald en die
niet (direct) zichtbaar waren in de jaarrekeningen, zodat evenmin kan worden
vastgesteld dat haar op dit punt een ernstig verwijt is te maken in het door haar
uitgevoerde toezicht. Hetgeen door Ennia c.s. is aangevoerd kan op dit punt haar
vordering niet dragen.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                   blad 77
datum uitspraak: 29 november 2021

5.124.  Het voorgaande betekent dat Van Doorn en Ansary hoofdelijk aansprakelijk
zijn voor de donaties gedurende de actieve bestuursperiode van Van Doorn, en dat
Andraous, Palm en Ansary hoofdelijk aansprakelijk zijn voor de donaties die zijn
gedaan tijdens hun bestuursperiode.

| *Aansprakelijkheid terzake donaties* | | | |
|---|---|---|---|
| *Van Doorn en Ansary:* | | *Andraous, Palm en Ansary:* | |
| **Doel** | **Bedrag (in NAf)** | **Doel** | **Bedrag (in NAf)** |
| US Peace Institute | 5.460.000 | US Peace Institute | 6.370.000 |
| Museum of Fine Arts | 2.184.000 | Bush Legacy | 910.000 |
| President Bush | 910.000 | Points of Light Institute | 1.456.000 |
| Taking Charge Foundation | 728.000 | James Baker Institute | 455.000 |
| Pentagon Memorial Fund | 546.000 | Int. Crisis Group | 455.000 |
| James Baker Institute | 546.000 | Ansary Foundation/ Meal Packages | 389.470 |
| Cesar Foundation | 200.500 | Cesar Foundation | 182.000 |
| **Totaal** | **10.574.500** | **Totaal** | **10.217.470** |

*ii. kosten adviseurs*

5.125.  Ennia c.s. stelt dat in de periode van 2006 tot en met 2017 voor een bedrag
van in totaal NAf 6.136.250 is betaald aan kosten voor adviseurs van Ansary en
Parman International. Ennia c.s. stelt dat deze kosten op geen enkele wijze verband
hielden met de bedrijfsvoering van Ennia c.s. Ansary c.s. heeft dat in algemene zin
betwist.

5.126.  De door Ennia c.s. gestelde kosten voor adviseurs vallen uiteen in drie
onderdelen:
   a)  betaling aan PwC Houston in de periode 2007-2017 voor geleverde fiscale
       adviesdiensten ten behoeve van Parman International en S&S voor een
       bedrag van in totaal NAf 1,7 miljoen;
   b)  betaling van een bedrag van NAf 3.640.000 aan de heer A. Petrello,
       commissaris van S&S;
   c)  betaling van een bedrag van in totaal NAf 796.250 aan Henze.

5.127.  Zonder nadere toelichting van de zijde van Ansary c.s., die ontbreekt, valt
niet in te zien waarom Ennia c.s. in redelijkheid zou moeten betalen voor deze
kosten. Het had op de weg van Ansary c.s. gelegen om onderbouwd te stellen op
grond waarvan deze kosten desondanks voor rekening van Ennia c.s. konden

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 78
datum uitspraak: 29 november 2021

komen. Ook voor deze betalingen geldt dat geen redelijk denkend bestuurder –
onder dezelfde omstandigheden – betalingen zou hebben verricht voor
werkzaamheden die niet ten goede zijn gekomen aan Ennia c.s. maar aan andere
ondernemingen zoals S&S, waarbij bovendien ook nog sprake was van aan Ennia
c.s. tegenstrijdige belangen. De bestuurders is in dit opzicht een ernstig verwijt te
maken.

5.128.   Voor de betalingen onder a) aan PwC geldt dat niet voldoende duidelijk is
welke bedragen in welk jaar zijn betaald, zodat evenmin kan worden vastgesteld
welke statutair bestuurder, naast Ansary als feitelijk bestuurder, voor welk bedrag
aansprakelijk kan worden gehouden. Voor die betalingen, waarvan overigens
onbetwist is gesteld dat de facturen door Ansary zelf zijn doorgeleid binnen Ennia
c.s., is Ansary daarom aansprakelijk.

5.129.   Voor de betalingen onder b) aan Petrello geldt dat op 13 januari 2014, 10
februari 2014 en 24 februari 2014 drie cheques van elk USD 1 miljoen namens Ennia
Investments zijn getekend door Andraous. Bij alle cheques is als omschrijving
'consulting' gegeven. Op geen enkele wijze is door Ansary c.s. aangetoond dat er
inderdaad sprake is (geweest) van advieswerkzaamheden, laat staan dat Petrello
voor deze werkzaamheden door Ennia Investments beloond diende te worden tot
een dergelijk bedrag. De facturen zijn via Ansary doorgeleid aan Andraous.
Ennia c.s. vordert de betaling van de bedragen van twee van de drie cheques, voor
een bedrag van omgerekend NAf 3.640.000. Dit bedrag zal worden toegewezen. In
deze periode waren Palm en Andraous statutair bestuurder en Ansary feitelijk
bestuurder. Zij zijn dan ook hoofdelijk aansprakelijk.

5.130.   Voor de betalingen onder c) aan Henze geldt dat Henze de advocaat was van
Ansary. Uit de feiten volgt dat hij in die hoedanigheid verschillende brieven heeft
opgesteld en transacties heeft begeleid, waaronder transacties betreffende S&S.
Ennia c.s. heeft een overzicht overgelegd, waaruit volgt dat in de periode van 14
oktober 2016 tot en met 25 april 2018 zeven maal een bedrag van USD 62.500 is
overgemaakt aan Henze vanuit Ennia Investments. Ansary c.s. heeft geen enkel
verweer gevoerd tegen de stellingen van Ennia c.s. dat Henze niet de belangen van
Ennia c.s., maar de belangen van andere aan Ansary gelieerde ondernemingen
diende en dat daarom niet valt in te zien waarom Ennia Investments voor deze
advieswerkzaamheden zou moeten betalen. Palm, Andraous en Ansary zijn als
(feitelijk) bestuurders hoofdelijk aansprakelijk.

5.131.   Voor betalingen aan adviseurs geldt dat Ennia c.s. onvoldoende heeft gesteld
om de conclusie te rechtvaardigen dat Nina Ansary als commissaris op de hoogte
had kunnen of moeten zijn van deze transacties. Gelet daarop kan evenmin worden
geoordeeld dat Nina Ansary in haar hoedanigheid van commissaris kan worden
verweten dat zij op dit punt onvoldoende toezicht heeft gehouden, zodat de
vordering wat betreft dit onderdeel jegens haar zal worden afgewezen.

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 79
datum uitspraak: 29 november 2021

5.132.  Samenvattend zal Ansary worden veroordeeld tot betaling van een bedrag
van NAf 1.700.000 en Ansary, Andraous en Palm hoofdelijk tot betaling van het
bedrag van NAf 4.436.250 (NAf 3.640.000 plus NAf 796.250).

>   *iii. salarissen aan personen die niet in dienst waren bij Ennia en/of excessief werden*
>   *betaald*

5.133.  Ennia c.s. heeft van een aantal personen gesteld dat zij weliswaar op de
loonlijst stonden van Ennia c.s., maar dat zij niet voor Ennia c.s. werkzaam waren.
Deze personen werkten voor of in opdracht van Ansary. Bij repliek heeft Ennia c.s.
de loonbelastingkaarten overgelegd, waaruit kan worden afgeleid welke bedragen
aan hen zijn betaald door Ennia Investments en Ennia Holding. Ennia c.s. heeft
gesteld dat de betreffende personen geen sollicitatieprocedure hebben doorlopen en
dat geen arbeidsovereenkomst is opgesteld. Een deel van de personen betreft
persoonlijk assistenten van Ansary. Ansary c.s. heeft daartegen aangevoerd dat door
Ennia c.s. niet voldoende duidelijk is gemaakt wie de HR-afdeling zou hebben
geïnstrueerd om de personen te betalen, zodat ook niet duidelijk is wie uit kan
leggen hoe de situatie in elkaar zit. Wat betreft de persoonlijk assistenten van
Ansary heeft Ansary c.s. gesteld dat hij zelf geen vergoeding kreeg voor zijn
werkzaamheden, zodat het niet meer dan redelijk is dat zijn assistenten wel werden
betaald.

5.134.  In de periode van 2008-2018 is aan Andy Wescot, Clarence Derby en Evan
Tromp een bedrag betaald van in totaal NAf 10.805.610. Ten aanzien van Andy
Wescot geldt dat de aan hem gedane betalingen zijn gedaan vanuit de National
Investment Bank. Dat dit betalingen zijn geweest die ten laste van  Ennia
Investments zijn gekomen, is niet gebleken. De vordering zal op dit onderdeel dan
ook worden afgewezen.

5.135.  Ennia c.s. heeft ten aanzien van Clarence Derby en Evan Tromp onbetwist
gesteld dat met hen geen (arbeids)overeenkomst is gesloten. Dat staat er op zichzelf
niet aan in de weg dat deze personen, als zij inderdaad aantoonbaar
werkzaamheden voor Ennia c.s. verrichtten, daarvoor betaald zouden moeten
worden. Het is dan echter wel aan gedaagden om dat aan te voeren en te
onderbouwen. Dat hebben gedaagden nagelaten. Zij hebben enkel naar voren
gebracht dat het voor hen niet duidelijk is wie de mensen van HR heeft
geïnstrueerd. In dat verband is nog van belang dat Ansary c.s. er na de verzochte en
toegewezen inzage in de (fysieke) administratie van Ennia c.s. kennelijk voor heeft
gekozen deze administratie niet te onderzoeken.

5.136.  In de periode januari 2011 tot november 2017 zijn tevens betalingen gedaan
aan de persoonlijk assistenten van Ansary, waarvan onbetwist is gesteld dat deze
personen binnen Ennia c.s. geen enkele rol speelden. Niet valt in te zien waarom
deze personen desondanks werden betaald door Ennia c.s. De betalingen worden in

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 80
datum uitspraak: 29 november 2021

ieder geval niet gerechtvaardigd door de stelling dat Ansary zelf niet werd betaald
voor zijn werkzaamheden en dat het daarom redelijk zou zijn om zijn assistenten
wel te betalen.

5.137.   Concluderend geldt ook voor deze betalingen dat geen redelijk denkend
bestuurder – onder dezelfde omstandigheden – betalingen zou hebben verricht voor
werkzaamheden die niet ten goede zijn gekomen aan Ennia c.s. maar aan andere
entiteiten of personen. Daarin is aan hen een ernstig verwijt te maken. Palm heeft
nog gesteld dat hij, bijvoorbeeld, niet op de hoogte was van de (hoge) betalingen en
andere vergoedingen aan Evan Tromp en dat Andraous deze instructies heeft
gegeven. Dat ontslaat hem echter niet van zijn (hoofdelijke) aansprakelijkheid
binnen het bestuur. De bestuurders zijn steeds (hoofdelijk) aansprakelijk voor zover
de betalingen in hun bestuursperiode zijn verricht. Ennia c.s. heeft niet
gespecificeerd wanneer de betalingen aan diverse personen precies hebben
plaatsgevonden. Gelet daarop zullen Van Doorn, Andraous en Palm alleen
aansprakelijk worden gehouden voor betalingen in de jaren waarin zij het volledige
jaar als statutair bestuurder waren aangesteld. Ansary is als feitelijk bestuurder over
de gehele periode aansprakelijk en voor Nina Ansary geldt dat zij niet aansprakelijk
is omdat onvoldoende is gesteld om de conclusie te rechtvaardigen dat aan haar als
commissaris in dit opzicht een verwijt is te maken. Dat resulteert in de volgende
bedragen waartoe gedaagden zullen worden veroordeeld, steeds gebaseerd op de
uit de overgelegde loonbelastingkaarten blijkende betalingen en afgerond op hele
NAf:
   -   over het jaar 2010: Ansary en Van Doorn (hoofdelijk) tot het bedrag van in
       totaal NAf 608.363 (NAf 361.925 (Derby) plus NAf 246.438 (Tromp))
   -   over het jaar 2011: Ansary tot het bedrag van in totaal NAf 788.429
       (NAf 99.972 (Cyrus) plus NAf 392.102 (Derby) plus NAf 63.831 (Leos) plus
       NAf 232.524 (Tromp);
   -   over de jaren 2012-2018: Ansary, Andraous en Palm (hoofdelijk) tot het
       bedrag van in totaal NAf 4.237.392 (NAf 127.444 (Tavallaly) plus
       NAf 140.184 (Archie) plus NAf 133.839 (Cyrus) plus NAf 2.313.870 (Derby)
       plus NAf 101.390 (Leos) plus NAf 1.185.336 (Tromp) plus
       NAf 235.329 (Clifford).

5.138.   Voor het overige zal de vordering Ennia c.s. bij gebrek aan voldoende
onderbouwing worden afgewezen.

       *iv. beloning commissarissen*

5.139.   Ennia c.s. neemt bij haar vordering ter hoogte van NAf 14.234.309 terzake de
vergoedingen aan commissarissen als uitgangspunt dat een vergoeding van
NAf 52.780 per commissaris per jaar bij Ennia 'standaard' was en acceptabel is. Dat
dit standaardbedrag te laag is, is door gedaagden niet gesteld en lijkt het gerecht
ook niet het geval. Uit het door gedaagden niet weersproken overzicht van de aan



Zaaknummers: CUR201903842/3843/3796/3844/3845/3846    blad 81
datum uitspraak: 29 november 2021

commissarissen betaalde vergoedingen blijkt echter dat aan een aantal van hen een veelvoud daarvan is uitgekeerd, veelal honderdduizenden per jaar. Zeker afgaand op het beperkte aantal bijeenkomsten (2 à 3 per jaar), roept dit vragen op over de ratio van en rechtvaardiging voor deze vergoedingen. Door gedaagden is op dat punt niets aangevoerd, anders dan het al eerder verworpen supermarkt-verweer. Ook uit de stukken blijkt niet dat door commissarissen – De Paus uitgezonderd – bijzondere inspanningen zijn verricht. Wat Nina Ansary betreft blijkt zelfs in het geheel niet van enige activiteit ten behoeve van Ennia. De conclusie kan dan ook geen andere zijn dat ook ten aanzien van de commissarisvergoedingen sprake is geweest van excessieve, onzakelijke uitgaven. Tegen de hiervoor omschreven achtergrond van waarschuwingen door onder meer de Centrale Bank en het grote concentratierisico, had geen redelijk handelend en op zijn taak toegeruste bestuurder deze excessieve betalingen kunnen doen, nog daargelaten de vraag of de van een raad van commissarissen te verwachten onafhankelijkheid daarmee niet in gevaar werd gebracht. De bestuurders treft hiervan een ernstig verwijt. Dat geldt ook voor Nina Ansary in haar hoedanigheid van commissaris, die immers op de hoogte was van de excessieve beloning.

*Excessieve vergoedingen aan commissarissen*

| | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 | Totale vergoeding in NAf |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Nina Ansary* | | | | | | | | | | | | | | |
| Betaald | 58.619 | 117.237 | 117.237 | 119.401 | 121.996 | 218.739 | 232.489 | 53.225 | 235.498 | 26.938 | - | - | - | 1.301.380 |
| **Excessief** | 5.839 | 64.457 | 64.457 | 66.621 | 69.216 | 165.959 | 179.709 | 445 | 182.718 | 548 | - | - | - | 799.970 |
| *Frank Carlucci* | | | | | | | | | | | | | | |
| Betaald | 57.789 | 115.577 | 115.577 | 117.723 | 120.318 | 217.177 | 231.181 | 51.948 | 234.247 | 52.664 | 153.976 | 52.780 | 52.780 | 1.573.738 |
| **Excessief** | 5.009 | 62.797 | 62.797 | 64.943 | 67.538 | 164.397 | 178.401 | | 181.467 | | 101.196 | | | 888.546 |
| *James Crystal* | | | | | | | | | | | | | | |
| Betaald | 57.789 | 115.577 | 115.577 | 117.723 | 120.318 | 217.177 | 231.181 | 51.948 | 234.247 | 52.664 | 153.976 | 52.780 | | 1.573.738 |
| **Excessief** | 5.009 | 62.797 | 62.797 | 64.943 | 67.538 | 164.397 | 178.401 | | 181.467 | | 101.196 | | | 888.546 |
| *Robert de Paus* | | | | | | | | | | | | | | |
| Betaald | - | | 67.420 | - | - | - | - | - | - | - | - | - | - | 67.420 |
| **Excessief** | - | | 41.030 | - | - | - | - | - | - | - | - | - | - | 41.030 |
| *Richard Gibson* | | | | | | | | | | | | | | |
| Betaald | 495.177 | - | - | - | 2.045.024 | 1.115.222 | 1.113.891 | 860.291 | 659.132 | 484.277 | 603.349 | 368.550 | 26.390 | 7.771.303 |
| **Excessief** | 442.397 | - | - | - | 1.992.244 | 1.062.442 | 1.061.111 | 807.511 | 606.352 | 431.497 | 550.569 | 315.770 | | 7.269.893 |
| *C. Gomes Casseres* | | | | | | | | | | | | | | |
| Betaald | 57.789 | 85.248 | 115.577 | 117.723 | 120.318 | 228.077 | 231.181 | 51.948 | 233.613 | 52.577 | 266.099 | - | - | 1.560.150 |
| **Excessief** | 5.009 | 32.468 | 62.797 | 64.943 | 67.538 | 175.297 | 178.401 | | 180.833 | - | 213.319 | | | 980.605 |
| *Jack Kemp* | | | | | | | | | | | | | | |
| Betaald | - | - | - | - | - | - | - | - | - | 21.944 | 153.976 | 52.780 | 52.780 | 281.479 |
| **Excessief** | - | - | - | - | - | - | - | - | - | - | 101.196 | - | - | 101.196 |
| *John Macomber* | | | | | | | | | | | | | | |
| Betaald | 57.789 | 115.577 | 115.577 | 117.723 | 120.318 | 217.177 | 231.181 | 51.948 | 234.247 | 52.664 | 153.976 | 52.780 | - | 1.573.738 |
| **Excessief** | 5.009 | 62.797 | 62.797 | 64.943 | 67.538 | 164.397 | 178.401 | | 181.467 | | 101.196 | | | 888.546 |
| *Jaime Saleh* | | | | | | | | | | | | | | |
| Betaald | 57.789 | 405.653 | 405.653 | 417.836 | 425.628 | 218.433 | 305.305 | 125.889 | 275.850 | 57.175 | 261.346 | - | - | 2.956.557 |
| **Excessief** | 5.009 | 352.873 | 352.873 | 365.056 | 372.848 | 165.653 | 252.525 | 73.109 | 223.070 | 4.395 | 208.566 | | | 2.375.977 |
| **Totaal betaald** | 842.739 | 954.870 | 1.052.620 | 1.008.130 | 3.073.921 | 2.432.003 | 2.576.410 | 1.247.196 | 2.106.834 | 800.904 | 1.746.698 | 579.670 | 237.510 | 18.659.504 |
| **Totaal excessief** | 473.279 | 638.190 | 709.550 | 691.450 | 2.704.461 | 2.062.543 | 2.206.950 | 881.064 | 1.737.374 | 436.440 | 1.377.238 | 315.770 | | 14.234.309 |

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 82
datum uitspraak: 29 november 2021

5.140.  Het voorgaande brengt mee dat Van Doorn als statutair bestuurder
aansprakelijk is voor de excessieve uitbetalingen die aan de commissarissen zijn
gedaan in zijn bestuursperiode(n). Palm en Andraous zijn als statutair bestuurder
aansprakelijk voor de excessieve betalingen in de periode van hun bestuurderschap.
Ennia c.s. heeft niet gespecificeerd wanneer de betalingen aan de commissarissen
precies hebben plaatsgevonden. Gelet daarop zullen Van Doorn, Andraous en Palm
alleen aansprakelijk worden gehouden voor excessieve betalingen in de jaren
waarin zij het volledige jaar als statutair bestuurder waren aangesteld. Ansary is als
feitelijk bestuurder over de gehele periode aansprakelijk en voor Nina Ansary geldt
dat zij aansprakelijk is voor alle betalingen die zijn gedaan na haar aantreden in
2009.
Dat resulteert in de volgende bedragen waartoe gedaagden zullen worden
veroordeeld.
-   over het jaar 2007: Ansary en Van Doorn (hoofdelijk) tot het bedrag van
    NAf 315.770;
-   over het jaar 2008: Ansary tot het bedrag van NAf 1.377.238;
-   over het jaar 2009: Ansary en Nina Ansary (hoofdelijk) tot het bedrag van
    NAf 436.440;
-   over het jaar 2010: Ansary, Van Doorn en Nina Ansary (hoofdelijk) tot het
    bedrag van NAf 1.737.374;
-   over het jaar 2011: Ansary en Nina Ansary (hoofdelijk) tot het bedrag van
    NAf 881.064;
-   over de jaren 2012-2017: Ansary, Andraous, Palm en Nina Ansary
    (hoofdelijk) tot het bedrag van NAf 9.486.423.

*v. reis-, verblijf- en representatiekosten*

5.141.  Door Ennia c.s. is voorts nog gesteld dat aan reis-, verblijfs- en
representatiekosten van de commissarissen buitensporig hoge bedragen zijn
uitgegeven (NAf 3.128.203 over een periode van 12,5 jaar). Hetgeen Ennia c.s.
daaraan ter onderbouwing heeft aangevoerd acht het gerecht echter onvoldoende
voor het oordeel dat aan gedaagden op dit punt een ernstig verwijt treft. Dit
onderdeel van de vordering zal dan ook worden afgewezen.

*vi. uitkoop eigenaren appartementen Mullet Bay*

5.142.  Het gevorderde met betrekking tot de uitkoop van appartementseigenaren
door SunResorts en de afkoop van de winstrechten van Resorts Caribe voor in totaal
NAf 56.966.000 zal eveneens worden afgewezen. Tegenover de vanuit Ennia
Investments gedane betalingen staat (indirect) de verwerving van circa 49.000 m2
grond waarop de appartementen stonden, zonder verdere verplichtingen jegens
appartementseigenaren en/of Resorts Caribe. Het gerecht ziet in de onderbouwing
door Ennia c.s. van dit onderdeel van haar vordering onvoldoende
aanknopingspunten voor het oordeel dat deze transacties voor Ennia evident

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                blad 83
datum uitspraak: 29 november 2021

ongunstig waren en dat gedaagden een ernstig verwijt kan worden gemaakt dat deze transacties door Ennia Investments zijn aangegaan.

    *vii. NetJets*

5.143.   Ennia c.s. stelt dat gedaagden ernstig verwijtbaar hebben gehandeld door de excessieve kosten van NetJets voor rekening van Ennia c.s. te laten komen. Zij stellen zich op het standpunt dat het gebruik van privévliegtuigen niet voor de hand ligt voor een Nederlands Caribisch verzekeraar. Ennia c.s. vordert terzake van NetJets (i) het verschil tussen de aan- en verkoopprijs van de NetJets ter hoogte van NAf 8.088.785 en (ii) de jaarlijkse kosten voor het gebruik van de vliegtuigen ter hoogte van NAf 19.633.497.

5.144.   Uit de door Ennia c.s. overgelegde stukken kan niet anders worden geconcludeerd dan dat ten laste van Ennia Investments voor miljoenen aan onzakelijke, excessieve uitgaven is gedaan. Gesteld noch gebleken is dat het gebruik van privévliegtuigen op enig moment van belang was voor de bedrijfsvoering van Ennia c.s. Dat Ansary als aandeelhouder woonachtig is in de Verenigde Staten is daarvoor in ieder geval onvoldoende grond. Daar komt bij er diverse vluchten zijn gemaakt tussen de Verenigde Staten en (zon)bestemmingen in Europa, die hoe dan ook geen enkel verband houden met de bedrijfsvoering van Ennia c.s. en die kennelijk door Ansary en/of zijn echtgenote zijn gemaakt. Hoewel Ansary heeft gesteld dat hij deze vluchten zelf heeft betaald, heeft hij daar geen enkel bewijs van overgelegd. Zelfs indien Ansary de privévluchten zelf heeft betaald neemt dat niet weg dat Ennia Investments hoe dan ook onnodig hoge kosten betaalde voor (de mogelijkheid tot) het gebruik van de privévliegtuigen. Naar het oordeel van het gerecht had geen redelijk handelend en op zijn taak toegeruste bestuurder deze excessieve betalingen kunnen doen, de aard van de onderneming in ogenschouw nemend. Uit het door Ennia c.s. overgelegde overzicht van uitgevoerde vluchten volgt dat ook de commissarissen gebruik maakten van de vliegtuigen. Daaruit kan echter nog niet zonder meer worden afgeleid dat ook Nina Ansary op de hoogte was van deze (miljoenen)kostenpost. Het gerecht ziet onvoldoende grond om ook aan Nina Ansary als toezichthouder in dit opzicht een ernstig verwijt te maken.

5.145.   Van Doorn, Andraous en Palm worden aansprakelijk gehouden voor excessieve betalingen terzake NetJets in de jaren waarin zij het volledige jaar als statutair bestuurder waren aangesteld. Ansary is als feitelijk bestuurder over de gehele periode aansprakelijk. Dat resulteert in de volgende bedragen waartoe gedaagden zullen worden veroordeeld.

- over het jaar 2008: Ansary tot het bedrag van NAf 1.727.365;
- over het jaar 2009: Ansary tot het bedrag van NAf 1.910.625;
- over het jaar 2010: Ansary en Van Doorn (hoofdelijk) tot het bedrag van NAf 2.319.730;
- over het jaar 2011: Ansary tot het bedrag van NAf 1.884.791;



zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 84
datum uitspraak: 29 november 2021

- over de jaren 2012-2018: Ansary, Andraous en Palm (hoofdelijk) tot het
  bedrag van NAf 19.879.770 (NAf 11.790.985 plus
  NAf 8.088.785).

*decharge en verjaring met betrekking tot de excessieve uitgaven*

5.146.  Gedaagden hebben zich ook ten aanzien van de excessieve uitgaven op het
standpunt gesteld dat zij zich kunnen beroepen op de aan hen verleende decharge.
Zoals hiervoor onder 5.72. tot 5.76. en 5.111. tot 5.113. is geoordeeld, gaat het beroep
op decharge niet op. Voor zover er al decharge is verleend geldt dat de betalingen
waar het om gaat niet in de jaarrekeningen van Ennia Investments zijn genoemd,
zodat de decharge zich daar niet over uitstrekt.

5.147.  Dat geldt ook voor het beroep op verjaring zoals dat is gedaan door Ansary,
Nina Ansary, Andraous en Palm. Zoals hiervoor onder 5.81. en 5.82. is geoordeeld,
kan het beroep op verjaring niet slagen.

**Slotsom**

5.148.  In de eerste dertig bladzijden van dit vonnis zijn de feiten vastgesteld op
grond waarvan het gerecht tot het oordeel is gekomen dat gedaagden Ennia c.s.
schade hebben toegebracht en dat zij jegens Ennia c.s. schadeplichtig zijn.
Vastgesteld is vervolgens dat de vennootschapsstructuur en het beleggingsbeleid
van Ennia c.s. na de overname door Ansary c.s. zodanig zijn gewijzigd, dat het
belang van Ennia c.s. en de polishouders niet langer centraal stond. Er is in
belangrijke mate niet voldaan aan de bijzondere zorgplicht die geldt voor
bestuurders en toezichthouders van een (levens)verzekeraar, zulks in weerwil van
zeer kritische observaties vanuit de eigen gelederen en herhaalde waarschuwingen
en aansporingen van toezichthouder de Centrale Bank. De specifieke door Ennia c.s.
aan gedaagden gemaakte verwijten - in de kern steeds neerkomend op het
bewerkstelligen of toelaten van onttrekkingen aan het vermogen van Ennia c.s.
waarvoor een redelijke, zakelijke grond ontbrak - zijn deels gegrond. In het
bijzonder de gang van zaken rond de investeringen van Ennia c.s. in S&S is voor
Ennia c.s. zeer nadelig geweest, nu de daarmee te behalen resultaten goeddeels - tot
een bedrag van NAf 743,94 miljoen - zijn overgeheveld naar (andere entiteiten van)
Ansary en Nina Ansary. Ook terecht zijn de verwijten van Ennia c.s. terzake
(dividend)uitkeringen en terzake excessieve en onzakelijke uitgaven aan onder meer
donaties, beloning commissarissen, privévliegtuigen en vergoedingen aan niet voor
Ennia c.s. werkzame personen. De verweren van gedaagden, waaronder hun beroep
op verjaring en decharge, slagen op deze punten niet. De vraag naar de
aansprakelijkheid van gedaagden is steeds beoordeeld op basis van ieders formele
verantwoordelijkheid en ieders eigen gedragingen of nalaten.

5.149.  Op grond van het voorgaande zijn gedaagden, deels hoofdelijk, gehouden tot schadevergoeding van in hoofdsom de volgende bedragen:

| *Ansary* | |
|---|---|
| **terzake** | **bedrag (in NAf)** |
| S&S | 743.940.000 |
| (dividend) uitkeringen | 188.975.969 |
| donaties | 20.791.970 |
| kosten adviseurs | 6.136.250 |
| salarissen aan personen die niet in dienst waren | 5.634.184 |
| RvC | 14.234.309 |
| NetJets | 27.722.282 |
| **totaal** | **1.007.434.964** |

| *Parman International* | |
|---|---|
| **terzake** | **bedrag (in NAf)** |
| (dividend) uitkeringen | 188.975.969 |
| **totaal** | **188.975.969** |

| *Nina Ansary* | |
|---|---|
| **terzake** | **bedrag (in NAf)** |
| S&S | 743.940.000 |
| (dividend) uitkeringen | 188.975.969 |
| RvC | 12.541.301 |
| **totaal** | **945.457.270** |

| *Van Doorn* | |
|---|---|
| **terzake** | **bedrag (in NAf)** |
| donaties | 10.574.500 |
| salarissen aan personen die niet in dienst waren | 608.363 |
| RvC | 2.053.144 |
| NetJets | 2.319.730 |
| **totaal** | **15.555.737** |

| *Andraous* | |
|---|---|
| **terzake** | **bedrag (in NAf)** |
| (dividend) uitkeringen | 188.975.969 |
| donaties | 10.217.470 |
| kosten adviseurs | 4.436.250 |
| salarissen aan personen die niet in dienst waren | 4.237.392 |
| RvC | 9.486.423 |
| NetJets | 19.879.770 |
| **totaal** | **237.233.274** |

zaaknummers: CUR201903842/3843/3796/3844/3845/3846          blad 86
datum uitspraak: 29 november 2021

| Palm | |
|---|---|
| terzake | bedrag (in NAf) |
| (dividend) uitkeringen | 188.975.969 |
| donaties | 10.217.470 |
| kosten adviseurs | 4.436.250 |
| salarissen aan personen die niet in dienst waren | 4.237.392 |
| RvC | 9.486.423 |
| NetJets | 19.879.770 |
| totaal | 237.233.274 |

5.150.  In het dictum van dit vonnis zullen de componenten van de totale hoofdsom afzonderlijk worden toegewezen, met daarbij steeds vermeld in hoeverre sprake is van hoofdelijkheid (des dat de een betalend de ander zal zijn bevrijd). De wettelijke rente, waartegen gedaagden geen relevant specifiek verweer hebben gevoerd, zal daarbij worden toegewezen vanaf de door Ennia c.s. in haar vordering opgenomen ingangsdata.

5.151.  Gelet op de uitkomst van deze procedure heeft Ennia c.s. geen afzonderlijk belang meer bij de gevorderde verklaring voor recht, zodat dat deel van de vordering zal worden afgewezen.

5.152.  Het vonnis zal conform de hoofdregel uitvoerbaar bij voorraad worden verklaard. Het gerecht ziet geen grond van die hoofdregel af te wijken. Ook voor zekerheidstelling bestaat gelet op wat in dat verband is aangevoerd onvoldoende aanleiding.

**De proceskosten en de buitengerechtelijke kosten**

5.153.  Ansary en Nina Ansary zullen als de overwegend in het ongelijk te stellen partij worden veroordeeld in de aan de zijde van Ennia c.s. gerezen proceskosten, waaronder het door Ennia c.s. met betrekking tot ieder betaalde griffierecht. Wegens de omvang en het financieel belang van de zaak zal het gemachtigdensalaris in afwijking van het liquidatietarief worden begroot op NAf 25.000 per punt.

5.154.  Ten aanzien van de overige gedaagden geldt dat partijen, gelet op hetgeen is gevorderd en hetgeen daarvan toewijsbaar is, deels in het gelijk en deels in het ongelijk worden gesteld. Daarbij past een compensatie van de proceskosten.

5.155.  Haar vordering tot vergoeding van buitengerechtelijke incassokosten heeft Ennia c.s. in dit geding, hoewel daartoe alle gelegenheid is geweest, niet becijferd en niet gespecificeerd. Dát dergelijke kosten zijn gemaakt, is evenwel evident. Het gerecht zal deze kosten bij dit vonnis met inachtneming van artikel 126 sub III

zaaknummers: CUR201903842/3843/3796/3844/3845/3846                    blad 87
datum uitspraak: 29 november 2021

Procesreglement Civiele Zaken ten aanzien van ieder van Ansary en Nina Ansary
begroten op NAf 37.500 (anderhalf punt x toegepaste tarief) en voor de overige
gedaagden steeds op NAf 9.000.

6.      **De beslissing**

Het Gerecht:

*terzake S&S*

6.1.    veroordeelt Ansary en Nina Ansary hoofdelijk tot betaling aan Ennia
Investments van NAf 743.940.000, te vermeerderen met de wettelijke rente vanaf
13 september 2017 tot aan de dag van algehele voldoening;

*terzake (dividend)uitkeringen*

6.2.    veroordeelt Ansary, Parman International, Nina Ansary, Andraous en Palm
hoofdelijk tot betaling aan Ennia Holding van NAf 188.975.969, te vermeerderen met
de wettelijke rente vanaf het moment dat de afzonderlijke (dividend)uitkeringen
aan Parman International zijn betaald tot aan de dag van algehele voldoening;

*terzake donaties*

6.3.    veroordeelt Ansary en Van Doorn hoofdelijk tot betaling aan Ennia c.s. van
NAf 10.574.500 en Ansary, Andraous en Palm voorts hoofdelijk tot betaling aan
Ennia Investments van NAf 10.217.470, te vermeerderen met de wettelijke rente
vanaf het moment van betaling van de desbetreffende donaties tot aan de dag van
algehele voldoening;

*terzake kosten adviseurs*

6.4.    veroordeelt Ansary en Andraous hoofdelijk tot betaling aan Ennia
Investments van NAf 4.436.250 en Ansary voorts tot betaling van NAf 1.700.000, te
vermeerderen met de wettelijke rente vanaf het moment van betaling van de
desbetreffende kosten tot aan de dag van algehele voldoening;

*terzake salarissen aan personen die niet in dienst waren*

6.5.    veroordeelt Ansary en Van Doorn hoofdelijk tot betaling aan Ennia c.s. van
NAf 608.363, en Ansary voorts tot betaling van NAf 788.429 en Ansary, Andraous
en Palm voorts hoofdelijk tot betaling van NAf 4.237.392, te vermeerderen met de
wettelijke rente vanaf het moment van betaling van de desbetreffende kosten tot aan
de dag van algehele voldoening;

zaaknummers: CUR201903842/3843/3796/3844/3845/3846        blad 88
datum uitspraak: 29 november 2021

*terzake beloning commissarissen*

6.6.      veroordeelt Ansary en Van Doorn hoofdelijk tot betaling aan Ennia c.s. van NAf 315.770, en Ansary voorts tot betaling van NAf 1.377.238 en Ansary en Nina Ansary voorts hoofdelijk tot betaling van NAf 436.440, en Ansary, Van Doorn en Nina Ansary voorts hoofdelijk tot betaling van NAf 1.737.374, en Ansary en Nina Ansary voorts hoofdelijk tot betaling van NAf 881.064, en Ansary, Andraous, Palm en Nina Ansary voorts hoofdelijk tot betaling van NAf 9.486.423, te vermeerderen met de wettelijke rente vanaf het moment van betaling van de desbetreffende beloningen tot aan de dag van algehele voldoening;

*terzake NetJets*

6.7.      veroordeelt Ansary tot betaling aan Ennia Investments van NAf 5.522.781, en Ansary en Van Doorn voorts hoofdelijk tot betaling van NAf 2.319.730, en Ansary, Andraous en Palm voorts hoofdelijk tot betaling van NAf 19.879.770, te vermeerderen met de wettelijke rente vanaf het moment van betaling van de desbetreffende kosten tot aan de dag van algehele voldoening;

*terzake buitengerechtelijke kosten en proceskosten*

6.8.      veroordeelt Ansary en Nina Ansary ieder tot betaling aan Ennia c.s. van NAf 37.500 en ieder van de overige gedaagden tot betaling van NAf 9.000;

6.9.      veroordeelt Ansary en Nina Ansary hoofdelijk in de proceskosten aan de zijde van Ennia c.s. gerezen, tot op heden begroot op NAf 15.000 aan griffierecht, NAf 1.418,92 aan explootkosten en NAf 100.000 voor gemachtigdensalaris, vermeerderd met nakosten van NAf 250 zonder betekening en NAf 400 met betekening, alle bedragen in geval van uitblijven van betaling te vermeerderen met de wettelijke rente vanaf de vijftiende dag na de uitspraak van dit vonnis;

6.10.      compenseert de proceskosten voor het overige aldus dat iedere partij de eigen kosten draagt;

6.11.      verklaart dit vonnis uitvoerbaar bij voorraad;

6.12.      wijst af het meer of anders gevorderde.

Dit vonnis is gewezen door mr. C.E.M. Nootenboom-Lock, rechter, en op 29 november 2021 uitgesproken ter openbare terechtzitting in aanwezigheid van de griffier.